## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re:                                                     :    Chapter 11
                                                           :
TUSCANY INTERNATIONAL HOLDINGS                             :    Case No. 14-10193 (_____)
(U.S.A.) LTD., et al.,                                     :
                                                           :    Joint Administration Pending
                        Debtors.[1]                        :

---------------------------------------------------------- x

## DECLARATION OF DERYCK HELKAA IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Under 28 U.S.C. § 1764, Deryck Helkaa declares as follows under the penalty of perjury:

      1.      I am the Chief Restructuring Officer of Tuscany International Drilling Inc. ("**TID**"), which is incorporated in Alberta, Canada and is the parent corporation of the other debtor and debtor in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"). I have served as Chief Restructuring Officer since November 25, 2013, and continue to do so pursuant to the terms of an engagement letter between FTI Consulting Canada Inc., of which I am a Senior Managing Director, and TID, dated as of November 25, 2013. I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtors.

      2.      As Chief Restructuring Officer, I am responsible for overseeing the operations and financial activities of the Debtors and their non-debtor affiliates, including but not limited to, monitoring cash flow, business relationships, workforce issues, and financial planning. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am

---

[1]      The Debtors in these cases are Tuscany International Holdings (U.S.A.) Ltd. and Tuscany International Drilling Inc. The last four digits of Tuscany International Holdings (U.S.A.) Ltd.'s U.S. federal tax identification number are 8192. The last four digits of Tuscany International Drilling Inc.'s Canadian tax identification number are 4278. The address for the Debtors is 1950, 140 – 4 Avenue S.W. Calgary, Alberta, Canada T2P 3N3.

generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.    On February 2, 2014 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession. TID's foreign subsidiaries and affiliates (the "**Non-Debtor Affiliates**" and, together with the Debtors, the "**Tuscany Entities**") are not chapter 11 debtors, will continue their business operations without supervision from the Court, and will not be subject to the requirements of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "**Bankruptcy Code**").

4.    I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2] The Debtors seek the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses.

---

[2]      Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

5.      Part I of this First Day Declaration provides an overview of the Debtors' businesses, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events leading to the Debtors' chapter 11 filings.  Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

### I.      COMPANY AND BUSINESS OVERVIEW

#### A.      Overview of Operations

6.      The Tuscany Entities provide onshore drilling and workover services to oil and gas companies to support the exploration, development, and production of oil and gas. They have a strong competitive position in the key onshore drilling markets of Colombia, Brazil, and Ecuador, where they contract their fleet of newer, technologically advanced, and efficient onshore drilling rigs to customers.  As described further below, the Colombian and Brazilian businesses are operated by certain of the Non-Debtor Affiliates, while the Ecuador business is operated by a branch office of Debtor TID.

7.      As of the Petition Date, the Tuscany Entities owned 26 rigs, of which 12 are located in Colombia, nine in Brazil and five in Ecuador.  Of these 26 rigs, 15 were contracted and operational as of the Petition Date and five were directly owned by the Debtors.

8.      The Tuscany Entities' fleet of rigs includes varying types of equipment, which allows them to customize their services to the distinctive needs of their customers.  In the

oil and gas drilling industry, the capability of a rig is often classified as "single drilling," "double drilling," or "triple drilling." Although all rigs drill with only a single pipe, rigs are categorized based upon the number of connected pipes that can "stand" in the rig derrick. For example, double drilling and triple drilling rigs allow the rigs to hold a stand of pipe that consists of two or three connected drill pipes. Single drilling and double drilling rigs are generally used for shallow exploration and development drilling activity, while triple drilling rigs, which have greater hoisting capacity, are typically used for deeper drilling. A majority of the Tuscany Entities' rigs are double drilling rigs, though their fleet does include single and triple drilling rigs as well. Their double and triple drilling rigs are typically used for the initial drilling of a well, while their single drilling rigs are used mostly for major repairs or modifications, known as "workovers."

9.      In addition, some of the rigs in the Tuscany Entities' fleet have specialty rig equipment. Many of the rigs have a top drive, which is a mechanical device suspended in the mast of the drilling rig that provides rotational force to facilitate the drilling of the borehole, as contrasted with a traditional rig with a rotary table that moves only vertically. A rig with a top drive increases the efficiency of the project and reduces the amount of manual labor and associated hazards involved with traditional rigs. Some of the rigs also have a hydraulic catwalk machine that allows the operators to pick up and lay down long pieces of drill pipe and casings without the use of more hazardous slings or cables. This assortment of specialized rigs enables the Tuscany Entities to provide services in a variety of different areas and enhances the value the rigs can provide to their customers.

10.      Oil and natural gas well drilling contracts are carried out on a daywork basis. Under these contracts, the Tuscany Entities charge the customer a fixed rate per day

regardless of the number of days needed to drill the well.  In addition, daywork contracts usually provide for a reduced day rate, or lump sum amount, for mobilization and demobilization of the rig to and from the well location and for both assembly and dismantling of the rig.  Contracts with customers vary in duration from a few days to multiple years and the Tuscany Entities' total revenue is generated from contracts with approximately ten customers.

11.    The Debtors' headquarters are located in Calgary, Alberta, Canada.  As of the Petition Date, the Tuscany Entities employed over 1,200 employees.  Of these employees, the Debtors employed 13 employees in Canada and approximately 330 employees in Ecuador.  None of the employees in Canada are party to any collective bargaining agreements; however, all of the employees in Ecuador are party to collective bargaining agreements with TID.

**B.    Corporate Structure**

12.    TID was formed through a predecessor in Alberta, Canada on April 6, 2004 and, after a series of mergers and name changes, became Tuscany International Drilling Inc. on April 16, 2010.  As shown on the corporate organizational chart attached hereto as Exhibit A, TID is the direct or indirect parent of all of the Tuscany Entities.  The Debtors in these Chapter 11 Cases are TID and Tuscany International Holdings (U.S.A.) Ltd. ("**TIH**").

13.    TIH was incorporated in Delaware on January 20, 2011 and is headquartered in Houston, Texas.  TIH's primary asset is its 33.87% ownership interest in Warrior Rig Limited Partnership ("**Warrior**"), a private oilfield services company specializing in the design, manufacture, sale and service of top drive systems and other rig parts.  Warrior is a Delaware limited partnership with headquarters in Calgary, Alberta.

14.    As discussed above, the Tuscany Entities have operations in Colombia, Brazil, and Ecuador.  The Colombian and Brazilian businesses are operated by certain of the

Non-Debtor Affiliates, while the Ecuadorian business is operated by a branch office of TID (the "**Ecuador Branch Office**").    Although a part of TID, the Ecuador Branch Office primarily functions as a separate corporate entity.  The Ecuador Branch Office generates enough revenue to fund the majority of its own operational costs and, like the Colombian and Brazilian entities, is managed by a local country manager who oversees all day-to-day operations.  As described in detail in Part II below, the Debtors request authority to pay all accrued and outstanding prepetition claims of creditors of the Ecuador Branch Office in the ordinary course of business pursuant to the *Motion of Debtors for Order (I) Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Foreign Claims and (II) Pursuant to Fed. R. Bankr. P. 2002(m), 6003 and 9007 Waiving Notice Requirements*, filed concurrently herewith.

15.    On April 19, 2010, TID was listed on the Toronto Stock Exchange under the symbol "TID" and on December 1, 2011, TID was listed on the Bolsa de Valores de Colombia (the Colombian stock exchange) under the symbol "TIDC."  As of January 27, 2014, TID had 375.2 million common shares outstanding, of which approximately 159.5 million were held by insiders.  TID also had 12.9 million stock options outstanding.

C.    **Summary of Prepetition Debt**

16.    In August 2010, certain of the Tuscany Entities entered into a loan agreement in the principal amount of $125 million, which, after a series of amendments, was increased on September 14, 2012 to $255 million (the "**Prepetition Loans**").  To address liquidity issues, the Tuscany Entities conducted various acquisitions, asset sales, and other dispositions, which allowed them to decrease the outstanding principal amount under their

Prepetition Loans to approximately $204,110,371,[3] pursuant to the terms of the Third Amended

and Restated Credit Agreement, dated December 23, 2013 (the "**Credit Agreement**").  The

lenders party to the Credit Agreement (the "**Prepetition Lenders**") hold senior, first priority

security interests in, and liens upon, substantially all assets of TID and the Non-Debtor

Affiliates, including a pledge of each of their stock.  The Debtors believe that, based upon

current valuations, the Prepetition Lenders are undersecured.

        17.    The Debtors believe that, as of the Petition Date, their unsecured trade

debt is no more than $6.5 million in the aggregate, of which $4.8 million was accrued in

connection with the Debtors' Canadian operations, and $1.7 million was accrued in connection

with the Ecuadorian operations.

## II.      EVENTS LEADING TO THE CHAPTER 11 FILINGS

        18.    The oilfield services industry is highly competitive.  Oilfield service

companies compete primarily on a regional basis, and competition varies significantly from

region to region at any particular time.  The Tuscany Entities compete directly with various

international and local companies in each region in which they operate.  Their revenue and

profitability depend largely on their rig utilization rates, which are affected by their ability to

enter into contracts with new or existing customers, the length of the contracts, and the

availability of their rigs.

        19.    Notwithstanding their positive market and competitive positions,

beginning in late 2012, the Tuscany Entities began to experience significant revenue, cash flow,

and liquidity challenges, due in large part to low rig utilization, non-payment by certain

---

[3]      The Tuscany Entities' prepetition debt also includes $4,104,310.31 USD resulting from a settlement in connection with an ISDA Master Agreement between TID and the Bank of Nova Scotia, which is to be converted into a term loan and added to the Prepetition Loans under the Credit Agreement.

customers on large overdue accounts receivable and underperforming acquisitions in Brazil and Africa.

20.    As of the Petition Date, the Tuscany Entities' overall rig utilization was less than 60%, with only 15 out of 26 rigs currently operational. Only two out of their nine Brazilian rigs are operational. The remaining seven rigs are "stacked," meaning they are without contracts and stored. Additionally, the Brazilian operations have significant selling, general and administrative expenses, which contribute further to the overall poor financial performance in Brazil. As a result, from January to October 2013, the Brazilian operations generated $26 million in revenue and a direct cost of $26 million, resulting in no gross margin. During that same time period, overhead costs were $6.7 million, leaving the Tuscany Entities' Brazilian affiliates with a negative EBITDA of $6.7 million.

21.    The Tuscany Entities' results have also been affected by a significant amount of accounts receivable that the Debtors believe is unlikely to be collected. For example, approximately $8.9 million is due to one of the Non-Debtor Affiliates from a Colombian customer, and approximately $4 million is due to TID from a customer in Ecuador. In addition, one of the Non-Debtor Affiliates is currently in arbitration proceedings to collect approximately $20 million in early termination penalties owed to it from a customer in Brazil.

22.    The Tuscany Entities also suffered financial losses in connection with a series of unprofitable acquisitions. On May 18, 2011, TID acquired Drillfor Perfurações do Brasil Ltda. ("**Drillfor**"), a Brazilian drilling and workover company, thereby increasing the Tuscany Entities' presence in Brazil by adding eight new rigs to their fleet. On September 15, 2011, TID consummated its acquisition of Caroil SAS from Etablissements Maurel & Prom ("**M&P**"), a French exploration and production company, which added six drilling rigs to the

Tuscany Entities' Colombian presence and eight rigs in Africa.  In each case, the operations

failed to meet the Tuscany Entities' financial projections and resulted in little, if any, profits.

23.    These challenges, among others, have caused a significant decline in the

Tuscany Entities' financial health.  To illustrate, the Tuscany Entities' consolidated EBITDA is

expected to have decreased from approximately $43.2 million in calendar year 2012 to

approximately $17.3 million in calendar year 2013.  In the same period, their revenue is

forecasted to have declined from approximately $222.8 million to approximately $163.6

million.

24.    As a result, since late 2012, TID's board of directors (the "**TID Board**")

has actively pursued and examined a number of potential strategic alternatives.  TID retained

Black Spruce Merchant Capital Corp. ("**Black Spruce**") and Citigroup Global Markets Inc.

("**Citigroup**") as financial advisors on October 10, 2012 and April 8, 2013, respectively.

25.    On May 9, 2013, the TID Board resolved to initiate a formal process to

identify, examine, and consider various potential strategic alternatives for the Tuscany Entities

with a view to enhancing shareholder value, including, among other alternatives, a sale of a

material portion of the assets of TID, a debt or equity financing, a recapitalization, or a merger

or other business combination.  The TID Board formed a special committee of independent

directors (the "**Special Committee**") to examine these potential strategic alternatives.

26.    In accordance with the Special Committee's directives, over 80 parties

were contacted, on a confidential basis, to solicit interest in a potential transaction with TID.

TID subsequently entered into confidentiality agreements with 12 interested parties and

provided such parties with access to a virtual data room and additional information to assist

with their due diligence.  The proposals received by the Special Committee were either highly

conditional, highly dilutive to existing shareholders and not actionable within a reasonable timeframe, or undervalued the assets proposed to be purchased.

27.     After full consideration of the Tuscany Entities' potential strategic and financial alternatives (with the assistance of their management and legal and financial advisors), the proposals submitted by potential investors, and follow-up discussions with certain interested parties, the Special Committee commenced its discussions with M&P regarding a possible asset sale. On September 5, 2013, TID and M&P entered into a non-binding memorandum of understanding ("**MOU**") with respect to the potential disposition of TID's assets in Africa, along with two additional rigs based in South America.

28.     On November 14, 2013, TID and M&P entered into definitive agreements with respect to: (i) the sale of TID's then wholly-owned subsidiary, Caroil SAS, to M&P (the "**Caroil Disposition**"), the primary assets of which consisted of nine drilling and workover rigs and associated assets in Africa; and (ii) the sale of two rigs based in South America to M&P (the "**Rig Sale**"). On December 23, 2013, TID completed the Caroil Disposition and on January 16, 2014, TID completed the Rig Sale. Pursuant to these dispositions, M&P: (i) assumed an aggregate of $50 million of debt under the Prepetition Loans from the Debtors; (ii) paid to TID an aggregate of $23 million, of which $3.5 million remains in escrow and $19.5 million was applied to reduce the outstanding amount under the Prepetition Loans; and (iii)  transferred 109 million common shares (the "**Consideration Shares**") of TID to a special purpose vehicle, which Consideration Shares may either be repurchased and cancelled by TID for no additional consideration, or be directed to be sold to third party purchasers with the proceeds of such sales applied to reduce the outstanding amount under the Prepetition Loans.

29.     Despite the Caroil Disposition and the Rig Sale, the Tuscany Entities remained in an overleveraged position, unable to make interest payments on their Prepetition Loans as scheduled.  Accordingly, in the months preceding the commencement of these cases, they continued to seek refinancing alternatives.  However, faced with a lack of viable financing options and rapidly dwindling liquidity, the Special Committee determined that the chapter 11 filings and the related debtor in possession financing offered by certain of the Prepetition Lenders was necessary to preserve the Debtors' going concern value.

30.     After extensive discussions with their advisors, the Debtors determined that filing for chapter 11 in the United States was in their best interest and in the best interest of their creditors.  Specifically, nearly all claims against the Debtors arise from the Prepetition Loans under the Credit Agreement, which is governed by U.S. law and for which the parties agreed to U.S. jurisdiction.  Credit Agreement, §§ 12.11, 12.12.  In addition, as discussed above, the Debtors seek to pay all prepetition claims in connection with the Ecuador Branch Office in full, thereby significantly reducing their unsecured trade debt.  Accordingly, the Debtors' main goal in these Chapter 11 Cases is to restructure their balance sheet through a consensual plan of reorganization supported by their Prepetition Lenders, who have significant connections to the United States.

31.     On January 24, 2014, certain of the Tuscany Entities entered into a forbearance agreement with the Prepetition Lenders under the Credit Agreement, pursuant to which the Prepetition Lenders agreed to forbear from exercising any of their rights or remedies in connection with certain events of default under the Credit Agreement until the earlier of February 3, 2014 or the occurrence of an additional event of default (the "**Forbearance Agreement**").  The Forbearance Agreement provided the Tuscany Entities additional time to

continue negotiations with the Prepetition Lenders and other constituencies to develop a consensual plan for the restructuring of their balance sheet and operations.

32.    As part of their restructuring efforts, the Debtors and certain of their Non-Debtor Affiliates entered into a Restructuring Support Agreement (the "**RSA**") with Prepetition Lenders holding approximately 95% of their Prepetition Loans.  The RSA contemplates that the Prepetition Lenders will acquire substantially all of the assets of TID in exchange for a credit bid of certain of their debt, effectuated through a plan of reorganization. The RSA also contemplates that a plan and disclosure statement will be filed within 30 days of the Petition Date, a hearing to approve the disclosure statement will occur within 60 days after the Petition Date, and a confirmation hearing will occur within 90 days of the Petition Date.  Importantly, the RSA also contemplates a bidding and marketing process to seek higher and better offers (the Debtors note that they engaged in a lengthy, and ultimately unsuccessful, marketing and refinancing process prepetition).  The Debtors anticipate filing a motion for approval of bidding procedures in the near future.

33.    Finally, certain of the Prepetition Lenders have agreed to provide debtor in possession financing (the "**DIP Facility**") in the principal amount of $35 million, plus a roll-up of an additional $35 million of prepetition debt.  The DIP Facility is structured as a new tranche of the existing Credit Agreement because it is guaranteed by certain Non-Debtors Affiliates thereunder.  A detailed description of the DIP Facility is set forth in the *Declaration of Deryck Helkaa in Support of Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Authorizing the Roll-Up of Certain*

*Prepetition Obligations, (VII) Scheduling a Final Hearing and (VIII) Granting Related Relief,* filed concurrently herewith.

## PART II

34.    In furtherance of the objective of a value-maximizing reorganization of the Debtors, the Debtors have sought approval of the First Day Pleadings and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Pleadings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in any of the First Day Pleadings.

35.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimum interruptions and disruptions to their businesses or loss of productivity or value and (b) constitutes a critical element in the Debtors' being able to successfully maximize value for the benefit of their estates.

I.    **ADMINISTRATIVE AND PROCEDURAL PLEADINGS**

A.    **Joint Administration Motion**

36.    The Debtors seek the joint administration of their two Chapter 11 Cases for procedural purposes only.  Many of the motions, hearings, and other matters involved in the Chapter 11 Cases will affect both of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications,

orders, and other pleadings, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates.

### B.    Retention Applications

37.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases. Accordingly, during these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals: (a) Latham & Watkins LLP, as co-counsel; (b) Young, Conaway, Stargatt & Taylor, LLP, as co-counsel; (c) McCarthy Tétrault LLP, as special Canadian counsel; (d) Prime Clerk LLP, as claims and noticing agent and administrative advisor; (e) Deloitte & Touche LLP, as tax professionals; and (f) FTI Consulting Canada Inc., as chief restructuring officer services provider. I believe that the above professionals are well-qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts. I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

### C.    Foreign Representative Motion

38.    The Debtors intend to seek ancillary relief in Canada pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 as amended (the "**CCAA**") in the Calgary Courts Center (Commercial List) (the "**Canadian Court**") in Calgary, Alberta, Canada. The purpose of the ancillary proceedings (the "**Canadian Proceedings**") is to request that the Canadian Court recognize these Chapter 11 Cases as a "foreign non-main proceeding" under the applicable provisions of the CCAA in order to, among other things, protect the Debtors' assets and operations in Canada. To commence the Canadian Proceedings,

the Debtors need authority for a Debtor entity to act as the "foreign representative," as defined in section 45(1) of the CCAA, on behalf of the Debtors' estates (the "**Foreign Representative**") and, therefore, the Debtors seek to appoint TID as such Foreign Representative in the Foreign Representative Motion.

## II.    BUSINESS OPERATION MOTIONS

### A.    Cash Management Motion

39.    In the Cash Management Motion, the Debtors seek entry of interim and final orders, pursuant to Bankruptcy Code Sections 105(a), 345, 363, and 364, (i) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (ii) granting the Debtors a waiver of certain bank account and related requirements of the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") to the extent that such requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described in the Cash Management Motion; (iii) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices notwithstanding the provisions of Bankruptcy Code Section 345(b); (iv) authorizing, but not directing, the Debtors to continue certain ordinary course intercompany transactions; and (v) according superpriority status to postpetition intercompany claims arising from certain of such transactions.  The Debtors also request that the Court authorize and direct all banks with which the Debtors' maintain accounts to continue to maintain, service, and administer such accounts and authorize third-party payroll and benefits administrators and providers to prepare and issue checks on behalf of the Debtors.

40.      In addition, the Debtors request authority in the Cash Management Motion to (i) maintain the Ecuador Accounts (as defined below) in the ordinary course of business and (ii) exclude the Ecuador Accounts from all applicable UST Requirements and noticing or other requirements arising under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, as applicable.

i.      The Debtors' Cash Management System and the Bank Accounts

41.      In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "**Cash Management System**") that I believe is integral to the operation and administration of their businesses.  The Cash Management System allows the Debtors to (a) monitor and control all of the Debtors' cash receipts and disbursements, (b) identify the cash requirements of the Debtors and their non-debtor subsidiaries, (c) transfer cash as needed to respond to the cash requirements of the Debtors and their non-debtor subsidiaries, and (d) track all intercompany transfers.

42.      The Cash Management System is managed by the Debtors at their headquarters in Alberta, Canada, where they oversee the administration of the various bank accounts to effect the collection, disbursement, and movement of cash.  Their oversight facilitates accurate cash forecasting and reporting and the monitoring of the collection and disbursement of funds to and from the Debtor Bank Accounts (as defined below).

43.      I believe that the Cash Management System is organized in a way that respects the separate cash funding and operating needs of the Debtors and their non-debtor subsidiaries.  A diagram depicting the Cash Management System is annexed as Attachment 1 to the Cash Management Motion.  As of the Petition Date, it is my understanding that the Debtors maintain fourteen bank accounts (the "**Debtor Bank Accounts**") in Canada, the United States,

and Ecuador, and their Non-Debtor Affiliates maintain a number of additional accounts in various countries, such as Colombia and Brazil. The Debtor Bank Accounts consist of (a) ten accounts held at The Bank of Nova Scotia ("**BNS**") in Canada and the United States,[4] (b) two accounts held at The Bank of New York Mellon Corporation ("**BONY**"), one of which is in the United States and the other of which is in Ecuador, (c) one account held at Banco del Pichincha C.A. in Ecuador (the "**BP Account**"), and (d) one account held at Banco Internacional in Ecuador (the "**BI Account**"). The BP Account (Account No. 7004),[5] the BI Account (Account No. 3240), and one of the accounts at BONY (Account No. 4008) (collectively, the "**Ecuador Accounts**") are maintained in connection with the Debtors' Ecuador Branch Office.

44.    In addition, it is my understanding that the Debtors' Non-Debtor Affiliates maintain various bank accounts held at banks local to the respective Non-Debtor Affiliate, as well as banks in the United States (the "**Non-Debtor Affiliate Accounts**"). Funds in such accounts are held either in U.S. Dollars or the currency local to the respective Non-Debtor Affiliate.

45.    A schedule of the Debtor Bank Accounts is annexed as Attachment 2 to the Cash Management Motion.[6] As reflected in Attachment 2 to the Cash Management Motion, all of the Debtor Bank Accounts are held in the name of Debtor TID.

46.    Cash Collection and Distribution Process. As discussed above, the Debtors and their Non-Debtor Affiliates provide drilling, completion and workover services to

---

[4]    Six of these accounts at BNS are inactive.

[5]    For the sake of simplicity, the Cash Management Motion and this First Day Declaration use only the last four digits of each account number to identify each account.

[6]    I believe that Attachment 2 to the Cash Management Motion lists all of the bank accounts that comprise the Debtors' Cash Management System. In the event that any bank account has been inadvertently omitted from Attachment 2, the Debtors request in the Cash Management Motion that the relief sought by the Cash Management Motion be deemed to apply to such account.

the oil and natural gas industry in South America. The Debtors and their Non-Debtor Affiliates perform such services pursuant to various agreements with their customers in Colombia, Brazil, and Ecuador.

47.    In Colombia, these agreements generally provide that payments by the customer are to be made into two separate accounts. It is my understanding that, depending on the agreement, a certain percentage of each customer payment is deposited into the specified local Non-Debtor Affiliate Account in Colombian Pesos. These funds are then used to pay the Colombian operating expenses in the ordinary course of business. To the extent that additional funds are needed, such funds are provided by TID pursuant to the intercompany transfers described in further detail below. The remainder of the customer payment is deposited in U.S. Dollars into a second Non-Debtor Affiliate Account, BONY Account No. 4007. I have been informed that funds in BONY Account No. 4007 are routinely swept into the Debtors' primary operating account, which is held at BNS (Account No. 7012, the "**Main U.S. Operating Account**").

48.    I understand that the Cash Management System operates similarly for customers located in Brazil. Those customers deposit a certain percentage of each payment into the specified local Non-Debtor Affiliate Account in Brazilian Reals, to be used to fund the Brazilian operating expenses in the ordinary course of business. As with the Colombian operations, if additional funds are needed, TID transfers such funds pursuant to the intercompany transfers described below. It is my understanding that the remainder of the customer payment is deposited into a second Non-Debtor Affiliate Account held at ING Bank (Account No. 3010), which is swept routinely into the Main U.S. Operating Account.

49.     I have been informed that in Ecuador, customers deposit payments in U.S. Dollars into one of the three Ecuador Accounts, depending on the terms of their agreement with the Debtors. A portion of the funds deposited in the Ecuador Accounts is swept regularly into the Debtors' Main U.S. Operating Account, but the vast majority of the funds are used to fund directly the operations of the Ecuador Branch Office.

50.     It is my understanding that funds from the Main U.S. Operating Account are distributed as necessary in the following manner:

(a)     *U.S. Payroll Account*:  Certain funds are deposited in a U.S. payroll account held at BNS in U.S. Dollars (Account No. 7217, the "**U.S. Payroll Account**"). The U.S. Payroll Account is used to pay all employees of the Debtors who are paid in U.S. Dollars.

(b)     *Canadian Operating Account*:  Certain funds are deposited in a Canadian operating account held at BNS in Canadian Dollars (Account No. 7010, the "**Canadian Operating Account**"). A portion of the funds in the Canadian Operating Account is used to pay all operating costs of TID, including all vendors, suppliers, lease parties, and professionals of TID, other than those that require payment in U.S. Dollars. A portion of the funds in the Canadian Operating Account is deposited in a Canadian payroll account held at BNS in Canadian Dollars (Account No. 0011, the "**Canadian Payroll Account**"). The Canadian Payroll Account is used to pay employees of the Debtors who are paid in Canadian Dollars.

(c)     *U.S. Vendors*:  Certain funds are used to pay those vendors of the Debtors and the Non-Debtor Affiliates that are located in the United States and require payment in U.S. Dollars.

(d)     *Non-Debtor Affiliate Operating Costs*:  Certain funds are also used to fund the operations of the Non-Debtor Affiliates and are transferred directly to such Non-Debtor Affiliates as needed.

(e)     *Debt Service Reserve Account*: Certain funds are occasionally deposited in BONY Account No. 4009, which serves as a debt service reserve account (the "**DSRA**") under the Debtors' prepetition credit facility. Pursuant to the prepetition credit facility, funds from the sale of certain specified assets of the Debtors or their Non-Debtor Affiliates are also deposited directly into the DSRA. I believe that historically, a portion of the funds in the Ecuador Account located at BONY (Account No. 4008) were also transferred to the DSRA. I have been informed that, as of the Petition Date, there are no funds in the DSRA.

ii.    Continued Use of the Debtors' Cash Management System and the Debtor Bank Accounts

51.    I believe the Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest.  I believe that, to require the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  It is my belief that any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value.  Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of my knowledge, the majority of the Debtor Bank Accounts are held at financially stable institutions insured in Canada by the Canada Deposit Insurance Corporation ("**CDIC**") or in the United States by the Federal Deposit Insurance Corporation ("**FDIC**").[7]  For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties.  Accordingly, the Debtors request that they be allowed to maintain and continue to use the Cash Management System, including maintenance of their existing Debtor Bank Accounts.

52.    As part of the relief requested in the Cash Management Motion, and to ensure that their transition into chapter 11 is as smooth as possible, the Debtors seek an order authorizing the Debtors to (i) maintain and continue to use the Debtor Bank Accounts, including but not limited to those accounts listed on Attachment 2 to the Cash Management Motion, in the same manner and with the same account numbers, styles, and document forms as are currently

---

[7]    The BP Account and the BI Account are located in Ecuador and, accordingly, are not insured by the CDIC or the FDIC.

employed; (ii) deposit funds in and withdraw funds from the Debtor Bank Accounts in the ordinary course by all usual means, including checks, wire transfers, ACH transfers, drafts, and electronic fund transfers or other items presented, issued, or drawn on the Debtor Bank Accounts; (iii) pay ordinary course bank fees in connection with the Debtor Bank Accounts, including prepetition fees; (iv) perform their obligations under the documents and agreements governing the Debtor Bank Accounts; and (v) for all purposes, treat the Debtor Bank Accounts as accounts of the Debtors in their capacities as debtors in possession.

53.    If the relief requested in the Cash Management Motion is granted, I have been informed that the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by the Debtors prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims against the Debtors, except those otherwise authorized by the Court, the Debtors will work closely with the banks at which the Debtor Bank Accounts are maintained (each a "**Bank**" and, collectively, the "**Banks**") to ensure appropriate procedures are in place to prevent checks issued by the Debtors prepetition from being honored absent this Court's approval and to ensure that no third-party with automatic debit capabilities is able to debit amounts attributable to the Debtors' prepetition obligations.  However, the Debtors request a waiver of this requirement with respect to the Ecuador Accounts because they are seeking authority to pay all prepetition claims incurred in connection with the Ecuador Branch Office in full pursuant to the Ecuador Payment Motion.

54.    The Debtors request that no Bank that implements such handling procedures and then honors a prepetition check or other item drawn on any account that is the subject of this Cash Management Motion (a) at the direction of the Debtors to honor such

prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a good faith error made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. I believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing cash management services to the Debtors.

55.    In the Cash Management Motion, the Debtors further request that the Banks be authorized to deduct from the appropriate Debtor Bank Accounts the Banks' fees and expenses (the "**Bank Fees and Expenses**"), and that no liens on any Debtor Bank Accounts take priority over the Bank Fees and Expenses except as set forth in any deposit agreements between the Debtors and the Banks.

56.    Additionally, in each instance in which the Debtors hold one or more accounts at a bank that is a party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of an interim or final order granting the Cash Management Motion, the Debtors will (i) contact such bank, (ii) provide such bank with the Debtors' employer identification numbers, and (iii) identify each of their accounts held at such bank as held by a debtor in possession in a bankruptcy case.  Where the Debtors hold one or more accounts at a bank that is not a party to a Uniform Depository Agreement with the U.S. Trustee, it is my understanding that the Debtors will use their good faith efforts to cause such bank to execute a Uniform Depository Agreement in a form prescribed by the Office of the U.S. Trustee within forty-five (45) days of entry of an interim or final order granting the Cash Management Motion, underline provided that the Debtors seek to waive this requirement with respect to the Ecuador Accounts.

57.    In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Cases, in the Cash Management Motion, the Debtors request that all Banks be authorized and directed to continue to administer, service, and maintain the Debtor Bank Accounts as such accounts were administered, serviced, and maintained prepetition, without interruption and in the ordinary course (including making deductions for Bank Fees and Expenses), and, when requested by the Debtors in their sole discretion, to honor any and all checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Debtor Bank Accounts on account of a claim against the Debtors arising on or after the Petition Date.

55.    The Debtors further request in the Cash Management Motion that they be authorized to implement such reasonable changes to the Cash Management System as they may deem necessary or appropriate, including, without limitation, closing any of the Debtor Bank Accounts and opening any additional bank accounts following the Petition Date (the "**New Accounts**") wherever the Debtors deem that such accounts are needed or appropriate and whether or not the banks in which the accounts are opened are designated approved depositories in the District of Delaware.  I understand that, notwithstanding the foregoing, any New Accounts that the Debtors open will be at banks that have executed a Uniform Depository Agreement with the U.S. Trustee, or at such banks that are willing to immediately execute such an agreement, and (i) any New Account in Canada will be (x) at one of the existing Banks or with a bank that is organized under the laws of Canada or any province therein and that is insured by the CDIC and (y) designated a "Debtor in Possession" account, as applicable in the relevant jurisdiction, by the relevant bank and (ii) any New Account that the Debtors open in the United States will be (x) at one of the existing Banks or with a bank that is organized under

the laws of the United States of America or any state therein and that is insured by the FDIC or

the Federal Savings and Loan Insurance Corporation and (y) designated a "Debtor in

Possession" account by the relevant bank.  The Debtors request that the relief sought by the

Cash Management Motion extend to any New Accounts and that any order approving this Cash

Management Motion provide that the New Accounts are deemed to be Debtor Bank Accounts

that are similarly subject to the rights, obligations, and relief granted in such order.  I understand

that the Debtors will provide the U.S. Trustee with prompt notice of any Debtor Bank Accounts

that they close or New Accounts that they open.  In furtherance of the foregoing, the Debtors

also request that the relevant banks be authorized to honor the Debtors' requests to open or

close (as the case may be) such Debtor Bank Account(s) or New Account(s).

iii.　　Continued Use of the Debtors' Existing Checks and Business Forms

56.　　To minimize expenses to their estates, the Debtors seek authorization in

the Cash Management Motion to continue using all checks substantially in the forms existing

immediately prior to the Petition Date, without reference to the Debtors' status as debtors in

possession; provided, however, that in the event the Debtors generate new checks during the

pendency of the Chapter 11 Cases other than from their existing stock of checks, such checks

will include a legend referring to the Debtors as "Debtor in Possession," provided further that

the Debtors request a waiver of this requirement with respect to the Ecuador Accounts.  The

Debtors also seek authority to use all correspondence and other business forms (including,

without limitation, letterhead, purchase orders, and invoices) without reference to the Debtors'

status as debtors in possession.[8]

---

[8]　　It is my understanding that, although the operating guidelines established for debtors in possession by the U.S. Trustee would require the Debtors to obtain and use new checks bearing the "Debtor in Possession" designation, the Debtors do not believe that such guidelines impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek explicit

57.    I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates. Further, I believe that such changes would disrupt the Debtors' business operations and would not confer any benefit upon parties that deal with the Debtors.  For these reasons, the Debtors request that they be authorized to use their existing check stock, correspondence, and other business forms without being required to place the label "Debtor in Possession" on any of the foregoing.

iv.    Waiver of Certain Requirements of the U.S. Trustee

58.    The Debtors further request in the Cash Management Motion, pursuant to Bankruptcy Code Sections 105(a) and 363, that the Court grant a waiver of certain bank account and related requirements of the U.S. Trustee to the extent that such requirements are inconsistent with (i) the Debtors' existing practices under the Cash Management System or (ii) any action taken by the Debtors in accordance with any order granting this Cash Management Motion or any other order entered in the Chapter 11 Cases.  I understand that in order to supervise the administration of chapter 11 cases, the U.S. Trustee has established certain operating guidelines for debtors in possession.  I have been informed that these requirements (the "**UST Requirements**") require chapter 11 debtors to, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor in possession account for cash collateral; and (iv) obtain checks for all debtor in possession accounts that bear (a) the designation "Debtor In Possession," (b) the bankruptcy case number, and (c) the type of account.  It is my

authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

understanding that the UST Requirements are designed to demarcate clearly prepetition transactions and operations from postpetition transactions and operations, and to prevent the inadvertent postpetition payment of prepetition claims. As noted previously, I believe that (i) the Debtors are able to work with the Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed and (ii) enforcement of certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

59.    In light of the complexity of the Cash Management System, I believe it would be onerous for the Debtors to meet the UST Requirement to close all existing bank accounts and open new debtor in possession accounts. Indeed, I believe this requirement would unnecessarily inconvenience the Debtors and, in the case of the Ecuador Branch Office, potentially cause irreparable harm for the reasons stated in the Cash Management Motion and in the Ecuador Payment Motion.

60.    Further, it is my belief that it would be unnecessary and inefficient to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to such accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations. I believe that the Debtors can pay their tax obligations most efficiently from their existing disbursement accounts at BNS in accordance with their existing practices, and the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of such accounts. The creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

61.    In addition, I believe that it is unnecessary to require the Debtors to abide by the UST Requirement to establish specific debtor in possession accounts for cash collateral. It is my understanding that, as set forth in the Debtors' motion for authority to use cash collateral and obtain debtor-in-possession financing, the Debtors have provided significant safeguards (negotiated in good faith with parties in interest) to ensure that parties with security interests in the Debtors' cash collateral are adequately protected and that such parties have been provided with notice of the proposed use of such cash collateral.

v.    Continued Deposit Practices

62.    As part of the Cash Management System, the Debtors routinely deposit funds into the Debtor Bank Accounts (the "**Deposit Practices**").  In the Cash Management Motion, the Debtors request (i) authorization to continue to deposit funds in accordance with existing practices under the Cash Management System, subject to any reasonable changes the Debtors may implement to the Cash Management System, and (ii) a waiver of the deposit requirements of Bankruptcy Code Section 345(b), on an interim basis, to the extent that such requirements are inconsistent with the Deposit Practices.  For the avoidance of doubt, to the extent any of the Debtor Bank Accounts may be classified as investment accounts, or to the extent any of the Debtors' routine deposits into Debtor Bank Accounts may be regarded as investment activity, the Debtors seek authorization in the Cash Management Motion to continue to deposit funds into such Debtor Bank Accounts in accordance with existing practices, notwithstanding the requirements of Bankruptcy Code Section 345(b).

vi.    Continued Intercompany Transactions and Accordance of Superpriority Status to Postpetition Intercompany Claims

63.    Additionally, the majority of the Debtors' revenue originates from the operations of their Non-Debtor Affiliates in Colombia.  Accordingly, it is my understanding that

the Debtors essentially operate on a "cash-negative" basis. Without the receivables from their Colombian operations, the Debtors and their other Non-Debtor Affiliates would be severely underfunded. For that reason, during the daily operation of the Debtors' businesses, funds are moved within the Cash Management System. I believe that there may be intercompany claims owing among the Debtors and their Non-Debtor Affiliates at any given time. Specifically, certain of the Debtors regularly participate in transactions with their Non-Debtor Affiliates, including payment of their expenses and operating costs (the "**Intercompany Transactions**"). As a result of the Intercompany Transactions, I believe the Debtors' books and records reflect prepetition obligations among the Debtors and their Non-Debtor Affiliates. Before the commencement of these Chapter 11 Cases, it is my understanding that the Debtors engaged in Intercompany Transactions in the ordinary course of business including, but not limited to, the following:

> (a)    *Payment of Expenses*: Expenses paid by a Debtor on behalf of the other Debtor and their Non-Debtor Affiliates (for example, payment of invoices for essential goods, tax and audit services, freight costs, insurance), which are allocated among the beneficiaries of such payments. Such transfers are recorded on intercompany accounts.

> (b)    *Advances to Fund General Expenses*: Ordinary course transactions, involving the Debtors transferring cash to the Non-Debtor Affiliates to pay general operational and administrative expenses and other expenses. Such transfers are recorded on intercompany accounts.

64.    In the Cash Management Motion, the Debtors seek authority to pay for or otherwise reconcile prepetition Intercompany Transactions if the Debtors deem such payment or reconciliation necessary and in the best interests of the Debtors' estates and other parties in interest. Additionally, the Debtors seek authority to set off prepetition obligations related to the Intercompany Transactions. Finally, the Debtors seek authority, in their discretion, to continue to engage in Intercompany Transactions postpetition in the ordinary course of business. All

Intercompany Transactions and payments will only be effected in accordance with all applicable strictures established in the Debtors' cash collateral and debtor in possession financing orders and documentation, including, without limitation, budgetary restrictions.

65.    I believe, in the exercise of my reasonable business judgment, continued funding of thee Debtors' Non-Debtor Affiliates is essential to the Debtors' estates because the Non-Debtor Affiliates are the source of the overwhelming majority of the Debtors' revenue. Without the revenue collected from the Non-Debtor Affiliates, it is my belief that the Debtors could not survive. Accordingly, the continued operation and maintenance of the Non-Debtor Affiliates is absolutely critical and the success of the Debtors is dependent upon the continued funding of the Non-Debtor Affiliates throughout the Chapter 11 Cases.

66.    The Debtors maintain records of all fund transfers and can ascertain, trace, and account for Intercompany Transactions. At the same time, if the Intercompany Transactions were to be discontinued, the Cash Management System and the related administrative controls would be disrupted to the Debtors' detriment.

67.    It is my understanding that, to ensure that each individual Debtor will not fund the operations of another entity at the expense of such Debtor's creditors, the Debtors request that all postpetition claims against a Debtor by another Debtor arising from Intercompany Transactions (the "**Intercompany Claims**") be accorded superpriority administrative claim status, subject and subordinate only to other superpriority administrative claims granted pursuant to order of the Bankruptcy Court. I have been informed that, if postpetition Intercompany Claims are accorded superpriority administrative claim status, then each individual Debtor on whose behalf another Debtor has utilized funds or incurred expenses will continue to bear ultimate repayment responsibility, thereby protecting the interests of each

individual Debtor's creditors.[9]  Accordingly, I believe that the Court should grant superpriority status to postpetition Intercompany Claims.

    vii. <u>Continued Payments to the Ecuador Branch Office to Remain in the Ecuador Accounts</u>

        68.     In the ordinary course of business, it is my understanding that customers of the Ecuador Branch Office routinely make payments into the Ecuador Accounts.  At times, a portion of these funds are swept into the Main U.S. Operating Account, which are then transferred as needed to each of the Non-Debtor Affiliates and the Ecuador Branch Office. However, because certain material taxes and fees apply to each transfer of funds between the Ecuador Accounts and the Main U.S. Operating Account, I understand that the Debtors typically allow the funds received from customers of the Ecuador Branch Office to remain in the Ecuador Accounts to fund the Ecuador Branch Office's ordinary course operating expenses in order to minimize the occurrence of such taxes and fees.

        69.     By the Cash Management Motion, the Debtors request authority to allow all funds deposited in the Ecuador Accounts to remain in the Ecuador Accounts for use by the Ecuador Branch Office, rather than transferring the funds from the Ecuador Accounts to the Main U.S. Operating Account, to the extent provided in the Debtors' cash collateral and debtor in possession financing orders and documentation, including, without limitation, budgetary restrictions.  Because these funds will be available to the Ecuador Branch Office to use in the ordinary course, the Debtors propose to limit the amount of transfers from the Main U.S. Operating Account to the Ecuador Accounts to a maximum of $1 million per month.

---

[9]      Nothing in the Cash Management Motion constitutes a request to validate the nature or amount of any Intercompany Transaction or Intercompany Claim, whether arising prepetition or postpetition.

B.    **Workforce Obligations Motion**

70.    In the Workforce Obligations Motion, the Debtors seek entry of interim

and final orders authorizing them, in their discretion, to pay, continue, or otherwise honor

various prepetition workforce-related obligations (collectively, the "**Prepetition Workforce**

**Obligations**") to or for the benefit of their (a) employees (collectively, the "**Employees**") and

(b) independent contractors (the "**Independent Contractors**" and, together with the

Employees, the "**Workforce**") for compensation, benefits, and expense reimbursements under

all plans, programs, and policies maintained or contributed to, and agreements entered into, by

the Debtors prior to the Petition Date (as described below, the "**Workforce Programs**").  In

addition, the Debtors request that the Court confirm their right to continue each of the

Workforce Programs in the ordinary course of business during the pendency of these Chapter 11

Cases in the manner and to the extent that such Workforce Programs were in effect immediately

prior to the filing of such cases and to make payments in connection with expenses incurred in

the postpetition administration of any Workforce Program.[10]

71.    The Workforce Programs under which the Prepetition Workforce

Obligations arise are described more fully in the Workforce Obligations Motion and include,

without limitation, plans, programs, policies, and agreements providing for (a) wages, salaries,

holiday and vacation pay, and other accrued compensation; (b) reimbursement of business,

travel, and other reimbursable expenses; and (c) benefits, with coverage as applicable for

eligible spouses and dependents, in the form of supplemental medical and dental coverage,

basic term life insurance, accidental death and dismemberment insurance, critical illness

---

[10]    In the Workforce Obligations Motion, the Debtors do not seek to assume or reject any Workforce Program
to the extent that such Workforce Program is deemed to be an executory contract within the meaning of Bankruptcy
Code Section 365.  Moreover, the Debtors do not waive their right to modify or terminate any Workforce Program
to the extent that such right exists under the terms of the Workforce Program or as may be authorized by applicable
law.

insurance, long-term disability coverage, workers' compensation, and miscellaneous other benefits provided to the Workforce in the ordinary course of business.[11]

72.    The Debtors also seek authorization to pay any and all local, state, provincial, and federal U.S. and Canadian withholding and payroll-related or similar taxes relating to the Prepetition Workforce Obligations including, but not limited to, all withholding taxes, social security taxes, Medicare taxes, Canadian Pension Plan contributions and Employment Insurance premiums.  In addition, the Debtors seek authorization to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees for savings programs, benefit plans, insurance programs, and other similar programs.

73.    The Debtors also request that, with respect to any Workforce Programs that are administered, insured, or paid through a third-party administrator or provider, the Debtors be expressly authorized, in their discretion, to pay any prepetition claims of such administrator and provider in the ordinary course of business to insure the uninterrupted delivery of payments or other benefits to the Employees.

74.    Further, in the Workforce Obligations Motion, the Debtors request that the Court authorize and direct all banks to receive, process, honor, and pay any and all checks drawn on the payroll and other bank accounts used by the Debtors to satisfy their Prepetition Workforce Obligations whether presented before, on, or after the Petition Date, upon receipt by each bank or financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  The Debtors additionally

---

[11]    It is my understanding that the Debtors may separately seek authorization to implement new postpetition retention, severance or similar employment protection programs designed to preserve employee morale, encourage continuing employment and otherwise ameliorate the effects on employees of these Chapter 11 Cases.  Pending approval of any such postpetition programs, the prepetition programs will continue in the ordinary course, subject to the provisions of Bankruptcy Code Section 503(c)(2).

request that the Court authorize them to issue new postpetition checks to replace any checks that may nevertheless be dishonored and to reimburse any expenses that the Workforce may incur as a result of any bank's failure to honor a prepetition check.

77.    It is my understanding that, as of the Petition Date, the Debtors' Workforce in Canada and Brazil consisted of thirteen (13) Employees, of whom twelve (12) were located at the Debtors' headquarters in Calgary, Alberta, Canada (the "**Headquarters**") and paid in Canadian dollars (the "**Canadian Employees**"), and one (1) was located at the Debtors' facilities in Brazil and paid in U.S. dollars (the "**Brazil Employee**").[12]  All of the Debtors' Employees are salaried Employees.  The Debtors' Workforce also currently includes two (2) Independent Contractors, one of whom works at the Debtors' Headquarters and one of whom works at the Debtors' facilities in Colombia.  Tuscany International Drilling Inc., the parent corporation and a Debtor in these Chapter 11 Cases, employs the Debtors' entire Workforce.

75.    I believe that the Debtors' ability to preserve their businesses and successfully reorganize is dependent on the expertise and continued enthusiasm and service of their Workforce.  Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, I believe that the morale and, thus, the performance of the Debtors' Workforce may be adversely affected.

78.    It is my belief that, if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course, their Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on Workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their

---

[12]      As described above, the Debtors also employ approximately 330 employees in Ecuador.  Such employees are addressed in the Ecuador Payment Motion.

01:14961762.2

NY\6150249.13

estates.  The Debtors have determined that continuation of the Workforce Programs is vital to preserving and rebuilding Workforce morale during the pendency of these Chapter 11 Cases and to reducing the level of attrition that might otherwise occur.

i.    Prepetition Workforce Compensation

a.  *Employee Payroll and Payroll Deductions*

79.    The Employees are paid semi-monthly on the 15th day and the last day of each month (or on the preceding business day if these dates fall on a holiday or weekend).  I have been informed that the average payroll each pay period is approximately $53,413.[13]  The Debtors manage and administer payroll for the Canadian Employees internally through a software program called Paymate.  The Debtors utilize Automatic Data Processing, Inc. ("**ADP**") for the administration of payroll for the Brazil Employee.

80.    It is my understanding that, as of the Petition Date, the Debtors made deductions from Employees' paychecks for payments to third parties on behalf of Employees for various provincial, federal, state, and local income, FICA, and other taxes, as well as for savings programs, pension plans, benefit plans, insurance and other similar programs (collectively, the "**Deductions**").  I have been informed that over the past twelve (12) months, the Debtors' average semi-monthly Deductions for Employees aggregated approximately $43,921.

81.    I believe certain Employees may be owed certain prepetition amounts on account of regular compensation earned through the Petition Date.  As such, the applicable Deductions have not yet been taken.  Additionally, even where Deductions have been withheld from the applicable Employee's paycheck, the Debtors may not yet have forwarded the Deductions to the various third parties noted above.

---

[13]    Dollar amounts used herein refer to Canadian dollars unless otherwise specified.  United States dollars are referred to as "**USD**".  As of the Petition Date, $1 USD is equal to approximately $1.11 Canadian Dollars.

82.    It is my understanding that the Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $9,080 (comprised of $5,702 owed to the Employees and $3,379 attributable to the Deductions).

### b.  Independent Contractors

83.    In addition to the Employees, it is my understanding that the Debtors also retain an IT consultant at the Headquarters and an operations specialist in Colombia as Independent Contractors in the ordinary course of business.  The Debtors' IT consultant is a former Employee of the Debtors and is paid on an hourly basis, and the Debtors' operations specialist is paid through a monthly retainer.  I have been informed that both Independent Contractors provide the Debtors with invoices for their services and are paid monthly.  On average, the Debtors pay approximately $31,000 per month in the aggregate to the Independent Contractors.

### c.  Vacation Days and Holidays

84.    As part of their overall compensation, the Employees are entitled to receive a certain number of vacation days each year.  I understand that Employees earn fifteen (15) to twenty-five (25) vacation days per year, depending upon their position and length of service with the Debtors, with those Employees who have been employed by the Debtors for a longer period of time being entitled to a greater number of vacation days than those Employees who have been with the Debtors for a shorter period of time.

85.    As part of their overall compensation, the Employees are entitled to receive a certain number of vacation days each year.  Employees earn fifteen (15) to twenty-five (25) vacation days per year, depending upon their position and length of service with the Debtors, with those Employees who have been employed by the Debtors for a longer period of

01:14961762.2

NY\6150249.13

time being entitled to a greater number of vacation days than those Employees who have been

with the Debtors for a shorter period of time.

86.    I have been informed that typically, Employees may carry over up to five

(5) unused vacation days from one calendar year to the next.[14] Any additional unused vacation

days are lost at the end of each calendar year.  Upon termination or retirement, Employees

receive payment on account of any accrued and unused vacation days.  I believe this policy is

consistent with the laws of most states and the province of Alberta, which provide that vacation

benefits are vested and must be paid upon termination of employment.  The Debtors estimate

that, as of the Petition Date, total accrued but unpaid vacation liability is approximately

$102,336.  Although the Debtors request authority to pay such accrued but unpaid vacation

liability in the ordinary course of business as necessary, no amounts will be due or owing to any

Employee unless and until such Employee is terminated or retires.

87.    I understand that Employees are also entitled to receive fourteen (14) paid

holidays per year, which consist of eleven (11) official holidays and three (3) additional days

between Christmas and New Year's Day.[15]

  d.  *Bonus Program*

88.    In the ordinary course of business, in order to encourage and reward

outstanding performance, I understand the Debtors offer their Employees the opportunity to earn

bonuses under a bonus program (the "**Bonus Program**"), under which the Employees are

eligible to earn awards if the Debtors meet certain predefined earnings thresholds.  I have been

---

[14]    Three (3) Employees are party to executive employment agreements providing that such Employees may carry over unused vacation days in a maximum amount equal to the number of vacation days such Employee earns in one year.

[15]    The Debtors have no formal sick leave policy.  Employees may take sick days when necessary without affecting their salary.

informed that the amount of such awards, if granted, is based upon the applicable Employee's position. In 2013, the Debtors did not meet the annual earnings threshold; accordingly, no bonuses were awarded under the Bonus Program. Moreover, I have been informed that the Debtors do not anticipate that any awards will be made under the Bonus Program in 2014 or during these Chapter 11 Cases.[16]

ii.    Prepetition Employee Reimbursements

a. *Business Expenses*

89.    I understand that the Debtors, in the ordinary course of their business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that Employees incur within the scope of their job duties. These include expenses for travel (including lodging, automobile rentals, meals, and internet charges), business-related entertainment expenses, taxi and mileage costs, and other general business-related expenses. Employees are expected to use sound judgment and good business sense when incurring the expenses. In order to be reimbursed, an Employee must submit his or her receipts to the Employee's supervisor for approval. It is my understanding that if approved, the Debtors reimburse the Employee by check or electronic funds transfer as soon as possible.

b. *Miscellaneous*

90.    The Debtors also offer certain other miscellaneous programs and benefits. For example, the Debtors offer Employees the ability to participate in a professional

---

[16]    The Debtors have not met the required earnings threshold since 2011 and, accordingly, no bonuses have been awarded to Employees under the Bonus Program since 2012 (on account of 2011 results). Although the Debtors do not anticipate awarding any bonuses in 2014, the Debtors reserve the right to seek authority to grant awards under the Bonus Program or to implement new bonus programs in the future. Moreover, the Debtors also maintained a stock option plan (the "**Stock Option Plan**") for certain of their Employees. The Stock Option Plan is no longer in effect and no stock options have been granted pursuant to the Stock Option Plan since 2011. As of the Petition Date, various Employees have been granted the option to purchase approximately 9,400,000 shares of Tuscany International Drilling Inc. common stock pursuant to the Stock Option Plan.

development program to obtain professional training and certifications (the "**Professional Development Program**"). I have been informed that, under the Professional Development Program, the Debtors provide reimbursement for reasonable business expenses, including, but not limited to, registration fees, transportation, and course materials, incurred in conjunction with the professional development seminar, conference, training program, or similar event. In order to be reimbursed, an Employee must successfully complete the program and submit the Employee's receipts to the Employee's supervisor for approval. If approved, the Debtors reimburse the Employee by check or electronic funds transfer as soon as possible. It is my understanding that the total amount of reimbursements paid under the Professional Development Program in 2013 was $9,906. I do not believe that there are any accrued but unpaid amounts under the Professional Development Program as of the Petition Date.

91.     I have been informed that the Debtors also provide parking to five (5) Employees at a cost to the Debtors of $550 per Employee per month and gym memberships to four (4) Employees at a cost of $35 per Employee per month.

92.     I believe that the Debtors' total prepetition obligations in respect of reimbursements will not exceed $5,000 as of the Petition Date (the "**Reimbursement Obligations**").

iii.    Employee Benefits

93.     I have been informed that, prior to the Petition Date, the Debtors offered Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) supplemental medical insurance (b) dental insurance, (c) basic term life and accidental death and dismemberment insurance, (d) long-term disability insurance, (e) savings and related types of benefits, (f) workers' compensation, and (g) miscellaneous other benefits provided to the Employees in the ordinary course of business (collectively, the

"**Employee Benefits**").  As of the Petition Date, the Debtors were obligated to pay certain

contributions to or provide benefits under such plans, programs, and policies.

     *a.  Medical, Dental, Life and Accidental Death and Dismemberment Insurance*

     94.    Under Canadian Law, all Canadian Employees receive basic health

insurance under a provincial health care plan.[17]  I have been informed that the Debtors provide

all Employees with supplemental medical insurance,[18] dental insurance, prescription drug

coverage, basic group life insurance, accidental death and dismemberment insurance ("**AD&D**"),

and related benefits (the "**Health Benefits Programs**") under plans administered by Sun Life

Financial ("**Sun Life**") for the Canadian Employees and by Cigna Health and Life Insurance

Company ("**Cigna**") for the Brazil Employee and the Independent Contractor located in

Colombia.  It is my understanding that the Debtors pay all premiums for the coverage provided

by Sun Life and Cigna.

     95.    I have been informed that Canadian Employees enrolled in the Health

Benefits Programs administered by Sun Life (the "**Sun Life Plan**") receive a variety of benefits

after they have been employed by the Debtors for at least three (3) months.  It is my

understanding that all such Canadian Employees are covered by an extended health care policy,

which covers 100% of eligible expenses incurred in the province of Alberta, 100% of eligible

expenses for emergency services incurred outside of the province of Alberta, and 80% of eligible

expenses for referred services outside of the province of Alberta.  The Sun Life Plan also pays

100% of the cost of eligible prescription drugs and vision-related benefits such as eye exams,

glasses, contact lenses, and related services.  I understand that Canadian Employees covered by

---

[17]    In addition, the Independent Contractor located in Colombia also receives basic health insurance under the provincial health care plan and supplemental health insurance paid for by the Debtors.

[18]    In the case of the Brazil Employee, the Debtors provide basic medical insurance rather than supplemental medical insurance.

the Sun Life Plan also receive dental coverage, which covers 100% of all eligible expenses for most preventive care and 50% or more of expenses relating to other dental care, up to a calendar year maximum of $2,000 per person covered by the plan.

96.    The Sun Life Plan also provides covered Canadian Employees with employee life insurance and AD&D insurance in amounts equal to three (3) times the Canadian Employee's annual salary, up to a maximum of $300,000, until the Canadian Employee reaches age 70 or retires.[19] Canadian Employees also receive dependent life insurance for their spouse and each child up to $15,000 and $7,500, respectively. The Sun Life Plan also provides critical illness insurance for critical illnesses, such as a heart attack, stroke, or organ transplant, up to a maximum of $25,000 until the Canadian Employee reaches age 65 or retires.

97.    I have been informed that the Brazil Employee is enrolled in the Health Benefits Program administered by Cigna (the "**Cigna Plan**").[20] Under the Cigna Plan, the Brazil Employee is covered by a medical coinsurance policy, which covers 100% of all eligible expenses, including vision-related benefits such as eye exams, glasses, contact lenses, and related services. The Brazil Employee also receives dental coverage, which covers 100% of all eligible expenses for most preventive care and 50% or more of expenses relating to other dental care up to a calendar year maximum of $1,500 per person covered by the plan. The Cigna Plan also provides the Brazil Employee with group term life insurance and AD&D insurance in amounts

---

[19]    The amount of insurance is reduced to 50% if the Employee is 65 or older.

[20]    As noted above, the Independent Contractor located in Colombia is also enrolled in a Health Benefits Program administered by Cigna. Such Independent Contractor's coverage is supplemental to the coverage provided under the Canadian provincial health care plan and provides benefits in the event the Independent Contractor needs medical care while located outside of Canada.

equal to two (2) times the Brazil Employee's annual salary, up to a maximum of $400,000, until the Brazil Employee retires.[21]

98.    I understand that the obligations that the Debtors incur on behalf of the Employees on account of the Health Benefits Programs are approximately $5,900 per month for the Sun Life Plan and $6,000 USD per month for the Cigna Plan.  The Debtors pay these premiums directly to Sun Life and Cigna monthly in advance.  I do not believe that any amounts are owed on account of the Health Benefits Programs as of the Petition Date.

  b.  *Long-Term Disability Programs*

99.    I have been informed that Employees receive, at their own cost, long-term disability ("**LTD**") insurance.  The LTD coverage for the Canadian Employees and the Brazil Employee is administered by Sun Life and Cigna, respectively.

100.    It is my understanding that, under the Sun Life LTD plan, if a Canadian Employee becomes disabled for at least four (4) months, Sun Life pays benefits equal to two-thirds (66.7%) of the first $3,000 of the Canadian Employee's monthly base salary plus fifty percent (50%) of the balance of the Canadian Employee's monthly base salary, up to a maximum of $6,000 per month for a period of up to twenty-four (24) months.[22]

101.    Under the Cigna LTD plan, if the Brazil Employee becomes disabled for at least ninety (90) days, Cigna pays benefits equal to two-thirds (66.67%) of the Brazil Employee's monthly base salary, up to a maximum of $5,000 per month for a period of up to twenty-four (24) months.  The Cigna LTD plan also provides the family of the Brazil Employee

---

[21]    The amount of insurance is reduced to 65% if the Brazil Employee is 65 or older, and further reduced to 50% if the Brazil Employee is 70 or older.

[22]    The right to begin receiving these benefits terminates once the Canadian Employee reaches age 65 or retires.

three (3) times the Brazil Employee's monthly base salary in the event of the Brazil Employee's death.

102.    I understand the Debtors pay the premiums for LTD insurance directly to Sun Life and Cigna each month in conjunction with the premiums paid for the Health Benefits Programs. The premiums are then deducted from the applicable Employee's paychecks and reimbursed to the Debtors. Because Employees pay all premiums for LTD coverage, I believe the Debtors do not owe any amounts in connection with this Employee Benefit.

    *c.  Savings Plans*

103.    I have been informed that the Debtors offer an employee share ownership plan (the "**ESOP**") for their Employees. The ESOP is a retirement savings plan administered by the Olympia Trust Company ("**Olympia Trust**"). Under the ESOP, an Employee may contribute up to 5% of his or her gross salary on a pre-tax basis, through voluntary payroll deductions, to the ESOP. It is my understanding that these contributions are deducted from the paychecks of participating Employees and paid to Olympia Trust. In the past, Olympia Trust would then purchase stock in Debtor Tuscany International Drilling Inc. on behalf of the applicable Employee. However, as of November 30, 2013, the Debtors ceased offering stock to their Employees under the ESOP. As of the date hereof, I understand each Employees' investments are being held by Olympia Trust in cash until an alternative investment vehicle is chosen. Currently, eleven (11) Employees participate in the ESOP.

104.    Pursuant to their agreement with Olympia Trust, the Debtors are required to make matching contributions to the ESOP. I have been informed that the Debtors paid approximately $18,567 in connection with matching contributions for the fourth quarter of 2013. The Debtors expect that the total aggregate amount of contributions in the first quarter of 2014

will be similar to the amount paid for the fourth quarter of 2013.  Accordingly, the Debtors

request authority to make matching contributions under the ESOP in 2014.

     *d.  Workers' Compensation*

     105.    I have been advised that under the laws of Alberta, the Debtors are

required to participate in workers' compensation programs administered by the Alberta

government to provide their Employees with workers' compensation coverage for claims arising

from or related to their employment with the Debtors.

     106.    Employees working at the Headquarters are covered under a workers'

compensation program administered by the Alberta Workers' Compensation Board (the

"**WCB**").  I have been informed that the Debtors pay the WCB approximately $3,200 per year on

a quarterly basis for workers' compensation coverage, and there is no deductible per occurrence.

Under Alberta law, upon the filing of a claim by an eligible Employee, the WCB pays the claim

amount directly to the Employee and the Debtors are not responsible for reimbursing the WCB.[23]

     107.    I believe it is critical that the Debtors be permitted to continue their

workers' compensation program and to pay outstanding prepetition claims, taxes, charges,

assessments, premiums, and third party administrator fees in the ordinary course of business

because alternative arrangements for workers' compensation coverage would most certainly be

more costly, and the failure to provide coverage may subject the Debtors and/or their officers to

severe penalties.  It is my understanding that to facilitate the ordinary course handling of

workers' compensation claims, the Debtors further request authority, in their sole discretion, to

lift the automatic stay of Bankruptcy Code Section 362 to allow workers' compensation

claimants to proceed with their claims under the applicable insurance policy or program and to

---

[23]     It is my understanding that the Debtors do not have any obligations to provide workers' compensation coverage for the Brazil Employee.

01:14961762.2

43

allow the Debtors or their insurance providers and/or third party administrators to negotiate, settle and/or litigate workers' compensation claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

### e. Honoring of Prepetition Benefits

108.    As described above, certain of the Employee Benefits remained unpaid or unprovided as of the Petition Date because certain obligations of the Debtors under the applicable plan, program, or policy accrued either in whole or in part prior to the commencement of these Chapter 11 Cases, but will not be required to be paid or provided in the ordinary course of the Debtors' business until a later date. The Debtors seek authority to pay or provide as they become due all prepetition Employee Benefits that have already accrued and that are described above. It is my understanding that the Debtors estimate that the aggregate accrued amount of such prepetition Employee Benefits is approximately $16,015.

### iv.    Continuation of Workforce Programs Postpetition

109.    In the Workforce Obligations Motion, the Debtors also request confirmation of their right to continue to perform their obligations with respect to all Workforce Programs, except as otherwise indicated therein. I believe that the Workforce Programs are essential to the Debtors' efforts to maintain Workforce morale and minimize attrition. I further believe that the expenses associated with the Workforce Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Workforce Programs were discontinued.

110.    Notwithstanding the foregoing, I have been informed that the Debtors reserve the right to evaluate all Workforce Programs and to make such modifications, including terminating any particular plan, program, or policy, as may be necessary or appropriate during the pendency of these cases.

v.   Payment to Independent Directors

111.   In the ordinary course of business, I understand that the Debtors pay fees and expenses on a quarterly basis to three (3) independent members of Tuscany International Drilling Inc.'s board of directors (the "**Independent Directors**").  The Independent Directors' service is required pursuant to the Directors' governing documents and, accordingly, it is essential that the Debtors be authorized to pay all prepetition amounts accrued as of the Petition Date to the Independent Directors.  I have been informed that as of the Petition Date, the Debtors estimate that the aggregate accrued but unpaid amounts owed to the Independent Directors is $25,792.  In addition, out of an abundance of caution, the Debtors request authority to continue to pay fees and expenses to the Independent Directors on a postpetition basis in the ordinary course of business.

vi.   Payment to Administrators

112.   With respect to the Employee compensation and benefits described above, I understand that the Debtors contract with several vendors to administer and deliver payments or other benefits to their Employees (the "**Administrators**").  The Debtors pay these Administrators' fees and expenses incurred in connection with providing such services.

113.   For example, I have been informed that the Debtors, in the ordinary course of business, pay monthly fees to Administrators as follows: (a) $135 (on average) to ADP in connection with payroll administration; (b) $1,700 to Olympia Trust in connection with the administration of the Savings Plan; which total approximately $1,835 per month, collectively.

114.   In conjunction with the Debtors' payment of Prepetition Workforce Obligations and continued performance under Workforce Programs, I have been advised that it is necessary to obtain specific authorization to pay any claims of the Administrators on a postpetition basis, including prepetition claims to the extent necessary to ensure uninterrupted

delivery of certain benefits to the Workforce. I believe that the Administrators may fail to adequately and timely perform or may terminate their services to the Debtors unless the Debtors pay the Administrators' prepetition claims for administrative services rendered and expenses incurred. I further believe that a need to engage replacement Administrators postpetition likely would cause significant disruption to the payment of benefits and other obligations to the Workforce. Accordingly, the Debtors submit that the payment of claims owed to the Administrators is in the best interest of the Debtors' estates.

vii.    Honoring of Prepetition Checks

115.    I have been advised that, prior to the Petition Date, the Debtors may have paid certain of their Prepetition Workforce Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Workforce Obligations, the Debtors request that the Court enter an order requiring the Debtors' banks to honor any such checks which are drawn on the Debtors' accounts, and authorizing the banks to rely on the representations of the Debtors as to which checks are subject to this Workforce Obligations Motion. To the extent that any such checks are nevertheless refused payment, the Debtors additionally request authority to issue replacement checks and to reimburse their Workforce for any loss resulting from the dishonoring.

C.    **Tax Motion**

116.    In the Tax Motion, the Debtors seek entry of an order pursuant to Bankruptcy Code Sections 105(a), 363(b), 506(a), 507(a)(8), and 541 and Bankruptcy Rule 6003, authorizing them to pay, in their sole discretion, but subject to the terms and provisions of any cash collateral and/or postpetition financing agreement made by the Debtors or order entered by the Court, any prepetition tax and fee obligations including, without limitation, sales, use, and excise taxes; income or gross receipts taxes; franchise taxes; real and personal property

taxes; business license, registration, commercial activity or other business, occupation or regulatory taxes or fees; any other types of taxes, fees, or similar charges; and any penalty, interest, or similar charges in respect of such taxes (collectively, the "**Taxes and Fees**")[24] owing to certain federal, state, provincial and local governmental entities in the United States and Canada, including as listed on Exhibit B to the Tax Motion (the "**Taxing Authorities**"). It is my understanding that the Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees under the Tax Motion to $25,000 unless further authorization is obtained from this Court.

117.   For the avoidance of doubt, it is my understanding that the requested authorization would be discretionary, allowing the Debtors, among other things, to elect to pay Taxes and Fees as to which their officers and directors may have personal liability in the event of nonpayment by the Debtors, before other Taxes and Fees; would be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate; and would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.

118.   In addition, the Debtors request in the Tax Motion that the Court authorize and direct the Debtors' banks to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid

---

[24]     The Debtors incur various taxes related to their employees and are separately required to withhold certain amounts from each employee's paycheck on account of things such as social security and FICA in the U.S., and Canadian Pension Plan payments and Employment Insurance premiums in Canada. It is my understanding that such payroll, withholding, and other employee-related tax obligations are separately addressed in the Motion of Debtors for Order under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 (i) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (ii) Confirming Right to Continue Workforce Programs on Postpetition Basis, (iii) Authorizing Payment of Withholding and Payroll-Related Taxes, (iv) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Workforce Programs, and (v) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments, which is contemporaneously filed herewith.

as of the Petition Date, and authorize the Debtors' banks and financial institutions to rely on the

representations of the Debtors as to which checks and fund transfers should be honored and paid

in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable

accounts to cover such payments.

119.    As set forth in the Tax Motion, it is my understanding that the Taxes and

Fees at issue are appropriate for payment to the extent that they are priority or secured claims

that are payable in full or, alternatively, under the personal liability theory or the doctrine of

necessity.  I believe that by paying the Taxes and Fees in the ordinary course of business, as and

when due, the Debtors will avoid unnecessary disputes with the Taxing Authorities—and

expenditures of time and money resulting from such disputes—over myriad issues that are

typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

120.    Prior to the Petition Date, the Debtors incurred obligations to federal,

state, provincial and local governments in the United States and Canada.  Although, as of the

Petition Date, I believe the Debtors were substantially current in the payment of assessed and

undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period may

not yet have become due.  It is my understanding that certain prepetition Taxes and Fees may

not be due until the applicable monthly, quarterly, or annual payment dates—in some cases

immediately and in others not until next year.[25]  I have been informed that in 2012, the Debtors

paid approximately $25,000 on account of Taxes and Fees.

---

[25]      In addition, certain taxes, such as the Canadian Goods and Services Tax (the "GST"), are reconciled with the applicable Taxing Authority on a monthly basis.  In the case of the GST, the Debtors are obligated to collect GST from customers who purchase goods or services from the Debtors, and the Debtors are obligated to pay GST to vendors who provide goods and services to the Debtors.  At the close of each month, the Debtors file a report with the Canada Revenue Service.  It is my understanding that, in the event that the Debtors have paid a greater amount of GST than they have collected during the applicable month, the Canada Revenue Service will issue a refund to the Debtors.  In the event that the Debtors have collected a greater amount of GST from their customers than they have paid during the month, the Debtors will be obligated to pay the excess GST to the Canada Revenue Service.

121.   I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful Chapter 11 process.  It is my understanding that, if such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (a) the obligations are priority, secured, or unsecured in nature, (b) the obligations are proratable or fully prepetition or postpetition, and (c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees and costs are priority, secured, or unsecured in nature.

122.   Moreover, I have been advised that certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

123.   I have been informed that certain of the Taxing Authorities may not have been paid or may have been sent checks and/or fund transfers for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, Taxes and Fees have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable and, thus, any checks or fund transfers will be issued on a postpetition basis.  Accordingly, the Debtors seek entry of an order authorizing and directing their banks and other financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers issued by the Debtors to the Taxing Authorities in payment of Taxes

and Fees that had not been honored and paid as of the Petition Date, and authorizing the

Debtors' banks and financial institutions to rely on the representations of the Debtors as to

which checks and fund transfers should be honored and paid in respect of Taxes and Fees,

provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

## III.    CONTINUING VENDOR MOTIONS

### A.    Critical Vendor Motion

124.    In the Critical Vendor Motion, the Debtors seek entry of interim and final

orders granting them authority to pay the prepetition fixed, liquidated, and undisputed claims

(the "**Critical Vendor Claims**") of certain critical suppliers of goods and services, with whom

the Debtors continue to do business and whose goods and services are essential to the Debtors'

and subsidiaries' operations (the "**Critical Vendors**").  It is my understanding that the Debtors

will attempt to condition the payment of individual Critical Vendor Claims on the agreement of

the Critical Vendor to continue supplying goods and/or services to the Debtors on the same

trade terms that, or better trade terms than, such Critical Vendors offered the Debtors

immediately prior to the Petition Date or, if more favorable, within the 60 day period prior to

the Petition Date, or pursuant to such other trade practices and programs that are favorable to

the Debtors.  In the Critical Vendor Motion, The Debtors seek to reserve the right to negotiate

new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor

Claim.  The Debtors further propose to limit the aggregate amount of payments to be made on

account of Critical Vendor Claims to $1.4 million unless further authorization is obtained from

this Court.

125.    Additionally, I have been informed that, as of the Petition Date, the

Debtors had outstanding prepetition purchase orders (collectively, the "**Outstanding Orders**")

with several suppliers (collectively, the "**Suppliers**") for ordinary course goods and services that had not yet been delivered as of the Petition Date and which I believe are integral to the Debtors' ongoing business operations.  Accordingly, the Debtors seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders for (a) shipments of goods delivered to and accepted by the Debtors on and after the Petition Date and (b) the provision of services to the Debtors on and after the Petition Date at the Debtors' request will be entitled to administrative expense priority status.

126.    In addition, the Debtors request in the Critical Vendor Motion that the Court authorize and direct the Debtors' banks and financial institutions to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of obligations owed to (a) the Critical Vendors and (b) the Suppliers on account of the Outstanding Orders, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of such obligations, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

i.    Payment of Critical Vendor Claims is Essential to the Debtors' Continued Operations During the Chapter 11 Cases

127.    As discussed above, the Debtors provide technologically advanced drilling equipment, products, and services to oil and gas exploration and production companies in South America.  The Debtors' ongoing business is dependent upon their ability to fulfill their obligations to these companies, which, in turn, is dependent upon the Debtors' and their subsidiaries' access to various essential goods and services.  I believe that payment of the Critical Vendor Claims is vital to the Debtors' and their subsidiaries' ability to deliver their services and, thus, to their effort to preserve and maximize value for all stakeholders.

128.   I believe that many of the Debtors' vendors and service providers will continue to do business with them after commencement of these cases because doing so simply makes good business sense.  In many cases, however, I  anticipate that certain Critical Vendors will: (a) refuse to deliver goods and services without payment of their prepetition claims; or (b) refuse to deliver goods and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors.  Accordingly, in the Critical Vendor Motion, the Debtors request authorization to pay the Critical Vendor Claims of such vendors and service providers, subject to the criteria below, because payment of such claims is necessary to achieve their chapter 11 objectives and preserve value for their various constituencies.

ii.    Stringent Criteria Will Be Used to Identify Critical Vendors

129.   I understand that, in order to ensure that the Debtors correctly identify their Critical Vendors, certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships, have conducted, and will continue to conduct, an extensive analysis and review of the Debtors' immediate needs for goods and services.

130.   I understand that, as part of such analysis and review, the Debtors have used, and will continue to use, the following criteria to determine which of the Debtors' vendors and service providers are Critical Vendors: (a) whether the vendor or service provider is a sole-source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement would result in significantly higher costs; (c) whether quality requirements, geographic constraints, customizations, or other specifications prevent the Debtors or their subsidiaries from obtaining the necessary goods or

services from alternative sources within a reasonable timeframe; (d) whether, if the vendor is not a sole source provider, the Debtors or their subsidiaries have insufficient inventory of goods or in-house capabilities to continue operations while a replacement is found and put into place; (e) whether a vendor or service provider is contractually obligated to continue to provide goods and services but the Debtors or their subsidiaries cannot afford the time and expense of an enforcement action if the vendor or service provider wrongfully refuses to perform, and in fact refuses to perform; (f) whether a vendor or service provider has possession of goods, products, or other deliverables as to which they are able to claim a possessory lien and, thus, to decline to deliver such items to the Debtors or their subsidiaries without payment; (g) whether a vendors' prepetition claim is entitled to administrative expense status under Bankruptcy Code Section 503(b)(9); and (h) whether a vendor or service provider meeting any of the aforementioned standards in (a) through (g) refuses to, demands pricing or trade terms that constitute an effective refusal to, or is likely financially unable to, provide goods or services to the Debtors on a postpetition basis if the prepetition balances are not paid.  I believe that this process has appropriately identified, and will continue to appropriately identify, only those vendors and service providers that are critical to the estates.

iii.  <u>Types of Goods and Services Giving Rise to Critical Vendor Claims Evidence Necessity for Payment</u>

131.    Among the types of Critical Vendors identified by the Debtors are certain providers of essential parts and equipment used in the operation of the Debtors' and their subsidiaries' rigs.  I believe that these vendors are critical to the Debtors' businesses because they provide parts that are, in many instances, custom made for the Debtors' and their subsidiaries' rigs, which other vendors would be unable to replicate within a reasonable time or at a reasonable cost to the Debtors.  In addition, it is my understanding that many of the Critical

Vendors possess unique technical knowledge and skills required to maintain and repair the Debtors' and their subsidiaries' equipment. Even in those instances where the Debtors could potentially find a replacement vendor to provide the goods and services necessary to maintain and operate their equipment, I believe that the time and other factors involved in replacing such Critical Vendors would be disruptive, cost-prohibitive and, in certain instances, impossible.

132.    As described in greater detail in the herein, the Debtors derive nearly all of their revenue from their rigs. Therefore, I believe that any delay in the provision of integral parts and equipment or servicing of the Debtors' and their subsidiaries' equipment and any disruption to the relationship between the Debtors and these Critical Vendors would cause irreparable harm to the Debtors' businesses.

133.    I believe that many of the Critical Vendors have already discontinued their credit terms with the Debtors and required cash on demand, due in part to the Debtors' financial instability. Accordingly, the I believe that there is a high likelihood that such Critical Vendors would no longer do business with the Debtors if they are not paid on account of any outstanding prepetition claims. Any refusal by the Critical Vendors to provide essential goods or perform key services would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtors' businesses.

iv. <u>Certain Critical Vendors Are Also Foreign Vendors</u>

134.    Further complicating the Debtors' dealings with their Critical Vendors is the fact that the Debtors' businesses are international in scope. In the ordinary course of their businesses, the Debtors obtain parts, equipment, and services from numerous Critical Vendors that are located in foreign countries, including Canada. I believe that the parts, equipment, and

services provided by these foreign Critical Vendors are necessary to preserve the Debtors' and their subsidiaries' operations and service their customers.

135.   I have been informed that, among the reasons for satisfying the Critical Vendor Claims is the fact that the majority of the Critical Vendors are foreign entities that may not be subject to the jurisdiction of this Court.  Thus, efforts by the Debtors to enforce the Bankruptcy Code against them could be expensive, time-consuming and, possibly, of little practical value.  Further, I am concerned that because these foreign Critical Vendors may not feel that the Bankruptcy Code can be enforced against them, some may (a) file lawsuits in foreign courts and obtain judgments against the Debtors or their subsidiaries, (b)  exercise "self help" remedies and seize valuable assets that the Debtors or their subsidiaries hold abroad, or (c) interfere with valuable foreign relationships to secure payment on the Critical Vendor Claims.

136.   Foreign vendors are often unfamiliar with the chapter 11 process, particularly those in countries with liquidation-oriented insolvency regimes.  As a result, it is my belief that absent prompt and full payment, the foreign Critical Vendors are likely to refuse to provide the parts, equipment, and services that are required by the Debtors and their subsidiaries during the pendency of the  Chapter 11 Cases.  Even if they do not take such drastic action, it is likely that the foreign Critical Vendors will delay providing such parts, equipment, and services and thereby expose the Debtors' estates to significant and irreparable economic harm.

137.   Under the circumstances, I believe that paying the Critical Vendor Claims is both necessary and essential to their ability to achieve their chapter 11 objectives and preserve value for their various constituencies.

138.    I understand that approximately $1.4 million is owed to Critical Vendors as of the Petition Date.  Accordingly, the Debtors request authority to make payments on account of Critical Vendor Claims in an aggregate amount of up to $1.4 million in the event that certain Critical Vendors did not provide the Debtors with invoices prior to the Petition Date for all prepetition amounts owed.

v.    Proposed Terms and Conditions for Payment of Critical Vendor Claims

139.    As noted above, I understand that the Debtors will attempt to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying goods or services to the Debtors on trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, within the 60 day period prior to the Petition Date (the "**Customary Trade Terms**").  In the Critical Vendor Motion, the Debtors seek to reserve the right to negotiate new trade terms (the "**Minimum Credit Terms**") with any Critical Vendor as a condition to payment of any Critical Vendor Claim, in the Debtors' discretion.

140.    I understand that to ensure that the Critical Vendors deal with the Debtors on either Customary Trade Terms or Minimum Credit Terms, the Debtors propose that a letter agreement (a "**Trade Agreement**") be sent to the Critical Vendors for execution, together with a copy of the Order granting the Critical Vendor Motion.

141.    It is my understanding that the Debtors seek only the authority to enter into Trade Agreements when the Debtors determine, in their sole discretion, that payment of such Critical Vendor Claims is necessary to enable the Debtors to realize their chapter 11 objectives and that such Trade Agreements are advisable.  The Debtors also seek authority to make payments on account of Critical Vendor Claims in the absence of a Trade Agreement if

the Debtors determine, in their business judgment, that failure to pay such Critical Vendor

Claims will result in harm to the Debtors' business operations and there is no reasonable

likelihood that the Debtors will negotiate an acceptable Trade Agreement with the applicable

vendors and/or service providers.

142.   It is my understanding that, by agreeing to provide Customary Trade

Terms or Minimum Credit Terms, the Critical Vendors are extending unsecured postpetition

credit to the Debtors for the benefit of all creditors.  Such Customary Trade Terms or Minimum

Credit Terms maintain the credit terms that the Debtors had prior to the Petition Date, or

provide other acceptable credit terms, and may provide the Debtors with more favorable terms

for unsecured credit than currently provided by the Critical Vendors or available elsewhere.

Accordingly, I believe that the treatment of the valid Critical Vendor Claims set forth in the

Critical Vendor Motion in exchange for Customary Trade Terms or Minimum Credit Terms is

in the best interests of the Debtors and their estates and I have been informed that it should be

approved by the Court in accordance with Bankruptcy Code Section 364(b).

143.   In the event that a Critical Vendor under a Trade Agreement refuses to

supply goods and/or services to the Debtors on Customary Trade Terms or Minimum Credit

Terms (or such other terms as are agreed by the parties) following receipt of payment on its

Critical Vendor Claim, or otherwise fails to comply with its Trade Agreement with the Debtors,

the Debtors seek authority in the Critical Vendor Motion to return the parties to the positions

they held immediately prior to entry of the Order approving the Critical Vendor Motion with

respect to all prepetition claims.  Further, the Debtors seek authority in the Critical Vendor

Motion, in their sole discretion and without further order of the Court to: (a) declare that any

Trade Agreement between the Debtors and such Critical Vendor is terminated; (b) declare that

payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity; and (c) recover or seek disgorgement of any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceed the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense. In addition, the Debtors seek to reserve the right to seek damages or other appropriate remedies against any breaching Critical Vendor.

144.    In the Critical Vendor Motion, the Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five business days following the Debtors' notification to the Critical Vendor of such a default; or the Debtors, in their discretion, reach a favorable alternative agreement with the Critical Vendor.

145.    I believe that the relief requested in the Critical Vendor Motion is necessary to permit the Debtors to obtain the timely delivery of goods from the Critical Vendors and uninterrupted provision of services from the Suppliers.

**B.    Shippers Motion**

i.    Distribution Claims

146.    In the Shippers Motion, the Debtors seek authority to pay, in their discretion, the  prepetition shipping and related claims (the "**Distribution Claims**") that are owed, either directly or indirectly, to (i) third-party shippers, haulers, common carriers, and other transporters (collectively, the "**Shippers**") and (ii) third-party freight forwarders (the

"**Freight Administrators**," and collectively with the Shippers, the "**Distribution Vendors**")

for prepetition services provided to the Debtors (the "**Distribution Services**"), to the extent the

Debtors determine, in the exercise of their business judgment, that such payments are necessary

or appropriate to (a) secure the delivery of critical parts and supplies to the Debtors or their

Non-Debtor Affiliates or (b) satisfy the liens, if any, in respect of amounts owed to such parties.

It is my understanding that, as of the Petition Date, approximately $60,000 is due and owing to

the Distribution Vendors on account of prepetition Distribution Claims.  In addition, it is

possible that certain amounts may become due in connection with services provided by the

Distribution Vendors prepetition that have not yet been billed.  Accordingly, the Debtors seek

authority to pay any prepetition Distribution Claims not to exceed $60,000 in the aggregate

without further Court order.

   ii.   Terms and Conditions of Payment

          147.   It is my understanding that the Debtors propose that all payments to the

Distribution Vendors made under the Shippers Motion be subject to certain conditions set forth

in the Shippers Motion, including the Distribution Vendor's agreement to continue to provide

goods or services to the Debtors on terms and conditions (including credit terms) as good or

better than those that existed within sixty (60) days of the Petition Date (the "**Customary**

**Terms**") during the pendency of the bankruptcy case.

          148.   In the Shippers Motion, the Debtors further request that all applicable

banks and other financial institutions be authorized and directed, when requested by the Debtors

in their sole discretion, to receive, process, honor, and pay any and all checks drawn on the

Debtors' accounts and to honor all funds transfer requests made in respect of payments made by

the Debtors to the Distribution Vendors, whether such checks were drawn or funds transfer

requests submitted prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments. Further, the Debtors request that such banks and other financial institutions be authorized to rely on the Debtors' representations as to the identification of checks drawn and funds transfer requests made to satisfy the Distribution Claims pursuant to the Shippers Motion.

149.    As more particularly described in the Shippers Motion, in the ordinary course of their business, the Debtors pay certain Shippers and Freight Administrators in connection with the delivery of materials, equipment, machinery, and other goods from the Debtors' suppliers to the Debtors' non-debtor subsidiaries in South America, where the Debtors' primary business operations are located.

150.    It is my understanding that the Debtors rely heavily upon Shippers, including private trucking, air, and cargo shippers, for delivery of essential products from certain of the Debtors' suppliers, the majority of which are located in Houston, Texas, to the Debtors' non-debtor operating subsidiaries in South America. It is my understanding that these shipments are essential to the Debtors' operations and continued business because they would be unable to maintain and operate their rigs and, thus, unable to provide services to their customers, without such shipments. I have been informed that most of the Debtors' freight costs are attributable to inbound freight from the Debtors' suppliers, which is generally transported via ship from the United States to South America. I believe that the Debtors, either directly or through the Freight Administrators, are generally responsible for any customs, duty, export, or similar charges.

151.    Although the Debtors may pay certain large Shippers directly, I understand that they also substantially rely upon Freight Administrators to manage their freight

needs.  The specific services performed by the Freight Administrators vary depending on the particular needs of the Debtors' businesses and the specialty of the particular Freight Administrator, but their services can include such things as paying Shippers, tracking cargo, booking transportation for freight, consolidating or forwarding freight, preparing and filing documentation associated with shipments, coordinating the pick-up and drop off of cargo, addressing scheduling issues and coordinating operational and financial aspects of the shipment process, such as ocean freight, customs clearing and inland transportation (i.e., shipment from the port of entry to one of the Debtors' facilities).

152.   With respect to payment of Shippers, although the Debtors may at times contract directly with the individual Shippers, it is my understanding that in most instances the Shippers invoice the applicable Freight Administrator that performs freight payment processing. Such Freight Administrators then pay the Shippers on the Debtors' behalf and subsequently settle accounts with the Debtors.

153.   It is my understanding that the Debtors seek to pay the Distribution Claims for several reasons.  First, I have been informed that many of the Distribution Vendors likely will assert possessory or other liens on any items currently in their possession if their prepetition claims are not paid.  I have also been informed that the perfection and maintenance of liens is, in most cases, dependent upon possession, so the Distribution Vendors likely would refuse to deliver or release such items until their claims have been satisfied and the liens released.  The values of these items generally exceed the amount of the outstanding Distribution Claims and, thus, it is my understanding that most of the Distribution Vendors ultimately will hold secured claims for the prepetition Distribution Claims.  Irrespective of the amount and validity of their liens, I believe the mere assertion of possessory or other liens will delay access to the materials,

equipment, and machinery used by the Debtors' and their non-debtor subsidiaries, thereby severely, if not irreparably, damaging the Debtors' businesses, and their ability to maximize estate value, and their prospects for a successful reorganization.

154.    Furthermore, if the prepetition Distribution Claims are not paid, I believe many Distribution Vendors may refuse to perform additional services for the Debtors. In such event, the Debtors will incur significant additional expenses (such as premium shipping rates) to replace these Distribution Vendors, which costs likely will exceed the amount of unpaid prepetition Distribution Claims that the Debtors request permission to pay hereunder.

155.    More importantly, I believe that locating entities to replace the Distribution Vendors would be difficult, if not impossible. For example, as noted above, the Debtors rely upon the specialized freight payment and negotiation services provided by the Freight Administrators. Absent these services, the Debtors would be required to negotiate with, and administer separate accounts with many different Shippers. Further, the Debtors benefit from lower shipping prices obtained through the Freight Administrators' negotiating power with Shippers. It is my belief that if the Debtors were required to switch to other Freight Administrators, they would incur significant operational disruption and increased costs.

156.    At the very least, I believe that replacing a Distribution Vendor will materially delay the transport and delivery of essential parts and supplies to the Debtors' non-debtor subsidiaries. Such delays could cause a material disruption in such subsidiaries' operations and, in turn, the delivery of their services to customers. Thus, the Debtors' ability to continue successfully operating their businesses will be jeopardized if they are forced to replace one or more of the Distribution Vendors.

### C.    Ecuador Payment Motion

157.    In the Ecuador Payment Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to pay certain prepetition obligations owing to or for the benefit of (a) all employees of the Debtors located in Ecuador (the "**Ecuador Employees**"), (b) all creditors located in Ecuador from which the Debtors obtain goods, materials, equipment, and services and otherwise transact business, including, but not limited to, suppliers, manufacturers, shippers, freight administrators, warehousemen, mechanics, utility providers, insurance providers, taxing and other governmental authorities, and all creditors utilized in connection with the compensation or provision of benefits to the Ecuador Employees (collectively, the "**Ecuador Creditors**" and, together with the Ecuador Employees, the "**Ecuador Parties**"), and (c) all creditors located in Colombia, Brazil or any other South American country who may have prepetition claims against the Debtors (the "**Additional South America Parties**" and, together with the Ecuador Parties, the "**Foreign Parties**"), (ii) confirming the Debtors' right to continue to pay or otherwise honor obligations owing to or for the benefit of the Foreign Parties postpetition, in the ordinary course of business, and (iii) waiving the noticing requirements set forth in Bankruptcy Rules 2002 and 2015 and Local Rule 2002-1 with respect to the Foreign Parties (the "**Noticing Requirements**").   I understand that such relief is warranted because (a) the practical jurisdiction of the Court does not extend to the Foreign Parties, making the protections afforded to the Debtors under the Bankruptcy Code not readily enforceable against the Foreign Parties and (b) the payment of the Foreign Claims and the waiver of the Noticing Requirements is necessary to protect their assets and operations

located in Ecuador and other South American countries,[26] preserve their foreign relationships, and ultimately achieve their chapter 11 objectives.

158.    The Debtors further request in the Ecuador Payment Motion that the Court authorize and direct the Debtors' banks and financial institutions to receive, process, honor and pay all prepetition and postpetition checks and fund transfers on account of the Foreign Claims, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers should be honored and paid in respect of the Foreign Claims, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

159.    As discussed above, the Debtors derive all of their revenue from their operations in Colombia, Brazil, and Ecuador. The Colombian and Brazilian operations are run by certain of the Debtors' Non-Debtor Affiliates. However, the Debtors' Ecuadorian operations are operated by the Ecuador Branch Office of TID. It is my understanding that the Ecuador Branch Office was included as a part of TID in order to obtain certain tax benefits that resulted from such an organizational structure. Although the Ecuador Branch Office is structurally a part of TID, it generally functions as a separate and distinct entity from TID. Revenue received from customers of the Ecuador Branch Office is deposited into local bank accounts reserved for the Ecuador Branch Office is not typically comingled with other funds in TID's main operating accounts. Instead, I understand that the revenue generated by the Ecuador Branch Office is used to fund its operational expenses. Accordingly, in practice, the Ecuador Branch Office operates almost entirely independently of TID, and functions in a substantially similar manner to the Non-Debtor Affiliates that manage the Debtors' operations in Colombia and Brazil.

---

[26]    Other than those assets and operations located in Ecuador, the Debtors' assets and operations in South America are owned and managed, respectively, by certain of their Non-Debtor Affiliates.

160.    In the ordinary course of their businesses, the Debtors pay for goods, materials, equipment, and services obtained from, and engage in other business relationships with, numerous Ecuador Creditors in order to support their operations in Ecuador.  The Debtors also employ approximately 330 unionized Ecuador Employees at the Ecuador Branch Office.  I believe that, unless the Ecuador Branch Office continues to have unfettered access to goods, materials, equipment, and services from, and uninterrupted business and employment relationships with, the Ecuador Parties, their ability to continue operations as a going concern will rapidly erode.

161.    The Debtors also have business relationships with a minimal number of Additional South America Parties located in Colombia, Brazil, and various other South American countries, each of whom may have a de minimis Foreign Claim against the Debtors.

162.    I believe that failure to promptly pay the Foreign Claims would severely disrupt their access to the goods and services provided by the Foreign Parties.  Additionally, in the case of the Ecuador Branch Office, should the Ecuador Parties even receive notice of the Chapter 11 Cases, the I believe that many of them will be wary of continuing to do business with the Debtors, in part because of the material differences in Ecuadorian insolvency laws and their likely unfamiliarity with the chapter 11 reorganization process and the protections afforded to creditors thereunder.[27]  I further believe that providing notice of the Chapter 11 Cases to the Additional South America Parties could have a similar result in Colombia, Brazil, and other South American countries.  Accordingly, I believe that the relief requested in the Ecuador Payment Motion is necessary in order to allow them to continue uninterrupted their operations

---

[27]    For example, the Ecuadorian insolvency regime is generally liquidation-oriented and rarely will a debtor reorganize under such laws.

01:14961762.2

NY\6150249.13

in Ecuador, thereby avoiding the loss of significant revenue generated by the Ecuador Branch Office.

i.    Payment of Foreign Claims

163.    Paramount among the reasons for satisfying the Foreign Claims is the fact that the Foreign Parties are likely not subject to the jurisdiction of this Court. Accordingly, I believe that efforts by the Debtors to enforce the Bankruptcy Code against them will be expensive, time-consuming and, ultimately, futile. Further, after discussions with their local Ecuadorian counsel, I understand that the Debtors are concerned that because Ecuador Creditors may feel that the Bankruptcy Code cannot be enforced against them, some of the Ecuador Creditors may (a) file lawsuits in foreign courts and obtain judgments against the Debtors, (b) exercise "self help" remedies and seize valuable assets that the Debtors hold abroad, or (c) interfere with valuable foreign relationships to secure payment on the Foreign Claims.

164.    Additionally, as noted above, Foreign Parties are often unfamiliar with the chapter 11 process, particularly in a country such as Ecuador, which does not have an insolvency regime comparable to that in the United States. As a result, I believe that absent prompt and full payment, the Ecuador Creditors are likely to refuse to provide the goods, materials, equipment, and services and to engage in other business relationships that are required by the Debtors during the pendency of these Chapter 11 Cases. Even if they do not take such drastic action, I believe that it is likely that the Ecuador Creditors will delay providing such goods, materials, equipment, and services, thereby jeopardizing the Debtors' cash flow and exposing the Debtors' estates to significant and potentially irreparable economic harm.

165.    I believe that this unfamiliarity with the chapter 11 process would be even more pronounced among the Debtors' Ecuador Employees. The Debtors employ 330 unionized workers in their Ecuador Branch Office. Any interruption in the payment of wages or benefits

to the Ecuador Employees would have a crippling effect on the Debtors' businesses. Even the suggestion that these Ecuador Employees may not be paid could cause the Ecuador Employees to cease working for the Debtors or even retaliate against the Debtors' management or their facilities, causing severe harm to the Debtors' businesses. Additionally, because all of the Ecuador Employees are party to collective bargaining agreements with the Debtors, the concerns of a single employee may quickly be shared with the entire workforce, causing panic among the Ecuador Employees. As a result, absent prompt and full payment to the Ecuador Employees of their wages and benefits, it will likely be impossible for the Debtors to continue their operations in Ecuador and preserve the value of their business.

166.    For the same reasons stated above, I believe that payment of the Foreign Claims of the small number of Additional South America Parties is necessary to avoid potential harm to the Debtors' and their Non-Debtor Affiliates' operations.

ii.    Waiver of Noticing Requirements

167.    I believe that providing notice of the Chapter 11 Cases to the Ecuador Parties would be catastrophic to their operations in Ecuador. Most, if not all, of the Ecuador Creditors are small trade creditors who are likely unfamiliar with the formalities of any bankruptcy proceeding, let alone a proceeding under U.S. bankruptcy law. Even if the Debtors are given authority to pay them in full, should they receive notice of court proceedings in the United States, they could cease doing business with the Debtors. The Ecuador Employees will be similarly apprehensive of the pending Chapter 11 Cases, and the Debtors fear that they will begin seeking alternative employment opportunities, leaving the Debtors with an insufficient workforce to maintain their operations in Ecuador.

168.    I also believe that providing notice of the Chapter 11 Cases to the few Additional South America Parties could cause the Additional South America Parties, who are

likely as unfamiliar with chapter 11 as their Ecuadorian counterparts, to terminate their business with the Debtors.  Moreover, because certain of the Additional South America Parties are located in Colombia and Brazil, where the Debtors' Non-Debtor Affiliates operate, I believe that providing them notice could cause them to incorrectly assume that the Debtors' Non-Debtor Affiliates are also debtors in these Chapter 11 Cases.  This would likely lead to widespread panic among not only the Additional South America Parties, but potentially other vendors and employees as well.

169.    Most importantly, because the Debtors seek to pay each of the Foreign Claims in full and to continue paying obligations owing to the Foreign Parties on a postpetition basis in the ordinary course of business, I believe that the Debtors' failure to provide notice of the Chapter 11 Cases to the Foreign Parties will cause no harm to the Foreign Parties.  It is my understanding that the Noticing Requirements are intended to ensure that all creditors receive proper notice of any actions that could potentially affect their rights so that they may have the opportunity to protect such rights.  However, if the Debtors are authorized to pay all Foreign Claims in full, as requested in this Motion, then the Foreign Parties will have no claims against the Debtors' estates to protect.  Instead, they will be unimpaired and, as such, I believe that a failure to provide notice of the Chapter 11 Cases will not deprive the Foreign Parties of their due process rights.  Further, to the extent that any of the Foreign Parties are determined to be impaired, the Debtors will provide notice as required under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  Accordingly, the Debtors submit that waiver of the Noticing Requirements with respect to the Foreign Parties is warranted under the unique circumstances of these Chapter 11 Cases.

170.    Moreover, I believe that the prepetition secured lenders under the Debtors' existing prepetition credit facility are likely undersecured.  Accordingly, all of the funds that the Debtors propose to use to pay the Foreign Claims is cash collateral of such lenders, who fully support the relief requested in this Motion.

## IV.    CONCLUSION

171.    The Debtors' ultimate goal in these Chapter 11 Cases is the maximization of estate value through a plan process contemplating a lender credit bid, but also a marketing process in the event that other value-enhancing proposals can be obtained.  In the near term, however, to minimize any loss of value of their businesses during these Chapter 11 Cases, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation a chapter 11 plan will be substantially enhanced.

172.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd. day of February 2014.

Tuscany International Holdings (U.S.A.) Ltd.,
et al.
Debtors and Debtors in Possession


Deryck Helkaa
Chief Restructuring Officer of Tuscany
International Drilling Inc.

# Exhibit 1

Tuscany International Drilling Inc. Organizational Chart

# TUSCANY INTERNATIONAL DRILLING INC.



NY/6163113.1