## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:                                             :        Chapter 11
                                                   :
TUSCANY INTERNATIONAL HOLDINGS                     :        Case No. 14-10193 (KG)
(U.S.A.) LTD., et al.,                             :
                                                   :        Jointly Administered
             Debtors.[1]                           :
                                                   :        **Obj. Deadline: March 14, 2014 at 4:00 p.m. (ET)**
                                                   :        **Hearing Date: March 21, 2014 at 10:00 a.m. (ET)**

------------------------------------------------------- x

## MOTION FOR ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS OR NEW STOCK PURSUANT TO A CHAPTER 11 PLAN, (B) APPROVING CERTAIN BIDDING PROTECTIONS, (C) AUTHORIZING AND SCHEDULING A DATE AND TIME FOR AN AUCTION PURSUANT TO SUCH PROCEDURES, AND (D) GRANTING CERTAIN RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (the "**Motion**"), pursuant to sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rules 2002-1(b) and 6004-1(c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (as amended, the "**Local Rules**"), for entry of an order, substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**"), (a) establishing bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "**Bidding Procedures**") for the proposed sale (the "**Plan Sale**"), pursuant to a joint plan of reorganization (the "**Plan**")

---

[1]        The Debtors in these cases are Tuscany International Holdings (U.S.A.) Ltd. and Tuscany International Drilling Inc. The last four digits of Tuscany International Holdings (U.S.A.) Ltd.'s U.S. federal tax identification number are 8192. The last four digits of Tuscany International Drilling Inc.'s Canadian tax identification number are 4278. The address for the Debtors is 1950, 140 – 4 Avenue S.W. Calgary, Alberta, Canada T2P 3N3.

under the Bankruptcy Code, of either (i) all or substantially all of the Debtors' assets, including

its ownership interests in its affiliates and subsidiaries, or (ii) all of the new capital stock (the

"**New Stock**") of Tuscany International Drilling Inc. ("**TID**") as reorganized pursuant to the Plan

("**Reorganized Parent**" and the property described in clauses (i) and (ii), collectively, the

"**Purchased Assets**"); (b) approving the Bidding Protections (as defined below); (c) authorizing

the Debtors to engage in an auction to solicit higher or otherwise better bids for all or a portion

of the Purchased Assets; and (d) certain related relief.  In support of the Motion, the Debtors

respectfully state as follows:

**JURISDICTION AND VENUE**

1.       This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference from the United States District Court*

*for the District of Delaware* dated as of February 29, 2012.  This is a core proceeding under

28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United

States Constitution.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

2.       On February 2, 2014 (the "**Petition Date**"), the Debtors filed voluntary

petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the

"**Chapter 11 Cases**").  The factual background regarding the Debtors, including their business

operations, their capital and debt structures, and the events leading to the filing of these Chapter

11 Cases, is set forth in detail in the Declaration of Deryck Helkaa, Chief Restructuring Officer

of Tuscany International Drilling Inc., in Support of Chapter 11 Petitions and First Day

Pleadings [Docket No. 2] (the "**Helkaa Declaration**"), filed on the Petition Date and fully

incorporated herein by reference.

3.     The Debtors continue to manage and operate their business as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108.  No trustee or examiner has been requested in these Chapter 11 Cases, and no committees have yet been appointed.

**A.      The Loan Agreements and the Restructuring Support Agreement.**

4.     As described more fully in the Helkaa Declaration, TID and certain of its affiliates are party to that certain Third Amended and Restated Credit Agreement, dated December 23, 2013 (the "**Credit Agreement**") with the lenders party thereto (the "**Prepetition Lenders**"), the Bank of New York Mellon, as Global Collateral Agent, Credit Suisse AG, Cayman Islands Branch, as Special Collateral Agent, BNY Mellon Servicos Financeiros DTVM S.A., as Brazilian Collateral Agent (collectively, the "**Collateral Agents**") and Credit Suisse AG, as administrative agent (the "**Prepetition Agent**"). On behalf of the Prepetition Lenders and itself, the Prepetition Agent holds senior, first priority security interests in, and liens upon, substantially all assets of TID and its non-debtor affiliates, including a pledge of each of their stock.  The Debtors believe that, based upon current valuations, the Prepetition Lenders are undersecured.

5.     On January 24, 2014, certain of the Tuscany Entities entered into a forbearance agreement with the Prepetition Lenders under the Credit Agreement, pursuant to which the Prepetition Lenders agreed to forbear from exercising any of their rights or remedies in connection with certain events of default under the Credit Agreement until the earlier of February 3, 2014 or the occurrence of an additional event of default (the "**Forbearance Agreement**").  The Forbearance Agreement provided the Tuscany Entities additional time to continue negotiations with the Prepetition Lenders and other constituencies to develop a consensual plan for the restructuring of their balance sheet and operations.

6.      Prior to the Petition Date, certain of the Prepetition Lenders (the "**DIP Lenders**") agreed to provide debtor in possession financing (the "**DIP Facility**") in the principal amount of $35 million, plus a roll-up of an additional $35 million of prepetition debt.  The DIP Facility was structured as a new tranche of the existing Credit Agreement and is memorialized in the Fourth Amended and Restated Credit Agreement dated as of February 6, 2014.  On February 4, 2014, the Court approved the DIP Facility on an interim basis [Docket No. 52].

7.      As part of their restructuring efforts, on January 31, 2014, the Debtors and certain of their non-debtor affiliates entered into a Restructuring Support Agreement (the "**RSA**") with Prepetition Lenders holding approximately 95% of the prepetition loans.  The RSA contemplates that either the Prepetition Lenders or the DIP Lenders will acquire all or substantially all of the assets of TID in exchange for a credit bid of certain of their debt, effectuated through a plan of reorganization.  Exhibit C to the RSA sets forth the general bidding and marketing process to be employed by the Debtors with respect to the proposed sale of the Purchased Assets, which, importantly, contemplates a process to seek higher and better offers from third parties.  The Bidding Procedures attached to the Bidding Procedures Order are designed to encourage a competitive bidding process as set forth in the RSA.

**B.      The Debtors' Prepetition Marketing Efforts.**

8.      Beginning in late 2012, the Debtors and their foreign subsidiaries and affiliates (the "**Non-Debtor Affiliates**" and, together with the Debtors, the "**Tuscany Entities**") began to experience significant revenue, cash flow, and liquidity challenges, due in large part to low rig utilization, non-payment by certain customers on large overdue accounts receivable and underperforming acquisitions in Brazil and Africa.

9.      As a result of a significant decline in the financial health of the Tuscany Entities, since late 2012, TID's board of directors (the "**TID Board**") has actively pursued and

examined a number of potential strategic alternatives.  TID retained Black Spruce Merchant Capital Corp. ("**Black Spruce**") and Citigroup Global Markets Inc. ("**Citigroup**") as financial advisors on October 10, 2012 and April 8, 2013, respectively.

10.     On May 9, 2013, the TID Board resolved to initiate a formal process to identify, examine, and consider various potential strategic alternatives for the Tuscany Entities with a view to enhancing shareholder value, including, among other alternatives, a sale of a material portion of the assets of TID, a debt or equity financing, a recapitalization, or a merger or other business combination.  The TID Board formed a special committee of independent directors (the "**Special Committee**") to examine these potential strategic alternatives.

11.     In accordance with the Special Committee's directives, over 80 parties were contacted, on a confidential basis, to solicit interest in a potential transaction with TID.  TID subsequently entered into confidentiality agreements with 12 interested parties and provided such parties with access to a virtual data room and additional information to assist with their due diligence.   The proposals received by the Special Committee were either highly conditional, highly dilutive to existing shareholders and not actionable within a reasonable timeframe, or undervalued the assets proposed to be purchased.

C.     **The Debtors' Prepetition Asset Sales.**

12.     On November 14, 2013, TID and Maurel & Prom Drilling Company BV ("**M&P**") entered into definitive agreements with respect to: (i) the sale of TID's then wholly-owned subsidiary, Caroil SAS, to M&P (the "**Caroil Disposition**"), the primary assets of which consisted of nine drilling and workover rigs and associated assets in Africa; and (ii) the sale of two rigs based in South America to M&P (the "**Rig Sale**").   On December 23, 2013, TID completed the Caroil Disposition and on January 16, 2014, TID completed the Rig Sale.  Pursuant to these dispositions, M&P: (i) assumed an aggregate of $50 million of debt

under the Prepetition Loans from the Debtors; (ii) paid to TID an aggregate of $23 million, of which $3.5 million remains in escrow and $19.5 million was applied to reduce the outstanding amount under the Prepetition Loans; and (iii) transferred 109 million common shares (the "**Consideration Shares**") of TID to a special purpose vehicle, which Consideration Shares may either be repurchased and cancelled by TID for no additional consideration, or be directed to be sold to third party purchasers with the proceeds of such sales applied to reduce the outstanding amount under the Prepetition Loans.

13.    Despite the Caroil Disposition and the Rig Sale, the Tuscany Entities remained in an overleveraged position, unable to make interest payments on their Prepetition Loans as scheduled.  Accordingly, in the months preceding the commencement of these cases, they continued to seek refinancing alternatives.  However, faced with a lack of viable financing options and rapidly dwindling liquidity, the Special Committee determined that the chapter 11 filings and the related debtor in possession financing offered by certain of the Prepetition Lenders was necessary to preserve the Debtors' going concern value.

**D.    The Stalking Horse Agreement.**

14.    The Debtors have been, and will continue to be, negotiating an asset purchase agreement (the "**Stalking Horse Agreement**")" by and between TID (the "**Seller**"), NewCo (the "**Stalking Horse Bidder**" or "**Buyer**", as applicable), and Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "**Administrative Agent**" and, together with Seller and Buyer, the "**Parties**"), regarding an acquisition of all or substantially all of the Purchased Assets of TID, including its ownership interests in certain of its subsidiaries.  The current draft form of the Stalking Horse Agreement is attached to this Motion as Exhibit B.  However, because the terms of the Stalking Horse Agreement are still being negotiated and finalized, the Parties reserve all of their rights with respect thereto.  The Debtors expect to file an executed version of

the Stalking Horse Agreement prior to any hearing on this Motion.  Furthermore, the Debtors'

disclosure statement, which is expected to be filed in the near term with this Court, will also

contain a summary of the Stalking Horse Agreement.  Pursuant to the Stalking Horse Agreement,

the Stalking Horse Bidder will provide the aggregate consideration of (i) $125,000,000 if certain

Heli-Rigs are sold by Seller (or an Affiliate thereof) before the Effective Date or (ii)

$155,000,000 if certain Heli-Rigs are not sold by Seller (or an Affiliate thereof) before the

Effective Date, in each case which the Stalking Horse Bidder may allocate, in its sole discretion,

between cash and a credit bid of the Pre-Petition Senior Obligations and/or the DIP Obligations

in exchange for substantially all of the Purchased Assets.  Certain of the key terms of the current

draft form of the Stalking Horse Agreement, which are representative only and still subject to

negotiation, are highlighted below:[2]

| Agreement to Sell and Purchase<br><br>(§ 2.1 of Stalking Horse Agreement) | • On the terms and conditions set forth in the Stalking Horse Agreement, the Plan and the Confirmation Order, at, and effective as of, the Closing, (a) Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall, by Buyer's payment of the Purchase Price, purchase and acquire from Seller, all of Sellers' right, title and interest, free and clear of all Liens (other than Permitted Liens (to the extent not otherwise discharged pursuant to the Plan)), in and to all of the Purchased Assets, including any Purchased Assets acquired by Seller after the date of the Stalking Horse Agreement but prior to the Closing and (b) Buyer shall assume from Seller, and Seller shall assign to Buyer, all of the Assumed Liabilities. |
|---|---|
| Purchase Price; Allocation of Purchase Price Credit Bid Component | • In consideration for the Purchased Assets, and subject to the terms and conditions of the Stalking Horse Agreement, at the Closing, the Buyer and/or one or more Buyer Designees shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay an aggregate amount equal to (i) $125,000,000 if the Heli-Rigs are sold by Seller (or an |

---

[2]  Capitalized terms used in this paragraph but not otherwise defined in the Motion shall have the meaning assigned to them in the Stalking Horse Agreement.  To the extent that the Motion and the Stalking Horse Agreement are inconsistent, the terms of the Stalking Horse Agreement shall control.

| | |
|---|---|
| **(§ 3.1 of Stalking Horse Agreement)** | Affiliate thereof) before the Effective Date or (ii) 155,000,000 if the Heli-Rigs are not sold by Seller (or an Affiliate thereof) before the Effective Date (such amount, the "**Purchase Price**"), comprised as follows: (A) $[_____] for the Equity Interests in the [Panama Subsidiary] (including, without limitation, all rights it or the Seller has with respect to the Centurion Receivable]; (B) $[_____] for the Equity Interests in the [Ecuador Subsidiary] (including, without limitation, all rights it or the Seller has with respect to the CYA Receivable]; (C) $[_____] for the Equity Interests in the [Brazil Subsidiaries] (including, without limitation, all rights it or the Seller has with respect to the HRT Receivable]; (D) $[_____] for the Equity Interests in the [Delaware Subsidiary]; and (E) $[_____] for the other Purchased Assets.  At any time prior to or during the Auction, Buyer may, in its sole discretion, adjust the foregoing initial allocation of the Purchase Price among the Equity Interests in the Acquired Subsidiaries and the other Purchased Assets. |
| | <ul><li>On the Closing Date, the Buyer shall pay or cause to be paid to the Seller all or some lesser portion of the Purchase Price as it elects, in its sole discretion, in the form of a credit bid of the Prepetition Obligations (the "**Purchase Price Credit Bid Component**"), with any balance to be paid in cash (the "**Purchase Price Cash Component**", and together with the Purchase Price Credit Bid Component, the "**Closing Payment**").[3]  If Buyer elects to include a Purchase Price Cash Component in the Closing Payment, Buyer shall pay or cause to be paid to the Seller at closing such amount by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing Date.</li></ul> |
| **Purchased Assets**<br><br>**(§ 2.2 of Stalking Horse Agreement)** | <ul><li>"**Purchased Assets**" shall mean all of Seller's right, title and interests in, to and under the tangible and intangible assets of Seller (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS) described in subsections (a) through (u) below:</li></ul><br>(a)      all of the Equity Interests;<br><br>(b)      all Cash of Seller as of the Closing; |

---

[3] If any cash is required to fund any obligations of Buyer/DIP Lenders to Seller at Closing, concept of Purchase Price Cash Component will result in a deduct to credit bid component of Purchase Price.

(c)      all Accounts Receivable of Seller as of the Closing, including, without limitation, the Centurion Receivable, the CYA Receivable and the HRT Receivable;

(d)      all inventory, supplies, materials and spare parts of Seller as of the Closing (including all rights of Seller to receive such inventory, supplies, materials and spare parts that are on order) and all open purchase orders with suppliers;

(e)      without duplication of the above, all royalties, advances, prepaid assets (excluding prepaid Taxes of Seller), security and other deposits, prepayments and other current assets relating to the Business or the Purchased Assets, the Assigned Contracts and the Assigned Real Property Leases, in each case of Seller as of the Closing (but excluding all interests in the Excluded Insurance Policies and all prepaid assets relating to Contracts that are not Assigned Contracts or Assigned Real Property Leases as of the Closing);

(f)      all Non-Real Property Contracts, including Contracts related to Seller IP and Licensed Intellectual Property, that have been, or are intended to be, assumed by and assigned to Buyer pursuant to Section 2.6 or Section 2.7 of the Stalking Horse Agreement (collectively, the "**Assigned Contracts**");

(g)      all Real Property Leases that have been, or are intended to be, assumed by and assigned to Buyer pursuant to Section 2.6 or Section 2.7 of the Stalking Horse Agreement (the "**Assigned Real Property Leases**");

(h)      all Seller IP;

(i)      all items of machinery, equipment, Drilling Rigs, supplies, furniture, fixtures, leasehold improvements (to the extent of Seller's rights to any leasehold improvements under the Assigned Real Property Leases) and other tangible personal property and fixed assets owned by Seller as of the Closing;

(j)      all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of Seller as of the Closing (except as otherwise described in Section 2.2 of the Stalking Horse Agreement), including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials related to the Business or the Purchased Assets (collectively, the "**Documentary**

**Materials**");

(k)      to the extent related to the Purchased Assets, all claims and causes of action of Seller as of the Closing (regardless of whether or not such claims and causes of action have been asserted by Seller) against Persons (including the Acquired Subsidiaries), and all rights of indemnity, warranty rights, rights of contribution and subrogation, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by Seller as of the Closing (regardless of whether such rights are currently exercisable);

(l)      all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Seller IP and all rights under any confidentiality agreements executed by any third party for the benefit of Seller to the extent relating to the Business or the Purchased Assets;

(m)      all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Current Employees, Former Employees or current or former directors, consultants, independent contractors and agents of Seller or any of its Affiliates or with third parties to the extent primarily relating to the Business or the Purchased Assets (or any portion thereof);

(n)      all of the rights and benefits accruing under all Governmental Approvals, all deposits and prepaid expenses (excluding prepaid Taxes of Seller) held by third parties and/or, to the extent transferable, any Governmental Authority and, to the extent transferable, all bank and deposit accounts;

(o)      the amount of, and all rights to any, insurance proceeds received by Seller (other than any amounts or rights to any insurance proceeds received under any Excluded Insurance Policy) after the date of the Stalking Horse Agreement in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(p)      any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against Seller Parties) arising out of or relating to any of the Purchased Assets as of the Closing (but excluding all interests in the Excluded Insurance Policies);

(q)      all prepaid and deferred items (excluding prepaid Taxes

of Seller) that relate to the Business or the Purchased Assets as of the Closing, including all prepaid rentals and unbilled charges, fees and deposits (but excluding all interests in the Excluded Insurance Policies);

(r)    to the extent transferable, all current and prior insurance policies of Seller that relate to the Purchased Assets or Assumed Liabilities, and all rights and benefits of Seller of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Courts relating to any debtor-in-possession financing obtained by Seller) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in the Excluded Insurance Policies;

(s)    any rights, claims or causes of action as of the Closing of Seller relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contract or Assigned Real Property Lease (including in each case, the Acquired Subsidiaries) in respect of the assets, properties, conduct of business or operations of Seller arising out of events occurring on or prior to the Closing Date, including any Avoidance Actions that relate solely to any Purchased Assets or Assumed Liabilities;

(t)    any rights, claims or causes of action as of the Closing of Seller relating to or arising against the Buyer or any of its Affiliates, Subsidiaries, or Representatives, including any Avoidance Actions against any such Persons; and

(u)    all other assets that are related to or used in connection with the Business and that are owned or leased by Seller as of the Closing.

If at any time after the Closing, Seller is in possession of any Purchased Asset or receives any payment, refund, reimbursement, credit or setoff from any Person in respect of any Purchased Asset, or otherwise acquires or possesses any rights, entitlements or assets in respect of the Purchased Assets, such payments, refunds, reimbursements, credits or set-offs as applicable (or any savings therefrom), shall be held by Seller in trust for the benefit of Buyer and, promptly following the receipt thereof, Seller shall pay over any such amounts to Buyer without set-off or deduction of any kind and/or shall, at Buyer's cost, execute and deliver any instruments of transfer or

11

| | |
|---|---|
| | assignment that are necessary to transfer and assign to Buyer or its designee, or otherwise vest Buyer or its designee with title to, such assets, payments, refunds, reimbursements credits or set-offs (or any savings therefrom). |
| **Excluded Assets**<br><br>**(§ 2.3 of Stalking Horse Agreement)** | • Notwithstanding any provision in the Stalking Horse Agreement to the contrary, the Purchased Assets shall not include any of the following (collectively, the "**Excluded Assets**"):<br><br>(a) Seller's rights under the Stalking Horse Agreement and the Loan Documents, and all consideration payable or deliverable to Seller pursuant to the terms and provisions of the Stalking Horse Agreement;<br><br>(b) any Contracts of Seller relating to Indebtedness;<br><br>(c) any Contracts (including each Contract or agreement rejected by Seller prior to the Closing Date), together with all prepaid assets relating to such Contracts, of Seller, other than the Assigned Contracts and the Assigned Real Property Leases;<br><br>(d) all rights, claims and causes of action of Seller against Persons (other than the Acquired Subsidiaries in the case of Seller) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of Seller (regardless of whether such rights are currently exercisable), in each case to the extent solely related to any Excluded Assets or Excluded Liabilities;<br><br>(e) all rights, claims and causes of action of Seller against any director or officer of Seller and all Excluded Insurance Policies and interests in the Excluded Insurance Policies;<br><br>(f) any Seller Benefit Plan or any right, title or interest in any assets of or relating thereto, or any assets relating to Excluded Liabilities described in Section 2.4(f) through (h) of the Stalking Horse Agreement, except as otherwise specifically provided in Section 5.8 of the Stalking Horse Agreement;<br><br>(g) every asset of Seller that would constitute a Purchased Asset (if owned immediately prior to the Closing) to the extent conveyed or otherwise disposed of during the period from the date of the Stalking Horse Agreement until the Closing Date (i) in the ordinary course of business, (ii) at the direction of the |

01:15095765.2

NY\6174174.10

|  | Bankruptcy Courts or (iii) as otherwise permitted by the terms of the Stalking Horse Agreement; |
|  | (h)    any Avoidance Actions that relate solely to any Excluded Assets or Excluded Liabilities; and |
|  | (i)    Seller's right, title and interest to the other assets, if any, set forth in <u>Schedule 2.3</u> of the Stalking Horse Agreement. |
|  | Notwithstanding anything in the Stalking Horse Agreement to the contrary, Buyer may, in its sole and absolute discretion (without any adjustment to the Purchase Price), at any time on or prior to the date that is one Business Day before the Closing Date, elect not to acquire any of the assets, properties and rights of Seller, and any asset so designated by Buyer on <u>Schedule 2.3</u> of the Stalking Horse Agreement (which Buyer may update from time to time by delivering the updated <u>Schedule 2.3</u> of the Stalking Horse Agreement to Seller) shall be an Excluded Asset for all purposes under the Stalking Horse Agreement. |
| **<u>Assumed Liabilities</u>**<br><br>**(§ 2.4 of Stalking Horse Agreement)** | • For purposes of the Stalking Horse Agreement, "**<u>Assumed Liabilities</u>**" means only the following Liabilities (to the extent not paid or discharged prior to the Closing, including subject to the discharge, release, and injunction provisions of the Plan) and no others: |
|  | (a)    the Liabilities of Seller arising under the Assigned Contracts and the Assigned Real Property Leases; *provided, however*, that Buyer shall not assume or agree to pay, discharge or perform any Liabilities of Seller under or with respect to any Assigned Contracts and Assigned Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory, to the extent relating to Seller Parties' conduct prior to the Closing; |
|  | (b)    any Liabilities expressly assumed by Buyer pursuant to <u>Section 5.8</u> of the Stalking Horse Agreement; |
|  | (c)    Taxes to the extent expressly payable by the Buyer pursuant to <u>Section 12.1</u> of the Stalking Horse Agreement; and |
|  | (d)    other Liabilities set forth on <u>Schedule 2.4</u> of the Stalking Horse Agreement. |

01:15095765.2

NY\6174174.10

| **Excluded Liabilities**<br><br>(§ 2.5 of Stalking Horse Agreement) | • Notwithstanding anything to the contrary in the Stalking Horse Agreement, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities whatsoever of Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is expressly not assuming being referred to collectively as the "**Excluded Liabilities**"), and Seller shall retain and be responsible for, in accordance with the Plan, the Excluded Liabilities. Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of Seller or of any predecessor of such Seller, whether incurred or accrued before or after the Petition Date or the Closing:<br><br>(a)    all Liabilities of Seller in respect of Indebtedness;<br><br>(b)    all Liabilities arising from or related to the operation or condition of the Purchased Assets prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing;<br><br>(c)    all Liabilities arising in connection with any violation of any Applicable Law or Order relating to the period prior to the Closing;<br><br>(d)    all Liabilities for fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of Seller or any of its Subsidiaries, or any of their respective directors, officers, or employees;<br><br>(e)    all Liabilities of Seller Parties arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by any Seller Party, whether or not used in the Business, including any Liabilities for noncompliance with Environmental Laws or the release of Hazardous Materials by any Seller Party on or prior to the Closing, whether known or unknown as of the Closing;<br><br>(f)    all Liabilities arising from or related to any claim, action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Seller Party or any of their |
|---|---|

respective Affiliates, or related to the Purchased Assets or the Assumed Liabilities, pending or threatened or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date;

(g)    any Liability arising out of facts or circumstances in existence prior to the Closing Date and from or related to any breach, default or failure to perform under, torts related to the performance of, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of a Seller Party or any of its Affiliates under any Contract, agreement, arrangement or understanding to which such Seller Party or any of its Affiliates is a party prior to the Closing Date;

(h)    all costs and expenses payable in connection with obtaining any Governmental Approvals;

(i)    all Liabilities for rejection damages arising from the rejection of any Contracts or Leases of any Seller Party on or before the date of the Stalking Horse Agreement or any rejection of such Contracts or Leases after the date of the Stalking Horse Agreement without the prior written consent of Buyer;

(j)    subject to Section 5.17 of the Stalking Horse Agreement, all Cure Payments;

(k)    all Taxes of Seller Parties (or Taxes of any branch offices of any Seller Party), including Taxes imposed on Seller Parties under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax law, other than Taxes expressly payable by the Buyer pursuant to Section 12.1 of the Stalking Horse Agreement;

(l)    all Liabilities of Seller Parties relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("**Professional Services**") performed in connection with the Stalking Horse Agreement and any of the transactions contemplated hereby or otherwise on behalf of Seller Parties, and any pre-Petition or post-Petition Claims for such Professional Services, including any brokerage fees, commissions, finders or similar fees incurred by any Seller Party in connection with the transactions contemplated by the Stalking Horse Agreement;

(m)    all Liabilities arising out of, relating to, or with respect

to any Seller Benefit Plan;

(n)     except, in each case, to the extent expressly assumed by Buyer pursuant to <u>Section 5.8</u> of the Stalking Horse Agreement, all Liabilities or claims arising out of, relating to or with respect to the employment or performance of services for, or termination of employment or services for, or potential employment or engagement for the performance of services for, any of Seller Parties (or any predecessor) of any individual Person or any Person acting as a professional employer organization, employee leasing company or providing similar services on or prior to the Closing (including as a result of the transactions contemplated by the Stalking Horse Agreement), including Liabilities or claims for wages, remuneration, compensation, vacation, paid time off, benefits, workers' compensation, severance (including statutory severance), separation, termination, unfair labor practice, discrimination, classification, or notice pay or benefits, or any other form of accrued or contingent compensation (including leave entitlements), irrespective of whether such Liabilities or claims are paid or made, as applicable, on, before or after Closing;

(o)     all Liabilities with respect to any Former Employee with respect to any period;

(p)     all Liabilities relating to Excluded Assets;

(q)     all accounts payable and other amounts payable of any Seller Party owed by it to any other Seller Party or other intercompany Liabilities to the extent they are not between Acquired Companies;

(r)     all Liabilities to any current or former equityholder of any Seller Party;

(s)     all Liabilities for which the Seller Entities have agreed to remain responsible in accordance with the Stalking Horse Agreement and the Plan, including professional and administrative fees and expenses for which the Seller has agreed to be responsible pursuant to the Plan;

(t)     all Liabilities arising from state or bankruptcy law theories of recovery, including fraudulent transfer; and

(u)     any other Liability of Seller Parties that arises in relation to the period prior to the Closing and is not expressly included among the Assumed Liabilities.

01:15095765.2

NY\6174174.10

| | |
|---|---|
| **Assumption and Assignment of Contracts**<br><br>**(§ 2.6 of Stalking Horse Agreement)** | • Promptly, but in any event, within ten (10) days from the date of the Stalking Horse Agreement, Seller shall deliver <u>Schedule 2.6(a)</u> of the Stalking Horse Agreement to Buyer, which Schedule shall contain with respect to each Assigned Contract, Seller's good-faith best estimate, as certified by the Chief Executive Officer or Chief Financial Officer of Seller, of the Cure Payments with respect to each such Assigned Contract; *provided*, *however*, that from and after the date of delivery of <u>Schedule 2.6(a)</u> of the Stalking Horse Agreement until five (5) Business Days prior to the Closing Date, Seller may provide updates or supplements to <u>Schedule 2.6(a)</u> of the Stalking Horse Agreement to include Assigned Contracts entered into after the date of the Stalking Horse Agreement in compliance with the terms of the Stalking Horse Agreement and/or to include revised Cure Payments with respect to any Assigned Contract set forth therein, which updates shall amend <u>Schedule 2.6(a)</u> of the Stalking Horse Agreement for all purposes hereof. Prior to the Closing Date, Seller shall commence appropriate proceedings before the Bankruptcy Courts and otherwise take all reasonably necessary actions in order to determine Cure Payments with respect to any Assigned Contract entered into prior to the Petition Date. Notwithstanding the foregoing, at any time and from time to time prior to the Closing, Buyer may identify any Assigned Contract as one that Buyer no longer desires to have assigned to it or its designee in accordance with <u>Section 2.7</u> of the Stalking Horse Agreement.  Payment of all Cure Payments for each Non-Real Property Contract and Real Property Lease that is assumed and assigned to Buyer shall be the sole responsibility of Seller, irrespective of the aggregate amount of such Cure Payments (whether reflected on <u>Schedule 2.6(a)</u> of the Stalking Horse Agreement or otherwise) and shall be paid by Seller within one (1) Business Day following the Closing Date.<br><br>• At the Closing, Seller shall assume and assign to Buyer the Assigned Contracts, in each case pursuant to Section 365 of the Bankruptcy Code and the Confirmation Order, subject to provision by Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Payments in respect of the Assigned Contracts as contemplated hereby. The payment of any Cure Payment in respect of all of the Assigned Contracts shall be borne by Seller, shall be paid by Seller, and shall not be the obligation, liability or responsibility of Buyer. Seller shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or |

| | |
|---|---|
| | otherwise payable on or prior to the Closing Date, and such Liabilities shall not be the obligation, liability or responsibility of Buyer. |
| | • If, following the Closing, a Seller Party receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then such Seller shall transfer, or shall cause the transfer of, such asset, property or right to Buyer as promptly as practicable for no additional consideration. |
| | • If, following the Closing, Buyer receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Buyer shall transfer such asset, property or right to Seller as promptly as practicable for no additional consideration. |
| **Representations and Warranties**<br><br>(**Article IV** of **Stalking Horse Agreement**) | • Usual Representations and Warranties with such changes and additions as are deemed appropriate or customary for Stalking Horse Agreements of this kind or as otherwise required by the Parties in the context of the proposed transaction. |
| **Certain Covenants**<br><br>(**Article V** of Stalking Horse Agreement) | • Usual Covenants with such changes and additions as are deemed appropriate or customary for Stalking Horse Agreements of this kind or as otherwise required by the Parties in the context of the proposed transaction. |
| **Conditions to Seller's Obligations**<br><br>(§ 6.1 of Stalking Horse Agreement) | • The obligations of Seller to consummate the transactions provided for in the Stalking Horse Agreement are subject to the satisfaction of, or waiver by Seller, on or prior to the Closing Date of each of the following conditions:<br><br>(a)    Representations.  The representations and warranties of Buyer set forth in the Stalking Horse Agreement shall be true and correct in all material respects on the date of the Stalking Horse Agreement and on and as of the Closing Date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only); *provided*, *however*, that this condition shall be deemed to have been satisfied even if such representations and warranties are not true and correct unless the individual or aggregate impact of all inaccuracies of such representations and warranties has resulted or would reasonably be expected to result in a Buyer |

| | |
|---|---|
| | Material Adverse Effect.

(b)      Performance.  Buyer shall have performed or complied with, in all material respects, all obligations, agreements and covenants contained in the Stalking Horse Agreement as to which performance or compliance by Buyer is required prior to or at the Closing.

(c)      Execution and Delivery of Closing Documents.  Buyer shall have executed and delivered to Seller all of the documents described in Section 7.4 of the Stalking Horse Agreement and Buyer shall be ready, willing and able to deliver to Seller the Purchase Price in accordance with Section 3.1 of the Stalking Horse Agreement.

Any condition specified in Section 6.1 of the Stalking Horse Agreement may be waived prior to Closing only by a written instrument signed by Seller and Buyer. (Section 6.1 of the Stalking Horse Agreement) |
| **Conditions to Buyer's Obligations**

**(§ 6.2 of Stalking Horse Agreement)** | • The obligations of Buyer to consummate the transactions provided for in the Stalking Horse Agreement are subject to the satisfaction of, or waiver by Buyer, on or prior to the Closing Date of each of the following conditions:

(a)      Representations.  The representations and warranties of Seller set forth in Section 4.1 of the Stalking Horse Agreement shall be true and correct in all material respects on the date of the Stalking Horse Agreement and on and as of the Closing Date with the same force and effect as if made on and as of such date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only), *provided*, *however*, that for purposes of determining the satisfaction of this condition, no effect shall be given to any materiality or Material Adverse Effect exception or qualification set forth in such representations and warranties.

(b)      Performance.  Seller shall have performed or complied with, in all material respects, all covenants or agreements contained in the Stalking Horse Agreement as to which performance or compliance by Seller is required prior to or at the Closing.

(c)      Execution and Delivery of Closing Documents.  Seller shall have executed and delivered to Buyer all of the documents |

01:15095765.2

NY\6174174.10

described in <u>Section 7.3</u> of the Stalking Horse Agreement.

(d)    <u>Payment of Cure Payments</u>.  The Cure Payments shall have been paid by, or on behalf of, Seller.

(e)    <u>No Litigation</u>.  No suit, action, investigation, proceeding or litigation shall be pending seeking to restrain or prohibit the consummation of the transactions contemplated by the Stalking Horse Agreement.

(f)    <u>Governmental Approvals</u>.  All consents and approvals required to be obtained for the sale and purchase of the Purchased Assets, after giving effect to the Confirmation Order, shall have been obtained and all filings and notifications required to be made and given, if any, after giving effect to the Confirmation Order, shall have been made or given.

Any condition specified in <u>Section 6.2</u> of the Stalking Horse Agreement may be waived by Buyer in its sole discretion; *provided* that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

| | |
|---|---|
| **Conditions to Buyer and Seller's Obligations**<br><br>**(§ 6.3 of Stalking Horse Agreement)** | • The obligations of each of Buyer and Seller to consummate the transactions provided for in the Stalking Horse Agreement are subject to the fulfillment or waiver by Buyer and Seller (other than the condition contained in <u>Section 6.3(a)</u> of the Stalking Horse Agreement, the fulfillment of which cannot be waived by any Party) on or prior to the Closing Date of each of the following conditions:<br><br>(a)    <u>No Violation of Order.</u> No Order shall have been enacted, entered, promulgated or enforced by any Governmental Authority with jurisdiction over the transactions contemplated by the Stalking Horse Agreement which prohibits or seeks to prohibit the consummation of the transactions contemplated by the Stalking Horse Agreement.<br><br>(b)    <u>Bidding Procedures Order</u>.  The U.S. Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance acceptable to Buyer in its sole discretion and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by Buyer in its sole discretion);<br><br>(c)    <u>Plan and Confirmation Order.</u> The Plan shall have become effective pursuant to the Confirmation Order, and such Confirmation Order shall be a Final Order (unless such Final |

| | Order requirement is waived by Buyer in its sole discretion); |
|---|---|
| | (d) __No Injunctions or Restraints__. No Applicable Law enacted, entered, promulgated, enforced or issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by the Stalking Horse Agreement shall be in effect. |
| __Frustration of Closing Conditions__ <br><br> (§ 6.4 of Stalking Horse Agreement) | • Neither Buyer nor Seller may rely on the failure of any condition set forth in Article VI of the Stalking Horse Agreement to be satisfied if such failure was caused by such party's failure to use its reasonable best efforts to cause the Closing to occur, as required by Section 5.3 of the Stalking Horse Agreement. |
| __Waiver of Closing Conditions__ <br><br> (§ 6.5 of Stalking Horse Agreement) | • Notwithstanding anything to the contrary set forth in the Stalking Horse Agreement, Buyer shall not waive any condition to Closing that would be material and adverse to the interests of the DIP Lenders under the Credit Agreement without the prior written consent of the Administrative Agent, acting on behalf of the DIP Lenders and at the direction of the Required DIP Lenders. |

15.    Pursuant to Section 3 of the RSA and paragraph P of the Bidding Procedures, the Debtors are permitted to entertain Competing Bids (as defined below) for the Purchased Assets and seek this Court's approval to hold an auction to solicit higher or otherwise better offers within approximately thirty (30) days of entry of the Bidding Procedures Order. The Debtors believe, based on their extensive prepetition marketing efforts, that this will provide a sufficient amount of time to solicit potentially higher or otherwise better offers.

**RELIEF REQUESTED**

**A.    Approval of the Bidding Procedures.**

16.    By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as Exhibit A, approving and establishing the Bidding Procedures for the submission of competing offers in connection with the Plan Sale. The Debtors have determined

01:15095765.2

NY\6174174.10

that it is in the best interest of their estates to confirm either the plan of reorganization they intend to file in the immediate future with the Stalking Horse Bidder (the "**Current Plan**"), embodying the credit bid of the Agents, or a plan with a different bidder willing to submit a competing offer that is higher and better than the terms set forth in the Current Plan (a "**Competing Bid**", and such bidder, a "**Competing Bidder**").  The Debtors intend, in the near term, to file the Current Plan and an accompanying disclosure statement, along with a motion to approve procedures for the solicitation of votes to accept the Plan and related procedures regarding confirmation of the Plan.

17.     In exercising their business judgment, the Debtors believe that it is in the best interests of their respective estates to subject the Current Plan to an open-market bidding process to ascertain whether a higher and better offer exists.  If a Competing Bid and Competing Bidder exist and prevail at the Auction, such bid will supplant the current offer the Stalking Horse Bidder has provided in the Current Plan pursuant to the Plan Sale.  Therefore, a Competing Bidder can only replace the Stalking Horse Bidder's offer if it affords better terms and higher consideration as determined in the Debtors' business judgment pursuant to the Bidding Procedures.

18.     The proposed bidding process is highly advantageous to the Debtors' estates, as it will provide a market-based valuation of the Debtors, maximizing recoveries to all creditor constituencies and providing the capital necessary to fund a plan.  The Bidding Procedures have been developed consistent with the objective of promoting active bidding that should result in the highest and best plan proposal that the marketplace can sustain.  Further, the Bidding Procedures reflect the Debtors' goal of conducting the bidding process in a controlled, fair and open manner that promotes and encourages interest in the Debtors' assets from both

financially capable and motivated bidders who are capable of funding a plan of reorganization with terms that are superior to those embodied in the Current Plan.

19.    Subject to the Court's approval, the Bidding Procedures to be employed by the Debtors are set forth in <u>Exhibit 1</u> attached to the Bidding Procedures Order.  Certain of the key terms of the Bidding Procedures are highlighted as follows[4]:

| **Assets to Be Sold** | • The Debtors shall sell either (1) all the New Stock or (2) all or substantially all of the Debtors' assets, including its ownership interests in its affiliates and subsidiaries. |
|---|---|
| **Participation Requirements** | • Potential Bidders must (1) deliver to the Debtors an executed confidentiality agreement in form and substance satisfactory to the Debtors; (2) deliver to the Debtors sufficient information, to the reasonable satisfaction of the Debtors in consultation with the Aggregate Required Lenders, demonstrating that the bidder has the financial ability to (A) close a Plan Sale and (B) provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Debtors and, if applicable, assigned to the Potential Bidder; (3) deliver to the Debtors a statement and other factual support demonstrating, to the reasonable satisfaction of the Debtors, in consultation with the Aggregate Required Lenders, that such bidder has a *bona fide* interest in consummating a Plan Sale and will be able to consummate a Plan Sale if selected as the Winning Bidder; and (4) fully disclose to the Debtors the identity of each entity or person that will be participating with such bidder in connection with the potential submission of a Bid.  <br><br>• Each Potential Bidder shall comply with all reasonable requests for additional information made by the Debtors or the Aggregate Required Lenders or their respective advisors regarding such Potential Bidder's financial wherewithal and ability to consummate and perform obligations in connection with the Plan Sale.  Failure by a Potential Bidder to comply with requests for additional information may be a basis for the |

---

[4]    At the hearing to approve the Bidding Procedures, the Debtors will ask the Court to approve appropriate dates and times for all blank spaces set forth in this Motion and the Exhibits.  Capitalized terms in this paragraph not otherwise defined in the Motion shall have the meaning assigned to them in the Bidding Procedures; to the extent that the Motion and the Bidding Procedures are inconsistent, the Bidding Procedures shall control.

| | |
|---|---|
| | Debtors in consultation with the Aggregate Required Lenders to determine that a Bid made by such Potential Bidder is not a Qualified Bid. |
| **Due Diligence** | • If a party qualifies as a Potential Bidder pursuant to the aforementioned participation requirements, the Debtors shall afford each Potential Bidder the time and opportunity to conduct reasonable due diligence until the Bid Deadline, taking into account the Debtors' need to protect their trade secrets and confidential research, development and commercial information.  The Debtors shall consult with the Aggregate Required Lenders with respect to the provision of due diligence information to the Potential Bidders and the due diligence process generally; provided, however, that, the Debtors shall not be required to provide any information to a Potential Bidder that, in the Debtors' business judgment, in consultation with the Aggregate Required Lenders, would, or would likely, cause significant competitive harm to the Debtors if such Potential Bidder did not consummate the Plan Sale or that is otherwise not in the best interest of the Debtors and their estates.   Neither the Debtors nor any of their affiliates (nor any of their respective representatives) are obligated to furnish any information relating to the Debtors' business operations, the Purchased Assets or otherwise to any person except to a Potential Bidder prior to the Bid Deadline. If the Debtors determine, in consultation with the Aggregate Required Lenders, that a Potential Bidder does not constitute (or will not likely constitute) a Qualified Bidder, then such Potential Bidder's ability to receive due diligence access shall terminate.  Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Debtors' business operations or the Purchased Assets, whether provided by the Debtors or their affiliates or representatives or any other party.  Neither the Debtors nor their affiliates or representatives make any express or implied representation or warranty as to the accuracy or completeness of any such information. |
| **Bid Deadline** | • The Debtors request that all Potential Bidders deliver a written copy of their bid not later than **5:00 PM (Eastern Time)** on Friday, April 25, 2014 (the "**Bid Deadline**"). |

| **Bid Requirements** | <ul><li>Bids must meet the Bid Deadline.</li></ul> |
|---|---|

| | • Bids must include a signed letter that such Potential Bidder offers to purchase any or all of the Purchased Assets[5] on the terms set forth in the Proposed Transaction Documents, and that such Bid (i) is formal, binding and unconditional (other than those conditions expressly set forth in the Proposed Purchase Agreement, including expressly stating any conditions relating to the assumption and/or assignment of executory contracts and unexpired leases) and (ii) remains open and irrevocable until five (5) business days following entry by the Bankruptcy Court of the Confirmation Order; <u>provided</u>, that if such Bid is the Winning Bid or the Second-Highest Bid, such Bid shall continue to remain open and irrevocable subject to the terms and conditions of the Bidding Procedures; |
|---|---|

• Bids must include copies of any purchase agreement, investment agreement or other applicable transaction document marked against the Stalking Horse Agreement (together with its exhibits, schedules, annexes and other attachments) related thereto (the "**Proposed Purchase Agreement**") pursuant to which such Potential Bidder proposes to effectuate the Proposed Transaction on the same or better timing as set forth in the Stalking Horse Agreement together with copies of all ancillary documents necessary or required for the consummation of, or which are contemplated by, the Proposed Transaction, including without limitation, (x) a specific and detailed summary of any proposed amendments, supplements or other modifications to the Plan, (y) any proposed amendments, supplements or other modifications to such Potential Bidder's existing financing documents relevant to the Proposed Transaction, investment documents or organizational documents, and (z) all proposed agreements, term sheets, documents and instruments governing or evidencing any non-cash consideration to be provided in the Proposed Transaction (such ancillary documents, together with the Proposed Purchase Agreement, the "**Proposed Transaction Documents**");

• Bids must include a list which specifies in detail which of the Debtors' unexpired leases and executory contracts are to be

---

[5]     A Potential Bidder can submit a bid for some or all of TID's equity interests in its subsidiaries.  The Debtors, in consultation with the Aggregate Required Lenders, will consider whether such Bid constitutes a Qualified Bid.

|  | assumed by the Debtors and, if applicable, assigned to the Potential Bidder in connection with the consummation of the Proposed Transaction and sufficient information to allow the Bankruptcy Court and the Debtors to determine the Proposed assignee's ability to comply with Section 365 of the Bankruptcy Code.<br><br>• Bids (other than the Stalking Horse Bid) must be accompanied by a deposit into escrow with the Debtors (or with an escrow agent selected by the Debtors) of an amount in cash equal to 10% of the cash portion of such Bid (the "**Good Faith Deposit**").<br><br>• Bids (other than the Stalking Horse Bid) must provide for aggregate consideration to the Debtors of not less than the Credit Purchase Price plus the sum of (x) the Bidding Protections and (y) the Wind-Down Reserve (collectively, the "**Minimum Initial Overbid Amount**"). The "**Wind-Down Reserve**" shall be an amount of cash sufficient for the Debtors to fund a reserve for the administration of the Plan and the Debtors' estates, payment of professional fees, and the wind down of the Debtors' remaining operations following the closing of the Proposed Transaction, in each case in an amount acceptable to the Debtors in consultation with the Aggregate Required Lenders. |
|---|---|

| | |
|---|---|
| **Auction** | • If one or more Qualified Bids in addition to the Stalking Horse Bid are received by the Debtors by the Bid Deadline, than the Debtors shall conduct an auction (the "**Auction**") at the offices of Latham & Watkins, 885 Third Avenue, New York, New York 10022 on Friday, May 2, 2014 beginning at 10:00 a.m. (prevailing Eastern Time), or such other time and place as determined by the Debtors, in consultation with the Aggregate Required Lenders; provided, however, that if the Debtors receive only one Qualified Bid in addition to the Stalking-Horse Bid, then the Debtors, in their reasonable business judgment and in consultation with the Aggregate Required Lenders, may elect not to conduct the Auction and such Qualified Bid and the Qualified Bidder that submitted such Qualified Bid shall be the Winning Bid and the Winning Bidder, respectively, for purposes of the Bidding Procedures, unless the Stalking Horse Bidder determines to offer additional consideration in the form of an increased Credit Bid Purchase Price or otherwise. For avoidance of doubt, the bid submitted by the Stalking Horse Purchaser is a Qualified Bid. |
| **Selection of the Successful Bid** | • At the conclusion of the Auction, the successful Bid shall be the highest or otherwise best Qualified Bid as determined at the Auction by the Debtors, in consultation with the Aggregate Required Lenders (the "**Winning Bid**"). |
| **Use of Plan Sale Proceeds** | • The Debtors are offering the Purchased Assets for sale pursuant to the Plan and in accordance with section 1129 of the Bankruptcy Code through the Bidding Procedures. <br><br> • The proceeds from the Winning Bid shall be used to make distributions under, and in accordance with the terms and conditions of, the Plan. |
| **Reservation of Rights** | • The Debtors may, with the consent of the Aggregate Required Lenders, modify the Bidding Procedures, including the extension of any deadlines set forth therein, or impose, at or prior to the Auction, additional terms and conditions on the proposed Plan Sale if, in their reasonable business judgment, in consultation with the Aggregate Required Lenders, such modifications or extensions of deadlines set forth therein would be in the best interests of the Debtors' estates and would likely assist in obtaining the highest or otherwise best |

01:15095765.2

NY\6174174.10

|  | offer for the Purchased Assets or the New Stock. The Debtors may also: (i) determine, in their reasonable business judgment, in consultation with the Aggregate Required Lenders, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of the Confirmation Order, any Bid that, in their reasonable business judgment and in consultation with the Aggregate Required Lenders, is: (x) inadequate or insufficient; (y) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures; or (z) contrary to the best interests of the Debtors and their estates. The Debtors, in their reasonable business judgment, and in consultation with the Aggregate Required Lenders, may schedule, adjourn or reschedule the Confirmation Hearing, and shall notify all relevant parties of such scheduling, adjournment or rescheduling in an appropriate manner. |

**B.      Approval of the Stalking Horse Protections and Auction Procedures.**

20.      As discussed above, the Stalking Horse Agreement contemplates the filing of the Current Plan with the Stalking Horse Bidder in addition to running a parallel bidding process pursuant to the Bidding Procedures to solicit Competing Bids.  After extensive arm's length negotiations, the Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement.  This Motion is intended to approve the Stalking Horse Bidder as the "stalking horse" bidder in connection with the Debtors' solicitation of higher and better offers for all or a portion of the Purchased Assets.

21.      To induce the Stalking Horse Bidder to expend the time, energy, and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and seek this Court's approval of, certain bid protections provided to the Stalking Horse Bidder under the Stalking Horse Agreement.  Subject to the terms set forth in the Stalking Horse Agreement and Bidding Procedures and this Court's approval, the Debtors have agreed that the Stalking Horse Bidder is entitled to reimbursement of its reasonable documented out-of-pocket expenses incurred in connection with the Plan Sale up to a maximum amount of $600,000 upon the

28

occurrence of certain conditions set forth in the Stalking Horse Agreement.  Any and all amounts owed on account of the Expense Reimbursement shall constitute super-priority administrative expenses of the Debtors' estates, subject to and junior to (a) any super-priority claims arising under the DIP Facility and (b) the Carve-Out (as defined under any interim or final order approving the DIP Facility, or the credit agreement governing the DIP Facility).  There is no additional break-up fee payable to the Stalking Horse Bidder.

22.    Moreover, any Competing Bid must exceed the aggregate consideration offered by the Stalking Horse Bidder by at least $1,000,000 over the Purchase Price and Expense Reimbursement (the "**Overbid Protection**" and, together with the Expense Reimbursement, the "**Bidding Protections**").

23.    The aforementioned Bidding Protections are material inducements for, and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse Agreement.  The Debtors believe that the Overbid Protections and the Expense Reimbursement are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Stalking Horse Bidder in connection with the transaction and (b) the expenses incurred by the Stalking Horse Bidder in preparing and negotiating the necessary documentation for the Stalking Horse Bid thereby setting the floor for the Auction that may be held by the Debtors.

24.    In the event that the Bidding Procedures yield a Competing Bid, the Debtors also seek authority to conduct an auction as contemplated by the Bidding Procedures at the offices of their counsel, Latham & Watkins LLP.[6]

---

[6]    The proceeds of the Auction may be best maximized to the extent that the operations of the subsidiaries— e.g., the Colombian, Ecuadorian, and Brazilian operations—are marketed in a coordinated fashion.  In this regard, TID asks the Court for authority to direct its Non-Debtor Affiliates to engage in a bidding process congruent with the procedures requested hereby for the Debtors' assets.

C.    **The Proposed Notice of Auction and Bidding Procedures.**

25.    The Debtors propose to serve the Bidding Procedures Order and a notice of the Bidding Procedures and the Auction (the "**Procedures Notice**"), in substantially the form attached to the Bidding Procedures Order as Exhibit 2, within three (3) business days after entry of the Bidding Procedures Order, upon the Notice Parties (as defined below).

**BASIS FOR RELIEF**

D.    **The Proposed Bidding Procedures are a Sound Exercise of the Debtors' Business Judgment.**

26.    Section 363(b)(1) of the Bankruptcy Code provides that  "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…".  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) further provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Id. § 105.

27.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and in connection with the confirmation of a chapter 11 plan if it demonstrates a sound business purpose for doing so.  See In re Federal Mogul Global, Inc., 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); see also In re Montgomery Ward Holding Corp., 242 B.R. 147, 154 (Bankr. D. Del. 1999) (finding that in evaluating business purpose of a sale, bankruptcy court may consider effect of sale on reorganization).

28.    Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate.  See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy]

Code [is] to enhance the value of the estate at hand."); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the …debtor's duty…is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); In re Summit Global Logistics, Inc., No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties").   To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate.  See Integrated, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

29.    With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures,  In re Trans World Airlines Inc., No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

30.    In the Debtors' case, the bid of the Stalking Horse Bidder as embodied in the Stalking Horse Agreement and the Current Plan, set forth a bidding floor which ensures an

acceptable minimum recovery to the Debtors' estates, and will progress to confirmation even in the absence of market interest in submitting Competing Bids.  However, in exercising their fiduciary duties, the Debtors have determined that the Bidding Procedures are the most appropriate method for encouraging bidders to submit Competing Bids—offers that can only increase recoveries to creditor constituencies, and that will ensure the consideration offered in the Current Plan is the highest and best the market can sustain.

   31. The Bidding Procedures provide a framework to entertain bids for the sale of their assets and, if such bids are received, to conduct an auction in an orderly yet competitive fashion encouraging bids that maximize the net value realized from the Plan Sale by the Debtors' estates. In particular, the Bidding Procedures contemplate an open and fair auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence, many of whom will have likely performed due diligence in the very recent past, and acquire the information necessary to submit a timely and well-informed bid.  In addition, the extensive marketing campaign conducted by the Debtors and their advisors over many months immediately prior to the Petition Date will streamline the process of providing adequate information to potential bidders.

   32. The Bidding Procedures provide the Debtors with an adequate opportunity to consider Competing Bids and select the highest and best offer for the Purchased Assets.  The Debtors therefore believe that submitting the Current Plan to a market-based test will ensure their restructuring maximizes recovery to their respective estates.  Accordingly, the Debtors and their stakeholders can be assured that, taking into account the financial condition of the business and the economy, the consideration obtained will be fair and reasonable and at or above market.

33.     Similar procedures have been previously approved by this Court.  See, e.g., In re: Oncure Holdings, Inc., Case No. 13-11540 (KG) (Bankr. D. Del. July 24, 2013); In re Protostar Ltd., Case No. 09-12659 (MFW) (Bankr. D. Del. Aug. 24, 2009); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Intermet Corp., Case No. 08-11859 (KG) (Bankr. D. Del. May 12, 2009); In re VI Acquisition Corp., Case No. 08-10623 (KG) (Bankr. D. Del Oct. 17, 2008); In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del May, 13, 2008); In re Global Home Products LLC., Case No. 06-10340 (KG) (Bankr. D. Del May 4, 2006); In re Russell-Stanley Holdings, Inc., Case No. 05-12339 (MFW) (Bankr. D. Del. Sept. 9, 2005); In re Ultimate Elecs., Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Mar. 24, 2005).

**E.     The Bidding Protections are Reasonable and Necessary.**

34.     As stated above, the Debtors seek to provide the Stalking Horse Bidder, in connection with its role in the bidding and Plan Sale process, with the Bidding Protections, including an Expense Reimbursement.

35.     Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of business judgment.  See O'Brien, 181 F.3d at 534-35; Integrated, 147 B.R. at 657 ("break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule"); 995 Fifth Ave., 96 B.R. at 28.

36.     In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  The Third Circuit has held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense

01:15095765.2

NY\6174174.10

provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. See O'Brien, 181 F.3d at 535 ("We … conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.  Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context.  Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.").

37.    Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Expense Reimbursement proposed herein passes muster.  The Expense Reimbursement is capped at $600,000, and is the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder.  The Expense Reimbursement is fair and reasonable in amount, and is reasonably intended to compensate for the risk to the Stalking Horse Bidder of being used as a stalking horse.

38.    The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement without the Expense Reimbursement.  Indeed, the Bidding Protections were designed to induce the Stalking Horse Bidder to both research the value of the Debtors and convert that value to a dollar figure on which other bidders could rely, and submit a bid (the Stalking Horse Agreement) without which bidding for the Purchased Assets might be more limited.  See, e.g., Integrated, 147 B.R. 650; 995 Fifth Ave., 96 B.R. at 28.  The Bidding Protections will compensate the Stalking Horse Bidder for the benefit it provides to the Debtors' estates in the event the Stalking Horse Agreement induces a third-party to submit a higher or otherwise better

bid.  The Debtors believe that such a fee is reasonable, given the benefits to the estates of having a definitive agreement with the Stalking Horse Agreement and the risk to the Stalking Horse Bidder that a third-party overbid ultimately may be accepted.

39.     Furthermore, the Expense Reimbursement—reaching a maximum amount of $600,000 in the aggregate in a transaction valued at least at $125,000,000, or less than 0.5%—is within the spectrum of termination fees approved by bankruptcy courts in other chapter 11 cases.  See, e.g., In re: Oncure Holdings, Inc., Case No. 13-11540 (KG) (Bankr. D. Del. July 24, 2013) (court approved a maximum combined break-up fee and expense reimbursement of $3,000,000 in connection with sale, which amounted to approximately 2.4% of purchase price); In re Global Motorsport Group, Inc., Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (court approved a maximum combined break-up fee and expense reimbursement of $650,000 in connection with sale, which amounted to approximately 4% of $16,000,000 purchase price); In re Global Home Products, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (court approved a break-up fee of 3.3%, or $700,000, in connection with sale); In re Ameriserve Food Distribution, Case No. 00-0358 (PJW) (Bankr. D. Del., Sept. 27, 2000) (court approved a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale); In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Jul. 5, 1998) (court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets).  For the reasons set forth above, the Debtors respectfully request approval of the proposed Expense Reimbursement to facilitate the sale of the Purchased Assets.[7]

---

[7]  The proposed order also includes an express reservation that that such expense reimbursement cap is without prejudice to the rights to reimbursement of any of the DIP Agent, the DIP Collateral Agents, the DIP Lenders, the Prepetition Agents or the Prepetition Secured Parties to reimbursement under the DIP Credit Agreement and/or the interim and final DIP orders.

40.     Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and any agreed upon Expense Reimbursement will permit the Debtors to insist that competing bids for the Plan Sale made in accordance with the Bidding Procedures be materially higher or otherwise better than the Stalking Horse Bidder's bid, to the benefit of the Debtors' estates.  Such measures will "increas[e] the likelihood that the price at which the [Purchased Assets will be] sold will reflect [their] true worth."  O'Brien, 181 F.3d at 537.

41.     The Debtors believe that all of the Bidding Procedures proposed herein, including the Bidding Protections, will increase the likelihood that the Debtors will receive the greatest possible consideration for the Purchased Assets because they will ensure a competitive and fair bidding process. They also allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maximizing the value of the estates.

42.     The Debtors submit that the proposed Bidding Procedures are reasonable under the facts and circumstances of these cases, especially in light of the extensive marketing of the Purchased Assets that the Debtors and their professionals have conducted.

**F.      Proposed Notice is Appropriate Under Bankruptcy Rule 2002.**

43.     A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections.  The Debtors submit that the Procedures Notice fully complies with Bankruptcy Rule 2002 and includes information regarding the Bidding Procedures necessary to enable interested parties to participate in the Auction.

44.     The Debtors further submit that the notice to be provided through the Procedures Notice of the Bidding Procedures and the method of service proposed herein

constitutes good and adequate notice of the Bidding Procedures and the other components of the Sale.   Therefore, the Debtors respectfully request this Court approve the foregoing notice procedures.

## NO PRIOR REQUEST

45.     No prior application for the relief sought herein has been duly made by the Debtors to this or any other Court.

## NOTICE

46.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the agent for the Debtors' prepetition secured financing; (c) counsel to the agent for the Debtors' postpetition secured financing; (d) the Internal Revenue Service; (e) the Canada Revenue Agency; (f) the Ontario Securities Commission; (g) the United States Attorney for the District of Delaware; (h) the Attorneys General for the states of California, New Mexico, North Dakota, Oklahoma, and Texas; (i) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; and (j) all parties who have requested notice under Bankruptcy Rule 2002 (collectively, the "**Notice Parties**").   The Debtors submit that, under the circumstances, no other or further notice is required.

47.     A copy of the Motion is available on the Court's website: www.deb.uscourts.gov.  Additional copies of the Motion are available for free on the website of the Debtors' claims and noticing agent, Prime Clerk LLC, at http://cases.primeclerk.com/tuscany, or can be requested by calling (855) 410-7360 from within the United States or +1 (646) 795-6965 if calling from outside the United States.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Order substantially in the form attached hereto as <u>Exhibit A</u>: (a) establishing the Bidding Procedures for the Plan Sale; (b) approving the Bidding Protections to be granted by the Debtors in the Bidding Procedures; (c) scheduling the Auction; and (d) granting certain related relief as the Court may deem appropriate.

Dated: February 28, 2014
   Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

<u>*/s/ Kara Hammond Coyle*</u>
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: 302-571-6600
Facsimile: 302-571-1253
Email: mnestor@ycst.com
   kcoyle@ycst.com

- and -

Mitchell A. Seider
Keith A. Simon
David A. Hammerman
Annemarie V. Reilly
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone:  212-906-1200
Fax:  212-751-4864
Email: mitchell.seider@lw.com
   keith.simon@lw.com
   david.hammerman@lw.com
   annemarie.reilly@lw.com

Proposed Counsel for Debtors and
Debtors in Possession