**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TUSCANY INTERNATIONAL HOLDINGS (U.S.A.) LTD., et al., | : | Case No. 14-10193 (KG) |
| | : | |
| | : | Jointly Administered |
| Debtors.[1] | : | |

------------------------------------------------------------------------ x

---

**DISCLOSURE STATEMENT FOR
THE JOINT PLAN OF REORGANIZATION FOR
TUSCANY INTERNATIONAL DRILLING INC. AND ITS AFFILIATE DEBTOR
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

| **YOUNG CONAWAY STARGATT & TAYLOR LLP** | **LATHAM & WATKINS LLP** |
|---|---|
| Michael R. Nestor (Bar No. 3526) | Mitchell A. Seider |
| Kara Hammond Coyle (Bar No. 4410) | Keith A. Simon |
| Rodney Square | David A. Hammerman |
| 1000 North King Street | Annemarie V. Reilly |
| Wilmington, Delaware 19801 | 885 Third Avenue |
| Telephone: (302) 571-6600 | New York, New York 10022 |
| Facsimile: (302) 571-1253 | Telephone: (212) 906-1200 |
| | Facsimile: (212) 751–4864 |

Counsel for the Debtors and Debtors-in-Possession

---

**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

[1]    The Debtors in these cases are Tuscany International Holdings (U.S.A.) Ltd. and Tuscany International Drilling Inc. The last four digits of Tuscany International Holdings (U.S.A.) Ltd.'s U.S. federal tax identification number are 8192. The last four digits of Tuscany International Drilling Inc.'s Canadian tax identification number are 4278. The address for the Debtors is 1950, 140 – 4 Avenue S.W. Calgary, Alberta, Canada T2P 3N3.

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON APRIL [  ], 2014**
(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AND CLAIMS AGENT MUST <u>ACTUALLY</u> <u>RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE AS SET FORTH IN THE DISCLOSURE STATEMENT ORDER.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE CHAPTER 11 CASES.

**PRESERVATION OF CERTAIN CAUSES OF ACTION UNDER THE PLAN:**

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST, OR TO OBJECT TO CONFIRMATION OF, THE PLAN, CREDITORS, INTEREST HOLDERS AND STAKEHOLDERS SHOULD BE AWARE THAT THE PLAN PRESERVES CERTAIN CAUSES OF ACTION AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.

---
**IMPORTANT INFORMATION FOR YOU TO READ**
---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE OR FOREIGN AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE OR FOREIGN AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR THE LAWS OF CANADA OR ANY FOREIGN JURISDICTION. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, PROVINCIAL LAW AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(2) OF THE SECURITIES ACT OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN <u>SECTION VI</u> HEREIN, "PLAN-RELATED RISK FACTORS."**

**TABLE OF CONTENTS**

Page

I. EXECUTIVE SUMMARY ............................................................................................................i

    A.    Purpose and Effect of the Plan ...........................................................................ii

    B.    Administrative, DIP Facility and Priority Tax Claims ...................................... iii

    C.    Classification and Treatment of Claims and Interests Under the Plan .............. v

    D.    Solicitation Procedures.....................................................................................vii

    E.    Voting Procedures.............................................................................................xi

    F.    Confirmation of the Plan .................................................................................xiii

    G.    Consummation of the Plan ...............................................................................xiv

    H.    Risk Factors.....................................................................................................xiv

II. BACKGROUND TO THE CHAPTER 11 CASE .....................................................................1

    A.    The Debtors' Corporate History and Structure ................................................1

    B.    Overview of the Debtors' Businesses ...............................................................1

    C.    Prepetition Indebtedness ...................................................................................2

    D.    Events Leading to the Chapter 11 Filing ..........................................................2

III. EVENTS DURING THE CHAPTER 11 CASE .....................................................................5

    A.    First Day Motions and Certain Related Relief ..................................................5

    B.    CCAA Case.......................................................................................................7

    C.    Reorganization Strategy and Sale Efforts .........................................................8

    D.    Ecuador Transfer Motion ..................................................................................9

    E.    Purchase Agreement..........................................................................................9

    F.    Filing of the Schedules and Establishment of the Claims Bar Date ................ 19

    G.    Exclusive Period for Filing a Plan and Soliciting Votes ................................. 19

    H.    Deadline to Assume or Reject Leases of Nonresidential Real Property................20

IV. SUMMARY OF THE PLAN .................................................................................................21

    A.    Administrative, DIP Facility and Priority Tax Claims .................................... 21

    B.    Classification and Treatment of Classified Claims and Equity Interests................23

    C.    Acceptance or Rejection of the Plan ............................................................... 28

    D.    Means for Implementation of the Plan ............................................................ 29

    E.    Treatment of Executory Contracts and Unexpired Leases .............................. 40

    F.    Provisions Governing Distributions ................................................................ 42

    G.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims............46

H.    Conditions Precedent to Confirmation and Consummation of the Plan ..................................48

I.    Release, Discharge, Injunction And Related Provisions ........................................................49

J.    Binding Nature of the Plan ...................................................................................................54

K.    Protection Against Discriminatory Treatment.......................................................................54

L.    Plan Indemnity .....................................................................................................................54

M.    Integral Part of Plan ............................................................................................................55

**V.    CONFIRMATION AND CONSUMMATION PROCEDURES ........................................56**

A.    Solicitation of Votes.............................................................................................................56

B.    Confirmation Procedures......................................................................................................56

C.    Statutory Requirements for Confirmation of the Plan............................................................56

D.    Consummation of the Plan ...................................................................................................61

**VI.    PLAN-RELATED RISK FACTORS ................................................................................62**

A.    Certain Bankruptcy Law Considerations ..............................................................................62

B.    Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan ..................................................................................................64

C.    Risk Factors that Could Negatively Impact the Debtors' Business.........................................65

D.    Risks Associated with Forward Looking Statements .............................................................68

E.    Disclosure Statement Disclaimer ..........................................................................................69

**VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............71**

A.    Liquidation Under Chapter 7 of the Bankruptcy Code..........................................................71

B.    Filing of an Alternative Plan of Reorganization....................................................................71

**VIII.    Applicability of Securities Laws to NewCo Ownership Interests ......................................72**

A.    NewCo Ownership Interests Issued in Reliance on Section 1145 of the Bankruptcy Code.....72

B.    Resale of NewCo Ownership Interests..................................................................................72

C.    Resale of the 1145 Securities by "Underwriters" and Rule 144A ...........................................73

D.    Legend.................................................................................................................................73

E.    Reorganized HoldCo Common Stock ...................................................................................74

**IX.    CERTAIN U.S. FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN ................75**

A.    In General............................................................................................................................75

B.    U.S. Federal Income Tax Consequences to Holders of Allowed Class 4 Claims ....................76

**X.    CERTAIN CANADIAN FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN....80**

A.    Introduction .........................................................................................................................80

B.    Tax Considerations Generally Applicable to the Company ....................................................81

C.   Tax Considerations Generally Applicable to Canadian Holders ...........................................................81

D.   Tax Considerations Generally Applicable to Non-Canadian Holders ...................................................83

**RECOMMENDATION**......................................................................................................................................**84**

**EXHIBITS**

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Disclosure Statement Order

EXHIBIT C        Financial Projections

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Historical Financial Statements

---

| |
|---|
| THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. |

# I.
## EXECUTIVE SUMMARY

Tuscany International Drilling Inc. ("**TID**" or "**HoldCo**"), a corporation incorporated in Alberta, Canada, the parent corporation of Tuscany International Holdings (U.S.A.) Ltd., ("**TIH**") the other debtor and debtor in possession (collectively, the "**Debtors**" or the "**Company**"), together with TIH submits this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Joint Plan of Reorganization for Tuscany International Drilling Inc. and its Affiliate Debtor under Chapter 11 of the Bankruptcy Code dated March 3, 2014 (the "**Plan**"),[2] which was filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  The Debtors have requested that a Confirmation Hearing on the Plan be scheduled for 10:00 a.m. prevailing Eastern Time on May 6, 2014 before the Bankruptcy Court.  A copy of the Plan is attached hereto as Exhibit A.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the commencement of the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") and the proceedings under the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 as amended (the "**CCAA**") taking place in Calgary, Alberta, Canada (the ("**CCAA Case**");

- the significant events that have occurred during the Chapter 11 Cases and the CCAA Case;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations, and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

---

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan. To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

## A.    PURPOSE AND EFFECT OF THE PLAN

### 1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.  Additionally, as discussed in greater detail in Section IV.J herein, titled "Binding Nature of the Plan," a bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

### 2.    Reorganization under the CCAA Case

The CCAA is the principal Canadian statute pursuant to which major restructurings are administered.  Like chapter 11, the CCAA maintains the debtor as a debtor-in-possession.  The CCAA creates a court-supervised process that allows the debtor to carry on business and maintain control over its assets while it negotiates and seeks approval for, a plan of compromise and arrangement acceptable to its creditors.  On February 4, 2014, the Canadian Bankruptcy Court entered a recognition order under Part IV of the CCAA, which, among other things, recognized these Chapter 11 Cases as "foreign non-main proceeding[s]" for the purposes of the CCAA.

### 3.    Financial Restructurings Under the Plan

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Section IV herein):

- a newly-formed entity (the "**NewCo**") organized by [certain of the Prepetition Lenders] for the purpose of consummating the transactions by this Plan will credit bid a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims to be determined in exchange for all or substantially all of the Purchased Assets of HoldCo (including its Equity Interests in TIH and certain Non-Debtor Affiliates) as described in the Purchase Agreement.  A detailed summary of the Purchase Agreement is provided in Section III.E below;

- the DIP Facility Claims will be satisfied in (i) Cash equal to the amount of such DIP Facility Claim; (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such DIP Facility Claim shall have agreed upon in writing; or (iii) such other treatment specified in **Error! Reference source not found.** of the Plan with the written consent of the DIP Facility Agent and Required DIP Lenders;

- the Holders of Prepetition Credit Agreement Claims and/or DIP Facility Claims will have their claims partially satisfied through the Purchase Price Credit Bid Component comprised of the Prepetition Credit Agreement Claims and/or DIP Facility Claims and their remaining Prepetition Credit Agreement Claims and/or DIP Facility Claims with respect to Holdco will be repaid in full and/or refinanced or replaced by obligations of NewCo (guaranteed by all Non-Debtor Obligors (as defined in the Credit Agreement)) under any Exit Facility;

- the Holders of General Unsecured Claims Against HoldCo and Intercompany Claims will not receive any recovery under the Plan;

- all Old Affiliate Interests in Affiliate Debtor shall remain effective on the Effective Date and be transferred to the Proposed Purchaser as part of the Purchased Assets; and

- all Old HoldCo Interests will be cancelled on the Effective Date.

      (a)      <u>New Equity Interests To be Issued Under the Plan</u>

On the Effective Date, Reorganized HoldCo shall issue 100% of the Reorganized HoldCo Common Stock to the Plan Administrator pursuant to the Amended/New Organizational Documents.  Reorganized HoldCo shall not be obligated to register the Reorganized HoldCo Common Stock under the Securities Act or Exchange Act or to list the Reorganized HoldCo Common Stock for public trading on any securities exchange or be a reporting issuer in any province of Canada.  Distribution of the Reorganized HoldCo Common Stock shall be made, pursuant to the written instruction of Reorganized HoldCo, by delivery or book-entry transfer thereof.

The NewCo Ownership Interests will constitute all of the equity interests in NewCo outstanding as of the Effective Date and shall be issued by NewCo in accordance with <u>Article III</u> of the Plan, subject to dilution on account of any shares issued in connection with the NewCo Incentive Plan.  NewCo shall not be obligated to register the NewCo Ownership Interests under the Securities Act or Exchange Act or to list the NewCo Ownership Interests for public trading on any securities exchange or be a reporting issuer in any province of Canada.  Distributions of the NewCo Ownership Interests shall be made, pursuant to the written instruction of NewCo, by delivery or book-entry transfer thereof by the applicable Distribution Agent as described in the Plan, as and to the extent practicable.  Upon the Effective Date, after giving effect to the transactions contemplated by the Plan, the authorized capital stock or other equity securities of NewCo shall be that number of shares of NewCo Ownership Interests as may be designated in the Amended/New Organizational Documents.

The New Equity Interests will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in <u>Section VIII</u> herein, titled "Exemptions From Securities Act Registration."

**B.**      **ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

The following is a summary of the treatment of Administrative, DIP Facility and Priority Tax Claims under the Plan.  For a more detailed description of the treatment of such Claims under the Plan, please see <u>Article II</u> of the Plan.

      **1.**      **Administrative Claims**

Except as otherwise provided in <u>Article II</u> of the Plan, the legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by the Plan.  Subject to the other terms and conditions of <u>Article II</u> of the Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing; provided, however, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Administrative Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

(a)    Bar Date for Administrative Claims

Except as otherwise provided in Article II.A of the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order by no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, the Estates, the Proposed Purchaser, and their respective assets and property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Administrative Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.

Objections to such payment requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) sixty (60) days after the Effective Date and (b) sixty (60) days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

(b)    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors shall pay Professionals retained by the Debtors in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by such Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than twenty-one (21) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

**2.    DIP Facility Claims**

On the Effective Date, each Holder of a DIP Facility Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such DIP Facility Claim; (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such DIP Facility Claim shall have agreed upon in writing; or (iii) such other treatment specified in Article III.B.4 of the Plan with the written consent of the DIP Facility Agent and Required DIP Lenders.

**3.    Priority Tax Claims**

The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by the Plan.  Subject to Article VIII of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the

iv

consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Priority Tax Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.  Any installment payments to be made under clause (C) or (D) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## C.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN <u>SECTION VI</u> BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW**.

## SUMMARY OF EXPECTED RECOVERIES

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 1 | Other Priority Claims<br><br>Expected Amount: $[0] | Each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim:<br><br>• Cash in an amount equal to the amount of such Allowed Other Priority Claim;<br><br>• Such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Other Priority Claim shall have agreed upon in writing; <u>or</u><br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 2 | Other Secured Claims<br><br>Expected Amount: $[0] | Each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim:<br><br>• Cash in an amount equal to the amount of such Other Secured Claim;<br><br>• Such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Other Secured Claim shall have agreed upon in writing;<br><br>• The Collateral securing such Other Secured Claim; <u>or</u><br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 3 | Secured Priority Tax Claims<br><br>Expected Amount: $[0] | Each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim:<br><br>• Cash in an amount equal to the amount of such Allowed Secured Priority Tax Claim;<br><br>• Such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Secured Priority Tax Claim shall have agreed upon in writing;<br><br>• The Collateral securing such Secured Priority Tax Claim;<br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; <u>or</u><br><br>• In accordance with section 1129(a)(9)(C) and (D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Secured Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable. | 100% |
| 4 | Prepetition Credit Agreement Claims<br><br>Expected Amount: $[201,975,433.74] [3] | Each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 4 Claim with respect to HoldCo:<br><br>• On the Effective Date, its Pro Rata share of the NewCo Ownership Interests (subject to dilution for the NewCo Incentive Plan) and the Net Cash Amount; <u>and</u><br><br>• After the Effective Date, subject to the terms and conditions of the Plan, its Pro Rata share of the Unused Cash Reserve Amount. | [  ]% |

---

[3]    Subject to confirmation, including deduction for principal amount of the roll-up.

vi

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
|---|---|---|---|
| 5-A | General Unsecured Claims Against HoldCo<br><br>Expected Amount: $[ ] | Each Holder of a General Unsecured Claim Against HoldCo shall not receive any distribution or retain any property on account of such General Unsecured Claim. | 0% |
| 5-B | General Unsecured Claims Against Affiliate Debtor<br><br>Expected Amount: $[ ] | Subject to <u>Article VIII</u> of the Plan, each Holder of an Allowed Class 5-B Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5-B Claim:<br><br>• Cash equal to the amount of such Allowed Class 5-B Claim;<br><br>• Such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5-B Claim shall have agreed upon in writing; <u>or</u><br><br>• Such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 6 | Intercompany Claims | Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under the Plan on account of such Intercompany Claim, *provided*, *however*, that the Reorganized Debtors may, with the consent of the Agent and Aggregate Required Lenders, reinstate, reconcile, cancel, or otherwise compromise such Intercompany Claims as may be necessary or advisable. | 0% |
| 7 | Old HoldCo Interests | Old HoldCo Interests will be cancelled and will be of no further force and effect, without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest shall not receive any distribution or retain any property on account of such Old HoldCo Interest. | 0% |
| 8 | Old Affiliate Interests in Affiliate Debtor | The Old Affiliate Interests will remain effective and outstanding on the Effective Date and will, subject to the terms and conditions of the Purchase Agreement, be transferred to the Proposed Purchaser as part of the Purchased Assets. | N/A |

## D.    SOLICITATION PROCEDURES

### 1.    The Solicitation and Voting Procedures

On [          ], 2014 the Bankruptcy Court entered the Disclosure Statement Order which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

**The discussion of the procedures below is a summary of the solicitation and voting process**. Detailed voting instructions will be provided with each ballot and are also set forth in greater detail in Disclosure Statement Order.

PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.

NY\6174610.7

2.      **The Voting and Claims Agent**

The Debtors have sought authority to retain Prime Clerk LLC to, among other things, act as Voting and Claims Agent.

Specifically, the Voting and Claims Agent will assist the Debtors with: (a) mailing Confirmation Hearing Notices (as defined in the Disclosure Statement Order); (b) mailing Solicitation Packages (as defined in the Disclosure Statement Order and as described below); (c) soliciting votes on the Plan; (d) receiving, tabulating, and reporting on ballots cast for or against the Plan by Holders of Claims against the Debtors; (e) responding to inquiries from creditors and stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (f) if necessary, contacting creditors regarding the Plan and their ballots.

3.      **Holders of Claims Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan.  The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within such Class) under the Plan:

| | SUMMARY OF STATUS AND VOTING RIGHTS | | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Status** | **Voting Rights** |
| (1) | Other Priority Claims | Unimpaired | Deemed to Accept |
| (2) | Other Secured Claims | Unimpaired | Deemed to Accept |
| (3) | Secured Priority Tax Claims | Unimpaired | Deemed to Accept |
| (4) | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| (5-A) | General Unsecured Claims Against HoldCo | Impaired | Deemed to Reject |
| (5-B) | General Unsecured Claims Against Affiliate Debtor | Unimpaired | Deemed to Accept |
| (6) | Intercompany Claims | Impaired | Deemed to Accept |
| (7) | Old HoldCo Interests | Impaired | Deemed to Reject |
| (8) | Old Affiliate Interests in Affiliate Debtor | Impaired | Deemed to Accept |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Class 4 (the "**Voting Class**") because Holders of Claims in the Voting Class are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.  The Debtors are **not** soliciting votes from (a) Holders of Unimpaired Claims in Classes 1, 2, 3, and 5-B, Holders of Intercompany Claims in Class 6, and Holders of Old Affiliate Interests in Affiliate Debtor in Class 8 because such parties are conclusively presumed to have accepted the Plan or (b) Holders of Claims in Class 5-A and Old HoldCo Interests in Class 7 because such parties are conclusively presumed to have rejected the Plan (collectively, the "**Non-Voting Classes**").

4.      **The Voting Record Date**

The Bankruptcy Court has approved [          ], 2014 as the voting record date with respect to Prepetition Credit Agreement Claims (the "**Voting Record Date**").  The Voting Record Date is the date on which it will be determined: (a) which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and receive Solicitation Packages in accordance with the Disclosure Statement Order; and (b) which Holders of Claims

and Equity Interests in the Non-Voting Classes are entitled to receive the Confirmation Hearing Notice, including notice of such Holder's non-voting status, in accordance with the Disclosure Statement Order.

### 5.    Contents of the Solicitation Package

The following documents and materials will collectively constitute the Solicitation Package:

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Class to vote to accept the Plan;

- the Confirmation Hearing Notice, attached to the Disclosure Statement Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Disclosure Statement Order;

- to the extent applicable, a ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached to the Disclosure Statement Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

### 6.    Distribution of the Solicitation Package to Holders of Claims Entitled to Vote on the Plan

With the assistance of the Voting and Claims Agent, the Debtors intend to distribute Solicitation Packages on or before [            ], 2014 (the "**Solicitation Mailing Date**").  The Debtors submits that the timing of such distribution will provide such Holders of Claims with adequate time within which to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).  The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Class receive no more than one Solicitation Package.  If a Holder holds Claims in more than one Class and is entitled to vote in more than one Class, such Holder will receive separate ballots which must be used for each separate Class of Claims.

### 7.    Distribution of Notices to Holders of Claims in Non-Voting Classes and Holders of Disputed Claims

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages and, instead, will receive the appropriate form of notice as follows:

- Unimpaired Claims – Deemed to Accept.  DIP Facility Claims, Administrative Claims and Priority Tax Claims are unclassified, non-voting Claims and Claims in Classes 1, 2, 3, and 5-B are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan.  As such, Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, an "Unimpaired Claims Notice" attached as Exhibit 4 to the Disclosure Statement Order.

- Impaired Claims – Deemed to Reject.  Holders of Claims in Class 5-A and Equity Interests in Class 7 are receiving no distribution under the Plan and, therefore, are conclusively presumed to reject the Plan.  As such, Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, a Notice of Non-Voting Status: No Recovery.

- Impaired Claims – Deemed to Accept.  Holders of Claims in Class 6 and Equity Interests in Class 8 do not retain or receive any property under the Plan, but are nonetheless deemed to accept the Plan because the Holders of such Claims and Equity Interests are Affiliates of the Debtors.  As such,

Holders of such Claims and Equity Interests will receive, in lieu of a Solicitation Package, a Notice of Non-Voting Status: No Recovery.

- [Disputed Claims.

    (a) Any Holder of a Disputed Claim for which the Debtors have filed an objection on or before April [__], 2014, whether such objection related to the entire Claim or a portion thereof, will not be entitled to vote on the Plan and will not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan.  Such Holders will receive a "Notice of Non-Voting Status: Disputed Claims," attached as Exhibit 2 to the Disclosure Statement Order.

    (b) Any Holder of a Claim in Class 4 against the Debtors for which such Holder has timely filed a Proof of Claim (or an untimely Proof of Claim which has been allowed as timely by the Bankruptcy Court under applicable law on or before the Voting Record Date), which is marked, in whole or in part, as contingent, unliquidated, or disputed, and that is not subject to an objection filed by the Debtors, will have such Claim temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00.  Such Holders will receive (a) a Solicitation Package that contains the applicable ballot, (b) a "Confirmation Hearing Notice," which notice informs such person or entity that its entire Claim has been allowed temporarily for voting purposes only and not for purposes of allowance or distribution, at $1.00 and (c) a "Notice of Limited Voting Status to Holders of Contingent, Unliquidated or Disputed Claims for Which No Objection Has Been Filed by the Debtors," attached as Exhibit 8 to the Disclosure Statement Order.]

    If any Holder described in the preceding two subparagraphs disagrees with the Debtors' classification or status of its Claim, then such Holder MUST file and serve a motion requesting temporary allowance of its Claim solely for voting purposes in accordance with the procedures set forth in the Disclosure Statement Order.

- Contract and Lease Counterparties.  Parties to certain of the Debtors' Executory Contracts and Unexpired Leases may not have scheduled Claims or Claims based upon Proofs of Claim pending the disposition of their contracts or leases by assumption or rejection.  Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, to ensure that such parties nevertheless receive notice of the Plan, counterparties to the Debtors' Executory Contracts and Unexpired Leases will receive, in lieu of a Solicitation Package, a "Contract/Lease Party Notice" in substantially the form as attached as Exhibit 6 to the Disclosure Statement Order.

## 8.    Additional Distribution of Solicitation Documents

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Class, the Debtors will also provide parties who have filed requests for notices under Bankruptcy Rule 2002 as of the Voting Record Date with the Disclosure Statement, Disclosure Statement Order and Plan.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Voting and Claims Agent at (855) 410-7360; (b) writing to Tuscany International Holdings (U.S.A.) Ltd., c/o Prime Clerk LLC, 830 3rd Avenue, 9th Floor, New York, NY 10022; and/or (c) visiting the Debtors' restructuring website at: http://cases.primeclerk.com/tuscany.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

## 9.    Filing of the Plan Supplement

The Debtors will file the Plan Supplement by [            ], 2014.  The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section I.D.9.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Voting and Claims Agent at (855) 410-7360; (b) writing to Tuscany International Holdings (U.S.A.) Ltd., c/o Prime Clerk LLC, 830 3rd Avenue, 9th

x

Floor, New York, NY 10022; and/or (c) visiting the Debtors' restructuring website at: http://cases.primeclerk.com/tuscany.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at http://www.deb.uscourts.gov.

The Plan Supplement will include all Exhibits and Plan Schedules that were not already filed as exhibits to the Plan or this Disclosure Statement, all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

As used herein, the term "**Distribution List**" means (a) the Office of the United States Trustee, (b) counsel to the DIP Facility Agent, (c) counsel to the Prepetition Agent, (d) the Internal Revenue Service, and (e) all parties that, as of the applicable date of determination, have filed requests for notice in this Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

## E.    VOTING PROCEDURES

Holders of Claims entitled to vote on the Plan are advised to read the Disclosure Statement Order, which sets forth in greater detail the voting instructions summarized herein.

### 1.    The Voting Deadline

The Bankruptcy Court has approved [5:00 p.m.] prevailing Eastern Time on April [   ], 2014 as the Voting Deadline.  The Voting Deadline is the date by which all Ballots must be properly executed, completed and delivered to the Voting and Claims Agent in order to be counted as votes to accept or reject the Plan.

### 2.    Types of Ballots

The Debtors will provide the Ballots, the form of which is attached to the Disclosure Statement Order as Exhibit 3, to Holders of Claims in the Voting Class (i.e. Class 4).

### 3.    Voting Instructions

Under the Plan, Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot and returning it to the Voting and Claims Agent prior to the Voting Deadline.

---

**PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE BALLOT THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES, AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

---

To be counted as votes to accept or reject the Plan, all Ballots (all of which will clearly indicate the appropriate return address) must be properly executed, completed, dated, and delivered by using the return envelope provided by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that they are **actually received** on or before the Voting Deadline by the Voting and Claims Agent at the following address:

---

Tuscany International Holdings (U.S.A.) Ltd.
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, NY 10022

If you have any questions on the procedures for voting
on the Plan, please call the Voting and Claims Agent at:
(855) 410-7360

---

*** *HOLDERS OF CLASS 4 PREPETITION CREDIT AGREEMENT CLAIMS MUST EXECUTE, COMPLETE AND RETURN THEIR BALLOTS IN ACCORDANCE WITH THE RULES FOR VOTING THEIR CLASS 4 PREPETITION CREDIT AGREEMENT CLAIMS SET FORTH IN THIS SECTION.* ***

4.    **Tabulation of Votes**

---

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASS.**

---

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY** **RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE VOTING AND CLAIMS AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAS BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- **ANY BALLOT THAT IS RECEIVED <u>AFTER</u> THE VOTING DEADLINE WILL <u>NOT</u> BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT.**

- **ADDITIONALLY, THE FOLLOWING BALLOTS WILL <u>NOT</u> BE COUNTED:**

  o    any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o    any Ballot cast by or on behalf of an entity that does not hold a Claim in the Voting Class;

  o    any Ballot cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed;

  o    any Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

  o    any Ballot cast for a Claim that is subject to an objection pending as of the Voting Record Date (except as otherwise provided in the Disclosure Statement Order);

  o    any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), or the Debtors' financial or legal advisors;

  o    any Ballot transmitted by facsimile, telecopy or electronic mail;

  o    any unsigned Ballot; or

  o    any Ballot not cast in accordance with the procedures approved in the Disclosure Statement Order.

**F.      CONFIRMATION OF THE PLAN**

**1.      The Confirmation Hearing**

The Confirmation Hearing will commence at [10:00 a.m.] prevailing Eastern Time on [May 6], 2014 before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801-3024.   The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.   Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

**2.      The Deadline for Objecting to Confirmation of the Plan**

The Confirmation Objection Deadline is 4:00 p.m. prevailing Eastern Time on April [    ], 2014.  Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "**Notice Parties**").

(a) Counsel to the Debtors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022-4834 (Attn: Mitchell Seider, Esq.), Young Conaway Stargatt &Taylor, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael Nestor, Esq.) and McCarthy Tetrault LLP, Suite 3300, 421-7th Avenue SW, Calgary AB T2P 4K (Attn: Sean Collins, Esq.);

(b) Counsel to the Agent, Mayer Brown LLP, 1675 Broadway, New York, New York 10019 (Attn: Howard Beltzer, Esq.) and Richards Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark Collins, Esq.); and

(c) The Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Tiiara Patton, Esq.).

CONFIRMATION   OBJECTIONS   NOT   TIMELY   FILED   AND   SERVED   IN   THE   MANNER   SET FORTH   HEREIN   MAY   NOT   BE   CONSIDERED   BY   THE   BANKRUPTCY   COURT   AND   MAY   BE OVERRULED WITHOUT FURTHER NOTICE.

**3.      Effect of Confirmation of the Plan**

Article X of the Plan contains certain provisions relating to (a) the compromise and settlement of Claims, (b) the release of the Released Parties by the Debtors and certain Holders of Claims, and each of their respective Related Persons, and (c) exculpation of certain parties.  **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly**.

> THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

NY\6174610.7

**G.    CONSUMMATION OF THE PLAN**

It will be a condition to confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will be consummated on the Effective Date.

**H.    RISK FACTORS**

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN SECTION VI HEREIN TITLED, "PLAN-RELATED RISK FACTORS."**

NY\6174610.7

## II.
## BACKGROUND TO THE CHAPTER 11 CASE

### A.    THE DEBTORS' CORPORATE HISTORY AND STRUCTURE

TID was formed through a predecessor in Alberta, Canada on April 6, 2004, and, after a series of mergers and name changes, became Tuscany International Drilling Inc. on April 16, 2010.  TID is the direct or indirect parent of certain foreign subsidiaries and Affiliates (the "**Non-Debtor Affiliates**" and, collectively with the Debtors, the "**Tuscany Entities**").  The Debtors in these Chapter 11 Cases are TID and TIH.

TIH was incorporated in Delaware on January 20, 2011, and is headquartered in Houston, Texas.  TIH's primary asset is its 33.87% ownership interest in Warrior Rig Limited Partnership ("**Warrior**"), a private oilfield services company specializing in the design, manufacture, sale and service of top drive systems and other rig parts.  Warrior is a Delaware limited partnership with headquarters in Calgary, Alberta.

The Tuscany Entities have operations in Colombia, Brazil, and Ecuador.  The Colombian and Brazilian businesses are operated by certain of the Non-Debtor Affiliates, while the Ecuadorian business is currently operated by a branch office of TID (the "**Ecuador Branch Office**").  Although a part of TID, the Ecuador Branch Office primarily functions as a separate corporate entity.  The Ecuador Branch Office generates enough revenue to fund the majority of its own operational costs and, like the Colombian and Brazilian entities, is managed by a local country manager who oversees all day-to-day operations.

On April 19, 2010, TID was listed on the Toronto Stock Exchange under the symbol "TID" and on December 1, 2011, TID was listed on the Bolsa de Valores de Colombia (the Colombian stock exchange) under the symbol "TIDC."  As of January 27, 2014, TID had 375.2 million common shares outstanding, of which approximately 159.5 million were held by insiders.  TID also had 12.9 million stock options outstanding.  TID was de-listed from the Toronto Stock Exchange at the end of January 2014, in connection with the execution of the Forbearance Agreement.

### B.    OVERVIEW OF THE DEBTORS' BUSINESSES

The Tuscany Entities provide onshore drilling and workover services to oil and gas companies to support the exploration, development, and production of oil and gas.  They have a strong competitive position in the key onshore drilling markets of Colombia, Brazil, and Ecuador, where they contract their fleet of newer, technologically advanced, and efficient onshore drilling rigs to customers.

As of the Petition Date, the Tuscany Entities owned 26 rigs, of which 12 are located in Colombia, nine in Brazil and five in Ecuador.  Of these 26 rigs, 15 were contracted and operational as of the Petition Date and five were directly owned by the Debtors.

The Tuscany Entities' fleet of rigs includes varying types of equipment, which allows them to customize their services to the distinctive needs of their customers.  In the oil and gas drilling industry, the capability of a rig is often classified as "single drilling," "double drilling," or "triple drilling."  Although all rigs drill with only a single pipe, rigs are categorized based upon the number of connected pipes that can "stand" in the rig derrick.  For example, double drilling and triple drilling rigs allow the rigs to hold a stand of pipe that consists of two or three connected drill pipes.  Single drilling and double drilling rigs are generally used for shallow exploration and development drilling activity, while triple drilling rigs, which have greater hoisting capacity, are typically used for deeper drilling.  A majority of the Tuscany Entities' rigs are double drilling rigs, though their fleet does include single and triple drilling rigs as well.  Their double and triple drilling rigs are typically used for the initial drilling of a well, while their single drilling rigs are used mostly for major repairs or modifications, known as "workovers."

In addition, some of the rigs in the Tuscany Entities' fleet have specialty rig equipment.  Many of the rigs have a top drive, which is a mechanical device suspended in the mast of the drilling rig that provides rotational force to facilitate the drilling of the borehole, as contrasted with a traditional rig with a rotary table that moves only vertically.  A rig with a top drive increases the efficiency of the project and reduces the amount of manual labor and

1

associated hazards involved with traditional rigs. Some of the rigs also have a hydraulic catwalk machine that allows the operators to pick up and lay down long pieces of drill pipe and casings without the use of more hazardous slings or cables. This assortment of specialized rigs enables the Tuscany Entities to provide services in a variety of different areas and enhances the value the rigs can provide to their customers.

Oil and natural gas well drilling contracts are carried out on a daywork basis. Under these contracts, the Tuscany Entities charge the customer a fixed rate per day regardless of the number of days needed to drill the well. In addition, daywork contracts usually provide for a reduced day rate, or lump sum amount, for mobilization and demobilization of the rig to and from the well location and for both assembly and dismantling of the rig. Contracts with customers vary in duration from a few days to multiple years and the Tuscany Entities' total revenue is generated from contracts with approximately ten customers.

As of the Petition Date, the Tuscany Entities employed over 1,200 employees. Of these employees, the Debtors employed 13 employees in Canada and approximately 330 employees in Ecuador. None of the employees in Canada are party to any collective bargaining agreements; however, all of the employees in Ecuador are party to collective bargaining agreements with TID.

## C.    PREPETITION INDEBTEDNESS

In August 2010, certain of the Tuscany Entities entered into a loan agreement in the principal amount of $125 million, which, after a series of amendments, was increased on September 14, 2012 to $255 million (the "**Prepetition Loans**"). To address liquidity issues, the Tuscany Entities conducted various acquisitions, asset sales, and other dispositions, which allowed them to decrease the outstanding principal amount under their Prepetition Loans to approximately $[201,975,433.74],[4] pursuant to the terms of the Third Amended and Restated Credit Agreement, dated December 23, 2013 (the "**Prepetition Credit Agreement**"). The Prepetition Credit Agreement was amended and restated in its entirety pursuant to that certain Fourth Amended and Restated Credit Agreement, dated February 5, 2014, by and among the Debtors, the subsidiaries of HoldCo party thereto, the DIP Facility Agent, the DIP Facility Lenders, and the other Entities party thereto (as amended, supplemented, or modified from time to time prior to the Effective Date, the "**Credit Agreement**"). As of the Petition Date, the "Prepetition Lenders" (as defined in the Credit Agreement) held senior, first priority security interests in, and liens upon, substantially all assets of TID and the Non-Debtor Affiliates, including a pledge of each of their stock.

## D.    EVENTS LEADING TO THE CHAPTER 11 FILING

### 1.    Low Rig Utilization

The oilfield services industry is highly competitive. Oilfield service companies compete primarily on a regional basis, and competition varies significantly from region to region at any particular time. The Tuscany Entities compete directly with various international and local companies in each region in which they operate. Their revenue and profitability depend largely on their rig utilization rates, which are affected by their ability to enter into contracts with new or existing customers, the length of the contracts and the availability of their rigs.

As of the Petition Date, the Tuscany Entities' overall rig utilization was less than 60%, with only 15 out of 26 rigs currently operational. Only two out of their nine Brazilian rigs are operational. The remaining seven rigs are "stacked," meaning they are without contracts and stored. Additionally, the Brazilian operations have significant selling, general and administrative expenses, which contribute further to the overall poor financial performance in Brazil. As a result, from January to October 2013, the Brazilian operations generated $26 million in revenue and a direct cost of $26 million, resulting in no gross margin. During that same time period, overhead costs were $6.7 million, leaving the Tuscany Entities' Brazilian affiliates with a negative EBITDA of $6.7 million.

---

[4]    Subject to confirmation, including deduction for principal amount of the roll-up.

### 2.      Unprofitable Acquisitions

The Tuscany Entities also suffered financial losses in connection with a series of unprofitable acquisitions. On May 18, 2011, TID acquired Drillfor Perfurações do Brasil Ltda. ("**Drillfor**"), a Brazilian drilling and workover company, thereby increasing the Tuscany Entities' presence in Brazil by adding eight new rigs to their fleet.  On September 15, 2011, TID consummated its acquisition of Caroil SAS from Etablissements Maurel & Prom ("**M&P**"), a French exploration and production company, which added six drilling rigs to the Tuscany Entities' Colombian presence and eight rigs in Africa.  In each case, the operations failed to meet the Tuscany Entities' financial projections and resulted in little, if any, profits.

These challenges, among others, have caused a significant decline in the Tuscany Entities' financial health.  To illustrate, the Tuscany Entities' consolidated EBITDA is expected to have decreased from approximately $43.2 million in calendar year 2012 to approximately $17.3 million[5] in calendar year 2013.  In the same period, their revenue is forecasted to have declined from approximately $222.8 million to approximately $163.6 million.

### 3.      Large Uncontrollable Receivable Balance

The Tuscany Entities' results have also been affected by a significant amount of accounts receivable that the Debtors believe are unlikely to be collected.  For example, approximately $8.9 million is due to one of the Non-Debtor Affiliates from a Colombian customer, and approximately $4 million is due to TID from a customer in Ecuador.  In addition, one of the Non-Debtor Affiliates is currently in arbitration proceedings to collect early termination penalties owed to it from a customer in Brazil.

### 4.      The Debtors' Prepetition Marketing Process

In response to declining EBITDA and tightening liquidity, since late 2012, TID's board of directors (the "**TID Board**") actively, but ultimately unsuccessfully, pursued and examined a number of potential strategic alternatives. As an example, on November 19, 2012, TID announced its intention to refinance its existing debt through the offering of senior secured notes. However, as announced on December 4, 2012, due to, among other things, TID's tenuous financial situation, market demand on reasonable terms was not sufficient to consummate the offering.

After approximately six months of continued refinancing and marketing efforts, on April 8, 2013, the TID Board retained Black Spruce Merchant Capital Corp. ("**Black Spruce**") and Citigroup Global Markets Inc. ("**Citigroup**") as financial advisors.  In addition, the TID Board continued to seek out potential opportunities on its own.  On May 9, 2013, the TID Board resolved to initiate a more formal process to identify, examine, and consider various potential strategic alternatives for the Tuscany Entities with a view to enhancing and preserving shareholder value.  Among the alternatives considered was a sale of all or a material portion of the assets of TID, as well as a debt or equity financing, a recapitalization, or a merger or other business combination. To further augment this process and avoid any potential conflicts of interest, the TID Board formed a special committee of independent directors (the "Special Committee") to examine these potential strategic alternatives. The members of the Special Committee are not members of management, nor are they affiliated with the Prepetition Lenders.

In accordance with the Special Committee's directives, over the course of two separate financing and sale processes during the past year, over 100 parties were contacted, on a confidential basis, to solicit interest in a potential transaction with TID.  TID subsequently entered into confidentiality agreements and advanced discussions with 31 interested parties and provided such parties with access to a virtual data room and additional information to assist with their due diligence, including extensive marketing materials prepared by Black Spruce and Citigroup. The proposals received by the Special Committee were either highly conditional, highly dilutive to existing shareholders and not actionable within a reasonable timeframe, or undervalued the assets proposed to be purchased.

---

[5]      On March 1, 2014, the Debtors filed the *Declaration of Deryck Helkaa in Response to Preliminary Objection of the Ad Hoc Committee of Equity Security Holders* [Docket No. 105], which notes that, based on current analyses, the correct 2013 EBITDA will likely be significantly lower due to significant write-downs related to doubtful accounts.

On November 14, 2013, TID and M&P entered into definitive agreements with respect to: (i) the sale of TID's then wholly-owned subsidiary, Caroil SAS, to M&P (the "**Caroil Disposition**"), the primary assets of which consisted of nine drilling and workover rigs and associated assets in Africa; and (ii) the sale of two rigs based in South America to M&P (the "**Rig Sale**").  On December 23, 2013, TID completed the Caroil Disposition and on January 16, 2014, TID completed the Rig Sale.  Pursuant to these dispositions, M&P: (i) assumed an aggregate of $50 million of debt under the Prepetition Loans from the Debtors; (ii) paid to TID an aggregate of $23 million, of which $3.5 million remains in escrow and $4.2 million was applied to reduce the outstanding amount under the Prepetition Loans; and (iii) transferred 109 million common shares (the "**Consideration Shares**") of TID to a special purpose vehicle, which Consideration Shares may either be repurchased and cancelled by TID for no additional consideration, or be directed to be sold to third party purchasers with the proceeds of such sales applied to reduce the outstanding amount under the Prepetition Loans.

Despite the Caroil Disposition and the Rig Sale, the Tuscany Entities remained in an overleveraged position, unable to make interest payments on their Prepetition Loans as scheduled.  Accordingly, in the months preceding the commencement of these cases, they continued to seek refinancing alternatives.  Despite TID's extensive marketing efforts, discussions with only one party resulted in significant negotiations over the material terms of a possible deal (such party, the "**Potential Purchaser**").  TID actively pursued a transaction with the Potential Purchaser, including the exchange of term sheet drafts.  However, the TID Board determined that based on the proposed terms, which did not contemplate anything near a par recovery for the Prepetition Lenders, continuing to pursue the transaction was not in the best interest of the Debtors or their estates.  Therefore, faced with a lack of viable financing options and rapidly dwindling liquidity, the Special Committee determined that the chapter 11 filings and the related debtor-in-possession financing offered by certain of the Prepetition Lenders was necessary to preserve the Debtors' going concern value.

### 5.    Third Amended and Restated Credit Agreement

The Debtors entered into the Third Amended and Restated Credit Agreement on December 23, 2013, which amended the terms of the Prepetition Loans.  The purpose of amending the Prepetition loans was, among other things, to (i) avoid a default under the Prepetition Loans due to the Debtors' inability to make a scheduled principal and interest payment in December 2013 and (ii) allow M&P to assume $50 million of obligations under the Prepetition Loans from the Debtors as part of the consideration for the Caroil Disposition.  Pursuant to the Prepetition Credit Agreement, TID and the Prepetition Lenders also agreed to: (i) defer all December 15, 2013 payment obligations of TID to January 24, 2014; (ii) defer certain financial covenants to January 24, 2014; (iii) convert revolving loans to term loans with a maturity date of September 14, 2015; and (iv) remove Caroil as a guarantor of the loans.

### 6.    The Debtors' Entry into the Forbearance Agreement

On January 24, 2014, certain of the Tuscany Entities entered into a forbearance agreement with the Prepetition Lenders under the Prepetition Credit Agreement, pursuant to which the Prepetition Lenders agreed to forbear from exercising any of their rights and remedies in connection with certain events of default under the Prepetition Credit Agreement.  The forbearance agreement afforded the Tuscany Entities additional time to negotiate with the Prepetition Lenders and establish a consensual restructuring process.

### 7.    The Debtors' Entry into the Restructuring Support Agreement

As part of their restructuring efforts, the Debtors and certain of their Non-Debtor Affiliates entered into the Restructuring Support Agreement with Prepetition Lenders holding approximately 95% of the prepetition obligations arising under the Prepetition Credit Agreement.  The Restructuring Support Agreement contemplates that the Prepetition Lenders and/or the DIP Facility Lenders will credit bid certain of their debt in exchange for all or substantially all of the assets of TID, but provides for a broad "fiduciary out" allowing the Debtors to seek competing offers through a bidding and marketing process.  This structure will ensure that that the Debtors will receive the highest and best offer for their assets, maximizing value for all parties in interest.  The Restructuring Support Agreement also established a timeline for the filing of the Plan and Disclosure Statement, a hearing to approve the Disclosure Statement, and a Confirmation Hearing.

### III.
### EVENTS DURING THE CHAPTER 11 CASE

**A.    FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF**

Immediately following the Petition Date, the Debtors devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, customers, employees and utility providers that the Debtors believed could be impacted by the commencement of the Chapter 11 Cases.  As a result of these initial efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

On February 2, 2014, the Debtors filed a number of motions (collectively referred to herein as "**First Day Motions**") with the Bankruptcy Court.  At hearings conducted on February 4, 2014 and March 7, 2014, the Bankruptcy Court entered several orders in connection with the First Day Motions to, among other things: (i) prevent interruptions to the Debtors' businesses; (ii) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers, and utility providers; (iii) provide access to critical financing and capital; and (iv) allow the Debtors to retain certain advisors to assist with the administration of the Chapter 11 Cases (each, a "**First Day Order**").

**1.    Procedural Motions**

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court approved the joint administration of the Debtors' cases.

**2.    Employment of Advisors**

To assist the Debtors in carrying out their duties as debtors-in-possession and to represent their interests in the Chapter 11 Cases, the Bankruptcy Court entered First Day Orders authorizing the Debtors to retain and employ the following advisors: (a) Latham & Watkins LLP and Young, Conaway, Stargatt & Taylor, LLP, as restructuring counsel; (b) McCarthy Tetrault LLP, as special Canadian counsel; (d) Prime Clerk LLP, as claims and noticing agent and administrative advisor, (e) Deloitte & Touche LLP, as tax professionals; (f) PricewaterhouseCoopers LLP, as auditors; and (g) FTI Consulting Canada Inc., as chief restructuring officer services provider.  The Debtors also sought and obtained orders approving and establishing procedures for the retention of professionals utilized in the ordinary course of the Debtors' businesses.

**3.    Foreign Representative Motion**

The Debtors also filed a motion for ancillary relief in Canada pursuant to the CCAA in the Calgary Courts Center (Commercial List) (the "**Canadian Court**") in Calgary, Alberta, Canada.  The purpose of the CCAA Case is to request that the Canadian Court recognize the Debtors Chapter 11 Cases as "foreign non-main proceeding" under the applicable provisions of the CCAA in order to, among other things, protect the Debtors' assets and operations in Canada through the imposition of a stay of proceedings against the Debtors in Canada similar to the automatic stay under section 362 of the Bankruptcy Code.  The Debtors asked the Bankruptcy Court to recognize TID as the foreign representative, as defined in section 45(1) of the CCAA (the "**Foreign Representative**") in the CCAA Case.

**4.    Stabilizing Operations**

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with customers, revenue and profits, the Debtors filed a number of First Day Motions to help facilitate the stabilization of its operations and effectuate, as much as possible, a smooth transition into operations as debtors-in-possession.  Specifically, in addition to certain orders discussed in greater detail below, the Debtors sought and obtained First Day Orders authorizing the Debtors to:

- pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits;

- pay prepetition obligations to shippers to secure the delivery of critical supplies to the Debtors or their Non-Debtor Affiliates and to satisfy any liens of shippers;

- maintain the existing cash management system;

- remit and pay certain taxes and fees; and

- pay employees, and foreign creditors in Ecuador, Colombia or Brazil who may have prepetition claims against the Debtors.

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of certain vendors and third-party service providers who the Debtors believe are essential to the ongoing operation of their businesses. The Debtors' ability to pay the claims of these vendors and service providers was and remains critical to maintaining ongoing business operations due to the Debtors' inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources. The Debtors' ability to pay the claims of these vendors and service providers, ultimately, was and remains critical to the success of the Debtors' Chapter 11 Cases.

## 5.    DIP Financing and Use of Cash Collateral

A critical goal of the Debtors' business stabilization efforts was to ensure the Debtors maintained sufficient liquidity to operate their businesses during the pendency of the Chapter 11 Cases. As such, as part of the negotiations pursuant to the Restructuring Support Agreement, certain Prepetition Lenders agreed to provide the Debtors with debtor in possession financing in the amount of $35 million, plus a roll-up of an additional $35 million of prepetition debt (the "**DIP Facility**"). The DIP Facility is structured as a new senior tranche of the Credit Agreement because it is guaranteed by certain Non-Debtor Affiliates. As the Debtors' prepetition marketing process demonstrated, no other parties were willing to provide a debtor-in-possession financing on better terms than the DIP Facility.

On the Petition Date, the Debtors filed their Debtors' *Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, (6) Authorizing the Roll-Up of Certain Prepetition Obligations, (7) Scheduling A Final Hearing and (8) Granting Related Relief* [Docket No. 12] (the "**DIP Motion**"). Through the DIP Motion, the Debtors sought permission from the Bankruptcy Court to enter into the Credit Agreement. The Debtors' obligations under the Credit Agreement are granted super-priority administrative claim status, and are secured by a first priority lien on substantially all of the Debtors' remaining property and assets. The Credit Agreement also provided for a dollar-for-dollar roll-up of those Prepetition Obligations of Prepetition Lenders who extended new money commitments to the Debtors.

At the hearing held on February 4, 2014, the Bankruptcy Court entered the Interim DIP Order, which, among other things: (a) authorized the Debtors to borrow up to $35 million under the Credit Agreement ($15 million of which was made available upon entry of the Interim DIP Order); (b) authorized the roll-up of Prepetition Obligations in the principal amount of $15 million (plus accrued interest) as DIP Loans; (c) granted superpriority liens and superpriority administrative claim status to the DIP Obligations; and (d) approved the Debtors' request to use cash collateral. On February 5, 2014, the Debtors and the DIP Facility Lenders entered into the Credit Agreement.

The financing provided under the Credit Agreement and the use of cash collateral has allowed the Debtors to, without limitation: (a) continue their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, suppliers, customers and employees; (c) pay various interest, fees and expenses under the Credit

Agreement; and (d) support their working capital, general corporate and overall operational needs of the Debtors and the Non-Debtor Affiliates.  The Credit Agreement has been essential to the preservation and maintenance of the going-concern value of the Debtors' businesses and, ultimately, a successful reorganization.

## B.    CCAA CASE

The CCAA is the principal Canadian statute for carrying out larger restructurings involving corporate debtors.  Part IV of the CCAA pertains to cross-border insolvencies and allows for the Canadian Bankruptcy Court, upon application of a foreign representative appointed by a foreign court to act in respect of a debtor company, to recognize foreign insolvency proceedings and to grant any other order that the Canadian Bankruptcy Court considers appropriate.  On February 4, 2014, the Canadian Bankruptcy Court granted a recognition order (the "**Recognition Order**") under Part IV of the CCAA.  The Recognition Order:

- recognized each of the Chapter 11 Cases as a "foreign non-main proceeding" for the purposes of the CCAA;

- stayed the commencement and continuation of any proceedings against the Debtors and their property until the expiry of the stay provided for in the Chapter 11 Cases;

- directed the Debtors to indemnify their directors and officers against obligations and liabilities that they may incur as directors and or officers after the commencement of Chapter 11 Cases except to the extent that such obligation was incurred as a result of the director's or officer's gross negligence or wilful misconduct and granted a priming charge in the aggregate amount of $100,000 as security for such indemnity;

- recognized the *Order Authorizing Payment of Prepetition Taxes and Fees* [Docket No. 45];

- recognized the *Order (INTERIM) (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Authorizing Continuation of Intercompany Transactions, and (IV) Granting Superpriority Status to Postpetition Intercompany Claims* [Docket No. 46];

- recognized the *Order (INTERIM) Authorizing Payment of Certain Prepetition Shipping and Related Claims* [Docket No. 47];

- recognized the *Order (INTERIM) (I) Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Foreign Claims and (II) Pursuant to Fed. R. Bankr. P. 2002(m), 6003 and 9007 Waiving Noticing Requirements* [Docket No. 48];

- recognized the *Order (INTERIM) (I) Authorizing Payment of Prepetition Claims of Certain Critical Vendors and Service Providers; (II) Confirming Administrative Expense Priority Status of Debtors' Undisputed Obligations for Postpetition Delivery of Goods and Services; and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers* [Docket No. 49]; and

- recognized the *Order (INTERIM) (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Benefits, Expense Reimbursements, and Related Obligations, (II) Confirming Right to Continue Workforce Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Workforce Programs, and (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments* [Docket No. 51].

It is anticipated that the Foreign Representative will seek recognition by the CCAA Court of further orders to be granted in the Chapter 11 Cases including, without limitation, any orders made to confirm the Plan and any related or ancillary relief granted in connection therewith.

## C.    REORGANIZATION STRATEGY AND SALE EFFORTS

With the assistance of their legal and financial advisors, and in consultation with and through the support of the Prepetition Lenders, the Debtors have continued their prepetition efforts to develop a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing and (c) enable the Debtors to emerge from chapter 11 through a value-maximizing auction and sale process.  At the business level, this reorganization strategy has primarily, though not exclusively, focused on:

- identifying which of the Debtors' operations are more financially viable and stabilizing operations;

- managing the Debtors' businesses to enhance their financial and operating performance, including utilizing the unique competitive advantage and opportunities afforded to chapter 11 debtors-in-possession; and

- reviewing the Debtors' Executory Contracts and Unexpired Leases to determine in conjunction with the Purchase Agreement, whether there are benefits to the Debtors in assuming or rejecting any Executory Contracts or Unexpired Leases.

The Restructuring Support Agreement commits the "Consenting Lenders" party thereto to a plan of reorganization designed to implement a comprehensive balance sheet restructuring through a credit bid by the Prepetition Lenders and/or DIP Facility Lenders for all or substantially all of the assets of TID (including its Equity Interests in TIH and certain Non-Debtor Affiliates) pursuant to the Plan, subject to an auction process.  Each of the parties thereto agrees to negotiate in good faith all of the various documents that are required for the implementation and achieving of the Debtors restructuring, including, without limitation (i) the First Day Motions, (ii) the Motion to assume the Restructuring Support Agreement, (iii) the DIP Motion, Interim DIP Order, and Final DIP Order, (iv) all solicitation materials in respect of the Plan, (v) this Disclosure Statement and the Plan, and (vi) any and all orders relating to the foregoing.

On February 28, 2014, the Debtors also filed the *Motion for Order (A) Establishing Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets or New Stock Pursuant to a Chapter 11 Plan, (B) Approving Certain Bidding Protections, (C) Authorizing and Scheduling a Date and Time for Auction Pursuant to Such Procedures, and (D) Granting Certain Related Relief* [Docket No. 103] (the "**Bidding Procedures Motion**"). The Bidding Procedures Motion seeks approval of, among other things, proposed bidding procedures for the sale of all or substantially all of the Debtors' assets or the new capital stock of Reorganized HoldCo, as reorganized under the Plan.  These bidding procedures are to be utilized by the Debtors in the postpetition sale process in an effort to secure the highest or otherwise best offer for the sale of the Debtors' businesses.  The Debtors also requested authorization to schedule a sale auction, to the extent necessary under the Bidding Procedures Motion.  A further description of the bidding procedures and the auction are provided in the Bidding Procedures Motion, and are incorporated herein by reference.  A hearing on the Bidding Procedures Motion is scheduled for March 21, 2014.

D.    **ECUADOR TRANSFER MOTION**[6]

On February 24, 2014, the Debtors filed the *Motion for Order Authorizing the Transfer of Tuscany International Drilling Inc.'s Ecuador Assets to Non-Debtor Affiliate Globaltechinv Ecuador S.A.*, [Docket No. 85] (the "**Ecuador Transfer Motion**").  The Ecuador Transfer Motion seeks authorization for TID to transfer outside of the ordinary course of business all assets owned by TID in connection with its branch office in Ecuador (the "**Ecuador Assets**") to Globaltechinv Ecuador S.A., a wholly-owned non-debtor subsidiary of TID that is incorporated in Ecuador.  The transfer of the Ecuador Assets will be subject to any and all liens, interests and defenses in effect prior to the transfer.  The purpose of the Ecuador Transfer Motion is to separate the Ecuador Assets from TID in order to facilitate a flexible bidding process whereby potential bidders can easily and efficiently bid on all or a portion of the Debtors' assets.

E.    **PURCHASE AGREEMENT**[7]

On [    ], 2014, the Debtors entered into the Purchase Agreement contemplating the acquisition of all or substantially all of the Purchased Assets (including HoldCo's equity interests in TIH and certain of the Non-Debtor Affiliates) by NewCo.  Pursuant to the Purchase Agreement, NewCo will provide the aggregate consideration of (i) $125,000,000 if certain Heli-Rigs are sold by TID (or an Affiliate thereof) before the Effective Date or (ii) $155,000,000 if certain Heli-Rigs are not sold by TID (or an Affiliate thereof) before the Effective Date, in each case which NewCo may allocate, in its sole discretion, between cash and a credit bid of the Prepetition Credit Agreement Claims and/or the DIP Facility Claims in exchange for substantially all of the Purchased Assets.  Certain of the key terms of the Purchase Agreement are highlighted below:

| | |
|---|---|
| **Agreement to Sell and Purchase**<br><br>(§ 2.1 of Purchase Agreement) | • On the terms and conditions set forth in the Purchase Agreement, the Plan and the Confirmation Order at, and effective as of, the Closing, (a) Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall, by Buyer's payment of the Purchase Price, purchase and acquire from Seller, all of Sellers' right, title and interest, free and clear of all Liens (other than Permitted Liens (to the extent not otherwise discharged pursuant to the Plan)), in and to all of the Purchased Assets, including any Purchased Assets acquired by Seller after the date of the Purchase Agreement but prior to the Closing and (b) Buyer shall assume from Seller, and Seller shall assign to Buyer, all of the Assumed Liabilities. |
| **Purchase Price; Allocation of Purchase Price Credit Bid Component**<br><br>(§ 3.1 of Purchase Agreement) | • In consideration for the Purchased Assets, and subject to the terms and conditions of the Purchase Agreement, at the Closing, the Buyer and/or one or more Buyer Designees shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay an aggregate amount equal to (i) $125,000,000 if the Heli-Rigs are sold by Seller (or an Affiliate thereof) before the Effective Date or (ii) 155,000,000 if the Heli-Rigs are not sold by Seller (or an Affiliate thereof) before the Effective Date (such amount, the "**Purchase Price**"), comprised as follows: (A) $[_____] for the Equity Interests in the [Panama Subsidiary] (including, without limitation, all rights it or the Seller has with respect to the Centurion Receivable]; (B) $[_____] for the Equity Interests in the [Ecuador Subsidiary] (including, without limitation, all rights it or the Seller has with respect to the |

---

[6]        The relief requested in the Ecuador Transfer Motion remains subject to further review and comment of counsel to the Debtors and counsel to the Agent.

[7]        Capitalized terms used in this paragraph but not otherwise defined in the Disclosure Statement or Plan shall have the meaning assigned to them in the Purchase Agreement.  To the extent that the Disclosure Statement and the Purchase Agreement are inconsistent, the terms of the Purchase Agreement shall control.

<table>
<tr>
<td></td>
<td>

CYA Receivable]; (C) $[_____] for the Equity Interests in the [Brazil Subsidiaries] (including, without limitation, all rights it or the Seller has with respect to the HRT Receivable]; (D) $[_____] for the Equity Interests in the [Delaware Subsidiary]; and (E) $[_____] for the other Purchased Assets. At any time prior to or during the Auction, Buyer may, in its sole discretion, adjust the foregoing initial allocation of the Purchase Price among the Equity Interests in the Acquired Subsidiaries and the other Purchased Assets.

• On the Closing Date, the Buyer shall pay or cause to be paid to the Seller all or some lesser portion of the Purchase Price as it elects, in its sole discretion, in the form of a credit bid of the Prepetition Obligations (the "**Purchase Price Credit Bid Component**"), with any balance to be paid in cash (the "**Purchase Price Cash Component**", and together with the Purchase Price Credit Bid Component, the "**Closing Payment**").[8] If Buyer elects to include a Purchase Price Cash Component in the Closing Payment, Buyer shall pay or cause to be paid to the Seller at closing such amount by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing Date.

</td>
</tr>
<tr>
<td>

**Purchased Assets**

**(§ 2.2 of Purchase Agreement)**

</td>
<td>

• "**Purchased Assets**" shall mean all of Seller's right, title and interests in, to and under the tangible and intangible assets of Seller (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with IFRS) described in subsections (a) through (u) below:

(a) all of the Equity Interests;

(b) all Cash of Seller as of the Closing;

(c) all Accounts Receivable of Seller as of the Closing, including, without limitation, the Centurion Receivable, the CYA Receivable and the HRT Receivable;

(d) all inventory, supplies, materials and spare parts of Seller as of the Closing (including all rights of Seller to receive such inventory, supplies, materials and spare parts that are on order) and all open purchase orders with suppliers;

(e) without duplication of the above, all royalties, advances, prepaid assets (excluding prepaid Taxes of Seller), security and other deposits, prepayments and other current assets relating to the Business or the Purchased Assets, the Assigned Contracts and the Assigned Real Property Leases, in each case of Seller as of the Closing (but excluding all interests in the Excluded Insurance Policies and all prepaid assets relating to Contracts that are not Assigned Contracts or Assigned Real Property Leases as of the Closing);

(f) all Non-Real Property Contracts, including Contracts related to Seller IP and Licensed Intellectual Property, that have been, or are intended to be, assumed by and assigned to Buyer pursuant to Section 2.6 or Section 2.7 of the Purchase Agreement (collectively, the "**Assigned Contracts**");

</td>
</tr>
</table>

---

[8]     If any cash is required to fund any obligations of Buyer/DIP Facility Lenders to Seller at Closing, concept of Purchase Price Cash Component will result in a deduct to credit bid component of Purchase Price.

(g)        all Real Property Leases that have been, or are intended to be, assumed by and assigned to Buyer pursuant to Section 2.6 or Section 2.7 of the Purchase Agreement (the "**Assigned Real Property Leases**");

(h)        all Seller IP;

(i)        all items of machinery, equipment, Drilling Rigs, supplies, furniture, fixtures, leasehold improvements (to the extent of Seller's rights to any leasehold improvements under the Assigned Real Property Leases) and other tangible personal property and fixed assets owned by Seller as of the Closing;

(j)        all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of Seller as of the Closing (except as otherwise described in Section 2.2 of the Purchase Agreement), including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials related to the Business or the Purchased Assets (collectively, the "**Documentary Materials**");

(k)        to the extent related to the Purchased Assets, all claims and causes of action of Seller as of the Closing (regardless of whether or not such claims and causes of action have been asserted by Seller) against Persons (including the Acquired Subsidiaries), and all rights of indemnity, warranty rights, rights of contribution and subrogation, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by Seller as of the Closing (regardless of whether such rights are currently exercisable);

(l)        all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Seller IP and all rights under any confidentiality agreements executed by any third party for the benefit of Seller to the extent relating to the Business or the Purchased Assets;

(m)        all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Current Employees, Former Employees or current or former directors, consultants, independent contractors and agents of Seller or any of its Affiliates or with third parties to the extent primarily relating to the Business or the Purchased Assets (or any portion thereof);

(n)        all of the rights and benefits accruing under all Governmental Approvals, all deposits and prepaid expenses (excluding prepaid Taxes of Seller) held by third parties and/or, to the extent transferable, any Governmental Authority, to the extent transferable, all bank and deposit accounts;

(o)        the amount of, and all rights to any, insurance proceeds received by Seller (other than any amounts or rights to any insurance proceeds received under any Excluded Insurance Policy) after the date of the Purchase Agreement in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(p)        any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against Seller Parties) arising out of or relating to any of the Purchased Assets as of the Closing (but

11

| | |
|---|---|
| | excluding all interests in the Excluded Insurance Policies); |
| | (q)      all prepaid and deferred items (excluding prepaid Taxes of Seller) that relate to the Business or the Purchased Assets as of the Closing, including all prepaid rentals and unbilled charges, fees and deposits (but excluding all interests in the Excluded Insurance Policies); |
| | (r)      to the extent transferable, all current and prior insurance policies of Seller that relate to the Purchased Assets or Assumed Liabilities, and all rights and benefits of Seller of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Courts relating to any debtor-in-possession financing obtained by Seller) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in the Excluded Insurance Policies; |
| | (s)      any rights, claims or causes of action as of the Closing of Seller relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assigned Contract or Assigned Real Property Lease (including in each case, the Acquired Subsidiaries) in respect of the assets, properties, conduct of business or operations of Seller arising out of events occurring on or prior to the Closing Date, including any Avoidance Actions that relate solely to any Purchased Assets or Assumed Liabilities; |
| | (t)      any rights, claims or causes of action as of the Closing of Seller relating to or arising against the Buyer or any of its Affiliates, Subsidiaries, or Representatives, including any Avoidance Actions against any such Persons; and |
| | (u)      all other assets that are related to or used in connection with the Business and that are owned or leased by Seller as of the Closing. |
| | If at any time after the Closing, Seller is in possession of any Purchased Asset or receives any payment, refund, reimbursement, credit or setoff from any Person in respect of any Purchased Asset, or otherwise acquires or possesses any rights, entitlements or assets in respect of the Purchased Assets, such payments, refunds, reimbursements, credits or set-offs as applicable (or any savings therefrom), shall be held by Seller in trust for the benefit of Buyer and, promptly following the receipt thereof, Seller shall pay over any such amounts to Buyer without set-off or deduction of any kind and/or shall, at Buyer's cost, execute and deliver any instruments of transfer or assignment that are necessary to transfer and assign to Buyer or its designee, or otherwise vest Buyer or its designee with title to, such assets, payments, refunds, reimbursements credits or set-offs (or any savings therefrom). |
| **Excluded Assets**<br><br>**(§ 2.3 of Purchase Agreement)** | •   Notwithstanding any provision in the Purchase Agreement to the contrary, the Purchased Assets shall not include any of the following (collectively, the "**Excluded Assets**"):<br><br>(a)      Seller's rights under the Purchase Agreement and the Loan Documents, and all consideration payable or deliverable to Seller pursuant to the terms and provisions of the Purchase Agreement; |

|  |  |
|---|---|
|  | (b)      any Contracts of Seller relating to Indebtedness; |
|  | (c)      any Contracts (including each Contract or agreement rejected by Seller prior to the Closing Date), together with all prepaid assets relating to such Contracts, of Seller, other than the Assigned Contracts and the Assigned Real Property Leases; |
|  | (d)      all rights, claims and causes of action of Seller against Persons (other than the Acquired Subsidiaries in the case of Seller) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of Seller (regardless of whether such rights are currently exercisable), in each case to the extent solely related to any Excluded Assets or Excluded Liabilities; |
|  | (e)      all rights, claims and causes of action of Seller against any director or officer of Seller and all Excluded Insurance Policies and interests in the Excluded Insurance Policies; |
|  | (f)      any Seller Benefit Plan or any right, title or interest in any assets of or relating thereto, or any assets relating to Excluded Liabilities described in Section 2.4(f) through (h) of the Purchase Agreement, except as otherwise specifically provided in Section 5.8 of the Purchase Agreement; |
|  | (g)      every asset of Seller that would constitute a Purchased Asset (if owned immediately prior to the Closing) to the extent conveyed or otherwise disposed of during the period from the date of the Purchase Agreement until the Closing Date (i) in the ordinary course of business, (ii) at the direction of the Bankruptcy Courts or (iii) as otherwise permitted by the terms of the Purchase Agreement; |
|  | (h)      any Avoidance Actions that relate solely to any Excluded Assets or Excluded Liabilities; and |
|  | (i)      Seller's right, title and interest to the other assets, if any, set forth in Schedule 2.3 of the Purchase Agreement. |
|  | Notwithstanding anything in the Purchase Agreement to the contrary, Buyer may, in its sole and absolute discretion (without any adjustment to the Purchase Price), at any time on or prior to the date that is one Business Day before the Closing Date, elect not to acquire any of the assets, properties and rights of Seller, and any asset so designated by Buyer on Schedule 2.3 of the Purchase Agreement (which Buyer may update from time to time by delivering the updated Schedule 2.3 of the Purchase Agreement to Seller) shall be an Excluded Asset for all purposes under the Purchase Agreement. |
| **Assumed Liabilities**<br><br>(§ 2.4 of Purchase Agreement) | • For purposes of the Purchase Agreement, "**Assumed Liabilities**" means only the following Liabilities (to the extent not paid or discharged prior to the Closing, including subject to the discharge, release, and injunction provisions of the Plan) and no others:<br><br>(a)      the Liabilities of Seller arising under the Assigned Contracts and the Assigned Real Property Leases; *provided, however*, that Buyer shall not assume or agree to pay, discharge or perform any Liabilities of Seller under or with respect to any Assigned Contracts and Assigned Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory, to |

13

| | |
|---|---|
| | the extent relating to Seller Parties' conduct prior to the Closing; |
| | (b)    any Liabilities expressly assumed by Buyer pursuant to <u>Section 5.8</u> of the Purchase Agreement; |
| | (c)    Taxes to the extent expressly payable by the Buyer pursuant to <u>Section 12.1</u> of the Purchase Agreement; and |
| | (d)    other Liabilities set forth on <u>Schedule 2.4</u> of the Purchase Agreement. |
| **<u>Excluded Liabilities</u>** <br><br> **(§ 2.5 of Purchase Agreement)** | • Notwithstanding anything to the contrary in the Purchase Agreement, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities whatsoever of Seller, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that Buyer is expressly not assuming being referred to collectively as the "**<u>Excluded Liabilities</u>**"), and Seller shall retain and be responsible for, in accordance with the Plan, the Excluded Liabilities. Without limiting the foregoing, Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of Seller or of any predecessor of such Seller, whether incurred or accrued before or after the Petition Date or the Closing: |
| | (a)    all Liabilities of Seller in respect of Indebtedness; |
| | (b)    all Liabilities arising from or related to the operation or condition of the Purchased Assets prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing; |
| | (c)    all Liabilities arising in connection with any violation of any Applicable Law or Order relating to the period prior to the Closing; |
| | (d)    all Liabilities for fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of Seller or any of its Subsidiaries, or any of their respective directors, officers, or employees; |
| | (e)    all Liabilities of Seller Parties arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by any Seller Party, whether or not used in the Business, including any Liabilities for noncompliance with Environmental Laws or the release of Hazardous Materials by any Seller Party on or prior to the Closing, whether known or unknown as of the Closing; |
| | (f)    all Liabilities arising from or related to any claim, action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Seller Party or any of their respective Affiliates, or related to the Purchased Assets or the Assumed Liabilities, pending or threatened or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date; |
| | (g)    any Liability arising out of facts or circumstances in existence prior to |

NY\6174610.7

the Closing Date and from or related to any breach, default or failure to perform under, torts related to the performance of, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of a Seller Party or any of its Affiliates under any Contract, agreement, arrangement or understanding to which such Seller Party or any of its Affiliates is a party prior to the Closing Date;

(h)       all costs and expenses payable in connection with obtaining any Governmental Approvals;

(i)       all Liabilities for rejection damages arising from the rejection of any Contracts or Leases of any Seller Party on or before the date of the Purchase Agreement or any rejection of such Contracts or Leases after the date of the Purchase Agreement without the prior written consent of Buyer;

(j)       subject to Section 5.17 of the Purchase Agreement, all Cure Payments;

(k)       all Taxes of Seller Parties (or Taxes of any branch offices of any Seller Party), including Taxes imposed on Seller Parties under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax law, other than Taxes expressly payable by the Buyer pursuant to Section 12.1 of the Purchase Agreement;

(l)       all Liabilities of Seller Parties relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("**Professional Services**") performed in connection with the Purchase Agreement and any of the transactions contemplated hereby or otherwise on behalf of Seller Parties, and any pre-Petition or post-Petition Claims for such Professional Services, including any brokerage fees, commissions, finders or similar fees incurred by any Seller Party in connection with the transactions contemplated by the Purchase Agreement;

(m)       all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan;

(n)       except, in each case, to the extent expressly assumed by Buyer pursuant to Section 5.8 of the Purchase Agreement, all Liabilities or claims arising out of, relating to or with respect to the employment or performance of services for, or termination of employment or services for, or potential employment or engagement for the performance of services for, any of Seller Parties (or any predecessor) of any individual Person or any Person acting as a professional employer organization, employee leasing company or providing similar services on or prior to the Closing (including as a result of the transactions contemplated by the Purchase Agreement), including Liabilities or claims for wages, remuneration, compensation, vacation, paid time off, benefits, workers' compensation, severance (including statutory severance), separation, termination, unfair labor practice, discrimination, classification, or notice pay or benefits, or any other form of accrued or contingent compensation (including leave entitlements), irrespective of whether such Liabilities or claims are paid or made, as applicable, on, before or after Closing;

(o)       all Liabilities with respect to any Former Employee with respect to any period;

15

|  |  |
|---|---|
|  | (p)     all Liabilities relating to Excluded Assets; |
|  | (q)     all accounts payable and other amounts payable of any Seller Party owed by it to any other Seller Party or other intercompany Liabilities to the extent they are not between Acquired Companies; |
|  | (r)     all Liabilities to any current or former equityholder of any Seller Party; |
|  | (s)     all Liabilities for which the Seller Entities have agreed to remain responsible in accordance with the Purchase Agreement and the Plan, including professional and administrative fees and expenses for which the Seller has agreed to be responsible pursuant to the Plan; |
|  | (t)     all Liabilities arising from state or bankruptcy law theories of recovery, including fraudulent transfer; and |
|  | (u)     any other Liability of Seller Parties that arises in relation to the period prior to the Closing and is not expressly included among the Assumed Liabilities. |
| **Assumption and Assignment of Contracts**<br><br>**(§ 2.6 of Purchase Agreement)** | • Promptly, but in any event, within ten (10) days from the date of the Purchase Agreement, Seller shall deliver <u>Schedule 2.6(a)</u> of the Purchase Agreement to Buyer, which Schedule shall contain with respect to each Assigned Contract, Seller's good-faith best estimate, as certified by the Chief Executive Officer or Chief Financial Officer of Seller, of the Cure Payments with respect to each such Assigned Contract; *provided*, *however*, that from and after the date of delivery of <u>Schedule 2.6(a)</u> of the Purchase Agreement until five (5) Business Days prior to the Closing Date, Seller may provide updates or supplements to <u>Schedule 2.6(a)</u> of the Purchase Agreement to include Assigned Contracts entered into after the date of the Purchase Agreement in compliance with the terms of the Purchase Agreement and/or to include revised Cure Payments with respect to any Assigned Contract set forth therein, which updates shall amend <u>Schedule 2.6(a)</u> of the Purchase Agreement for all purposes hereof. Prior to the Closing Date, Seller shall commence appropriate proceedings before the Bankruptcy Courts and otherwise take all reasonably necessary actions in order to determine Cure Payments with respect to any Assigned Contract entered into prior to the Petition Date. Notwithstanding the foregoing, at any time and from time to time prior to the Closing, Buyer may identify any Assigned Contract as one that Buyer no longer desires to have assigned to it or its designee in accordance with <u>Section 2.7</u> of the Purchase Agreement. Payment of all Cure Payments for each Non-Real Property Contract and Real Property Lease that is assumed and assigned to Buyer shall be the sole responsibility of Seller, irrespective of the aggregate amount of such Cure Payments (whether reflected on <u>Schedule 2.6(a)</u> of the Purchase Agreement or otherwise) and shall be paid by Seller within one (1) Business Day following the Closing Date.<br><br>• At the Closing, Seller shall assume and assign to Buyer the Assigned Contracts, in each case pursuant to Section 365 of the Bankruptcy Code and the Confirmation Order, subject to provision by Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Payments in respect of the Assigned Contracts as contemplated hereby. The payment of any Cure Payment in respect of all of the Assigned Contracts shall be borne by Seller, shall be paid by Seller, and shall not be the obligation, liability or responsibility of Buyer. Seller shall be solely responsible for the |

16

| | |
|---|---|
| | payment, performance and discharge when due of the Liabilities under the Assigned Contracts arising or otherwise payable on or prior to the Closing Date, and such Liabilities shall not be the obligation, liability or responsibility of Buyer.<br><br>• If, following the Closing, a Seller Party receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then such Seller shall transfer, or shall cause the transfer of, such asset, property or right to Buyer as promptly as practicable for no additional consideration.<br><br>• If, following the Closing, Buyer receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then Buyer shall transfer such asset, property or right to Seller as promptly as practicable for no additional consideration. |
| **Representations and Warranties**<br><br>(**Article IV** of **Purchase Agreement**) | • Usual Representations and Warranties with such changes and additions as are deemed appropriate or customary for Purchase Agreements of this kind or as otherwise required by the Parties in the context of the proposed transaction. |
| **Certain Covenants**<br><br>(**Article V of Purchase Agreement**) | • Usual Covenants with such changes and additions as are deemed appropriate or customary for Purchase Agreements of this kind or as otherwise required by the Parties in the context of the proposed transaction. |
| **Conditions to Seller's Obligations**<br><br>(**§ 6.1 of Purchase Agreement**) | • The obligations of Seller to consummate the transactions provided for in the Purchase Agreement are subject to the satisfaction of, or waiver by Seller, on or prior to the Closing Date of each of the following conditions:<br><br>(a)    Representations.  The representations and warranties of Buyer set forth in the Purchase Agreement shall be true and correct in all material respects on the date of the Purchase Agreement and on and as of the Closing Date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only); *provided*, *however*, that this condition shall be deemed to have been satisfied even if such representations and warranties are not true and correct unless the individual or aggregate impact of all inaccuracies of such representations and warranties has resulted or would reasonably be expected to result in a Buyer Material Adverse Effect.<br><br>(b)    Performance.  Buyer shall have performed or complied with, in all material respects, all obligations, agreements and covenants contained in the Purchase Agreement as to which performance or compliance by Buyer is required prior to or at the Closing.<br><br>(c)    Execution and Delivery of Closing Documents.  Buyer shall have executed and delivered to Seller all of the documents described in Section 7.4 of the Purchase Agreement and Buyer shall be ready, willing and able to deliver to Seller the Purchase Price in accordance with Section 3.1 of the Purchase Agreement.<br><br>Any condition specified in Section 6.1 of the Purchase Agreement may be waived prior to Closing only by a written instrument signed by Seller and |

17

| | Buyer. |
|---|---|
| **Conditions to Buyer's Obligations**<br><br>**(§ 6.2 of Purchase Agreement)** | • The obligations of Buyer to consummate the transactions provided for in the Purchase Agreement are subject to the satisfaction of, or waiver by Buyer, on or prior to the Closing Date of each of the following conditions:<br><br>(a)    Representations.  The representations and warranties of Seller set forth in Section 4.1 of the Purchase Agreement shall be true and correct in all material respects on the date of the Purchase Agreement and on and as of the Closing Date with the same force and effect as if made on and as of such date (other than representations and warranties that are made as of another date, which shall be so true and correct as of such date only), *provided*, *however*, that for purposes of determining the satisfaction of this condition, no effect shall be given to any materiality or Material Adverse Effect exception or qualification set forth in such representations and warranties.<br><br>(b)    Performance.  Seller shall have performed or complied with, in all material respects, all covenants or agreements contained in the Purchase Agreement as to which performance or compliance by Seller is required prior to or at the Closing.<br><br>(c)    Execution and Delivery of Closing Documents.  Seller shall have executed and delivered to Buyer all of the documents described in Section 7.3 of the Purchase Agreement.<br><br>(d)    Payment of Cure Payments.  The Cure Payments shall have been paid by, or on behalf of, Seller.<br><br>(e)    No Litigation.  No suit, action, investigation, proceeding or litigation shall be pending seeking to restrain or prohibit the consummation of the transactions contemplated by the Purchase Agreement.<br><br>(f)    Governmental Approvals.  All consents and approvals required to be obtained for the sale and purchase of the Purchased Assets, after giving effect to the Confirmation Order, shall have been obtained and all filings and notifications required to be made and given, if any, after giving effect to the Confirmation Order, shall have been made or given.<br><br>Any condition specified in Section 6.2 of the Purchase Agreement may be waived by Buyer in its sole discretion; *provided* that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer. |
| **Conditions to Buyer and Seller's Obligations**<br><br>**(§ 6.3 of Purchase Agreement)** | • The obligations of each of Buyer and Seller to consummate the transactions provided for in the Purchase Agreement are subject to the fulfillment or waiver by Buyer and Seller (other than the condition contained in Section 6.3(a) of the Purchase Agreement, the fulfillment of which cannot be waived by any Party) on or prior to the Closing Date of each of the following conditions:<br><br>(a)    No Violation of Order.  No Order shall have been enacted, entered, promulgated or enforced by any Governmental Authority with jurisdiction over the transactions contemplated by the Purchase Agreement which prohibits or seeks to prohibit the consummation of the transactions contemplated by the Purchase Agreement. |

| | |
|---|---|
| | (b)     <u>Bidding Procedures Order</u>.  The U.S. Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance acceptable to Buyer in its sole discretion and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by Buyer in its sole discretion);<br><br>(c)     <u>Plan and Confirmation Order.</u> The Plan shall have become effective pursuant to the Confirmation Order, and such Confirmation Order shall be a Final Order (unless such Final Order requirement is waived by Buyer in its sole discretion);<br><br>(d)     <u>No Injunctions or Restraints</u>.  No Applicable Law enacted, entered, promulgated, enforced or issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by the Purchase Agreement shall be in effect. |
| **Frustration of Closing Conditions**<br><br>**(§ 6.4 of Purchase Agreement)** | • Neither Buyer nor Seller may rely on the failure of any condition set forth in <u>Article VI</u> of the Purchase Agreement to be satisfied if such failure was caused by such party's failure to use its reasonable best efforts to cause the Closing to occur, as required by <u>Section 5.3</u> of the Purchase Agreement. |
| **Waiver of Closing Conditions**<br><br>**(§ 6.5 of Purchase Agreement)** | • Notwithstanding anything to the contrary set forth in the Purchase Agreement, Buyer shall not waive any condition to Closing that would be material and adverse to the interests of the DIP Facility Lenders under the Credit Agreement without the prior written consent of the Administrative Agent, acting on behalf of the DIP Facility Lenders and at the direction of the Required DIP Lenders. |

## F.    FILING OF THE SCHEDULES AND ESTABLISHMENT OF THE CLAIMS BAR DATE

### 1.    Filing of the Schedules

The Debtors filed a motion to request an extension of the date by which they must file their Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code to March 19, 2014.  A hearing on the motion is scheduled for March 7, 2014.

### 2.    Establishment of the Claims Bar Date

On February 10, 2014, the Debtors filed the *Motion of Debtors for Entry of an Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Administrative Expense Claims Arising under Section 503(b)(9) of the Bankruptcy Code) and Approving the Form and Manner of Notice Thereof* [Docket No. 67] (the "**Bar Date Motion**"), requesting that April 2, 2014 be established as the General Bar Date (as defined under the Bar Date Motion) and establishing August 1, 2014 as the Governmental Bar Date (as defined under the Bar Date Motion).

## G.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a

19

competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

Pursuant to the Restructuring Support Agreement, the Debtors must file their Plan and Disclosure Statement well within 120 days provided for under the Bankruptcy Code.  If the Debtors need to file motions to extend the deadline, then they will do so as necessary.

**H.     DEADLINE TO ASSUME OR REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY**

Pursuant to section 365(d)(4) of the Bankruptcy Code, the time within which the Debtors have to assume or reject unexpired leases of nonresidential real property is also scheduled to expire on June 2, 2014, unless extended by order of the Bankruptcy Court.  The Debtors will file motions to extend this deadline as necessary.

## IV.
## SUMMARY OF THE PLAN

> **THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS SECTION IV AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

A.    **ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS**

1.    **Administrative Claims**

Except as otherwise provided in Article II of the Plan, the legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by the Plan.  Subject to the other terms and conditions of Article II of the Plan, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing; provided, however, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Administrative Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

(a)    Bar Date for Administrative Claims

Except as otherwise provided in Article II.A of the Plan and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order by no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors, the Estates, the Proposed Purchaser, and their respective assets and property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Administrative Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.

Objections to such payment requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) sixty (60) days after the Effective Date and (b) sixty (60) days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

NY\6174610.7

       (b)      <u>Professional Fee Claims</u>

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors shall pay Professionals retained by the Debtors in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by such Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than twenty-one (21) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

**2.      DIP Facility Claims**

On the Effective Date, each Holder of a DIP Facility Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such DIP Facility Claim; (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such DIP Facility Claim shall have agreed upon in writing; or (iii) such other treatment specified in <u>Article III.B.4</u> of the Plan with the written consent of the DIP Facility Agent and Required DIP Lenders.

**3.      Priority Tax Claims**

The legal, equitable, and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by the Plan.  Subject to <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Priority Tax Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.  Any installment payments to be made under clause (C) or (D) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

### B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

#### 1.    Summary

The Plan constitutes a separate plan of reorganization for each Debtor for all purposes, including, without limitation, for voting, confirmation, and distribution purposes.  The Plan does not contemplate the substantive consolidation of the Debtors or their respective Estates for any purpose.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims, and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified as described below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class, is not an Assumed Liability under the Purchase Agreement, and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.

#### 2.    Classification and Treatment of Claims and Equity Interests

(a)    <u>Class 1 – Other Priority Claims</u>

o    *Classification*:  Class 1 consists of the Other Priority Claims.

o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by the Plan.  Subject to <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court; <u>provided</u> further that any Class 1 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

o    *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

(b)    Class 2 – Other Secured Claims

o    *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim that may exist against the Debtors.

o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 2 Claims are unaltered by the Plan.  Subject to <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court; <u>provided</u> further that any Class 2 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

o    *Voting*:  Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(c)    Class 3 – Secured Priority Tax Claims

o    *Classification*:  Class 3 consists of the Secured Priority Tax Claims.

o    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 3 Claims are unaltered by the Plan.  Subject to <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized

24

Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Class 3 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business. Any installment payments to be made under clause (D) or (E) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

o   *Voting*: Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

(d)   Class 4 – Prepetition Credit Agreement Claims

o   *Classification*:  Class 4 consists of the Prepetition Credit Agreement Claims.

o   *Allowance*:  The Prepetition Credit Agreement Claims are deemed Allowed in the aggregate principal amount of $[201,975,433.74],[9] exclusive of accrued and unpaid interest, fees and other costs and expenses.

o   *Treatment*:  On the Effective Date, NewCo shall, on behalf of all Prepetition Lenders and/or DIP Facility Lenders, as applicable and in accordance with the terms and conditions of the Purchase Agreement, credit bid a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims equal to the Purchase Price Credit Bid Component in exchange for the Purchased Assets.  On and after the Effective Date, such credit bid shall, for all purposes, be deemed to have permanently reduced, on a Pro Rata basis, [a principal amount] of the Prepetition Credit Agreement Claims and/or DIP Facility Claims by the portion of the Purchase Price Credit Bid Component comprised of such Prepetition Credit Agreement Claims and/or DIP Facility Claims, as applicable.  On and as of the Effective Date, but without limiting the scope of Article V.H or Article V.T of the Plan, the remaining Prepetition Credit Agreement Claims and/or DIP Facility Claims, as applicable, will be repaid in full and/or refinanced or replaced by obligations of NewCo, to be guaranteed by all Non-Debtor Obligors, under any Exit Facility.

On the Effective Date, each Holder of an Allowed Prepetition Credit Agreement Claim and/or DIP Facility Claim shall receive, on account of such Claim, its Pro Rata share of the NewCo Ownership Interests (subject to dilution for the NewCo Incentive Plan) and the Net Cash Amount.  After the Effective Date, subject to the terms and conditions of the Plan, each Holder of an Allowed Prepetition Credit Agreement Claim and/or DIP Facility Claim shall receive, on account of such Claim, its Pro Rata share of the Unused Cash Reserve Amount.

In addition to NewCo, the Agent, acting at the direction of the Aggregate Required Lenders, may create one or more holding entities and/or blocker entities that will hold direct or indirect interests in NewCo, with the ownership interests in such

_____

[9]    Subject to confirmation, including deduction for principal amount of the roll-up.

holding and/or blocker entities being distributed on a Pro Rata basis to the applicable DIP Facility Lenders and/or Prepetition Lenders. The organizational documents and corporate structure for such holding and/or blocker entities shall be acceptable to the Agent and the Aggregate Required Lenders in their sole discretion.

Notwithstanding the foregoing, with the prior written consent of the Agent and Aggregate Required Lenders, the Plan and the Restructuring Documents may be altered or amended to provide that (i) the Purchased Assets will not include all assets of HoldCo, but rather certain assets will remain with HoldCo and (ii) the Reorganized HoldCo Common Stock will be issued, on a Pro Rata basis, to the Prepetition Lenders rather than the Plan Administrator.

For the avoidance of doubt, NewCo, the Debtors or the Reorganized Debtors (as applicable) shall deliver distributions on account of the Allowed DIP Facility Claims and Allowed Prepetition Credit Agreement Claims directly to the DIP Facility Agent and Prepetition Agent, respectively, and such applicable agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims and shall make distributions with respect thereto in accordance with the applicable terms and conditions of the Credit Agreement.

o    *Voting*: Class 4 is Impaired, and Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

(e)    Class 5 – General Unsecured Claims

### A.   **Sub-Class A: General Unsecured Claims Against HoldCo**

o    *Classification*: Class 5-A consists of the General Unsecured Claims against HoldCo.

o    *Treatment*: Each Holder of a General Unsecured Claim against HoldCo shall not receive any distribution or retain any property on account of such General Unsecured Claim.

o    *Voting*: Class 5-A is an Impaired Class, and the Holders of Claims in Class 5-A will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Claims in Class 5-A will not be entitled to vote to accept or reject the Plan.

### B.   **Sub-Class B: General Unsecured Claims Against Affiliate Debtor**

o    *Classification*: Class 5-B consists of the General Unsecured Claims against Affiliate Debtor.

o    *Treatment*: The legal, equitable and contractual rights of the Holders of Allowed Class 5-B Claims are unaltered by the Plan. Subject to <u>Article VIII</u> of the Plan, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 5-B Claim is an Allowed Class 5-B Claim as of the Effective Date or (ii) the date on which such Class 5-B Claim becomes an Allowed Class 5-B Claim, each Holder of an Allowed Class 5-B Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5-B Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 5-B Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5-B Claim shall have agreed upon in writing; or (C)

26

such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 5-B Claims incurred by Affiliate Debtor in the ordinary course of business may be paid in the ordinary course of business by Affiliate Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Class 5-B Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

o  *Voting*: Class 5-B is an Unimpaired Class, and the Holders of Claims in Class 5-B are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 5-B are not entitled to vote to accept or reject the Plan.

(f)  Class 6 – Intercompany Claims

o  *Classification*:  Class 6 consists of the Intercompany Claims.

o  *Treatment*:  Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under the Plan on account of such Intercompany Claim; provided, however, that the Reorganized Debtors may, with the consent of the Agent and Aggregate Required Lenders, reinstate, reconcile, cancel, or otherwise compromise such Intercompany Claims as may be necessary or advisable.

o  *Voting*: Class 6 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 6 shall be conclusively deemed to have accepted the Plan.

(g)  Class 7 –  Old HoldCo Interests

o  *Classification*:  Class 7 consists of the Old HoldCo Interests.

o  *Treatment*:  On the Effective Date, the Old HoldCo Interests will be cancelled without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest shall not receive any distribution or retain any property on account of such Old HoldCo Interest.

o  *Voting*: Class 7 is an Impaired Class, and the Holders of Old HoldCo Interests in Class 7 will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Old HoldCo Interests in Class 7 will not be entitled to vote to accept or reject the Plan.

(h)  Class 8 - Old Affiliate Interests in Affiliate Debtor

o  *Classification*:  Class 8 consists of the Old Affiliate Interests in Affiliate Debtor.

o  *Treatment*:  The Old Affiliate Interests shall remain effective and outstanding on the Effective Date and shall, subject to the terms and conditions of the Purchase Agreement, be transferred to the Proposed Purchaser as part of the Purchased Assets.

o  *Voting*: Class 8 is an Impaired Class.  However, because the Holder of such Old Affiliate Interests is HoldCo, it shall be conclusively deemed to have accepted the Plan.

### 3. Special Provision Governing Unimpaired Claims and Assumed Liabilities

Except as otherwise provided in the Plan, nothing therein shall affect or limit the Debtors', the Reorganized Debtors', or the Proposed Purchaser's applicable rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims or Assumed Liabilities, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims or Assumed Liabilities.

### 4. Elimination of Vacant Classes

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## C. ACCEPTANCE OR REJECTION OF THE PLAN

### 1. Presumed Acceptance of Plan

Classes 1, 2, 3, and 5-B are Unimpaired under the Plan.  Therefore, the Holders of Claims in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

Classes 6 and 8 are Impaired under the Plan.  However, because the Holders of such Claims and Equity Interests are Affiliates of the Debtors, the Holders of Claims in Class 6 and Holders of Equity Interests in Class 8 are conclusively deemed to have accepted the Plan.

### 2. Presumed Rejection of Plan

Classes 5-A and 7 are Impaired and will receive no distribution under the Plan on account of their respective Claims or Equity Interests.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### 3. Voting Class

Class 4 is Impaired under the Plan.  The Holders of Claims in such Class as of the Voting Record Date are entitled to vote to accept or reject the Plan.

### 4. Acceptance by Impaired Class of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

5.        **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by Class 4. The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to modify the Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

6.        **Votes Solicited in Good Faith**

The Debtors have, and upon the Confirmation Date will be deemed to have, solicited votes on the Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation. Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Persons will be entitled to, and upon the Confirmation Date will be granted, the protections of section 1125(e) of the Bankruptcy Code.

## D.        MEANS FOR IMPLEMENTATION OF THE PLAN

1.        **Wind-Down and Dissolution of Reorganized HoldCo**

Subject to <u>Article V.U</u> of the Plan, Reorganized HoldCo shall, promptly after the Effective Date and the full administration of the Plan and the transactions contemplated by the Plan, make a voluntary assignment under and pursuant to the BIA, and thereafter promptly wind-down and dissolve in accordance with applicable law.

2.        **Restructuring Transactions**

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and any consents or approvals required thereunder, the entry of the Confirmation Order will constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate the Affiliate Debtor under the laws of jurisdictions other than the laws of which the Affiliate Debtor is presently incorporated. Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations, or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, will be deemed to have been authorized and approved by the Bankruptcy Court. The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan and the Restructuring Documents and any consents or approvals required thereunder.

3.        **Consummation of the Purchase Agreement**

On the Effective Date, the Debtors shall consummate the transactions contemplated by the Purchase Agreement pursuant to the terms thereof in exchange for the Purchase Price; provided that the conditions precedent set forth in the Purchase Agreement have been satisfied or waived in accordance with the terms of the Purchase Agreement.  Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Purchase Agreement will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors.  The Debtors and the Reorganized Debtors (as applicable) are authorized to execute and deliver, and to consummate the transactions contemplated by, the Purchase Agreement, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, in each case in form and substance acceptable to the Agent and Aggregate Required Lenders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Purchase Agreement).

(a)        Transfer of Purchased Assets

On the Effective Date, in consideration and in exchange for the Purchase Price, the Debtors will tender to the Proposed Purchaser duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the Purchased Assets free and clear of all Liens, Claims, and interests (other than the Assumed Liabilities and permitted liens) pursuant to the terms and conditions of the Purchase Agreement.

(b)        Payment of Purchase Price Cash Component and Discharge of Assumed Liabilities

The Proposed Purchaser shall (i) promptly perform and discharge all Assumed Liabilities in the ordinary course of business in accordance with the terms and conditions of any applicable agreements relating thereto and (ii) pay the Purchase Price Cash Component (if any) in accordance with the Purchase Agreement.

(c)        Good Faith of the Proposed Purchaser

The transactions contemplated by the Purchase Agreement are undertaken by the Debtors and the Proposed Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale shall not affect the validity of the Sale (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Proposed Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

(d)        No Successor Liability for the Proposed Purchaser

Except as otherwise expressly provided in the Plan, the Confirmation Order, or the Purchase Agreement, the Proposed Purchaser: (i) does not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and (iii) shall not have any successor or transferee liability of any kind or character; provided that the Proposed Purchaser shall promptly perform and discharge the obligations specified in the Purchase Agreement, including, without limitation, the Assumed Liabilities

30

4.        **Direction to Prepetition Agent and DIP Facility Agent**

By voting to accept the Plan, each such Prepetition Lender and DIP Facility Lender will be deemed to instruct and direct the Prepetition Agent and DIP Facility Agent, as applicable, pursuant to Article X of the Credit Agreement, and each such vote to accept the Plan shall, for all purposes, constitute an instruction from each and every such Prepetition Lender and DIP Facility Lender directing the Prepetition Agent and DIP Facility Agent, as applicable, to (i) act as Distribution Agent to the extent required by the Plan and (ii) take any other actions required or contemplated to be taken by the Prepetition Agent and DIP Facility Agent, as applicable, under the Plan or any of the Restructuring Documents to which it is a party.

5.        **Continued Corporate Existence**

Subject to the Restructuring Transactions permitted by Article V.B of the Plan, after the Effective Date, the Reorganized Debtors will continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated, or otherwise modified under the Plan.  Notwithstanding anything to the contrary under the Plan, the Claims of a particular Debtor or Reorganized Debtor will remain the obligations solely of such Debtor or Reorganized Debtor and will not become obligations of the other Debtor or Reorganized Debtor solely by virtue of the Plan or the Chapter 11 Cases.

6.        **Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims**

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan, but in all cases excluding the Purchased Assets, will vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in Article V of the Plan.  On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

7.        **[Intentionally Omitted]**

8.        **No Discharge or Release of Liens Securing the Prepetition Credit Agreement Claims**

Notwithstanding anything in the Plan to the contrary, all property of the Estates of the Debtors, including the Cash Reserves and all claims, rights, and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with the Plan, will remain encumbered by and subject to the Liens securing the DIP Facility Claims and the Prepetition Credit Agreement Claims, as applicable, and such Liens will not be, and will not be deemed to be, discharged or released on account of the Confirmation or Consummation of the Plan.

9.        **New Equity Interests**

(a)        Reorganized HoldCo Common Stock

On the Effective Date, Reorganized HoldCo shall issue 100% of the Reorganized HoldCo Common Stock to the Plan Administrator pursuant to the Amended/New Organizational Documents.  Reorganized HoldCo shall not be obligated to register the Reorganized HoldCo Common Stock under the Securities Act or Exchange Act or to list

31

the Reorganized HoldCo Common Stock for public trading on any securities exchange or be a reporting issuer in any province of Canada.  Distribution of the Reorganized HoldCo Common Stock shall be made, pursuant to the written instruction of Reorganized HoldCo, by delivery or book-entry transfer thereof.

(b)    NewCo Ownership Interests

The NewCo Ownership Interests will constitute all of the equity interests in NewCo outstanding as of the Effective Date and shall be issued by NewCo in accordance with Article III of the Plan, subject to dilution on account of any shares issued in connection with the NewCo Incentive Plan.  NewCo shall not be obligated to register the NewCo Ownership Interests under the Securities Act or Exchange Act or to list the NewCo Ownership Interests for public trading on any securities exchange or be a reporting issuer in any province of Canada.  Distributions of the NewCo Ownership Interests shall be made, pursuant to the written instruction of NewCo, by delivery or book-entry transfer thereof by the applicable Distribution Agent as described in the Plan, as and to the extent practicable.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of NewCo shall be that number of shares of NewCo Ownership Interests as may be designated in the Amended/New Organizational Documents.

**10.    NewCo Ownership Agreement**

On the Effective Date, NewCo shall be authorized to enter into and consummate the transactions contemplated by the NewCo Ownership Agreement, and any agreement or document entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by the NewCo Ownership Agreement).

On and as of the Effective Date, NewCo and all of the Holders of NewCo Ownership Interests shall be deemed to be parties to the NewCo Ownership Agreement, without the need for execution by any party thereto other than NewCo.  The NewCo Ownership Agreement shall be binding on all Persons receiving, and all Holders of the, NewCo Ownership Interests (and their respective successors and assigns), whether such NewCo Ownership Interest is received or to be received on or after the Effective Date and regardless of whether such applicable Person executes or delivers a signature page to the NewCo Ownership Agreement; provided however that, with respect to any Person that fails to execute and deliver a signature page to the NewCo Ownership Agreement, any NewCo Ownership Interests to be distributed pursuant to or in connection with the Plan to such Person shall be treated as an undeliverable distribution pursuant to Article VII.D.4 of the Plan until such Person executes and delivers to NewCo a signature page to the NewCo Ownership Agreement.

**11.    Plan Securities and Related Documentation; Exemption from Securities Laws**

On and after the Effective Date, each of NewCo, the Debtors, and the Reorganized Debtors is authorized to and shall provide, distribute or issue, as applicable, the New Equity Interests and any and all other securities to be provided, distributed or issued under the Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be provided, distributed, issued, executed or delivered pursuant to or in connection with the Plan, including, without limitation, an Exit Facility (collectively, the "**Plan Securities and Documents**"), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.  The issuance of the Plan Securities and the distribution thereof under the Plan shall be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions.

Any offering of any Plan Securities distributed or issued in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code. Any Plan Securities issued in reliance on the exemption from registration under the Securities Act provided by Section 4(2) of such act will be issued in a private placement and subsequent sales shall be required to be registered under the Securities Act or exempt from such registration requirements.

Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement).

## 12.    Release of Liens and Claims

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Confirmation Order, the Plan, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII of the Plan, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims, and other interests described above. Any Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors or the Proposed Purchaser, as applicable, such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors or the Proposed Purchaser, as applicable.

## 13.    Organizational Documents

The respective organizational documents of each of the Debtors and NewCo shall be amended and restated, replaced, or otherwise contain terms and conditions as necessary to satisfy the provisions of the Plan and the Bankruptcy Code. Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of the New Equity Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of the New Equity Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated by the Plan. After the Effective Date, the Reorganized Debtors and NewCo may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

14. **Directors and Officers of NewCo and the Reorganized Debtors**

The New Board of NewCo shall initially consist of up to [five (5)] directors, who shall be designated in accordance with the terms and conditions of the NewCo Ownership Agreement, which directors shall be identified in Plan Schedule [__] to be Filed with the Plan Supplement. Any directors selected pursuant to this section shall, to the extent applicable, be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of NewCo, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person. Each such director and officer shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of NewCo.

On and as of the Effective Date, except as otherwise required by applicable law, the Plan Administrator shall become the sole officer and director of Reorganized HoldCo. The existing boards of directors and other governing bodies of each of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity.

15. **Corporate Action**

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File, or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant hereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant to the Plan or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors, officers, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members, or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions, or consents of any Person.

As of the Effective Date, all matters provided for in the Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members, or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions, and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of the Debtors and the Reorganized Debtors will be authorized to certify or attest to any of the foregoing actions.

34

16.    **Cancellation of Notes, Certificates and Instruments**

On the Effective Date, except to the extent otherwise provided in the Plan (including, without limitation, and for the avoidance of doubt, Article V.H of the Plan), all notes, stock, instruments, certificates, agreements, and other documents evidencing or relating to any Impaired Claim and/or the Old HoldCo Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person

17.    **Old Affiliate Interests**

On the Effective Date, the Old Affiliate Interests shall remain effective and outstanding, and shall be transferred to NewCo in accordance with the terms and conditions of the Purchase Agreement.  The Affiliate Debtor shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by the Plan.

18.    **Sources of Cash for Plan Distributions**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to the Plan will be obtained from their respective Cash balances, including Cash from operations, the Cash Reserves, and the Purchase Price Cash Component, as applicable.

19.    **Continuing Effectiveness of Final Orders**

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

20.    **Funding and Use of Cash Reserves**

On or before the Effective Date, the Debtors shall fund the Cash Reserves in such amounts as are necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserves were established, including, without limitation, reserving an amount of Cash equal to 100% of distributions to which Holders of Disputed Claims in each such applicable Class would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims.

The Cash contained in each applicable Cash Reserve shall be used solely to pay the obligations and liabilities for which such applicable reserve was established.  The Debtors and the Reorganized Debtors, as applicable, shall maintain detailed records of all payments made from each Cash Reserve, such that all payments and transactions shall be adequately and promptly documented in, and readily ascertainable from, their respective books and records.  After the Effective Date, neither the Debtors nor the Reorganized Debtors shall deposit any other funds or property into the Cash Reserves without further order of the Bankruptcy Court or otherwise commingle funds in the Cash Reserves.

For the avoidance of doubt, the Cash contained in the Cash Reserves constitutes the cash collateral of the DIP Facility Agent and the Prepetition Agent and, accordingly, Reorganized HoldCo shall have no interest whatsoever in such Cash other than to use such Cash to pay the obligations and liabilities for which such applicable reserve was established. Once all such obligations and liabilities are either paid, satisfied and discharged in full in Cash or are Disallowed by Final Order, the Unused Cash Reserve Amount, if any, shall be distributed to the DIP Facility Agent or the Prepetition Agent, as applicable, for application to the DIP Facility Claims or Prepetition Credit Agreement Claims, as applicable, or, to the extent that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, to the applicable agent thereunder, in each case in accordance with the terms and conditions of the Plan.

### 21.    The Plan Administrator for Reorganized HoldCo

(a)    Appointment

From and after the Effective Date, the Plan Administrator shall act as estate representative for Reorganized HoldCo for all purposes under the Plan and the Chapter 11 Cases, including pursuant to section 1123(b) of the Bankruptcy Code and shall serve in such capacity until resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement.

(b)    Rights, Powers, and Duties of the Plan Administrator.

As the sole officer and director of Reorganized HoldCo, the Plan Administrator shall be authorized, for and on behalf of Reorganized HoldCo, to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the transactions contemplated herein, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. The Plan Administrator, and any other applicable director and officer, shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of Reorganized HoldCo. From and after the Effective Date and continuing through the date of entry of a final decree closing the Chapter 11 Case for Reorganized HoldCo, the Plan Administrator shall possess the rights of a party-in-interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Chapter 11 Case for Reorganized HoldCo and, in connection therewith, shall have the right to appear and be heard on matters brought before the Bankruptcy Court with respect to Reorganized HoldCo and/or the interpretation or enforcement of the Plan Administrator Agreement.

Reorganized HoldCo shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under the Plan. Such rights, powers and duties, which shall be exercisable by the Plan Administrator for and on behalf of Reorganized HoldCo pursuant to the Plan Administrator Agreement, shall include, without limitation, the following with respect to Reorganized HoldCo:

(i)    investing Reorganized HoldCo's Cash, including, but not limited to, the Cash held in the Wind-Down Reserve in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities; (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(ii)    calculating and paying all distributions to be made under the Plan, the Plan Administrator Agreement, and other orders of the Bankruptcy Court to Holders of Allowed Claims against Reorganized HoldCo;

(iii)    establishing the Cash Reserves and paying the obligations and liabilities for which such reserve was established (which payment shall not require further notice to or approval of the Bankruptcy Court);

(iv)    employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of Reorganized HoldCo or the Plan Administrator;

(v)    making and filing tax returns for Reorganized HoldCo and responding to or taking any and all actions as are necessary and appropriate in order to comply with any tax audit for Reorganized HoldCo, including with respect to the filings of such tax returns and the conduct of audits;

(vi)    settling, allowing, objecting to, or otherwise disposing of any Claims or Equity Interests asserted against HoldCo and/or Reorganized HoldCo on any basis;

(vii)    seeking estimation of contingent or unliquidated Claims asserted against HoldCo and/or Reorganized HoldCo under section 502(c) of the Bankruptcy Code;

(viii)    seeking determination of tax liability of HoldCo and/or Reorganized HoldCo under section 505 of the Bankruptcy Code;

(ix)    selling or otherwise disposing of any remaining non-Cash assets of Reorganized HoldCo and thereafter depositing the applicable net cash proceeds, if any, into the applicable Cash Reserve;

(x)    dissolving Reorganized HoldCo;

(xi)    determining in accordance with the Plan and the Plan Administrator Agreement when to conduct a Subsequent Distribution;

(xii)    exercising all power and authority that may be exercised, and taking all proceedings and acts that may be taken, by any officer, director, or stockholder of Reorganized HoldCo;

(xiii)    filing any necessary post-confirmation reports with the Bankruptcy Court with respect to Reorganized HoldCo;

(xiv)    calculating and paying all quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) with respect to Reorganized HoldCo;

(xv)    filing quarterly operating reports as required by the United States Trustee with respect to Reorganized HoldCo;

(xvi)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement;

(xvii)    commencing, pursuing, litigating, abandoning, disposing of, or settling, as appropriate, any and all Litigation Claims not otherwise transferred or conveyed to the Proposed Purchaser pursuant to the Purchase Agreement;

(xviii)    taking any and all other actions necessary or appropriate to implement or consummate the Plan and/or the provisions of the Plan Administrator Agreement with respect to Reorganized HoldCo; and

(xix)    taking any and all other actions necessary or appropriate to implement any of the foregoing and to administer and/or close the Chapter 11 Case with respect to Reorganized HoldCo.

NY\6174610.7

(c)        Compensation of the Plan Administrator.

The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms of the Plan Administrator Agreement. Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred from the Wind-Down Reserve. The payment of the fees, costs, and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; _provided_, _however_, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court.

(d)        Limitation of Liability; Indemnification.

As of and after the Effective Date, neither the Plan Administrator or its Related Persons nor any of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities under the Plan, shall be liable for any act taken or omitted to be taken in such capacity in connection with or in contemplation of the transactions contemplated by the Plan and/or the Plan Administrator Agreement, in each case other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Plan Administrator, its Related Persons, and each of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities under the Plan, may, in connection with the performance of their respective functions, and in their sole and absolute discretion and without any requirement or obligation, consult with the respective attorneys, accountants, financial advisors, and other professionals or Related Persons of NewCo and the Reorganized Debtors, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing (other than for acts or omissions constituting gross negligence, actual fraud, or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction).

Reorganized HoldCo shall indemnify and hold harmless the Plan Administrator, its Related Persons, and each of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities under the Plan, from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses (including reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the administration or implementation of the Plan or the transactions contemplated herein, the administration and wind-down of Reorganized HoldCo and its Estate, or the discharge of their respective duties or responsibilities under the Plan Administrator Agreement or the Plan; _provided_, _however_, that no such indemnification shall be made to such Persons for acts or omissions that constitute gross negligence, actual fraud, or willful misconduct of such applicable Person as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. Any such indemnification or reimbursement payments shall be made from the Wind-Down Reserve.

The Plan Administrator, its Related Persons, and each of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities under the Plan, shall be entitled to rely upon the exculpation, release, indemnification, and limitation of liability provisions set forth in the Plan Administrator Agreement, the Plan, and the Confirmation Order. All such provisions shall survive the Effective Date and the termination of the Plan Administrator Agreement.

(e)        Forum for Actions Against the Plan Administrator.

Without permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced against the Plan Administrator in its official capacity as such, with respect to its status, duties, powers, acts, or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

NY\6174610.7

(f)    Insurance.

The Plan Administrator shall be authorized to obtain all reasonably necessary insurance coverage for itself and Reorganized HoldCo, and their respective Related Persons, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of Reorganized HoldCo and (ii) the liabilities, duties and obligations of the Plan Administrator and its Related Persons under the Plan Administrator Agreement and the Plan (in the form of an errors and omissions policy, general liability, directors' and officers' insurance, or otherwise), which insurance coverage may remain in effect for a reasonable period after the termination of the Plan Administrator Agreement (including for customary tail coverage and related time periods).  Any such insurance coverage shall be paid for from the Wind-Down Reserve.

(g)    Authority to Object to and Settle Disputed Claims.

From and after the Effective Date, the Plan Administrator (on behalf of Reorganized HoldCo) shall be authorized with respect to those Claims which are not Allowed under the Plan or by Final Order and which do not constitute an Assumed Liability under the Purchase Agreement, (i) to object to, and seek estimation of, any Claims filed against HoldCo and/or Reorganized HoldCo and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims, in the ordinary course of business and without further notice to or order of the Bankruptcy Court.

(h)    Wind-Down and Dissolution of Reorganized HoldCo.

As soon as reasonably practicable after the Effective Date, the Plan Administrator shall: (1) take any action reasonably necessary to effectuate the wind-down of Reorganized HoldCo; (2) file a certificate of dissolution for Reorganized HoldCo, together with all other necessary corporate and company documents, to effect such dissolution in accordance with applicable law; (3) complete and file all required federal, state, and local tax returns, as applicable, for Reorganized HoldCo, including with respect to the filings of such tax returns and the conduct of audits; and (4) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan, including, without limitation, commencement of a voluntary assignment under the BIA.

(i)    Closing of the Chapter 11 Case for Reorganized HoldCo.

When (a) all Disputed Claims filed against HoldCo and/or Reorganized HoldCo have become Allowed or have been Disallowed by Final Order, (b) all remaining assets of Reorganized HoldCo have been liquidated and converted into Cash (other than those assets abandoned by Reorganized HoldCo), and such Cash has been distributed in accordance with the Plan, and (c) all Wind-Down Costs and Expenses have been paid in full in Cash, the Plan Administrator shall promptly (i) seek authority from the Bankruptcy Court to close the Chapter 11 Case for Reorganized HoldCo in accordance with the Bankruptcy Code and the Bankruptcy Rules; (ii) effectuate the dissolution of Reorganized HoldCo in accordance with applicable law, and (iii) resign as officer and director of Reorganized HoldCo.

## 22.    Fees and Expenses of Prepetition Agent

The Debtors shall, on the Effective Date and to the extent invoiced, pay the Prepetition Agent Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

## 23.    Completion Bonus Program

On and after the Effective Date, the Debtors, and the Reorganized Debtors, as applicable, shall be authorized to make the payments contemplated by the Completion Bonus Program pursuant to section 1129(a)(4) of the Bankruptcy Code, without further notice and hearing before the Bankruptcy Court or consent of any Person. The aggregate payments under the Completion Bonus Program will not exceed $[_____] without further approval of the Bankruptcy Court.

39

24.    **NewCo Incentive Plan**

After the Effective Date, NewCo may adopt and implement the NewCo Incentive Plan, whose terms and conditions, including recipients, individual awards, and vesting periods, shall be determined by the New Board of NewCo.  Notwithstanding anything in the Plan to the contrary, any shares of NewCo Ownership Interests issued pursuant to the NewCo Incentive Plan shall dilute the shares of NewCo Ownership Interests otherwise distributed or to be distributed through or pursuant to the Plan (whether on or after the Effective Date), including, without limitation, pursuant to the credit bid and Sale contemplated by the Purchase Agreement.

E.    **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors (subject to the consent of the Proposed Purchaser) in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)    have been assumed or rejected by prior order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)    are identified on Plan Schedule [ ] or in the Plan Supplement, in either case which Plan Schedule may be amended by the Debtors (subject to the consent of the Proposed Purchaser) to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Schedule and serving it on the affected contract parties at least ten (10) days prior to the date of the Confirmation Hearing; or

(iv)    are rejected or terminated pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease, or (iii) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan shall revest in and be fully enforceable by the Reorganized Debtors or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

2.        **Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases**

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "**Cure Claim Amount**").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least ten (10) days prior to the Confirmation Hearing, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment, or any related cure amount must be Filed, served, and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order shall constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it (subject to the consent of the Proposed Purchaser). The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to the Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

3.        **Rejection of Executory Contracts or Unexpired Leases**

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease (subject to the consent of the Proposed Purchaser).  All Executory Contracts and Unexpired Leases listed on Plan Schedule [ ] shall be deemed rejected as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in Article VI of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

4.        **Claims on Account of the Rejection of Executory Contracts and Unexpired Leases**

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided under the Plan.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G of the Plan.  To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant rejection Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

5.        **Extension of Time to Assume or Reject**

Notwithstanding anything to the contrary set forth in Article VI of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired.  The deemed assumption provided for in Article VI of the Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

F.        **PROVISIONS GOVERNING DISTRIBUTIONS**

1.        **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.  Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VIII of the Plan.

### 2.        No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

### 3.        Distributions by the Reorganized Debtors or Other Applicable Distribution Agent

Other than as specifically set forth in the Plan, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will make all distributions required to be distributed under the Plan; provided that, solely with respect to any Assumed Liability, the Proposed Purchaser shall serve as Distribution Agent under the Plan. Distributions on account of the Allowed DIP Facility Claims and Allowed Prepetition Credit Agreement Claims will be made directly to the DIP Facility Agent and Prepetition Agent, respectively, and such applicable agent will be, and will act as, the Distribution Agent with respect to its respective Class of Claims and will make distributions with respect thereto in accordance with the applicable terms and conditions of the Credit Agreement or, to the extent that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, shall be made to the relevant administrative agent thereunder for distribution to the lenders thereunder.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by the Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 4.        Delivery and Distributions; Undeliverable or Unclaimed Distributions

(a)        Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, the Debtors, the Reorganized Debtors, or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes under the Plan to recognize and distribute securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, any distributions made to the DIP Facility Agent or Prepetition Agent shall be treated by such applicable agent in accordance with the applicable terms and conditions of the Credit Agreement or, to the extent that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, shall be made to the relevant administrative agent thereunder for distribution to the lenders thereunder.

(b)        Delivery of Distributions in General

Except as otherwise provided under the Plan, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the Credit Agreement), including, in the event that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, that such distributions shall be made to the relevant administrative agent thereunder for distribution to the lenders thereunder; provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

(c)     Minimum Distributions

Notwithstanding anything in the Plan to the contrary, no Distribution Agent will be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or shares of NewCo Ownership Interests, in each case with respect to Impaired Claims. With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar or share of NewCo Ownership Interests under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of NewCo Ownership Interests (up or down), with half dollars or shares of NewCo Ownership Interests or more being rounded up to the next higher whole number and with less than half dollars or shares of NewCo Ownership Interests being rounded down to the next lower whole number.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under the Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under subsection (d) below.

(d)     Undeliverable Distributions

Holding of Certain Undeliverable Distributions.   If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).   Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to Article VII.D.4(b) of the Plan, until such time as any such distributions become deliverable.   Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of the distribution being undeliverable.

Failure to Claim Undeliverable Distributions.   Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to the Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors, the Proposed Purchaser, or their respective assets or property, or any Distribution Agent.   In such case, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary. Any Cash, Plan Securities and Documents, or other property held for distribution or allocation on account of such Claim shall be distributed or allocated to the Prepetition Agent for distribution or allocation in accordance with the Plan.   Nothing contained in the Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

Failure to Present Checks. Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors, the Proposed Purchaser, or their respective assets or property. In such case, any Cash held for payment on account of such Claims shall be distributed to the Prepetition Agent for distribution in accordance with the Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

5.      **Compliance with Tax Requirements**

In connection with the Plan and all distributions under the Plan, the Reorganized Debtors or other applicable Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding and reporting requirements. The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

6.      **Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

7.      **Means of Cash Payment**

Payments of Cash made pursuant to the Plan will be in U.S. dollars and will be made, at the option of the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by such Person. Cash payments to foreign creditors may be made, at the option of the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable), in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

8.      **Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the "Treatment" sections in Article III of the Plan or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VIII of the Plan. Except as otherwise provided under the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for under the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

9.      Setoffs

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are reserved by the Plan, the Debtors, the Reorganized Debtors, and the Proposed Purchaser (as applicable) may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable) may hold against the Holder of any such Allowed Claim; provided that, at least ten (10) days prior to effectuating such withholding, the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable), shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors, the Reorganized Debtors, and the Proposed Purchaser (as applicable) may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable) of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to the Plan or the Confirmation Order.

G.      **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1.      **Resolution of Disputed Claims**

        (a)      Allowance of Claims

After the Effective Date, the Debtors and the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors, and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved, or adjudicated if the Chapter 11 Cases had not been commenced.

        (b)      Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the applicable Reorganized Debtors shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw, or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, this provision shall not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases; provided further that, solely with respect to the Assumed Liabilities, the foregoing rights and powers shall belong exclusively to the Proposed Purchaser.  From and after the Effective Date, the applicable Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court; provided that, solely with respect to the Assumed Liabilities, the foregoing rights and powers shall belong exclusively to the Proposed Purchaser.  The applicable Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

        (c)      Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the applicable Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate

any such Claims, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection; provided that, solely with respect to the Assumed Liabilities, the foregoing rights and powers shall belong exclusively to the Proposed Purchaser.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

(d)     Deadline to File Objections to Claims

Any objections to Claims shall be Filed by no later than the Claims Objection Deadline; provided that nothing contained in the Plan shall limit the Reorganized Debtors' or the Proposed Purchaser's right to object to Claims, if any, Filed or amended after the Claims Objection Deadline.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors, the Reorganized Debtors, and the Proposed Purchaser shall, as applicable, continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

**2.      No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

**3.      Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims**

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such distributions will be made pursuant to the applicable provisions of Article VII of the Plan.

**4.      Reserve for Disputed Claims**

The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall establish such appropriate reserves for Disputed Claims in Classes as it determines necessary or appropriate.  Without limiting the foregoing, reserves for Disputed Claims shall equal an amount of Cash equal to 100% of distributions to which Holders of such Disputed Claims in each applicable Class would be entitled under the Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors, the Reorganized Debtors, and the Proposed Purchaser, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims in accordance with Article VIII.A.3 of the Plan.

## H.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Confirmation Order, the Plan, and the Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Term Sheet or otherwise acceptable to the Debtors, the Agent, and the Aggregate Required Lenders; and

- The Confirmation Order shall have been entered by the Bankruptcy Court.

### 2.    Conditions Precedent to Consummation

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Confirmation Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

- The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors, the Agent, and the Aggregate Required Lenders, authorizing and approving the assumption, assumption and assignment, and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement;

- The Canadian Bankruptcy Court shall have entered a recognition order of the Confirmation Order, and such recognition order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

- The Plan and the Restructuring Documents shall not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet or otherwise acceptable to the Debtors, the Agent, and the Aggregate Required Lenders;

- The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case be in full force and effect. All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Purchase Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied or waived concurrently with the occurrence of the Effective Date);

- All consents, actions, documents, certificates and agreements necessary to implement the Plan and the transactions contemplated by the Purchase Agreement shall have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, shall have expired;

- The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, the Purchase Price Cash Component in accordance with the terms and conditions of the Purchase Agreement;

- The New Board and Plan Administrator shall each have been selected and appointed;

48

- The Exit Facility, if any, shall have closed or will close simultaneously with the effectiveness of the Plan;

- The Cash Reserves shall have been funded in full in Cash by the Debtors in accordance with the terms and conditions of the Plan;

- The Restructuring Support Agreement shall be in full force and effect;

- All Prepetition Agent Fees and Expenses shall, to the extent invoiced, have been paid in full in Cash; and

- The Confirmation Date shall have occurred.

### 3.    Waiver of Conditions

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of the Plan set forth in <u>Article IX</u> of the Plan may be waived by the Debtors, with the consent of the Agent and the Aggregate Required Lenders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

### 4.    Effect of Non-Occurrence of Conditions to Confirmation or Consummation

If the Confirmation or the Consummation of the Plan does not occur with respect to one or more of the Debtors, then the Plan shall, solely with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders or any other Entity in any respect.

## I.    RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

### 1.    General

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable.

Notwithstanding anything contained under the Plan to the contrary, the allowance, classification, and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments under the Plan, are settled, compromised, terminated and released pursuant to the Plan; <i>provided</i>, <i>however</i>, that nothing contained in the Plan shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan.

49

2.      **Release of Claims and Causes of Action**

    (a)      <u>Release by the Debtors</u>

      Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in <u>Article X</u> of the Plan or elsewhere in the Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "<u>Debtor Releasing Parties</u>") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver, and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "<u>Debtor Release</u>") from any and all Claims, Causes of Action, Litigation Claims, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, The Plan, the Restructuring Support Agreement, and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule [ ]; (ii) any Causes of Action arising from gross negligence, actual fraud, or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release. Notwithstanding the foregoing, nothing in <u>Article X.B</u> of the Plan shall or shall be deemed to operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.

      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained under the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

The foregoing release shall not affect or impair the releases and claim and lien allowances provided in the DIP Facility Orders.

(b)        Release by Third Parties

Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in **Article X** of the Plan or elsewhere in the Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties in paragraph (a) above, each Non-Debtor Releasing Party and each other Holder of a Claim against any Debtor (together with the Debtor Releasing Parties, the "**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived, and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**Third Party Release**") from any and all Claims, Causes of Action, Litigation Claims, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Restructuring Support Agreement, and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of the Plan or the solicitation of votes on the Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against *any* of the Released Parties; *provided, however,* that the foregoing provisions of this Third Party Release shall neither (1) apply to any Person or Entity that affirmatively opts-out of such Third Party Release on its respective ballot or other opt-out notice, in each case in accordance with the procedures set forth therein, nor (2) operate to waive or release (i) any Causes of Action expressly listed on Plan Schedule [__]; (ii) any Causes of Action arising from gross negligence, actual fraud, or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's interim or final fee application in these Chapter 11 Cases.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained under the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable, and reasonable; and (v) given and made

51

after due notice and opportunity for hearing.

The foregoing release shall not affect or impair the releases and claim and lien allowances provided in the DIP Facility Orders.

### 3. Waiver of Statutory Limitations on Releases

Under the Plan, each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### 4. Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date: (i) the rights afforded under the Plan and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or the Proposed Purchaser, or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, the Proposed Purchaser, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

5.        **Exculpation**

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of the Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, including the Restructuring Support Agreement and Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of the Plan; _provided_, _however_, that the foregoing provisions of this exculpation shall not operate to waive or release (i) any Causes of Action expressly set forth in and preserved by the Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud, or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's interim or final fee application in these Chapter 11 Cases; _provided_, _further_, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in Article X.E of the Plan shall or shall be deemed to operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in the Plan.

The foregoing exculpation shall not affect or impair the releases and claim and lien allowances provided in the DIP Facility Orders.

6.        **Preservation of Causes of Action**

(a)        Maintenance of Causes of Action

Except as otherwise provided in Article X of the Plan or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all applicable Litigation Claims not otherwise transferred or conveyed to the Proposed Purchaser pursuant to the Purchase Agreement, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of their applicable Litigation Claims not otherwise transferred or conveyed to the Proposed Purchaser pursuant to the Purchase Agreement without notice to or approval from the Bankruptcy Court.

(b)        Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by, as applicable, the Debtors, the Reorganized Debtors, or the Proposed Purchaser (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised, or settled in the Plan (including, without limitation, and for

the avoidance of doubt, the Release contained in Article X.B of the Plan and Exculpation contained in Article X.E of the Plan) or any other Final Order (including, without limitation, the DIP Facility Orders, or the Confirmation Order). In addition, the Debtors, the Reorganized Debtors, and the Proposed Purchaser, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

7.    **Injunction**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, from and after the Effective Date, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind; or (v) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any entity so released, discharged, or exculpated (or the property or estate of any entity so released, discharged, or exculpated). All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

## J.    BINDING NATURE OF THE PLAN

On the Effective Date, and effective as of the Effective Date, the Plan shall bind, and shall be deemed binding upon, the Debtors, the Reorganized Debtors, any and all Holders of Claims against and Equity Interests in the Debtors, all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, the Proposed Purchaser, each Entity acquiring property under the Plan, any and all non-debtor parties to Executory Contracts and Unexpired Leases with the Debtors and the respective successors and assigns of each of the foregoing, to the maximum extent permitted by applicable law, and notwithstanding whether or not such Entity (i) will receive or retain any property, or interest in property, under the Plan, (ii) has Filed a Proof of Claim or interest in the Chapter 11 Cases, or (iii) failed to vote to accept or reject the Plan, affirmatively voted to reject the Plan or is conclusively presumed to reject the Plan.

## K.    PROTECTION AGAINST DISCRIMINATORY TREATMENT

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Proposed Purchaser, or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors, or the Proposed Purchaser, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## L.    PLAN INDEMNITY

In addition to the matters set forth in the Plan and not by way of limitation thereof, the Reorganized Debtors and the Proposed Purchaser shall, and the Debtors shall continue to, indemnify and hold harmless all Persons who are or were managers, officers or directors of any of the Debtors at any time on or after the Petition Date (collectively, the "**Indemnified Parties**") on account of and with respect to any Claims (whether or not any Proof of Claim or cure claim has been Filed with respect thereto) or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities threatened or asserted by any Person against any such managers, officers, or directors with respect to or based upon, in whole or in part, any act taken or omitted to be taken, or alleged act taken or omitted to be taken, in such capacities on or prior to the Effective Date, irrespective of

54

whether such amounts are owed in connection with a prepetition or postpetition act or omission (collectively, the "**Indemnified Claims**"), but in each case only to the extent that (a) the acts, omissions or alleged acts or omissions of such applicable Person were indemnifiable under the Debtors' prepetition organizational documents (whether in the bylaws, certificates of incorporation, charters, operating agreements, board resolutions, employment contracts, or otherwise) and (b) the otherwise indemnifiable expense, liability, loss, or other amount is determined not to be covered under the D&O Tail Policy purchased by the Debtors prior to the Petition Date; provided, however, that in addition to the foregoing limitations, the Proposed Purchaser shall have no obligation to indemnify or hold harmless any Indemnified Parties for any Indemnified Claims to the extent such Indemnified Claims arise from gross negligence, actual fraud, or willful misconduct of such applicable Indemnified Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court

## M.  INTEGRAL PART OF PLAN

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision.

NY\6174610.7

# V.
## CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    SOLICITATION OF VOTES

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Section I herein titled, "Executive Summary" and set forth in detail in the Disclosure Statement Order, which is attached as Exhibit B to this Disclosure Statement.

**PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

### B.    CONFIRMATION PROCEDURES

#### 1.    Confirmation Hearing

The Confirmation Hearing will commence at [ ]:[ ] __.m. prevailing Eastern Time on [May 6], 2014 before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware 19801-3024.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

The Confirmation Objection Deadline is [ ]:00 [   ].m. prevailing Eastern Time on [        ], 2014.

All Confirmation Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Confirmation Objection Deadline.

> CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

#### 2.    Filing Objections to the Plan

Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the Notice Parties, as defined in Section I.F herein.

### C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

56

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan is reasonable; or (b) if it is to be fixed after confirmation of the Plan, is subject to the approval of the Bankruptcy Court for the determination of reasonableness;

- The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan. The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim will have accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan; and

- All outstanding fees payable pursuant to section 1930 of title 28 of the United States Code will be paid when due.

## 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provide, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor or debtors are liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the chapter 11 cases were converted to a chapter 7 case and the assets of the particular debtors' estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and

57

(c) compare such holder's liquidation distribution to the distribution under the chapter 11 plan that such holder would receive if the chapter 11 plan were confirmed.

In chapter 7 cases, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid in full: (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the cash amount that would be available for satisfaction of claims (other than secured claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtors, augmented by the unencumbered cash held by the debtors at the time of the commencement of the liquidation. Such cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the debtor's business and the use of chapter 7 for purposes of a liquidation.

As described in more detail in the liquidation analysis attached hereto as Exhibit D (the "**Liquidation Analysis**"), the Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest in each Class with a recovery greater than or equal to the value of any distributions if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale of the Debtors' assets and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution. In addition, distributions in a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Cases and the Claims against the Debtors. [As set forth in the Liquidation Analysis, Holders of Class 5-A Claims and Class 7 Old HoldCo Interests would not receive any recovery under a chapter 7 liquidation, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.]

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have separately analyzed the ability of each of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors separately analyzed the ability of Reorganized HoldCo to wind down its operations and the ability of NewCo to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The financial projections of NewCo (the "**Financial Projections**") are attached hereto as Exhibit C. Additionally, the Debtors' consolidated historical financial statements are attached hereto as Exhibit E (the "**Historical Financial Statements**").]

The Debtors believe that the Plan provides for a sufficient amount of Cash in the Wind-Down Reserve available to the Plan Administrator to wind-down Reorganized HoldCo and its Estate. Because the Plan contemplates the liquidation of Reorganized HoldCo, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code with respect to Reorganized HoldCo.

Further, as illustrated by the Financial Projections, the Debtors believe that as a result of the transactions contemplated by the Plan and Purchase Agreement, NewCo should have sufficient cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing business operations. The Debtors believe that confirmation and consummation is, therefore, not likely to be followed by the liquidation or further

reorganization of NewCo. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code with respect to NewCo.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE FINANCIAL PROJECTIONS HAVE NOT BEEN EXAMINED OR COMPILED BY INDEPENDENT ACCOUNTANTS. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THEIR ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. INEVITABLY, SOME ASSUMPTIONS WILL NOT MATERIALIZE AND UNANTICIPATED EVENTS AND CIRCUMSTANCES MAY AFFECT THE ACTUAL FINANCIAL RESULTS. THEREFORE, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PERIOD OF THE FINANCIAL PROJECTIONS MAY VARY FROM THE PROJECTED RESULTS AND THE VARIATIONS MAY BE MATERIAL. ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE FINANCIAL PROJECTIONS ARE BASED IN CONNECTION WITH THEIR EVALUATION OF THE PLAN.

BASED ON THE FINANCIAL PROJECTIONS SET FORTH IN EXHIBIT C HERETO, THE DEBTORS BELIEVE THAT THEY WILL BE ABLE TO MAKE ALL DISTRIBUTIONS AND PAYMENTS UNDER THE PLAN AND THAT CONFIRMATION OF THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OF THE REORGANIZED DEBTORS OR THE NEED FOR FURTHER FINANCIAL REORGANIZATION OF THE REORGANIZED DEBTORS.

3.       **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2, 3, and 5-B are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan. Claims in Class 6 and Equity Interests in Class 8 are Impaired, but are deemed to have accepted the Plan because such Holders are Affiliates of HoldCo. Accordingly, the Debtors are not required to solicit their vote.

Claims in Class 4 are Impaired under the Plan, and as a result, the Holders of Claims in Class 4 are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to Class 4, and without considering whether the Plan "discriminates unfairly" with respect to Class 4, as both standards are

described herein.  As explained above, Class 4 will have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in amount and a majority in number of the Claims of Class 4 (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Claims in Class 5-A (General Unsecured Claims Against HoldCo) and Old HoldCo Interests in Class 7 are impaired and deemed to have rejected the Plan.  The Debtors, therefore, will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code as more fully described below.

### 4.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

### 5.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 6.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- <u>Secured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- <u>Unsecured Claims</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- <u>Equity Interests</u>.  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

    o    the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such

60

holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; <u>or</u>

o    if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**As noted above, the Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable, in view of the deemed rejection by Classes 5-A and 7.**  To the extent that the Voting Class votes to reject the Plan, the Debtors further reserve the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with <u>Article XII</u> of the Plan.

The votes of Holders of Claims in Class 5-A and Old HoldCo Interests in Class 7 are not being solicited because, under <u>Article III</u> of the Plan, there will be no distribution to such Holders and, therefore, such Holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  All Class 6 Claims may be, with the consent of the Agent and the Aggregate Required Lenders, reinstated, reconciled, cancelled or otherwise compromised as may be necessary or advisable.  All Class 8 Equity Interests will remain effective and outstanding on the Effective Date and will be transferred to the Proposed Purchaser as part of the Purchased Assets.

Notwithstanding the deemed rejection by Classes 5-A and 7, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## D.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see <u>Article IX.B</u> of the Plan.

# VI.
## PLAN-RELATED RISK FACTORS

> PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    The Debtors May Fail to Satisfy the Vote Requirement.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan of reorganization.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan does not "unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation were not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Section 1129(b)(1) of the Bankruptcy Code provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, the Bankruptcy Court may only confirm such a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan." Subject to the Restructuring Transactions, the Plan contemplates that Old Affiliate Interests in Affiliate Debtor will remain effective and outstanding on the Effective

Date and may be owned and held by the same applicable Person(s) that held and/or owned such Old Affiliate Interests in Affiliate Debtor immediately prior to the Effective Date.  The Plan's treatment of Old Affiliate Interests in Affiliate Debtor has no economic substance and does not enable any junior creditor or interest holder to retain or recover any value under the Plan.  This technical preservation of Old Affiliate Interests in Affiliate Debtor is solely a means to preserve the corporate and organizational structure of the Debtors in order to avoid the unnecessary cost of reconstituting that structure.  There can be no assurance, however, that the Bankruptcy Court will find that the Plan satisfies the requirements of section 1129(b)(1) of the Bankruptcy Code.

Confirmation of the Plan is also subject to certain conditions as described in <u>Article IX</u> of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Non-Consensual Confirmation of the Plan May Be Necessary.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, in the event that the Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors, and Reorganized Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection.  Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. The Effective Date May Not Occur.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 7. The Purchase Agreement, and the Transactions Contemplated Thereby, May Not Be Consummated.

Although the Debtors believe that, in connection with the confirmation of the Plan, NewCo will, on behalf of all Prepetition Lenders and DIP Facility Lenders, as applicable and in accordance with the terms and conditions of the Purchase Agreement, credit bid a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims equal to the Purchase Price Credit Bid Component in exchange for the Purchased Assets, there can be no assurance as to such timing or as to whether the Purchase Agreement, and the transactions contemplated as part of the Purchase Agreement, will become effective.  As discussed in <u>Section IV.H</u> herein, there are certain material conditions to Closing contemplated by the Plan and the Purchase Agreement that may not be satisfied, including, for example, the Debtors' ability to assume one or more of their contracts.

8.      **Contingencies Will Not Affect Validity of Votes of the Voting Class to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Class to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.      **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

1.      **The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court.**

In connection with the consummation of the Plan, the Reorganized Debtors expect to receive the consideration contemplated under the Plan.  Parties in interest in these Chapter 11 Cases may oppose confirmation of the Plan by alleging that the value of the Reorganized Debtors is higher than the Purchase Price and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  At the Confirmation Hearing, the Bankruptcy Court may hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors.  Based on that evidence, the Bankruptcy Court may determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

2.      **There May Be a Lack of a Trading Market For the New Equity Interests.**

It is anticipated that there will be no active trading market for the New Equity Interests.  The Reorganized Debtors have no intention of registering any of the securities under the Securities Act, nor applying to list any of the securities on any national securities exchange.  Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities.  In addition, the Reorganized Debtors will not be required to file reports with the Securities and Exchange Commission or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

3.      **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results or Service Their Debt.**

Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors there is no guarantee that the Financial Projections will be realized.  The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs.  Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) taking advantage of future opportunities; (b) growing their businesses; or (c) responding to future changes in the drilling industry and competitive pressures.  Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.

4.      **The Estimated Valuation of the Reorganized Debtors, the New Equity Interests and the Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent the Private or Public Sale Values of the Reorganized Debtors' securities.**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the private or public sale values of the Reorganized Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of Reorganized Debtors), including, without

64

limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

**5.      NewCo Will Control the Reorganized Debtors.**

Consummation of the Plan and the effectuation of the Restructuring Transactions will result in the Prepetition Lenders acquiring 100% of the NewCo Ownership Interests.

## C.      RISK FACTORS THAT COULD NEGATIVELY IMPACT THE DEBTORS' BUSINESS

**1.      The Debtors' markets may be adversely affected by industry conditions that are beyond their control.**

The Debtors sell their drilling services to oil and natural gas exploration and production companies. They depend on their customers' willingness to make operating and capital expenditures.   If these expenditures decline, the Debtors' businesses may suffer.  Their customers' willingness to explore, develop and produce depends largely upon prevailing industry conditions that are influenced by numerous factors over which the Debtors' management has no control, such as:

- the supply of and demand for oil;
- the prices, and expectations about future prices, of oil;
- the supply of and demand for land drilling rigs in South America;
- technological advances which affect the equipment used to drill oil and gas wells;
- the cost of exploring for, developing, producing and delivering oil and natural gas;
- the expected rates of decline of current oil and natural gas production;
- lead times associated with acquiring equipment and products and availability of personnel;
- regulation of drilling activity;
- the discovery rates of new oil and natural gas reserves;
- available pipeline and other transportation capacity;
- weather conditions that can affect oil and natural gas operations over a wide area;
- domestic and worldwide economic conditions;
- technical advances affecting energy consumption;
- the availability and cost of alternate suppliers of key rig components, raw materials, component parts, and other equipment if the Debtors' current suppliers are unable to act as the Debtors' supplier;
- the price and availability of alternative fuels; and
- merger and divestiture activity among oil and natural gas producers.

In addition, a decrease in the development rate of oil and natural gas reserves in the Debtors' market areas may also have an adverse impact on their businesses, even in an environment of stronger oil and natural gas prices.

**2.      Crude Oil and Natural Gas Prices.**

One of the most significant factors that can affect the business of the Debtors is oil and natural gas commodity prices. Commodity prices affect the capital programs of energy exploration and production companies, as the price they receive for the crude oil and natural gas they produce has a direct impact on the cash flow available to them and the subsequent demand for the services provided by the Debtors. Crude oil and natural gas prices have been volatile in recent years, and may continue to be as weather conditions, government regulation, political and economic environments, pipeline capacity, storage levels and other factors outside of the Debtors' control continue to influence commodity prices. Demand for the Debtors' services in the future will continue to be influenced by commodity prices and the resultant impact on the cash flow of its customers, and may not be reflective of historical activity levels.

65

3.      **The Debtors' businesses depend on a small number of significant customers and contracts within the oil and natural gas production industry.**

The Debtors' businesses are dependent on their existing contracts and their relationships with approximately ten (10) customers in South America.  A reduction in business from these customers resulting from reduced capital spending on exploration and development, a work stoppage, sourcing of drilling services from other suppliers, or other factors could materially impact the Debtors' businesses, financial condition, and results of operations.  It is likely that the Debtors will continue to derive a significant portion of their revenue from a relatively small number of customers in the future.  If one or more major customers decided not to continue to use the Debtors' services, revenue could decline and their operating results and financial condition could be harmed.

4.      **Foreign Operations.**

The Debtors provide drilling and workover services in several international onshore drilling areas. The Debtors' operations are subject to regulations in various jurisdictions and support of the oil and natural gas industry can vary in these jurisdictions. In general, the Debtors negotiate long term service contracts for drilling and workover services and these contracts usually include clauses for the Debtors' protection.

The Debtors' continuing operations are located in international markets which have significant uncertainties. These markets include Brazil, Ecuador and Colombia. Uncertainties include, but are not limited to, the risk of war, terrorism, expropriation, nationalization, renegotiation or nullification of existing or future concessions and contracts, the imposition of international sanctions, a change in crude oil pricing policies, a change in taxation policies, and the imposition of currency controls. These uncertainties, all of which are beyond the Debtors' control, could have a material adverse effect on the Debtors' business, prospects and results of operations.

5.      **Foreign Exchange Exposure.**

The Debtors' consolidated financial statements are presented in United States dollars and, therefore, operations in Canada, Colombia and Brazil result in foreign exchange risk to the Debtors.  The principal foreign exchange risk relates to the conversion of Colombian peso (COP), Canadian dollar (CAD $), Euro, and Brazilian real (BRL) denominated activity to United States dollars (USD $).  The COP/USD exchange rate at September 30, 2013 was 1,908 compared to 1,767 at December 31, 2012.  The CAD/USD dollar exchange rate at September 30, 2013 was 1.03 compared to 0.99 at December 31, 2012.  The Euro/USD dollar exchange rate at September 30, 2013 was 0.7389 compared to 0.7584 at December 31, 2012.  The BRL/USD dollar exchange rate at September 30, 2013 was 2.21 compared to 2.05 on December 31, 2012.  Under the Debtors' current operating structure, its operations in Canada, Colombia, and Brazil are considered to be integrated for foreign currency translation purposes. Fluctuations in future exchange rates will impact the United States dollar equivalent of the results reported by the Debtors' foreign subsidiary and branches.

6.      **Continued Unpaid Receivables.**

The Debtors' small number of significant customers increases their exposure to the risks of nonpayment and nonperformance.  A significant reduction in the Debtors' customers' liquidity may result in a decrease in their ability to pay or otherwise perform on their obligations to the Debtors.  Any increase in the nonpayment of and nonperformance by one or more major customers, either as a result of recent changes in financial and economic conditions or otherwise, could have an adverse impact on the Debtors' operating results and could adversely affect their liquidity.

66

7.      **Rig upgrade, refurbishment, and construction projects are subject to risks and uncertainties, including delays and cost overruns.**

The Debtors may from time to time make significant expenditures in connection with upgrading and refurbishing their rig fleet.  In the future, these activities may include planned upgrades to maintain quality standards, routine maintenance and repairs.  Rig upgrade, refurbishment, and construction projects are subject to the risks of delay or cost overruns inherent in any large construction project, including the following:

- shortages of equipment or skilled labor;
- unforeseen engineering problems;
- unanticipated change orders;
- work stoppages;
- adverse weather conditions;
- unexpectedly long delivery times for manufactured rig components;
- unanticipated repairs to correct defects in construction not covered by warranty;
- failure or delay of third-party equipment vendors or service providers;
- unforeseen cost increases, including the cost of equipment, labor or raw materials, particularly steel;
- loss of revenue associated with downtime to remedy malfunctioning equipment; and
- loss of revenue to perform repairs associated with defects, unanticipated equipment refurbishment, and delays in commencement of operations.

Any one of the above risks could adversely affect the Debtors' financial condition and results of operations. Additionally, capital expenditures for rig upgrade, refurbishment, or construction projects could exceed the Debtors planned capital expenditures.

8.      **The contract drilling business is highly competitive.**

Competition in contract drilling involves such factors as price, rig availability, efficiency, condition, and type of equipment, the mobility and efficiency of the rigs, the offering of ancillary services, reputation, operating safety, and quality of service and experience of the rig crews. Competition is primarily on a regional basis and may vary significantly by region at any particular time.  Land drilling rigs can be readily moved from one region to another in response to changes in levels of activity, and an oversupply of rigs in one region may result in increased price competition across several other geographies.

Although many contracts for drilling services are awarded based solely on price, the Debtors attempt to differentiate their services based upon their newer, technologically advanced, and efficient rigs, operational efficiency and safety.  This strategy is less effective when lower demand for drilling services intensifies price competition and makes it more difficult or impossible to compete on any basis other than price. Also, future improvements in operational efficiency and safety by the Debtors' competitors could negatively affect the Debtors' ability to differentiate their services.

9.      **The Debtors' operating and maintenance costs with respect to their rigs include fixed costs that will not decline in proportion to decreases in dayrates.**

The Debtors do not expect their operating and maintenance costs with respect to their rigs to necessarily fluctuate in proportion to changes in operating revenue.  Operating revenue may fluctuate as a function of changes in dayrate, but costs for operating a rig are generally fixed or only semi-variable regardless of the dayrate being earned. During times of reduced activity, reductions in costs may not be immediate as portions of the crew may be required to prepare the Debtors' rigs to be "stacked," meaning they are without contracts and stored, after which time the crew members are assigned to active rigs or dismissed.  Moreover, when the Debtors' rigs are mobilized from one geographic location to another, the labor and other operating and maintenance costs can vary significantly.  In general, labor costs increase due to higher salary levels, inflation, and increases in workers' compensation insurance. Equipment maintenance expenses fluctuate depending upon the type of activity the unit is performing and the age

and condition of the equipment.  Contract preparation expenses vary based on the scope and length of contract preparation required and the duration of the firm contractual period over which such expenditures are amortized.

> ### 10.    Low Rig Utilization.

The Debtors' businesses are currently facing a period of low demand, with only 15 out of their 26 rigs currently operational.  In fact, in Brazil in particular, much of the new drilling is taking place offshore and only two of the Debtors' nine Brazilian rigs are operational.  There is no guarantee that onshore drilling in Brazil will ever be as robust as the offshore drilling market.  Additionally, the Brazilian operations have significant selling, general and administrative expenses, which contribute further to the overall poor financial performance in Brazil.  Thus there might not be sufficient demand for these additional rigs in the future, and continuing to maintain these rigs without contracts may have a material impact on the Debtors' revenues and profitability.

## D.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

> ### 1.    The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.

**<u>The financial information contained in this Disclosure Statement has not been audited.</u>**  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

> ### 2.    Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.

This Disclosure Statement contains various projections concerning the financial results of NewCo's operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of NewCo may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of NewCo, some of which may not materialize, including, without limitation, assumptions concerning the timing of confirmation and consummation of the Plan in accordance with its terms.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD <u>NOT</u> BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

E.       **DISCLOSURE STATEMENT DISCLAIMER**

1.       **The Information Contained Herein Is for Soliciting Votes Only.**

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

2.       **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission.**

This Disclosure Statement has not been filed with the Securities and Exchange Commission or any state regulatory authority.  Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.       **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.  The offer of New Equity Interests has not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act, and other applicable nonbankruptcy law, the issuance of the New Equity Interests will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code or section 4(2) of the Securities Act.

4.       **This Disclosure Statement Contains Forward Looking Statements.**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.       **No Legal or Tax Advice Is Provided to You by this Disclosure Statement.**

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.       **No Admissions Are Made by This Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, any Debtor) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

7.      **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims or causes of action and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims, causes of action or objections to Claims.

8.      **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or its Estate are specifically or generally identified herein.

9.      **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.     **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.     **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the United States Trustee.

NY\6174610.7

**VII.**
**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.     LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If the Plan or an alternative chapter 11 plan of reorganization cannot be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets.  A discussion of the effect a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Section V.C herein, titled "Statutory Requirements for Confirmation of the Plan."  The Debtors believe that liquidation under chapter 7 would result in (i) smaller or equal distributions being made to creditors entitled to a recovery than those provided for in the Plan based on the liquidation value of the Debtors' assets and because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

**B.     FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets.  As discussed above, during the negotiations prior to the filing of the Chapter 11 Cases, the Bidding Procedures Motion and the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, preserving their businesses and allowing their creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors than the Plan because the Plan provides for a greater return to creditors.

The prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' businesses and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' suppliers, distributors, customers, and agents, the vast majority of which are located outside the U.S., will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the Credit Agreement or otherwise, in order to service its debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were to be unable to obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

# VIII.
## APPLICABILITY OF SECURITIES LAWS TO NEWCO OWNERSHIP INTERESTS

**A.     NEWCO OWNERSHIP INTERESTS ISSUED IN RELIANCE ON SECTION 1145 OF THE BANKRUPTCY CODE**

The NewCo Ownership Interests are being offered pursuant to the Plan and the applicable Amended/New Organization Documents for NewCo.  The offer and delivery of the NewCo Ownership Interests is subject to federal securities laws.  The Debtors believe that the issuance of the NewCo Ownership Interests as provided under the Plan, will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering and equivalent exemptions in state securities laws.  In the alternative, the offer and delivery of the NewCo Ownership Interests will be made without registration under the Securities Act of 1933, in reliance on an exemption from registration provided by Section 1145(a)(1) of the Bankruptcy Code, which also exempts the offer and delivery of the NewCo Ownership Interests from similar state securities laws.  Under the Plan, the NewCo Ownership Interests will be issued to the Holders of Prepetition Credit Agreement Claims and/or DIP Facility Claims in reliance upon section 1145(a)(1) of the Bankruptcy Code (together, the "**1145 Securities**").  Section 1145(a)(1) of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of a security by a successor to the debtor if:

- the offer or sale occurs under a plan of reorganization;

- the recipients of such security hold a claim against, an interest in or claim for administrative expense in the case concerning the debtor; and

- such security is offered in exchange for a claim against, an interest in or claim for administrative expense in the case concerning the debtor, or is offered principally in such exchange and partly for cash and property.

**B.     RESALE OF NEWCO OWNERSHIP INTERESTS**

Pursuant to section 1145(c) of the Bankruptcy Code, an offer or sale of the 1145 Securities is deemed to be a public offering. The 1145 Securities may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the 1145 Securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of such securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing such securities and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in the Securities Act.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or

are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

## C.    RESALE OF THE 1145 SECURITIES BY "UNDERWRITERS" AND RULE 144A

Resales by persons who receive the 1145 Securities who are deemed to be "underwriters" (as such term is defined in the Bankruptcy Code) (collectively, the "**Restricted Holders**") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Restricted Holders would, however, be permitted to sell the 1145 Securities, as applicable, without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission pursuant to a registration agreement or otherwise. Under the Plan, however, Restricted Holders are not entitled to any registration rights. Any person who is an "underwriter" but not an "issuer" with respect to an offer of the 1145 Securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

Under certain circumstances, Restricted Holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the Securities and Exchange Commission. However, NewCo does not presently intend to make publicly available the requisite current information regarding NewCo, and as a result, Rule 144 will not be available for resales of New Equity Interests by Restricted Holders.

## D.    LEGEND

Pursuant to the Plan, certificates evidencing NewCo Ownership Interests will bear a legend substantially in the form below (the "**Legend**"):

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR APPLICABLE STATE SECURITIES LAWS ("<u>STATE ACTS</u>") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT OR STATE ACTS."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED HOLDCO WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF NEWCO, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN THE NEWCO OWNERSHIP INTERESTS. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL**

**RECIPIENTS OF ANY NEWCO OWNERSHIP INTERESTS TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER, AND UNDER WHAT CIRCUMSTANCES, THEY MAY SELL, ASSIGN, TRANSFER, OR OTHERWISE DISPOSE OF SUCH SECURITIES.**

Additionally, any of the 1145 Securities held by an identified Restricted Holder will be subject to bear the Legend on any certificates evidencing such 1145 Securities.

**E.        REORGANIZED HOLDCO COMMON STOCK**

TID has been de-listed from the Toronto Stock Exchange.  There is therefore no active trading market for the trading of the stock of TID.  After the consummation of the Plan, there still will be no trading market for the Reorganized HoldCo Common Stock.  Reorganized HoldCo is considered a shell company for reporting purposes under Canadian securities law.

**IX.**
**CERTAIN U.S. FEDERAL INCOME**
**TAX CONSEQUENCES OF THE PLAN**

**A.    IN GENERAL**

The following discussion summarizes certain material U.S. federal income tax consequences to Holders expected to result from the consummation of the Plan.  This discussion is based on current provisions of the IRC, applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the IRS.  There can be no assurance that the IRS will not take a contrary view, no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to a particular Holder of a Claim.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only.  This summary does not address foreign, state or local tax consequences of the Plan. The tax treatment of a Holder may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences or any consequences of the Medicare contribution tax on net investment income, and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in the Plan or the tax consequences to a Holder of a DIP Facility Claim (in its capacity as a Holder of a DIP Facility Claim).  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction, Holders that have a "functional currency" other than the United States dollar, Holders that are not "United States persons" within the meaning of Section 7701(a)(30) of the IRC and Holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder.  Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

75

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE IRC, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### B.    U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF ALLOWED CLASS 4 CLAIMS

#### 1.    Gain or Loss Recognition With Respect to the Purchase Price Credit Bid Component

Pursuant to the Plan, the Agent (or its Affiliate), at the direction of the Aggregate Required Lenders, will form NewCo and NewCo will, on the Effective Date, credit bid a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims equal to the Purchase Price Credit Bid Component and pay the Purchase Price Cash Component, if any, in exchange for the Purchased Assets.  Upon NewCo's receipt of the Purchased Assets in exchange for the Purchase Price, NewCo should recognize gain or loss for U.S. federal income tax purposes, and, provided that NewCo is treated as a partnership for U.S. federal income tax purposes, a Holder of an Allowed Class 4 Claim that directly holds NewCo Ownership Interests should recognize its allocable share of such gain or loss. Such a Holder's allocable share of such gain or loss should generally be equal to the difference, if any, between (x) the sum of its adjusted tax basis in that portion of its Allowed Class 4 Claim that is included in the Purchase Price Credit Bid Component plus any cash contributed by such Holder to NewCo to be used as part of the Purchase Price Cash Component, and (y) the fair market value of such Holder's allocable portion of the Purchased Assets plus such Holder's allocable portion of any Net Cash Amount and any Unused Cash Reserve Amount.  A Holder should consult its own tax advisor regarding the U.S. federal income tax treatment of any Unused Cash Reserve Amount that is received after the taxable year of such Holder that includes the Effective Date.

The character of any gain or loss, whether capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i)  the tax status of the Holder of the Claim; (ii) whether the Claim has been held for more than one year; (iii) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (iv) whether the Claim was acquired at a market discount.  A Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan may be subject to limits on the use of such capital losses.

A Holder of an Allowed Class 4 Claim that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally should be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

However, the precise tax consequences to  Holders will depend on their own circumstances and, accordingly, Holders should consult their own tax advisor as to their tax consequences arising from the consummation of the Plan.

2.        **Gain or Loss Recognition With Respect to the Remaining Prepetition Credit Agreement**

Pursuant to the Plan, on and as of the Effective Date, the remaining Prepetition Credit Agreement Claims (after reduction by the Purchase Price Credit Bid Component) will be repaid in full and/or refinanced or replaced by obligations of NewCo, to be guaranteed by all Non-Debtor Obligors, under any Exit Facility.

Under general principles of U.S. federal income tax law, whether a debt instrument is treated as "exchanged" in a transaction that can give rise to taxable gain or loss for U.S. federal income tax purposes (regardless of whether the existing debt instrument is actually exchanged for a new debt instrument) generally depends on whether the debt instrument has been modified to the extent that it differs materially either in kind or in extent from the original debt instrument.  In this regard, governing Treasury Regulations (the "**Modification Regulations**") provide that, as a general rule, a deemed exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant (a "significant modification").  The determination as to whether the Exit Facility is expected to constitute a significant modification of the Prepetition Credit Agreement Claims cannot be made until the terms of the Exit Facility have been established.  However,  the following disclosure, except as otherwise specifically indicated, assumes that interests under the Exit Facility that are received by Holders of Allowed Class 4 Claims in exchange for their Prepetition Credit Agreement Claims will differ from the Prepetition Credit Agreement Claims to the extent that such exchange will constitute a taxable exchange under the Modification Regulations.

Accordingly, a Holder of an Allowed Class 4 Claim that receives an interest in the Exit Facility, and/or cash in exchange for its Prepetition Credit Agreement Claims generally should recognize gain or loss for U.S. federal income tax purposes upon the exchange in an amount equal to the difference between (i) the amount realized by such Holder (exclusive of any portion of the amount realized that is attributable to accrued and unpaid interest, which generally should be taxable to the Holder as ordinary interest income to the extent that such interest has not previously been included in income by such Holder) and (ii) the Holder's adjusted tax basis in such  Prepetition Credit Agreement Claims on the Effective Date.

In general, the amount realized by a Holder upon such an exchange should equal the sum of (x) the issue price of any interest in the Exit Facility received in exchange for the Holder's  Prepetition Credit Agreement Claims (as discussed below) plus (y) the amount of any cash received in exchange for the Holder's Prepetition Credit Agreement Claims.

The character of any gain or loss, whether capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including:  (i) the tax status of the Holder of the Claim; (ii) whether the Claim has been held for more than one year; (iii) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (iv) whether the Claim was acquired at a market discount.  A Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan may be subject to limits on the use of such capital losses.

A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC.  Under those rules (subject to a de minimis exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

If, contrary to the assumption set forth above, the Exit Facility does not constitute a significant modification of the Prepetition Credit Agreement Claims pursuant to the Modification Regulations, a Holder of an Allowed Class 4 Claim should not recognize taxable gain or loss on the receipt of interests in the Exit Facility in exchange for its Prepetition Credit Claims; provided that,  to the extent that such Holder receives an increased principal amount of the Exit Facility on account of accrued and unpaid interest that is a component of the Prepetition Credit Agreement Claims, such increased principal amount should generally  be taxable as interest to the extent not previously included by such Holder in income.  In such event, the amount of such increased principal amount taken into account as payment with respect to accrued and unpaid interest generally should be equal to the "issue price" of such increased principal amount received by the Holder.  In the event and to the extent that the amount treated as

received by the Holder in satisfaction of such accrued and unpaid interest is less than the amount previously taken into income with respect to such accrued and unpaid interest by such Holder, such Holder could have a loss

(a)    Issue Price of the Exit Facility

The issue price of the Exit Facility will generally depend on whether a substantial amount of the interests in the Exit Facility are treated as issued for cash and, if not, whether either the Exit Facility or the Credit Agreement are treated as "traded on an established market" under applicable Treasury Regulations.  Holders of Class 4 Claims should consult their own tax advisor regarding the applicability of these rules to the determination of the issue price of the Exit Facility.

If, contrary to the assumption set forth above, the Exit Facility does not constitute a significant modification of the Prepetition Credit Agreement Claims pursuant to the Modification Regulations, then that portion of the Exit Facility that is issued in exchange for the principal amount of Prepetition Credit Agreement Claims (such portion of the Exit Facility, the "existing amount") should not be treated as reissued for U.S. federal income tax purposes.  In such event (i) the issue price of that portion of the Exit Facility that is not issued in exchange for the principal amount of Prepetition Credit Agreement Claims (such portion of the Exit Facility, the "newly issued amount") would depend on whether the newly issued amount constituted a "qualified reopening" of the existing amount for U.S. federal income tax purposes and (ii) the newly issued amount may not be fungible for U.S. federal income tax purposes with the existing amount, and may be required to have a separate CUSIP (or other identifying number).

(b)    Original Issue Discount, Market Discount, Acquisition Premium, and Bond Premium

If the issue price of the Exit Facility (or the newly issued amount of the Exit Facility, in the event that, contrary to the assumption set forth above, the Exit Facility does not constitute a significant modification of the Prepetition Credit Agreement Claims pursuant to the Modification Regulations)  is less than its "stated redemption price at maturity" (as defined in applicable Treasury Regulations) by more than a statutorily defined de minimis amount then, the Exit Facility (or the newly issued amount, as applicable) would be treated as being issued with original issue discount.  In such event, a Holder generally would be required to include such original issue discount in income for U.S. federal income tax purposes as it accrues, on a constant yield to maturity basis, regardless of such Holder's regular method of accounting for U.S. federal income tax purposes.

Holders of Class 4 Claims should consult their own tax advisor regarding any possible tax consequences to them resulting from the application of the market discount, acquisition premium, or bond premium rules to their acquisition, ownership or disposition of interests in the  Exit Facility.

3.    **Accrued and Unpaid Interest**

Holders of Allowed Class 4 Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any property or cash received  pursuant to the Plan is attributable to accrued but unpaid interest, if any, with respect to their Allowed Class 4 Claims.  The extent to which the receipt of property or cash should be attributable to accrued but unpaid interest is unclear.  The Debtors intend to take the position, and the Plan provides, that property and cash received pursuant to the Plan will, to the extent permitted by law, first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon.  However, no assurances can be given that the IRS will not challenge this position.  If, contrary to the Debtors' intended position, such a receipt of property or cash were treated as being allocated first to accrued but unpaid interest, a Holder would first realize ordinary income with respect to the receipt in an amount equal to the accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder otherwise realizes a loss as a result of the Plan.

Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any).

78

4.        **Backup Withholding and Information Reporting**

A Holder may be subject to backup withholding, currently at the rate of 28%, with respect to any "reportable" payments received pursuant to the Plan unless (i) such Holder is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and complies with applicable requirements of the backup withholding rules.   A Holder who does not provide a correct taxpayer identification number may be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup holding rules by timely filing the appropriate claim for refund with the IRS.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including certain transactions that result in the taxpayer recognizing a loss in excess of specified thresholds.  Each Holder should consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations.

**THE FOREGOING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN AND THE APPLICATION OF FEDERAL, STATE, LOCAL AND FOREIGN TAX LAWS.   NEITHER THE DEBTORS NOR THEIR PROFESSIONALS SHALL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.**

**X.**
**CERTAIN CANADIAN FEDERAL INCOME**
**TAX CONSEQUENCES OF THE PLAN**

**A.      INTRODUCTION**

The following summary is based upon the current provisions of the Income Tax Act (Canada) and the regulations thereunder (the "**Tax Act**") in force on the date hereof, all specific proposals to amend the Tax Act publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof and the Debtors' understanding of the current administrative policies and assessing practices of the Canada Revenue Agency (the "**CRA**") published by the CRA prior to the date hereof.  There can be no assurance that the proposed amendments will be implemented in their current form or at all.  This summary is not exhaustive of all possible income tax considerations and, except for the proposed amendments, does not otherwise take into account or anticipate any changes in law, whether by judicial, governmental or legislative decision or action, or changes in the administrative policies or assessing practices of the CRA, nor does it take into account other federal tax legislation or considerations or the tax legislation or considerations of any province, territory, or foreign jurisdiction.   The provisions of provincial income tax legislation vary from province to province in Canada and in some cases differ from federal income tax legislation.

This summary is intended for general information purposes only, and does not purport to address all of the Canadian federal income tax considerations that may be relevant to the particular circumstances of a holder of claims under the Plan or the Debtors.  This summary is not intended to be, nor should it be construed to be legal or tax advice to any particular Holder.  Holders are urged to consult their own tax advisors concerning the tax consequences to them of the Plan.

No ruling has been requested or obtained from the CRA with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to Holders with respect to the Canadian federal income tax consequences described herein.

This summary does not apply to a holder of a Claim or Old HoldCo Equity Interest: (i) that is a "financial institution" (as defined in the Tax Act for purposes of the "mark-to-market" rules); (ii) that is a "specified financial institution" (as defined in the Tax Act); (iii) that is a partnership; (iv) an interest in which would be a "tax shelter investment" (as defined in the Tax Act); (v) that has elected to determine its Canadian tax results in a foreign currency pursuant to the functional currency reporting rules; or (vi) that has entered or will enter into a "synthetic disposition arrangement" or derivative forward agreement" (as defined in the Tax Act).

**1.        Exchange rates**

All amounts, including the cost of, interest or dividends, received and accrued on, and proceeds of disposition from any Claim, NewCo Equity Interest, or Equity Interest in the TID, must be determined in Canadian dollars at applicable exchange rates for purposes of the Tax Act.  Any amount denominated in U.S. dollars must be converted into Canadian dollars, generally at the exchange rate quoted by the Bank of Canada as its noon rate on the date the amount first arose.

80

**B.      TAX CONSIDERATIONS GENERALLY APPLICABLE TO THE COMPANY**

**1.      NewCo Credit Bid**

Pursuant to the Plan, the Prepetition Agent (or its Affiliate), at the direction of the Aggregate Required Lenders, will form NewCo and NewCo will, on the Effective Date, credit bid a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims equal to the Purchase Price Credit Bid Component plus the Purchase Price Cash Component, if any, in exchange for the Purchased Assets.   The transfer by TID of the Purchased Assets to NewCo pursuant to the Purchase Agreement will result in TID having disposed of the Purchased Assets for proceeds of disposition equal to the portion of Purchase Price Credit Bid Component attributable to the Purchased Assets.   Generally, TID will realize capital gains (or capital losses) for Canadian federal income tax purposes equal to the amount by which the proceeds of disposition, net any reasonable costs of disposition, exceed (or are less than) the adjusted cost bases of the Purchased Assets.   The tax treatment of any such capital gains (or capital losses) is described below under "Taxation of Capital Gains and Capital Losses".

**2.      Application of the Debt Forgiveness Rules**

The Tax Act contains rules (the "debt forgiveness rules") which may affect TID as a result of the implementation of the Plan.   These rules generally apply where a "commercial debt obligation" (as defined in the Tax Act) is settled or extinguished without any payment or by the payment of an amount less than the principal amount of the debt.

In general, the debt forgiveness rules provide that the amount by which the principal amount of a commercial debt obligation (including, generally, accrued and unpaid interest thereon) exceeds the amount paid in satisfaction of such principal amount (such excess being referred to in this discussion as the "forgiven amount") is to be applied to reduce, in prescribed order, certain tax attributes of the TID, including: (i) non-capital losses of prior taxation years; (ii) net capital losses of prior taxation years; (iii) capital cost and undepreciated capital cost of depreciable property; (iv) cumulative eligible capital; and (v) adjusted cost base of certain other capital property (collectively, the "**Tax Shield**").   Generally, one-half of the amount by which the forgiven amount exceeds the Tax Shield will be required to be included in TID's income for the taxation year of the Effective Date, subject to a potential off-setting deduction for insolvent corporations.   Different rules may apply to the settlement of debts accrued to suppliers of inventory and certain other trade debts.

**C.      TAX CONSIDERATIONS GENERALLY APPLICABLE TO CANADIAN HOLDERS**

For the purposes of the following discussion, the term "Canadian Holder" means a holder of a Claim or Old HoldCo Interest in TID that, for the purposes of the Tax Act: (i) is a resident or deemed resident in Canada for purposes of the Tax Act; or (ii) that does not deal at arm's length with or is affiliated with any Debtor for purposes of the Tax Act.

**1.      Amounts Received by a Canadian Holder on Account of Interest**

A Canadian Holder who receives cash or other consideration in satisfaction of a Claim may realize ordinary income or loss to the extent that any portion of such consideration is characterized as interest.

The Canadian federal income tax consequences arising as a result of the non-payment of interest owing to a Canadian Holder will be dependent on the particular circumstances of the Canadian Holder, including the method followed in computing its income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such interest.

2.        **Settlement of Claims Held by Canadian Trade Creditors**

The Canadian federal income tax consequences to a Canadian Holder whose Claim arose in the course of a business carried on by it, who has included an amount in income for the year or a previous year in respect of such Claim (a "**Canadian Trade Creditor**") and who receives cash or other property in satisfaction of a Claim will depend on its particular circumstances, including the method regularly followed in computing income for tax purposes and whether it has previously claimed a bad or doubtful debt deduction in respect of such Claim.

Where a Canadian Trade Creditor has previously claimed a bad or doubtful debt deduction in respect of a Claim and receives cash or other property in satisfaction of such Claim, the Canadian Trade Creditor may be required to include in computing its income (in the taxation year in which such property is received) an amount equal to the aggregate fair market value of such property or cash.

It is the published administrative position of the CRA that where property is accepted by a Canadian Trade Creditor in settlement of a debt of a kind that would qualify for a deduction under paragraph 20(1)(p) of the Tax Act, and the fair market value of the property at the time it is acquired by the Canadian Trade Creditor is less than the amount of trade debt, the difference will be deductible by the Canadian Trade Creditor as a bad debt.

It is the published administrative position of the CRA that where a trade debt of a taxpayer is satisfied by the issuance of property, if the property is retained by the taxpayer for a period of time which, in the circumstances, indicates that it was held as an investment, any subsequent disposition will be considered to be the disposition of a capital property and will be subject to the rules relating to capital gains and capital losses as described below under "Taxation of Capital Gains and Capital Losses". However, if the property is disposed of in circumstances indicating that the taxpayer did not have the intention of retaining it as an investment, then the profit or loss arising on the disposition will constitute income or loss from business.

3.        **Settlement of Claims Held as Capital Property by Canadian Holders**

A Canadian Holder of a Claim against the Debtors who receives cash or other property in satisfaction of the principal amount of a Claim held as capital property will be considered to have disposed of the Claim for proceeds of disposition equal to the amount of cash plus the fair market value of any other property received.  Generally, such holder will realize a capital gain (or capital loss) for Canadian federal income tax purposes equal to the amount by which the proceeds of disposition, net of any reasonable costs of disposition, exceed (or are less than) the adjusted cost base of the Claim, determined immediately prior to the Effective Date.

A Canadian Holder of a Claim held as capital property that is extinguished without payment should generally realize a capital loss for Canadian federal income tax purposes equal to the Canadian Holder's adjusted cost base in such Claim extinguished under the Plan.  The tax treatment of any such capital loss is described below under "Taxation of Capital Gains and Capital Losses".

4.        **Cancellation of Equity Interests in the Company**

Pursuant to the Plan, all Old HoldCo Interests will be extinguished and cancelled, and the holders of all Old HoldCo Interests in the Company will receive no recovery on account of such interests.  As a result, a Canadian Holder will realize a capital loss on the cancellation of its Old HoldCo Interests in TID for nil consideration equal to the adjusted cost base to the Canadian Holder of such Old HoldCo Interests, plus any reasonable costs of disposition. The tax treatment of any such capital loss is described below under "Taxation of Capital Gains and Capital Losses".

5.        **Taxation of Capital Gains and Capital Losses**

Generally, a Canadian Holder is required to include in computing its income for a taxation year one-half of the amount of any capital gain (a "taxable capital gain") realized in the year.  Subject to and in accordance with the provisions of the Tax Act, a Canadian Holder is required to deduct one-half of the amount of any capital loss (an "allowable capital loss") realized in a taxation year from taxable capital gains realized in the year by such Canadian Holder.  Allowable capital losses in excess of taxable capital gains may be carried back and deducted in any of the three preceding taxation years or carried forward and deducted in any following year against net taxable capital gains realized in such year to the extent and under the circumstances described in the Tax Act.

A Canadian Holder that is a "Canadian-controlled private corporation" (as defined in the Tax Act) may be liable to pay an additional refundable tax of 6 2/3% on certain investment income, including taxable capital gains.

D.        **TAX CONSIDERATIONS GENERALLY APPLICABLE TO NON-CANADIAN HOLDERS**

The following is a summary of certain Canadian federal income tax considerations generally applicable to a holder who, at all relevant times, for purposes of the Tax Act: (i) is not and is not deemed to be resident in Canada; (ii) holds a Claim or Equity Interest, as the case may be, as capital property, (iii) deals at arm's length and is not affiliated with any Debtor; and (iv) does not use or hold and is not deemed to use or hold the Claim or Equity Interest, as the case may be, in the course of carrying on a business in Canada (a "**Non-Canadian Holder**").  In addition, this summary does not address the considerations relevant to a Non-Canadian Holder to whom a New Equity Interest or an Old HoldCo Interest, as the case may be, constitutes "taxable Canadian property" (as defined in the Tax Act), nor does it address the considerations relevant to a Non-Canadian Holder that is an insurer carrying on business in Canada and elsewhere.

A Non-Canadian Holder will not realize any Canadian federal income tax consequences as a result of the settlement of a Claim or cancellation of its Equity Interests, as the case may be, pursuant to the Plan.

THE FOREGOING SUMMARY IS INTENDED ONLY AS A SUMMARY OF CERTAIN CANADIAN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.  SUCH SUMMARY IS PROVIDED FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE CANADIAN FEDERAL, PROVINCIAL, TERRITORIAL, LOCAL, FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

/s/ Deryck Helkaa

Tuscany International Holdings (U.S.A.) Ltd.,

By:      Deryck Helkaa

Title:    Chief Restructuring Officer of Tuscany International Drilling

Prepared by:

| **YOUNG CONAWAY STARGATT & TAYLOR LLP** | **LATHAM & WATKINS LLP** |
|:---:|:---:|
| Michael R. Nestor (Bar No. 3526) | Mitchell A. Seider |
| Kara Hammond Coyle (Bar No. 4410) | Keith A. Simon |
| Rodney Square | David A. Hammerman |
| 1000 North King Street | Annemarie V. Reilly |
| Wilmington, Delaware 19801 | 885 Third Avenue |
| Telephone:  (302) 571-6600 | New York, New York 10022 |
| | Telephone:  (212) 906-1200 |
| | Facsimile:   (212) 751–4864 |

Counsel for the Debtors and Debtors-in-Possession

84

**EXHIBIT A**

Plan of Reorganization

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
In re:                                                        :   Chapter 11
                                                             :
TUSCANY INTERNATIONAL HOLDINGS                                :   Case No. 14-10193 (KG)
(U.S.A.) LTD., et al.,                                        :
                                                             :   Jointly Administered
            Debtors.[1]                                       :
------------------------------------------------------------ x

---

### JOINT PLAN OF REORGANIZATION FOR
### TUSCANY INTERNATIONAL DRILLING INC. AND ITS AFFILIATE DEBTOR
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

| | |
|---|---|
| **YOUNG CONAWAY STARGATT & TAYLOR, LLP** | **LATHAM & WATKINS LLP** |
| Michael R. Nestor (No. 3526) | Mitchell A. Seider |
| Kara Hammond Coyle (No. 4410) | Keith A. Simon |
| Rodney Square | David A. Hammerman |
| 1000 North King Street | Annemarie V. Reilly |
| Wilmington, DE 19801 | 885 Third Avenue |
| Telephone: (302) 571-6600 | New York, New York 10022 |
| Facsimile: (302) 571-1253 | Telephone: (212) 906-1200 |
| | Facsimile: (212) 751-4864 |

Counsel for the Debtors and Debtors-in-Possession

Dated:    March [__], 2014

---

**THIS IS NOT A SOLICITATION OF VOTES ON THIS PLAN.  VOTES MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.**

---

[1]  The Debtors in these cases are Tuscany International Holdings (U.S.A.) Ltd. and Tuscany International Drilling Inc.  The last four digits of Tuscany International Holdings (U.S.A.) Ltd.'s U.S. federal tax identification number are 8192.  The last four digits of Tuscany International Drilling Inc.'s Canadian tax identification number are 4278.  The address for the Debtors is 1950, 140 – 4 Avenue S.W. Calgary, Alberta, Canada T2P 3N3.

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME AND
DEFINED TERMS ...................................................................................1
   A.    Rules of Interpretation; Computation of Time..........................................1
   B.    Defined Terms ..........................................................................................2

ARTICLE II. ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS...........16
   A.    Administrative Claims ..............................................................................16
   B.    DIP Facility Claims..................................................................................17
   C.    Priority Tax Claims ..................................................................................17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND EQUITY INTERESTS .........................................................................18
   A.    Summary ..................................................................................................18
   B.    Classification and Treatment of Claims and Equity Interests.................19
   C.    Special Provision Governing Unimpaired Claims and Assumed Liabilities .........24
   D.    Elimination of Vacant Classes .................................................................24

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .........................................24
   A.    Presumed Acceptance of Plan...................................................................24
   B.    Presumed Rejection of Plan ......................................................................24
   C.    Voting Class..............................................................................................25
   D.    Acceptance by Impaired Class of Claims .................................................25
   E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
Bankruptcy Code .....................................................................................25
   F.    Votes Solicited in Good Faith ..................................................................25

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................25
   A.    Wind-Down and Dissolution of Reorganized HoldCo ...........................25
   B.    Restructuring Transactions .......................................................................25
   C.    Consummation of the Purchase Agreement..............................................26
   1.    Transfer of Purchased Assets....................................................................26
   2.    Payment of Purchase Price Cash Component and Discharge of Assumed
Liabilities .................................................................................................27
   3.    Good Faith of the Proposed Purchaser......................................................27
   4.    No Successor Liability for the Proposed Purchaser...................................27
   D.    Direction to Prepetition Agent and DIP Facility Agent...........................27
   E.    Continued Corporate Existence ................................................................27
   F.    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and
Claims ......................................................................................................28
   G.    [Intentionally Omitted] .............................................................................28
   H.    No Discharge or Release of Liens Securing the Prepetition Credit
Agreement Claims ....................................................................................28
   I.    New Equity Interests.................................................................................28

i

J.        NewCo Ownership Agreement ...............................................................29
K.       Plan Securities and Related Documentation; Exemption from Securities
          Laws ........................................................................................................29
L.        Release of Liens and Claims .................................................................30
M.      Organizational Documents .....................................................................30
N.       Directors and Officers of NewCo and the Reorganized Debtors ..........30
O.       Corporate Action ....................................................................................31
P.        Cancellation of Notes, Certificates and Instruments .............................32
Q.       Old Affiliate Interests ............................................................................32
R.       Sources of Cash for Plan Distributions .................................................32
S.        Continuing Effectiveness of Final Orders .............................................32
T.        Funding and Use of Cash Reserves .......................................................32
U.       The Plan Administrator for Reorganized HoldCo .................................33
V.       Fees and Expenses of Prepetition Agent ...............................................37
W.      Completion Bonus Program ...................................................................37
X.       NewCo Incentive Plan ...........................................................................37

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
          LEASES ..................................................................................................37
A.        Assumption of Executory Contracts and Unexpired Leases ..................37
B.        Cure of Defaults; Assignment of Executory Contracts and Unexpired
          Leases .....................................................................................................38
C.        Rejection of Executory Contracts and Unexpired Leases ......................39
D.       Claims on Account of the Rejection of Executory Contracts and
          Unexpired Leases ...................................................................................40
E.        Extension of Time to Assume or Reject .................................................40

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ...............................40
A.        Distributions for Claims Allowed as of the Effective Date ...................40
B.        No Postpetition Interest on Claims ........................................................40
C.        Distributions by the Reorganized Debtors or Other Applicable Distribution
          Agent ......................................................................................................41
D.       Delivery and Distributions; Undeliverable or Unclaimed Distributions ..............41
E.        Compliance with Tax Requirements ......................................................43
F.        Allocation of Plan Distributions Between Principal and Interest ..........43
G.       Means of Cash Payment .........................................................................43
H.       Timing and Calculation of Amounts to Be Distributed .........................44
I.         Setoffs ....................................................................................................44

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
          UNLIQUIDATED AND DISPUTED CLAIMS ....................................44
A.        Resolution of Disputed Claims ..............................................................44
B.        No Distributions Pending Allowance .....................................................45
C.        Distributions on Account of Disputed Claims Once They Are Allowed and
          Additional Distributions on Account of Previously Allowed Claims ..................46
D.       Reserve for Disputed Claims .................................................................46

ii

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND
    CONSUMMATION OF THE PLAN ...................................................................46
    A.    Conditions Precedent to Confirmation ..................................................46
    B.    Conditions Precedent to Consummation ...............................................46
    C.    Waiver of Conditions ............................................................................47
    D.    Effect of Non-Occurrence of Conditions to Confirmation or
        Consummation .......................................................................................48

ARTICLE X. RELEASE, DISCHARGE, INJUNCTION AND RELATED
    PROVISIONS ..................................................................................................48
    A.    General ..................................................................................................48
    B.    Release of Claims and Causes of Action ..............................................48
    C.    Waiver of Statutory Limitations on Releases .......................................51
    D.    Discharge of Claims ..............................................................................51
    E.    Exculpation ...........................................................................................52
    F.    Preservation of Causes of Action .........................................................52
    G.    **Injunction** ...........................................................................................53
    H.    **Binding Nature Of Plan** ..................................................................53
    I.    Protection Against Discriminatory Treatment ......................................54
    J.    Plan Indemnity ......................................................................................54
    K.    Integral Part of Plan ..............................................................................54

ARTICLE XI. RETENTION OF JURISDICTION ...........................................55

ARTICLE XII. MISCELLANEOUS PROVISIONS ...........................................56
    A.    Dissolution of the Committee ...............................................................56
    B.    Payment of Statutory Fees; Post-Effective Date Professional Fees and
        Expenses ...............................................................................................57
    C.    Conflicts ................................................................................................57
    D.    Modification of Plan .............................................................................57
    E.    Revocation or Withdrawal of Plan ........................................................57
    F.    Successors and Assigns .........................................................................58
    G.    Reservation of Rights ............................................................................58
    H.    Further Assurances ................................................................................58
    I.    Severability ...........................................................................................58
    J.    Service of Documents ...........................................................................59
    K.    Exemption from Transfer Taxes Pursuant to Section 1146(a) of the
        Bankruptcy Code ..................................................................................61
    L.    Governing Law ......................................................................................61
    M.    Tax Reporting and Compliance .............................................................61
    N.    Schedules ..............................................................................................61
    O.    No Strict Construction ...........................................................................61
    P.    Entire Agreement ..................................................................................62
    Q.    Closing of Chapter 11 Cases .................................................................62
    R.    Substantial Consummation ....................................................................62
    S.    2002 Notice Parties ..............................................................................62

T.    Request for Court Hearing and Right to be Heard................................................62
U.    Powers of  Proposed Purchaser...........................................................................62

iv

**JOINT PLAN OF REORGANIZATION FOR
TUSCANY INTERNATIONAL DRILLING INC. AND ITS AFFILIATE DEBTOR
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Tuscany International Drilling Inc. ("**HoldCo**") and the other above-captioned debtor and debtor-in-possession (each a "**Debtor**" and, collectively, the "**Debtors**") propose the following joint plan of reorganization (the "**Plan**") for the resolution of the outstanding Claims (as defined below) against, and Equity Interests (as defined below) in, each of the Debtors.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code (as defined below).  Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, and projections, and for a summary and analysis of this Plan, the treatment provided for herein and certain related matters.  There are also other agreements and documents, which will be filed with the Bankruptcy Court (as defined below), that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Schedules.  All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to the restrictions and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

## ARTICLE I.

## RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

A.      *Rules of Interpretation; Computation of Time*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced item shall be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided herein, any reference herein to an existing or to be Filed contract, lease, instrument, release, indenture, or other agreement or document shall mean as it may be amended, modified or supplemented from time to time; (d) any reference to an Entity as a Holder of Claim or Equity Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (f) unless otherwise stated, the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (h) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan; (j) references to a specific article, section, or subsection of any statute, rule, or regulation expressly referenced herein shall, unless otherwise specified, include any amendments to or successor provisions of such article, section, or subsection; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of

courts, and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan without further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

"*510(b) Equity Claim*" means any Claim against any Debtor subordinated pursuant to section 510(b) of the Bankruptcy Code.

"*Accrued Professional Compensation*" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code to the extent incurred on or after the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the Prepetition Agent Fees and Expenses; (e) the DIP Facility Claims; (f) the Cure Claim Amounts; and (g) the Bidding Protections, but solely in the manner provided in the Bidding Procedures Order and the Purchase Agreement upon the occurrence and satisfaction of the conditions set forth therein.

"*Administrative Claims Bar Date*" means the Business Day which is thirty (30) days after the Effective Date, or such other date as approved by Final Order of the Bankruptcy Court.

"*Affiliate*" means an "affiliate", as defined in section 101(2) of the Bankruptcy Code.

"*Affiliate Debtor*" means Tuscany International Holdings (U.S.A.) Ltd., as debtor-in-possession in these Chapter 11 Cases pending in the Bankruptcy Court.

"*Agent*" means Credit Suisse AG, in its capacity as DIP Facility Agent and as Prepetition Agent.

"*Aggregate Required Lenders*" means, collectively, the Required Consenting Lenders and the Required DIP Lenders.

"*Allowed*" means, with respect to a Claim, an Allowed Claim in a particular Class or category specified.  Any reference herein to the allowance of a particular Allowed Claim includes both the secured and unsecured portions of such Claim.

"*Allowed Claim*" means a Claim that is not a Disputed Claim or a Disallowed Claim and (a) for which a Proof of Claim has been timely Filed by the applicable Claims Bar Date and as to which no objection to allowance thereof has been timely interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; (b) that has been listed by the Debtors in their Schedules as liquidated in a specified amount and is not disputed or contingent and for which no contrary Proof of Claim has been timely Filed; or (c) that is expressly Allowed pursuant to the terms of this Plan or a Final Order of the Bankruptcy Court.  The term "Allowed Claim" shall not, for purposes of computing distributions under this Plan, include interest on such Claim from and after the Petition Date, except as provided in sections 506(b) or 511 of the Bankruptcy Code or as otherwise expressly set forth in this Plan or a Final Order of the Bankruptcy Court.

"*Allowed _____ Claim*" means an Allowed Claim of the type described.

"*Amended/New Organizational Documents*" means, as applicable, the amended and restated or new applicable organizational documents of Reorganized HoldCo and NewCo in substantially the form attached to this Plan as Exhibit [___]-1 and Exhibit [___]-2, respectively, or Filed with the Plan Supplement.

"*Assumed Liabilities*" means the "Assumed Liabilities", as defined in the Purchase Agreement.

"*Auction*" means the auction conducted pursuant to, and in accordance with, the Bidding Procedures Order.

"*Avoidance Actions*" means any and all avoidance, recovery, subordination or other related actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law (whether domestic or foreign), including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

"*Ballots*" means the ballots accompanying the Disclosure Statement, which were approved by the Disclosure Statement Order (modified, as necessary, based upon the applicable voting party in accordance with the Disclosure Statement Order).

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"*Beneficial Holder*" means, as of the applicable date of determination, a beneficial owner of the Old HoldCo Interests as reflected in the records maintained by the Registered Record Owner or Intermediary Record Owner, as applicable.

"*BIA*" means the Bankruptcy and Insolvency Act of Canada.

"*Bidding Protections*" means the "Bidding Protections", as defined in the Bidding Procedures Order.

"*Bidding Procedures*" means the bidding procedures approved by, and attached as Exhibit 1 to, the Bidding Procedures Order.

"*Bidding Procedures Order*" means that certain *Order (A) Establishing Bidding Procedures For The Sale Of All Or Substantially All Of The Debtors' Assets Or The New Stock Pursuant To A Chapter 11 Plan, (B) Approving Certain Bidding Protections, (C) Authorizing And Scheduling A Date And Time For An Auction Pursuant To Such Procedures, And (D) Granting Certain Related Relief*, entered by the Bankruptcy Court on [_____], 2014 (Docket No. [___]), as such order may be amended, supplemented, or modified from time to time.

"*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or a day on which commercial banks are not authorized or required to close in New York City, New York or in Calgary, Alberta.

"*Canadian Bankruptcy Court*" means the Court of Queen's Bench of Alberta having jurisdiction over the CCAA Case.

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Reserves*" means, collectively and without duplication, the Wind-Down Reserve, the Professional Fee Reserve, and the Disputed Claims Reserve, in each case which reserve shall be reasonably acceptable to the Debtors, the Agent and the Aggregate Required Lenders.

"*Causes of Action*" means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counterclaims, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law (whether domestic or foreign), or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

"*CCAA Case*" means the case commenced in the Canadian Bankruptcy Court by HoldCo under the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36, as amended.

"*Chapter 11 Case(s)*" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court being jointly administered under case number 14-10193 (KG).

"*Claim*" means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against any Debtor.

"*Claims Bar Date*" means the last date for filing Proofs of Claim in these Chapter 11 Cases against any Debtor, which date shall be established by Final Order of the Bankruptcy Court.

"*Claims Objection Deadline*" means, with respect to any applicable Proof of Claim, the latest of (a) one hundred eighty (180) days after the Effective Date; (b) ninety (90) days after the Filing of such Proof of Claim, or (c) such other date as may be specifically fixed by Final Order of the Bankruptcy Court for objecting to such Claim.

"*Claims Register*" means the official register of Claims maintained by the Voting and Claims Agent.

"*Class*" means a category of Holders of Claims or Equity Interests as set forth in <u>Article III</u> hereof pursuant to section 1122(a) of the Bankruptcy Code.

"*Closing*" means the "Closing", as defined in the Purchase Agreement.

"*Closing Date*" means the "Closing Date", as defined in the Purchase Agreement.

"*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

"*Collateral*" means any property or interest in property of the Debtors' Estates that is subject to a valid, perfected, and enforceable Lien to secure a Claim.

"*Commission*" means the U.S. Securities and Exchange Commission.

"*Committee*" means any official committee of unsecured creditors or equity holders of the Debtors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, if appointed and as reconstituted from time to time.

"*Completion Bonus Program*" means the incentive program for certain key employees of the Debtors, in substantially the form attached to this Plan as <u>Exhibit [__]</u> or Filed with the Plan Supplement.

"*Confirmation*" means the occurrence of the Confirmation Date, subject to all conditions specified in <u>Article IX.A</u> of this Plan having been satisfied or waived pursuant to <u>Article IX.C</u> of this Plan.

"*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

"*Consenting Prepetition Lenders*" means those Prepetition Lenders that are party to the Restructuring Support Agreement as "Consenting Lenders" thereunder.

"*Consummation*" means the occurrence of the Effective Date.

"*Credit Agreement*" means that certain Fourth Amended and Restated Credit Agreement, dated as of February 5, 2014, by and among HoldCo, the subsidiaries of HoldCo party thereto, the DIP Facility Agent, the DIP Facility Lenders, and the other Entities party thereto (as amended, supplemented, or modified from time to time prior to the Effective Date).

"*Cure Claim Amount*" has the meaning set forth in <u>Article VI.B</u> of this Plan.

"*D&O Tail Policy*" means that certain directors' & officers' liability insurance policy purchased by the Debtors prior to the Petition Date.

"*Debtor(s)*" means, individually, either of the above-captioned debtors and debtors-in-possession and, collectively, both of the above-captioned debtors and debtors-in-possession.

"*DIP Facility*" has the meaning set forth in the Credit Agreement.

"*DIP Facility Agent*" means Credit Suisse AG, as special collateral agent and administrative agent under the Credit Agreement in respect of the DIP Facility.

"*DIP Facility Claim*" means any Claim arising from, under, or in connection with the DIP Facility, including, without limitation, any and all "DIP Obligations" as defined in the Credit Agreement.

"*DIP Facility Lenders*" means the "DIP Lenders" as defined in the Credit Agreement.

"*DIP Facility Orders*" means, collectively, the Interim DIP Order and Final DIP Order.

"*Disallowed Claim*" means a Claim, or any portion thereof, that (a) has been disallowed by a Final Order, or (b) (i) is Scheduled at zero, in an unknown amount or as contingent, disputed or unliquidated and (ii) as to which the Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law.

"*Disclosure Statement*" means that certain *Disclosure Statement for the Joint Plan Of Reorganization For Tuscany International Drilling Inc. And Its Affiliate Debtor Under Chapter 11 Of The Bankruptcy Code*, dated as of [_____], 2014 (as amended, supplemented, or modified from time to time) that was approved by the Disclosure Statement Order.

"*Disclosure Statement Order*" means that certain [*Order (A) Approving the Disclosure Statement, (B) Establishing the Voting Record Date, Voting Deadline and Other Dates, (C) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (D) Approving the Manner and Form of Notice and Other Related Documents*,] entered by the Bankruptcy Court on [_____], 2014 (Docket No. [__]), as such order may be amended, supplemented, or modified from time to time.

"*Disputed Claim*" means a Claim, or any portion thereof, that is not a Disallowed Claim, that has not been Allowed pursuant to this Plan or a Final Order of the Bankruptcy Court, and

(a)     if a Proof of Claim has been timely Filed by the applicable Claims Bar Date, such Claim is designated on such Proof of Claim as unliquidated, contingent or disputed, or in zero or unknown amount, and has not been resolved by written agreement of the parties or a Final Order of the Bankruptcy Court; or

(b)     if either (1) a Proof of Claim has been timely Filed by the applicable Claims Bar Date or (2) a Claim has been listed on the Schedules as other than unliquidated, contingent or disputed, or in zero or unknown amount, a Claim (i) as to which any Debtor has timely filed an objection or request for estimation in accordance with this Plan, the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court or for which such time period to

6

object or file a request for estimation has not yet expired as of the applicable date of determination or (ii) which is otherwise disputed by any Debtor in accordance with applicable law, in each case which objection, request for estimation or dispute has not been withdrawn, overruled or determined by a Final Order; or

(c)     that is the subject of an objection or request for estimation Filed in the Bankruptcy Court and which such objection or request for estimation has not been withdrawn, resolved or overruled by Final Order of the Bankruptcy Court; or

(d)     that is otherwise disputed by any Debtor in accordance with the provisions of this Plan or applicable law, which dispute has not been withdrawn, resolved or overruled by Final Order.

"*Disputed Claims Reserve*" means any reserve established by the Debtors pursuant to Article VIII.D.

"*Distribution Agent*" means the Reorganized Debtors or any party designated by the Reorganized Debtors to serve as distribution agent under this Plan. For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims and Allowed Prepetition Credit Agreement Claims, the DIP Facility Agent and the Prepetition Agent, respectively, will be and shall act as the Distribution Agent.

"*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder, which date shall be the Effective Date.

"*Ecuador Branch Office*" means the branch office of [HoldCo] that is headquartered in Quito, Ecuador and from which the Debtors' Ecuadorian business is operated.

"*Effective Date*" means the first Business Day on which the conditions specified in Article IX.B of this Plan have been satisfied or waived in accordance with the terms of Article IX.C of this Plan.

"*Entity*" means an "entity", as defined in section 101(15) of the Bankruptcy Code.

"*Equity Interest*" means (a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock and other ownership interests, together with (i) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights, and (b) any 510(b) Equity Claim, in each case as in existence immediately prior to the Effective Date.

"*Equity Security*" means an "equity security", as defined in section 101(16) of the Bankruptcy Code.

"*Estate(s)*" means, individually, the estate of each of the Debtors and, collectively, the estates of both of the Debtors created under section 541 of the Bankruptcy Code.

"*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.*, as now in effect or hereafter amended, any rules and regulations promulgated thereunder, and any similar federal, state or local law.

"*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Agent; (e) the Releasing Prepetition Lenders; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Distribution Agents; (i) the Plan Administrator; and (j) NewCo; and in each case the respective Related Persons of each of the foregoing Entities.

"*Exculpation*" means the exculpation provision set forth in <u>Article X.E</u> hereof.

"*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Exhibit*" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as such exhibit is amended, modified or otherwise supplemented from time to time.

"*Exit Facility*" means any proposed new-money financing to be provided to NewCo or its Affiliates on the Effective Date, which financing shall be on terms and conditions acceptable to the Agent and Aggregate Required Lenders.

"*Face Amount*" means (a) when used in reference to a Disputed Claim, the full stated amount of the Claim asserted by the applicable Holder in any Proof of Claim timely Filed with the Bankruptcy Court (or such lesser estimated amount approved by order of the Bankruptcy Court), and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

"*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"*Final DIP Order*" means that certain *Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Postpetition Financing, (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, (6) Authorizing The Roll-Up Of Certain Prepetition Obligations, And (7) Granting Related Relief*, entered by the Bankruptcy Court on March [__], 2014 (Docket No. [__]), as amended, supplemented or modified from time to time.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

"*General Unsecured Claim*" means any Claim against the Debtors that is not a/an: Administrative Claim; DIP Facility Claim; Professional Fee Claim; Priority Tax Claim; Secured Priority Tax Claim, Other Priority Claim; Other Secured Claim; Intercompany Claim; Prepetition Credit Agreement Claim; or 510(b) Equity Claim.  To the extent applicable, the limitations imposed by section 502 of the Bankruptcy

Code shall apply to the relevant General Unsecured Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

"*Governmental Unit*" means a "governmental unit", as defined in section 101(27) of the Bankruptcy Code.

"*HoldCo*" means Tuscany International Drilling Inc., as debtor-in-possession in these Chapter 11 Cases pending in the Bankruptcy Court.

"*Holder*" means an Entity holding a Claim against, or Equity Interest in, any Debtor.

"*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Indemnified Claims*" has the meaning set forth in Article X.J below.

"*Indemnified Parties*" has the meaning set forth in Article X.J below.

"*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is as soon as practicable after the Effective Date, but no later than thirty (30) days after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims; provided that any applicable distributions under this Plan on account of the Allowed DIP Facility Claims or the Allowed Prepetition Credit Agreement Claims shall be made to the applicable Distribution Agent on the Effective Date, and each such Distribution Agent shall make its respective distributions as soon as practicable thereafter.

"*Intercompany Claim*" means any Claim, other than an Administrative Claim or a Secured Claim, against either of the Debtors held by another Debtor or by a non-Debtor subsidiary of a Debtor.

"*Interim DIP Order*" means that certain *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (1) Approving Postpetition Financing, (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, (6) Authorizing The Roll-Up Of Certain Prepetition Obligations, (7) Scheduling A Final Hearing And (8) Granting Related Relief*, entered by the Bankruptcy Court on February 4, 2014 (Docket No. 52), as amended, supplemented or modified from time to time.

"*Intermediary Record Owners*" means, as of the applicable date of determination, the banks, brokerage firms, or the agents thereof as the Entity through which the Beneficial Holders hold the Old HoldCo Interests.

"*IRC*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the Internal Revenue Service of the United States of America.

"*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"*Litigation Claims*" means the claims, rights of action, suits or proceedings, whether in law (domestic or foreign) or in equity, whether known or unknown, that any Debtor or any Estate may hold

against any Entity, including, without limitation, the Causes of Action of the Debtors.  A non-exclusive list of the Litigation Claims held by the Debtors as of the Effective Date is attached hereto as <u>Plan Schedule [  ]</u> or to be Filed with the Plan Supplement, which shall be deemed to include any derivative actions filed or that could be filed against any Debtor as of the Effective Date.

"*Loan Documents*" means the "Loan Documents", as defined in the Credit Agreement.

"*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

"*Net Cash Amount*" means the sum of (x) the Purchase Price Cash Component and (y) the amount of Cash on the Debtors' balance sheet immediately prior to the Effective Date, less the aggregate amount of the Cash Reserves.

"*New Board*" means (i) with respect to Reorganized HoldCo, the initial board of directors of Reorganized HoldCo, which shall be solely the Plan Administrator unless otherwise required by applicable law, and (ii) with respect to NewCo, the initial [five] member board of directors of NewCo, which shall be designated in accordance with the terms and conditions of the NewCo Ownership Agreement.  The members of each respective New Board shall be listed on <u>Plan Schedule [___]</u> attached hereto or to be Filed with the Plan Supplement.

"*New Equity Interests*" means, collectively, the NewCo Ownership Interests and the Reorganized HoldCo Common Stock.

"*NewCo*" means [_____], a newly formed [Delaware limited liability company] organized by [certain of the Prepetition Lenders] for the purpose of consummating the transactions contemplated by the Purchase Agreement and this Plan.

"*NewCo Incentive Plan*" means the incentive plan for certain key employees of Newco, in substantially the form attached to this Plan as <u>Exhibit [___]</u> or Filed with the Plan Supplement.

"*NewCo Ownership Agreement*" means that certain [Ownership Agreement] of NewCo, in substantially the form attached to this Plan as <u>Exhibit [___]</u> or Filed with the Plan Supplement.

"*NewCo Ownership Interests*" means the Equity Securities or other new ownership interests in NewCo authorized to be issued pursuant to this Plan and the applicable Amended/New Organizational Documents for NewCo, which interests shall be subject to the terms and conditions of the NewCo Ownership Agreement.

"*Non-Debtor Obligors*" means the "Non-Debtor Obligors", as defined in the Credit Agreement.

"*Non-Debtor Releasing Party*" means, collectively: (a) the Committee and the members thereof in their capacity as such; (b) the Prepetition Agent; (c) the Releasing Prepetition Lenders; (d) the DIP Facility Agent; (e) the DIP Facility Lenders; and (f) NewCo.

"*Non-Voting Classes*" means, collectively, Classes [__], [__], and [__].

"*Old Affiliate Interests*" means the Equity Interests in the Affiliate Debtor, as in existence immediately prior to the Effective Date.

"*Old HoldCo Interest*" means the Equity Interests in HoldCo, as in existence immediately prior to the Effective Date.

"*Ordinary Course Professionals Order*" means that certain *Order Under 11 U.S.C. §§ 105(A), 327, 330, And 331 Authorizing Employment And Payment Of Professionals Utilized In Ordinary Course Of Business*, entered by the Bankruptcy Court on [_____], 2014 (Docket No. [__]), as amended, supplemented, or modified from time to time.

"*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, a DIP Facility Claim, or an Administrative Claim.

"*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, DIP Facility Claim, Secured Priority Tax Claim, or Prepetition Credit Agreement Claim.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

"*Petition Date*" means February 2, 2014, the date on which the Debtors commenced the Chapter 11 Cases.

"*Plan*" means this *Joint Plan Of Reorganization For Tuscany International Drilling Inc. And Its Affiliate Debtor Under Chapter 11 Of The Bankruptcy Code*, dated [_____], 2014, including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be amended, supplemented, or modified from time to time.

"*Plan Administrator*" means the Person designated by the Debtors as approved by order of the Bankruptcy Court, and identified in Plan Schedule [__] of the Plan Supplement (and any successor thereto), to administer this Plan and the Plan Administrator Agreement with respect to the wind-down of Reorganized HoldCo.

"*Plan Administrator Agreement*" means the agreement to be entered into between HoldCo and the Plan Administrator specifying the rights, duties and responsibilities of the Plan Administrator under this Plan, in substantially the form attached to this Plan as Exhibit [__] or to be Filed with the Plan Supplement.

"*Plan Schedule*" means a schedule annexed to either this Plan or as an appendix to the Disclosure Statement, as such schedule is amended, modified or otherwise supplemented from time to time.

"*Plan Securities*" has the meaning set forth in Article V.K of this Plan.

"*Plan Securities and Documents*" has the meaning set forth in Article V.K of this Plan.

"*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, supplemented, or modified from time to time, in form and substance consistent in all material respects with the terms and conditions set forth in the Restructuring Term Sheet or such other terms and conditions

which are acceptable to the Debtors, the Agent, and the Aggregate Required Lenders.  The Plan Supplement shall be Filed with the Bankruptcy Court at least ten (10) days prior to the Voting Deadline.

"*Prepetition Agent*" means Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent and special collateral agent for the Prepetition Lenders under the Credit Agreement.

"*Prepetition Agent Fees and Expenses*" means all unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition Agent incurred through the Effective Date in accordance with the Credit Agreement or other Loan Documents.

"*Prepetition Credit Agreement Claims*" means any and all Claims arising from, under or in connection with the Credit Agreement or any other Loan Document (including, without limitation, any and all "Prepetition Obligations" as defined in the Credit Agreement), in each case whether a Secured Claim or an Unsecured Deficiency Claim, but in all cases excluding the DIP Facility Claims.

"*Prepetition Lenders*" means the "Prepetition Lenders", as defined in the Credit Agreement.

"*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Professional*" means any Entity retained by the Debtors or the Committee in the Chapter 11 Cases pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code (other than an ordinary course professional pursuant to the Ordinary Course Professionals Order).

"*Professional Fee Claim*" means a Claim for Accrued Professional Compensation under sections 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code.

"*Professional Fee Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price Cash Component or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash (a) the Professional Fee Claims incurred on or prior to the Effective Date, plus (b) the reasonable fees, costs and expenses incurred by the Professionals on or after the Effective Date in connection with the preparation of interim and final fee applications and obtaining Bankruptcy Court approval, whether on an interim or final basis, of their respective Professional Fee Claims.

"*Professional Fees Bar Date*" means the Business Day that is forty-five (45) days after the Effective Date or such other date as approved by Final Order of the Bankruptcy Court.

"*Proof of Claim*" means a proof of Claim Filed against either Debtor in the Chapter 11 Cases.

"*Proposed Purchaser*" means NewCo.

"*Pro Rata*" means the proportion that (a) the Face Amount of a Claim in a particular Class or Classes (or portions thereof, as applicable) bears to (b) the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class or Classes (or portions thereof, as applicable), unless this Plan provides otherwise.

"*Purchase Agreement*" means that certain Asset Purchase Agreement, dated as of [_____], 2014, by and among HoldCo, NewCo, and the Agent, a copy of which is attached to this Plan as Exhibit [___] or to be Filed with the Plan Supplement, as amended, supplemented or modified from time to time.

"*Purchase Price*" means the "Purchase Price", as defined in the Purchase Agreement, which is comprised of the Purchase Price Cash Component and the Purchase Price Credit Bid Component.

"*Purchase Price Cash Component*" means the "Purchase Price Cash Component", as defined in the Purchase Agreement.

"*Purchase Price Credit Bid Component*" means the "Purchase Price Credit Bid Component", as defined in the Purchase Agreement.

"*Purchased Assets*" means the "Purchased Assets", as defined in the Purchase Agreement.

"*Required Consenting Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Required DIP Lenders*" has the meaning set forth in the Restructuring Support Agreement.

"*Registered Record Owners*" means, as of the applicable date of determination, the respective owners of the Old HoldCo Interests whose holdings thereof are in their own name.

"*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise) and present and former Affiliates and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including *ex officio* members), managers, managed accounts or funds, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date, and any Person claiming by or through any of them, including such Related Persons' respective heirs, executors, estates, servants, and nominees; *provided*, *however*, that no insurer of any Debtor shall constitute a Related Person.

"*Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article X.B hereof.

"*Released Party*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Committee and the members thereof in their capacity as such; (d) the Prepetition Agent; (e) the Releasing Prepetition Lenders; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Distribution Agents; (i) the Plan Administrator; and (j) NewCo; and in each case the respective Related Persons of each of the foregoing Entities.

"*Releasing Prepetition Lender*" means a Prepetition Lender that fails to affirmatively opt out of the Third Party Release as provided on its respective Ballot.

"*Releasing Party*" has the meaning set forth in Article X.B hereof.

"*Reorganized Debtors*" means, subject to the Restructuring Transactions, the Debtors as reorganized pursuant to this Plan on or after the Effective Date, and their respective successors.

"*Reorganized HoldCo*" means, subject to the Restructuring Transactions, Tuscany International Drilling Inc., as reorganized pursuant to this Plan on or after the Effective Date, and its successors.

"*Reorganized HoldCo Common Stock*" means [the one share of new common stock, $0.01 par value per share, of Reorganized HoldCo authorized to be issued pursuant to this Plan and its

Amended/New Organizational Documents, which stock shall be owned and held by the Plan Administrator or its permitted successor or assigns.]

"*Restructuring Documents*" means, collectively, the documents and agreements (and the exhibits, schedules, annexes and supplements thereto) necessary to implement, or entered into in connection with, this Plan, including, without limitation, [the Purchase Agreement, the Plan Supplement, the Exhibits, the Plan Schedules, the Amended/New Organizational Documents, the Plan Administrator Agreement, the Exit Facility, the NewCo Ownership Agreement, and the Plan Securities and Documents], which documents and agreements shall in each case contain terms and conditions consistent in all material respects with those set forth in the Restructuring Term Sheet or such other terms and conditions which are acceptable to the Debtors, the Agent, and the Aggregate Required Lenders.

"*Restructuring Support Agreement*" mean that certain Restructuring Support Agreement, dated as of January 31, 2014, by and among HoldCo, the subsidiaries of HoldCo party thereto, the Prepetition Agent, and the Consenting Prepetition Lenders, a copy of which is attached to this Plan as Exhibit [___], as such agreement is amended, supplemented or modified from time to time.

"*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement, as such term sheet is amended, supplemented or modified from time to time.

"*Restructuring Transaction*" has the meaning ascribed thereto in Article V.B of this Plan.

"*Sale*" means the sale of the Purchased Assets to the Proposed Purchaser pursuant to the terms and conditions contained in the Purchase Agreement.

"*Scheduled*" means with respect to any Claim or Equity Interest, the status and amount, if any, of such Claim or Equity Interest as set forth in the Schedules.

"*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and the applicable Bankruptcy Rules, as such Schedules they may be amended, modified, or supplemented from time to time.

"*Secured Claim*" means a Claim that is secured by a Lien on property in which any of the Debtors' Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Secured Priority Tax Claim*" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, any rules and regulations promulgated thereunder, and any similar federal, state or local law.

"*Stamp or Similar Tax*" means any stamp tax, recording tax, conveyance fee, intangible or similar tax, mortgage tax, personal or real property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to

speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

"*Subsequent Distribution*" means any distribution of property under this Plan to Holders of Allowed Claims other than the initial distribution given to such Holders on the Initial Distribution Date.

"*Subsequent Distribution Date*" means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided*, *however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Subsequent Distribution Date will be the last Business Day of the month following the end of the first (1st) calendar quarter after the calendar quarter in which the Effective Date falls.

"*Unexpired Lease*" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Deficiency Claim*" means, with respect to a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, the amount by which such Claim exceeds the value of the Claim holder's interest in such Estate's interest in such property or the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"*Unused Cash Reserve Amount*" means the remaining Cash, if any, in the Cash Reserves after all obligations and liabilities for which such reserves were established are paid, satisfied and discharged in full in Cash or are Disallowed by Final Order.

"*Voting and Claims Agent*" means Prime Clerk LLC, in its capacity as solicitation, notice, claims and balloting agent for the Debtors.

"*Voting Class*" means Class [4].

"*Voting Deadline*" means the date and time by which all Ballots must be received by the Voting and Claims Agent in accordance with the Disclosure Statement Order, which date is [_____], 2014 as set forth in the Disclosure Statement Order.

"*Voting Record Date*" means the date for determining which Holders of Claims in the Voting Class are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, which date is [_____], 2014 as set forth in the Disclosure Statement Order.

"*Wind-Down Costs and Expenses*" means, collectively, (a) the following Claims with respect to the Debtors to the extent accrued and unpaid as of the Effective Date and not an Assumed Liability under the Purchase Agreement: (i) Administrative Claims; (ii) Priority Tax Claims; (iii) Other Priority Claims; (iv) Other Secured Claims; (v) Secured Priority Tax Claims; and (vi) General Unsecured Claims Against Affiliate Debtor; plus (b) the fees, costs and expenses incurred on or after the Effective Date by or on behalf of [Reorganized HoldCo and/or the Plan Administrator] (including, without limitation, the reasonable fees, costs and expenses incurred by any of their respective retained professionals) pursuant to or in connection with the consummation of the transactions contemplated by this Plan, the Restructuring

Documents or the Plan Administrator Agreement or incurred in connection with the discharge of any of their respective duties and responsibilities hereunder or thereunder.

"*Wind-Down Reserve*" means the reserve established and maintained by the Debtors from the Purchase Price Cash Component or other Cash on hand existing immediately prior to the Effective Date to pay in full in Cash the Wind-Down Costs and Expenses.

## ARTICLE II.

## ADMINISTRATIVE, DIP FACILITY, AND PRIORITY TAX CLAIMS

A.    *Administrative Claims*

Except as otherwise provided in this Article II, the legal, equitable and contractual rights of the Holders of Allowed Administrative Claims are unaltered by this Plan.  Subject to the other terms and conditions of this Article II, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim (other than an Allowed Professional Fee Claim) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing; *provided*, *however*, that Administrative Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Administrative Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

1.    Bar Date for Administrative Claims

Except as otherwise provided in this Article II.A and section 503(b)(1)(D) of the Bankruptcy Code, unless previously Filed or paid, requests for payment of Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order by no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Reorganized Debtors, the Proposed Purchaser, and their respective assets and property, and such Administrative Claims shall be deemed discharged as of the Effective Date.  All such Administrative Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof.

Objections to such payment requests must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) sixty (60) days after the Effective Date and (b) sixty (60) days after the Filing of the applicable request for payment of Administrative Claims, if applicable, as the same may be modified or extended from time to time by Final Order of the Bankruptcy Court.

2.    Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are

designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Fees Bar Date; provided that the Reorganized Debtors shall pay Professionals retained by the Debtors in the ordinary course of business for any work performed after the Effective Date, including those reasonable and documented fees and expenses incurred by such Professionals in connection with the implementation and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order, in each case without further application or notice to or order of the Bankruptcy Court.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by no later than twenty-one (21) days after the Filing of the applicable final request for payment of the Professional Fee Claim.

Each Holder of an Allowed Professional Fee Claim shall be paid in full in Cash from the Professional Fee Reserve within five (5) Business Days after entry of the order approving such Allowed Professional Fee Claim.

B.      *DIP Facility Claims*

On the Effective Date, each Holder of a DIP Facility Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) Cash equal to the amount of such DIP Facility Claim; (ii) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such DIP Facility Claim shall have agreed upon in writing; or (iii) such other treatment specified in Article III.B.4 below with the written consent of the DIP Facility Agent and Required DIP Lenders.

C.      *Priority Tax Claims*

The legal, equitable and contractual rights of the Holders of Allowed Priority Tax Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders:  (A) Cash equal to the amount of such Allowed Priority Tax Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (C) such other treatment such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code or (D) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Priority Tax Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided

further that any Priority Tax Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.  Any installment payments to be made under clause (C) or (D) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

*A.      Summary*

This Plan constitutes a separate plan of reorganization for each Debtor for all purposes, including, without limitation, for voting, confirmation, and distribution purposes.  This Plan does <u>not</u> contemplate the substantive consolidation of the Debtors or their respective Estates for any purpose.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described below.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, for voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remaining portion of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class, is not an Assumed Liability under the Purchase Agreement, and has not been paid, released, Disallowed or otherwise settled prior to the Effective Date.

<u>Summary of Classification and Treatment of Classified Claims and Equity Interests</u>

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| (1)   | Other Priority Claims | Unimpaired | Deemed to Accept |
| (2)   | Other Secured Claims | Unimpaired | Deemed to Accept |
| (3)   | Secured Priority Tax Claims | Unimpaired | Deemed to Accept |
| (4)   | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| (5-A) | General Unsecured Claims Against HoldCo | Impaired | Deemed to Reject |
| (5-B) | General Unsecured Claims Against Affiliate Debtor | Unimpaired | Deemed to Accept |
| (6)   | Intercompany Claims | Impaired | Deemed to Accept |

| Class | Claim/Equity Interest | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| (7) | Old HoldCo Interests | Impaired | Deemed to Reject |
| (8) | Old Affiliate Interests in Affiliate Debtor | Impaired | Deemed to Accept |

B.    *Classification and Treatment of Claims and Equity Interests*

1.    Class 1 - Other Priority Claims

    (a)    *Classification*: Class 1 consists of the Other Priority Claims.

    (b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by this Plan.  Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim as of the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 1 Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 1 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court; <u>provided</u> further that any Class 1 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

    (c)    *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Claims in Class 1 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject this Plan.

2.    Class 2 - Other Secured Claims

    (a)    *Classification*:  Class 2 consists of the Other Secured Claims.  Class 2 consists of separate subclasses for each Other Secured Claim that may exist against the Debtors.

    (b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 2 Claims are unaltered by this Plan.  Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim as of the Effective Date or (ii)

the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 2 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 2 Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court; *provided* further that any Class 2 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

(c)    *Voting*: Class 2 is an Unimpaired Class, and the Holders of Claims in Class 2 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject this Plan.

3.    Class 3 - Secured Priority Tax Claims

(a)    *Classification*:  Class 3 consists of the Secured Priority Tax Claims.

(b)    *Treatment*:  The legal, equitable and contractual rights of the Holders of Allowed Class 3 Claims are unaltered by this Plan.  Subject to Article VIII hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders:  (A) Cash equal to the amount of such Allowed Class 3 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 3 Claim shall have agreed upon in writing; (C) the Collateral securing such Allowed Class 3 Claim; (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code or (E) pursuant to and in accordance with sections 1129(a)(9)(C) and 1129(a)(9)(D) of the Bankruptcy Code, Cash in an aggregate amount of such Allowed Class 3 Claim payable in regular installment payments over a period ending not more than five (5) years after the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and the Debtors or Reorganized Debtors, as applicable, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that Class 3 Claims incurred by any Debtor in the ordinary course of business may be paid in the

ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court; provided further that any Class 3 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.   Any installment payments to be made under clause (D) or (E) above shall be made in equal quarterly Cash payments beginning on the first applicable Subsequent Distribution Date, and continuing on each Subsequent Distribution Date thereafter until payment in full of the applicable Allowed Class 3 Claim.

*Voting:*  Class 3 is an Unimpaired Class, and the Holders of Claims in Class 3 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 3 are not entitled to vote to accept or reject this Plan.

4.  Class 4 - Prepetition Credit Agreement Claims

(a)  *Classification:*  Class 4 consists of the Prepetition Credit Agreement Claims.

(b)  *Allowance*:  The Prepetition Credit Agreement Claims are deemed Allowed in the aggregate principal amount of $[201,975,433.74],[2] exclusive of accrued and unpaid interest, fees and other costs and expenses.

(c)  Treatment:  On the Effective Date, Newco shall, on behalf of all Prepetition Lenders and/or DIP Facility Lenders, as applicable and in accordance with the terms and conditions of the Purchase Agreement, credit bid a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims equal to the Purchase Price Credit Bid Component in exchange for the Purchased Assets.  On and after the Effective Date, such credit bid shall, for all purposes, be deemed to have permanently reduced, on a Pro Rata basis, a principal amount of the Prepetition Credit Agreement Claims and/or DIP Facility Claims by the portion of the Purchase Price Credit Bid Component comprised of such Prepetition Credit Agreement Claims and/or DIP Facility Claims, as applicable.  On and as of the Effective Date, but without limiting the scope of Article V.H or Article V.T below, the remaining Prepetition Credit Agreement Claims and/or DIP Facility Claims, as applicable, will be repaid in full and/or refinanced or replaced by obligations of NewCo, to be guaranteed by all Non-Debtor Obligors, under any Exit Facility.

On the Effective Date, each Holder of an Allowed Prepetition Credit Agreement Claim and/or DIP Facility Claim shall receive, on account of such Claim, its Pro Rata share of the NewCo Ownership Interests (subject to dilution for the NewCo Incentive Plan) and the Net Cash Amount.  After the Effective Date, subject to the terms and conditions of this Plan, each Holder of an Allowed Prepetition

---

[2]  [Subject to confirmation, including deduction for principal amount of the roll-up]

Credit Agreement Claim and/or DIP Facility Claim shall receive, on account of such Claim, its Pro Rata share of the Unused Cash Reserve Amount.

In addition to Newco, the Agent, acting at the direction of the Aggregate Required Lenders, may create one or more holding entities and/or blocker entities that will hold direct or indirect interests in NewCo, with the ownership interests in such holding and/or blocker entities being distributed on a Pro Rata basis to the applicable DIP Facility Lenders and/or Prepetition Lenders. The organizational documents and corporate structure for such holding and/or blocker entities shall be acceptable to the Agent and the Aggregate Required Lenders in their sole discretion.

Notwithstanding the foregoing, with the prior written consent of the Agent and Aggregate Required Lenders, this Plan and the Restructuring Documents may be altered or amended to provide that (i) the Purchased Assets will not include all assets of HoldCo, but rather certain assets will remain with HoldCo and (ii) the Reorganized HoldCo Common Stock will be issued, on a Pro Rata basis, to the Prepetition Lenders rather than the Plan Administrator.

For the avoidance of doubt, NewCo, the Debtors or the Reorganized Debtors (as applicable) shall deliver distributions on account of the Allowed DIP Facility Claims and Allowed Prepetition Credit Agreement Claims directly to the DIP Facility Agent and Prepetition Agent, respectively, and such applicable agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims and shall make distributions with respect thereto in accordance with the applicable terms and conditions of the Credit Agreement.

    (d)    *Voting:* Class 4 is Impaired, and Holders of Claims in Class 4 are entitled to vote to accept or reject this Plan.

5.   <u>Class 5 – General Unsecured Claims</u>

    A.  **<u>Sub-Class A:  General Unsecured Claims Against HoldCo</u>**

    (a)    *Classification:* Class 5-A consists of the General Unsecured Claims against HoldCo.

    (b)    *Treatment:*  Each Holder of a General Unsecured Claim against HoldCo shall not receive any distribution or retain any property on account of such General Unsecured Claim.

    (c)    *Voting:* Class 5-A is an Impaired Class, and the Holders of Claims in Class 5-A will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Claims in Class 5-A will not be entitled to vote to accept or reject this Plan.

    B.  **<u>Sub-Class B:  General Unsecured Claims Against Affiliate Debtor</u>**

    (a)    *Classification:* Class 5-B consists of the General Unsecured Claims against Affiliate Debtor.

(b)     *Treatment:*  The legal, equitable and contractual rights of the Holders of Allowed Class 5-B Claims are unaltered by this Plan.  Subject to <u>Article VIII</u> hereof, on, or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Class 5-B Claim is an Allowed Class 5-B Claim as of the Effective Date or (ii) the date on which such Class 5-B Claim becomes an Allowed Class 5-B Claim, each Holder of an Allowed Class 5-B Claim shall receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 5-B Claim, at the election of the Debtors or Reorganized Debtors, as applicable, but in each case with the consent of the Agent and Aggregate Required Lenders: (A) Cash equal to the amount of such Allowed Class 5-B Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors, as applicable, and the Holder of such Allowed Class 5-B Claim shall have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; *provided*, *however*, that Class 5-B Claims incurred by Affiliate Debtor in the ordinary course of business may be paid in the ordinary course of business by Affiliate Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court; <u>provided</u> further that any Class 5-B Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Proposed Purchaser in the ordinary course of business.

(c)     *Voting:* Class 5-B is an Unimpaired Class, and the Holders of Claims in Class 5-B are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Claims in Class 5-B are not entitled to vote to accept or reject this Plan.

6.   <u>Class 6 – Intercompany Claims</u>

(a)     *Classification*: Class 6 consists of the Intercompany Claims.

(b)     *Treatment:*  Each Holder of an Intercompany Claim shall not receive any distribution or retain any property under this Plan on account of such Intercompany Claim; <u>provided</u>, however, that, the Reorganized Debtors may, with the consent of the Agent and Aggregate Required Lenders, reinstate, reconcile, cancel, or otherwise compromise such Intercompany Claims as may be necessary or advisable.

(c)     *Voting:* Class 6 is an Impaired Class.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class 6 shall be conclusively deemed to have accepted this Plan.

7.   <u>Class 7 - Old HoldCo Interests</u>

(a)     *Classification*: Class 7 consists of the Old HoldCo Interests.

(b)     *Treatment*: On the Effective Date, the Old HoldCo Interests will be cancelled without further notice to, approval of or action by any Entity, and each Holder of an Old HoldCo Interest shall not receive any distribution or retain any property on account of such Old HoldCo Interest.

NY\6181461.2

(c) *Voting*: Class 7 is an Impaired Class, and the Holders of Old HoldCo Interests in Class 7 will be conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Old HoldCo Interests in Class 7 will not be entitled to vote to accept or reject this Plan.

8. <u>Class 8 - Old Affiliate Interests in Affiliate Debtor</u>

(a) *Classification*: Class 8 consists of the Old Affiliate Interests in Affiliate Debtor.

(b) *Treatment*:  The Old Affiliate Interests shall remain effective and outstanding on the Effective Date and shall, subject to the terms and conditions of the Purchase Agreement, be transferred to the Proposed Purchaser as part of the Purchased Assets.

(c) *Voting*: Class 8 is an Impaired Class.  However, because the Holder of such Old Affiliate Interests is HoldCo, it shall be conclusively deemed to have accepted this Plan.

C. *Special Provision Governing Unimpaired Claims and Assumed Liabilities*

Except as otherwise provided herein, nothing under this Plan shall affect or limit the Debtors', the Reorganized Debtors', or Proposed Purchaser's applicable rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims or Assumed Liabilities, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims or Assumed Liabilities.

D. *Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or a claim temporarily allowed under Bankruptcy Rule 3018, or as to which no vote is cast, shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

A. *Presumed Acceptance of Plan*

Classes [_], [_], and [_] are Unimpaired under this Plan.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

Class [_] is Impaired under this Plan.  However, because the Holders of such Claims are Affiliates of the Debtors, the Holders of Claims in Class [_] are conclusively deemed to have accepted this Plan.

B. *Presumed Rejection of Plan*

NY\6181461.2

Classes [_], [_], and [_] are Impaired and shall receive no distribution under this Plan on account of their respective Claims or Equity Interests.  Therefore, the Holders of Claims or Equity Interests in such Classes are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

C.      *Voting Class*

Class [4] is Impaired under this Plan.  The Holders of Claims in such Class as of the applicable Voting Record Date are entitled to vote to accept or reject this Plan.

D.      *Acceptance by Impaired Class of Claims*

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted this Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept this Plan.

E.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by Class [4].  The Debtors request confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan or any Exhibit or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

F.      *Votes Solicited in Good Faith*

The Debtors have, and upon the Confirmation Date shall be deemed to have, solicited votes on this Plan from the Voting Class in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors, the Reorganized Debtors, and each of their respective Related Persons shall be entitled to, and upon the Confirmation Date are hereby granted, the protections of section 1125(e) of the Bankruptcy Code.

**ARTICLE V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *Wind-Down and Dissolution of Reorganized HoldCo*

Subject to <u>Article V.U</u> below, Reorganized HoldCo shall, promptly after the Effective Date and the full administration of this Plan and the transactions contemplated herein, make a voluntary assignment under and pursuant to the Bankruptcy and Insolvency Act of Canada, and thereafter promptly wind-down and dissolve in accordance with applicable law.

B.      *Restructuring Transactions*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Documents and

any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan prior to, on and after the Effective Date, including such actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses, to otherwise simplify the overall corporate structure of the Reorganized Debtors, or to reincorporate the Affiliate Debtor under the laws of jurisdictions other than the laws of which the Affiliate Debtor is presently incorporated.  Such restructuring may include one or more mergers, consolidations, restructures, dispositions, liquidations or dissolutions, as may be determined by the Debtors or Reorganized Debtors to be necessary or appropriate, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder (collectively, the "**Restructuring Transactions**").

All such Restructuring Transactions taken, or caused to be taken, shall be deemed to have been authorized and approved by the Bankruptcy Court.  The actions to effect the Restructuring Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and having such other terms to which the applicable entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions, but in all cases subject to the terms and conditions of this Plan and the Restructuring Documents and any consents or approvals required thereunder.

C.      *Consummation of the Purchase Agreement*

On the Effective Date, the Debtors shall consummate the transactions contemplated by the Purchase Agreement pursuant to the terms thereof in exchange for the Purchase Price; <u>provided</u> that the conditions precedent set forth in the Purchase Agreement have been satisfied or waived in accordance with the terms of the Purchase Agreement.  Upon entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Purchase Agreement will be deemed authorized and approved without any requirement of further act or action by the Debtors' shareholders or the Debtors' boards of directors.  The Debtors and the Reorganized Debtors (as applicable) are authorized to execute and deliver, and to consummate the transactions contemplated by, the Purchase Agreement, as well as to execute, deliver, file, record and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, in each case in form and substance acceptable to the Agent and Aggregate Required Lenders and without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the Purchase Agreement).

1.      Transfer of Purchased Assets

On the Effective Date, in consideration and in exchange for the Purchase Price, the Debtors will tender to the Proposed Purchaser duly executed bills of sale and assignment or other appropriate instruments and documents transferring title to and interest in the Purchased Assets free and clear of all Liens, Claims and interests (other than the Assumed Liabilities and permitted liens) pursuant to the terms and conditions of the Purchase Agreement.

NY\6181461.2

2.        Payment of Purchase Price Cash Component and Discharge of Assumed Liabilities

The Proposed Purchaser shall (i) promptly perform and discharge all Assumed Liabilities in the ordinary course of business in accordance with the terms and conditions of any applicable agreements relating thereto and (ii) pay the Purchase Price Cash Component in accordance with the Purchase Agreement.

3.        Good Faith of the Proposed Purchaser

The transactions contemplated by the Purchase Agreement are undertaken by the Debtors and the Proposed Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale shall not affect the validity of the Sale (including the assumption, assignment and/or transfer of any Executory Contract or Unexpired Lease), unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Proposed Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code as applicable.

4.        No Successor Liability for the Proposed Purchaser

Except as otherwise expressly provided in this Plan, the Confirmation Order, or the Purchase Agreement, the Proposed Purchaser: (i) does not, pursuant to this Plan or otherwise, assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity; and (iii) shall not have any successor or transferee liability of any kind or character; provided that the Proposed Purchaser shall promptly perform and discharge the obligations specified in the Purchase Agreement, including, without limitation, the Assumed Liabilities.

D.        Direction to Prepetition Agent and DIP Facility Agent

By voting to accept this Plan, each such Prepetition Lender and DIP Facility Lender hereby instructs and directs the Prepetition Agent and DIP Facility Agent, as applicable, pursuant to Article X of the Credit Agreement, and each such vote to accept this Plan shall, for all purposes, constitute an instruction from each and every such Prepetition Lender and DIP Facility Lender directing the Prepetition Agent and the DIP Facility Agent, as applicable, to (i) act as Distribution Agent to the extent required by this Plan, and (ii) take any other actions required or contemplated to be taken by the Prepetition Agent and the DIP Facility Agent, as applicable, under this Plan or any of the Restructuring Documents to which it is a party.

E.        Continued Corporate Existence

Subject to the Restructuring Transactions permitted by Article V.B of this Plan, after the Effective Date, the Reorganized Debtors shall continue to exist as separate legal entities in accordance with the applicable law in the respective jurisdiction in which they are incorporated or formed and pursuant to their respective certificates or articles of incorporation and by-laws, or other applicable organizational documents, in effect immediately prior to the Effective Date, except to the extent such certificates or articles of incorporation and by-laws, or other applicable organizational documents, are amended, restated or otherwise modified under this Plan.  Notwithstanding anything to the contrary herein, the Claims of a particular Debtor or Reorganized Debtor shall remain the obligations solely of

27

such Debtor or Reorganized Debtor and shall not become obligations of the other Debtor or Reorganized Debtor solely by virtue of this Plan or the Chapter 11 Cases.

F.     *Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any Restructuring Document, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property and assets of the Estates of the Debtors, including all claims, rights, and Litigation Claims of the Debtors, and any other assets or property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with this Plan, but in all cases excluding the Purchased Assets, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, and other encumbrances, subject to the Restructuring Transactions and Liens which survive the occurrence of the Effective Date as described in this <u>Article V</u>. On and after the Effective Date, the Reorganized Debtors may (i) operate their respective businesses, (ii) use, acquire, and dispose of their respective property and (iii) compromise or settle any Claims, in each case without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

G.     *[Intentionally Omitted]*

H.     *No Discharge or Release of Liens Securing the Prepetition Credit Agreement Claims*

Notwithstanding anything in this Plan to the contrary, all property of the Estates of the Debtors, including the Cash Reserves and all claims, rights and causes of action and any property acquired by the Debtors or the Reorganized Debtors under or in connection with this Plan, shall remain encumbered by and subject to the Liens securing the DIP Facility Claims and the Prepetition Credit Agreement Claims, as applicable, and such Liens shall not be, and shall not be deemed to be, discharged or released on account of the Confirmation or Consummation of this Plan.

I.     *New Equity Interests*

1.     <u>Reorganized HoldCo Common Stock</u>

On the Effective Date, Reorganized HoldCo shall issue 100% of the Reorganized HoldCo Common Stock to the Plan Administrator pursuant to the Amended/New Organizational Documents. Reorganized HoldCo shall not be obligated to register the Reorganized HoldCo Common Stock under the Securities Act or Exchange Act or to list the Reorganized HoldCo Common Stock for public trading on any securities exchange or be a reporting issuer in any province of Canada.   Distribution of the Reorganized HoldCo Common Stock shall be made, pursuant to the written instruction of Reorganized HoldCo, by delivery or book-entry transfer thereof.

2.     <u>NewCo Ownership Interests</u>

The NewCo Ownership Interests will constitute all of the equity interests in NewCo outstanding as of the Effective Date and shall be issued by NewCo in accordance with <u>Article III</u> of this Plan, subject to dilution on account of any shares issued in connection with the NewCo Incentive Plan.  NewCo shall not be obligated to register the NewCo Ownership Interests under the Securities Act or Exchange Act or to list the NewCo Ownership Interests for public trading on any securities exchange or be a reporting issuer in any province of Canada.   Distributions of the NewCo Ownership Interests shall be made, pursuant to the written instruction of NewCo, by delivery or book-entry transfer thereof by the applicable

28

Distribution Agent as described herein, as and to the extent practicable. Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of NewCo shall be that number of shares of NewCo Ownership Interests as may be designated in the Amended/New Organizational Documents.

J.        *NewCo Ownership Agreement*

On the Effective Date, NewCo shall be authorized to enter into and consummate the transactions contemplated by the NewCo Ownership Agreement, and any agreement or document entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by the NewCo Ownership Agreement).

On and as of the Effective Date, NewCo and all of the Holders of NewCo Ownership Interests shall be deemed to be parties to the NewCo Ownership Agreement, without the need for execution by any party thereto other than NewCo. The NewCo Ownership Agreement shall be binding on all Persons receiving, and all Holders of, the NewCo Ownership Interests (and their respective successors and assigns), whether such NewCo Ownership Interest is received or to be received on or after the Effective Date and regardless of whether such applicable Person executes or delivers a signature page to the NewCo Ownership Agreement; provided however that, with respect to any Person that fails to execute and deliver a signature page to the NewCo Ownership Agreement, any NewCo Ownership Interests to be distributed pursuant to or in connection with this Plan to such Person shall be treated as an undeliverable distribution pursuant to Article VII.D.4 of this Plan until such Person executes and delivers to NewCo a signature page to the NewCo Ownership Agreement.

K.        *Plan Securities and Related Documentation; Exemption from Securities Laws*

On and after the Effective Date, each of NewCo, the Debtors, and the Reorganized Debtors is authorized to and shall provide, distribute or issue, as applicable, the New Equity Interests and any and all other securities to be provided, distributed or issued under this Plan (collectively, the "**Plan Securities**") and any and all other notes, stock, instruments, certificates, and other documents or agreements required to be provided, distributed, issued, executed or delivered pursuant to or in connection with this Plan, including, without limitation, an Exit Facility (collectively, the "**Plan Securities and Documents**"), in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The issuance of the Plan Securities and the distribution thereof under this Plan shall be exempt from registration under applicable securities laws (including Section 5 of the Securities Act or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer of a security) pursuant to section 1145(a) of the Bankruptcy Code, Section 4(2) of the Securities Act and/or other applicable exemptions.

Any offering of any Plan Securities distributed or issued in reliance on the exemption from registration under the Securities Act pursuant to section 1145(a) of the Bankruptcy Code may be sold without registration to the extent permitted under section 1145 of the Bankruptcy Code and is deemed to be a public offering, and such Plan Securities may be resold without registration to the extent permitted under section 1145 of the Bankruptcy Code. Any Plan Securities issued in reliance on the exemption from registration under the Securities Act provided by Section 4(2) of such act will be issued in a private placement and subsequent sales shall be required to be registered under the Securities Act or exempt from such registration requirements.

Without limiting the effect of section 1145 of the Bankruptcy Code, all documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of this Plan shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

L.    *Release of Liens and Claims*

To the fullest extent provided under section 1141(c) and other applicable provisions of the Bankruptcy Code, except as otherwise provided in the Confirmation Order, this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VII hereof, all Liens, Claims, mortgages, deeds of trust, or other security interests against the assets or property of the Debtors or the Estates shall be fully released, canceled, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

The filing of the Confirmation Order with any federal, state, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens, Claims and other interests described above.  Any Entity holding such Liens, Claims or interests shall, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors or Proposed Purchaser, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors or Proposed Purchaser, as applicable.

M.    *Organizational Documents*

The respective organizational documents of each of the Debtors and NewCo shall be amended and restated, replaced, or otherwise contain terms and conditions as necessary to satisfy the provisions of this Plan and the Bankruptcy Code.  Such organizational documents shall: (i) to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities; (ii) authorize the issuance of the New Equity Interests in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by this Plan; (iii) to the extent necessary or appropriate, include restrictions on the transfer of the New Equity Interests; and (iv) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Debtors and NewCo may, subject to the terms and conditions of the Restructuring Documents, amend and restate their respective organizational documents as permitted by applicable law.

N.    *Directors and Officers of NewCo and the Reorganized Debtors*

The New Board of NewCo shall initially consist of up to [five (5)] directors, who shall be designated in accordance with the terms and conditions of the NewCo Ownership Agreement, which directors shall be identified in Plan Schedule [___] to be Filed with the Plan Supplement.  Any directors selected pursuant to this section shall, to the extent applicable, be subject to approval of the Bankruptcy Court pursuant to section 1129(a)(5) of the Bankruptcy Code.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, at or prior to the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of NewCo, and, to the extent such Person is an insider other than by virtue of being a director or an officer, the nature of any compensation for such Person.  Each such director and officer shall serve from and after the

Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of NewCo.

On and as of the Effective Date, except as otherwise required by applicable law, the Plan Administrator shall become the sole officer and director of Reorganized HoldCo. The existing boards of directors and other governing bodies of each of the Debtors will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

O.      Corporate Action

Each of the Debtors and the Reorganized Debtors may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, including, without limitation, the issuance and the distribution of the securities to be issued pursuant hereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors or by any other Person (except for those expressly required pursuant hereto or by the Restructuring Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, officers, managers, members or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

As of the Effective Date, all matters provided for in this Plan involving the legal or corporate structure of the Debtors or the Reorganized Debtors (including, without limitation, the adoption of the Amended/New Organization Documents and similar constituent and organizational documents, and the selection of directors and officers for, each of the Reorganized Debtors), and any legal or corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan, shall be deemed to have occurred and shall be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the stockholders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors or by any other Person.

On and after the Effective Date, the appropriate officers of the Debtors and the Reorganized Debtors are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of the Debtors and the Reorganized Debtors shall be authorized to certify or attest to any of the foregoing actions.

P.      *Cancellation of Notes, Certificates and Instruments*

On the Effective Date, except to the extent otherwise provided herein (including, without limitation, and for the avoidance of doubt, Article V.H), all notes, stock, instruments, certificates, agreements and other documents evidencing or relating to any Impaired Claim and/or the Old HoldCo Interests shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

Q.      *Old Affiliate Interests*

On the Effective Date, the Old Affiliate Interests shall remain effective and outstanding, and shall be transferred to NewCo in accordance with the terms and conditions of the Purchase Agreement.  The Affiliate Debtor shall continue to be governed by the terms and conditions of its applicable organizational documents as in effect immediately prior to the Effective Date, except as amended or modified by this Plan.

R.      *Sources of Cash for Plan Distributions*

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments required pursuant to this Plan will be obtained from their respective Cash balances, including Cash from operations, the Cash Reserve, and the Purchase Price Cash Component, as applicable.

S.      *Continuing Effectiveness of Final Orders*

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date.  Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

T.      *Funding and Use of Cash Reserves*

On or before the Effective Date, the Debtors shall fund the Cash Reserves in such amounts as are necessary in order to be able to pay in full in Cash the obligations and liabilities for which such reserves were established, including, without limitation, reserving an amount of Cash equal to 100% of distributions to which Holders of Disputed Claims in each such applicable Class would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors and the Reorganized Debtors, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims.

The Cash contained in each applicable Cash Reserve shall be used solely to pay the obligations and liabilities for which such applicable reserve was established.  The Debtors and the Reorganized Debtors, as applicable, shall maintain detailed records of all payments made from each Cash Reserve, such that all payments and transactions shall be adequately and promptly documented in, and readily ascertainable from, their respective books and records.  After the Effective Date, neither the Debtors nor the Reorganized Debtors shall deposit any other funds or property into the Cash Reserves without further order of the Bankruptcy Court or otherwise commingle funds in the Cash Reserves.

For the avoidance of doubt, the Cash contained in the Cash Reserves constitutes the cash collateral of the DIP Facility Agent and the Prepetition Agent and, accordingly, Reorganized HoldCo shall have no interest whatsoever in such Cash other than to use such Cash to pay the obligations and liabilities for which such applicable reserve was established. Once all such obligations and liabilities are either paid, satisfied and discharged in full in Cash or are Disallowed by Final Order, the Unused Cash Reserve Amount, if any, shall be distributed to the DIP Facility Agent or the Prepetition Agent, as applicable, for application to the DIP Facility Claims or Prepetition Credit Agreement Claims, as applicable, or, to the extent that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, to the applicable agent thereunder, in each case in accordance with the terms and conditions of this Plan.

U.    *The Plan Administrator for Reorganized HoldCo*

1.    *Appointment*.  From and after the Effective Date, the Plan Administrator shall act as estate representative for Reorganized HoldCo for all purposes under this Plan and the Chapter 11 Cases, including pursuant to section 1123(b) of the Bankruptcy Code, and shall serve in such capacity until resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement.

2.    *Rights, Powers and Duties of the Plan Administrator*.  As the sole officer and director of Reorganized HoldCo, the Plan Administrator shall be authorized, for and on behalf of Reorganized HoldCo, to execute, deliver, file or record such documents, instruments, releases and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and the transactions contemplated herein, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The Plan Administrator, and any other applicable director and officer, shall serve from and after the Effective Date pursuant to applicable law and the terms of the Amended/New Organizational Documents and the other constituent and organizational documents of Reorganized HoldCo.  From and after the Effective Date and continuing through the date of entry of a final decree closing the Chapter 11 Case for Reorganized HoldCo, the Plan Administrator shall possess the rights of a party-in-interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to the Chapter 11 Case for Reorganized HoldCo and, in connection therewith, shall have the right to appear and be heard on matters brought before the Bankruptcy Court with respect to Reorganized HoldCo and/or the interpretation or enforcement of the Plan Administrator Agreement.

Reorganized HoldCo shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under this Plan.  Such rights, powers and duties, which shall be exercisable by the Plan Administrator for and on behalf of Reorganized HoldCo pursuant to the Plan Administrator Agreement, shall include, without limitation, the following with respect to Reorganized HoldCo:

(a)    investing Reorganized HoldCo's Cash, including, but not limited to, the Cash held in the Wind-Down Reserve in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof which are guaranteed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities; (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof; or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or any order of the Bankruptcy Court entered in the Chapter 11 Cases;

33

(b)    calculating and paying all distributions to be made under this Plan, the Plan Administrator Agreement and other orders of the Bankruptcy Court to Holders of Allowed Claims against Reorganized HoldCo;

(c)    establishing the Cash Reserves and paying the obligations and liabilities for which such reserve was established (which payment shall not require further notice to or approval of the Bankruptcy Court);

(d)    employing, supervising and compensating professionals retained to represent the interests of and serve on behalf of Reorganized HoldCo or the Plan Administrator;

(e)    making and filing tax returns for Reorganized HoldCo and responding to or taking any and all actions as are necessary and appropriate in order to comply with any tax audit for Reorganized HoldCo, including with respect to the filings of such tax returns and the conduct of audits;

(f)    settling, allowing, objecting to or otherwise disposing of any Claims or Equity Interests asserted against HoldCo and/or Reorganized HoldCo on any basis;

(g)    seeking estimation of contingent or unliquidated Claims asserted against HoldCo and/or Reorganized HoldCo under section 502(c) of the Bankruptcy Code;

(h)    seeking determination of tax liability of HoldCo and/or Reorganized HoldCo under section 505 of the Bankruptcy Code;

(i)    selling or otherwise disposing of any remaining non-Cash assets of Reorganized HoldCo and thereafter depositing the applicable net cash proceeds, if any, into the applicable Cash Reserve;

(j)    dissolving Reorganized HoldCo;

(k)    determining in accordance with this Plan and the Plan Administrator Agreement when to conduct a Subsequent Distribution;

(l)    exercising all power and authority that may be exercised, and taking all proceedings and acts that may be taken, by any officer, director, or stockholder of Reorganized HoldCo;

(m)    filing any necessary post-confirmation reports with the Bankruptcy Court with respect to Reorganized HoldCo;

(n)    calculating and paying all quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) with respect to Reorganized HoldCo;

(o)    filing quarterly operating reports as required by the United States Trustee with respect to Reorganized HoldCo;

(p)    exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement;

NY\6181461.2

(q)     commencing, pursuing, litigating, abandoning, disposing of, or settling, as appropriate, any and all Litigation Claims not otherwise transferred or conveyed to the Proposed Purchaser pursuant to the Purchase Agreement;

(r)     taking any and all other actions necessary or appropriate to implement or consummate this Plan and/or the provisions of the Plan Administrator Agreement with respect to Reorganized HoldCo; and

(s)     taking any and all other actions necessary or appropriate to implement any of the foregoing and to administer and/or close the Chapter 11 Case with respect to Reorganized HoldCo.

3.    *Compensation of the Plan Administrator.*  The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms of the Plan Administrator Agreement.  Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of reasonable fees, costs and expenses incurred from the Wind-Down Reserve.  The payment of the fees, costs and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided, however*, that any disputes related to such fees, costs and expenses shall be brought before the Bankruptcy Court.

4.    *Limitation of Liability; Indemnification.*  As of and after the Effective Date, neither the Plan Administrator or its Related Persons nor any of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities hereunder, shall be liable for any act taken or omitted to be taken in such capacity in connection with or in contemplation of the transactions contemplated by this Plan and/or the Plan Administrator Agreement, in each case other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Plan Administrator, its Related Persons, and each of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities hereunder, may, in connection with the performance of their respective functions, and in their sole and absolute discretion and without any requirement or obligation, consult with the respective attorneys, accountants, financial advisors, and other professionals or Related Persons of NewCo and the Reorganized Debtors, and shall not be liable for any act taken, omitted to be taken or suffered to be done in accordance with advice or opinions rendered by such Persons, regardless of whether such advice or opinions are provided in writing (other than for acts or omissions constituting gross negligence, actual fraud or willful misconduct of such applicable Entity as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction).

Reorganized HoldCo shall indemnify and hold harmless the Plan Administrator, its Related Persons, and each of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities hereunder, from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including reasonable attorneys' fees, disbursements and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the administration or implementation of this Plan or the transactions contemplated herein, the administration and wind-down of Reorganized HoldCo and its Estate, or the discharge of their respective duties or responsibilities under the Plan Administrator Agreement or this Plan; *provided, however*, that no such indemnification shall be made to such Persons for acts or omissions

35

that constitute gross negligence, actual fraud or willful misconduct of such applicable Person as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  Any such indemnification or reimbursement payments shall be made from the Wind-Down Reserve.

The Plan Administrator, its Related Persons, and each of the Related Persons of any of the Reorganized Debtors assisting Reorganized HoldCo and/or the Plan Administrator with its duties and responsibilities hereunder, shall be entitled to rely upon the exculpation, release, indemnification and limitation of liability provisions set forth in the Plan Administrator Agreement, this Plan and the Confirmation Order.  All such provisions shall survive the Effective Date and the termination of the Plan Administrator Agreement.

5.  *Forum For Actions Against the Plan Administrator*.  Without permission of the Bankruptcy Court, no judicial, administrative, arbitral or other action or proceeding shall be commenced against the Plan Administrator in its official capacity as such, with respect to its status, duties, powers, acts or omissions as Plan Administrator in any forum other than the Bankruptcy Court.

6.  *Insurance*.  The Plan Administrator shall be authorized to obtain all reasonably necessary insurance coverage for itself and Reorganized HoldCo, and their respective Related Persons, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of Reorganized HoldCo and (ii) the liabilities, duties and obligations of the Plan Administrator and its Related Persons under the Plan Administrator Agreement and this Plan (in the form of an errors and omissions policy, general liability, directors' and officers' insurance or otherwise), which insurance coverage may remain in effect for a reasonable period after the termination of the Plan Administrator Agreement (including for customary tail coverage and related time periods).  Any such insurance coverage shall be paid for from the Wind-Down Reserve.

7.  *Authority to Object to and Settle Disputed Claims*.  From and after the Effective Date, the Plan Administrator (on behalf of Reorganized HoldCo) shall be authorized with respect to those Claims which are not Allowed hereunder or by Final Order and which do not constitute an Assumed Liability under the Purchase Agreement, (i) to object to, and seek estimation of, any Claims filed against HoldCo and/or Reorganized HoldCo and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims, in the ordinary course of business and without further notice to or order of the Bankruptcy Court.

8.  *Wind-Down and Dissolution of Reorganized HoldCo*.  As soon as reasonably practicable after the Effective Date, the Plan Administrator shall:  (1) take any action reasonably necessary to effectuate the wind-down of Reorganized HoldCo; (2) file a certificate of dissolution for Reorganized HoldCo, together with all other necessary corporate and company documents, to effect such dissolution in accordance with applicable law; (3) complete and file all required federal, state and local tax returns, as applicable, for Reorganized HoldCo, including with respect to the filings of such tax returns and the conduct of audits; and (4) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of this Plan, including, without limitation, commencement of a voluntary assignment under the Bankruptcy and Insolvency Act of Canada.

9.  *Closing of the Chapter 11 Case for Reorganized HoldCo*.  When (a) all Disputed Claims filed against HoldCo and/or Reorganized HoldCo have become Allowed or have been Disallowed by Final Order, (b) all remaining assets of Reorganized HoldCo have been liquidated and converted into Cash (other than those assets abandoned by Reorganized HoldCo), and such Cash has been distributed in accordance with this Plan, and (c) all Wind-Down Costs and Expenses have been paid in full in Cash, the Plan Administrator shall promptly (i) seek authority from the Bankruptcy Court to close the Chapter 11 Case for Reorganized HoldCo in accordance with the Bankruptcy Code and the Bankruptcy Rules; (ii)

effectuate the dissolution of Reorganized HoldCo in accordance with applicable law and (c) resign as officer and director of Reorganized HoldCo.

V.    *Fees and Expenses of Prepetition Agent*

The Debtors shall, on the Effective Date and to the extent invoiced, pay the Prepetition Agent Fees and Expenses (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases), without application by any such parties to the Bankruptcy Court, and without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.

W.    *Completion Bonus Program*

On and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to make the payments contemplated by the Completion Bonus Program pursuant to section 1129(a)(4) of the Bankruptcy Code, without further notice and hearing before the Bankruptcy Court or consent of any Person. The aggregate payments under the Completion Bonus Program will not exceed $[_____] without further approval of the Bankruptcy Court.

X.    *NewCo Incentive Plan*

After the Effective Date, NewCo may adopt and implement the NewCo Incentive Plan, whose terms and conditions, including recipients, individual awards and vesting periods, shall be determined by the New Board of NewCo. Notwithstanding anything in this Plan to the contrary, any shares of NewCo Ownership Interests issued pursuant to the NewCo Incentive Plan shall dilute the shares of NewCo Ownership Interests otherwise distributed or to be distributed through or pursuant to this Plan (whether on or after the Effective Date), including, without limitation, pursuant to the credit bid and Sale contemplated by the Purchase Agreement.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be assumed by the Debtors (subject to the consent of the Proposed Purchaser) in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that:

(i)    have been assumed or rejected by prior order of the Bankruptcy Court;

(ii)    are the subject of a motion to reject pending on the Effective Date;

(iii)    are identified on Plan Schedule [_] hereto or in the Plan Supplement, in either case which Plan Schedule may be amended by the Debtors (subject to the consent of the Proposed Purchaser) to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended Plan Schedule and serving it on the affected contract parties at least ten (10) days prior to the date of the Confirmation Hearing; or

(iv)    are rejected or terminated pursuant to the terms of this Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or Consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan shall revest in and be fully enforceable by the Reorganized Debtors or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

B.      *Cure of Defaults; Assignment of Executory Contracts and Unexpired Leases*

Any defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to this Plan shall be satisfied, pursuant to and to the extent required by section 365(b)(1) of the Bankruptcy Code, by payment of the applicable default amount in Cash on the Effective Date or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing (the "**Cure Claim Amount**").

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under this Plan, at least ten (10) days prior to the Confirmation Hearing, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Claim Amount, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment, or any related cure amount must be Filed, served and actually received by the Debtors at least three (3) days prior to the Confirmation Hearing (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or cure amount will be deemed to have consented to such matters and will be deemed to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and cure amount. The Confirmation Order shall constitute an order

38

of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment. If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it (subject to the consent of the Proposed Purchaser). The Debtors or the Reorganized Debtors, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Subject to any cure claims Filed with respect thereto, assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment, in each case as provided in section 365 of the Bankruptcy Code. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned by Final Order shall be deemed disallowed and expunged (subject to any cure claims Filed with respect thereto), without further notice to or action, order, or approval of the Bankruptcy Court.

With respect to any Executory Contract or Unexpired Lease assumed and assigned pursuant to this Plan, upon and as of the Effective Date, the applicable assignee shall be deemed to be substituted as a party thereto for the applicable Debtor party to such assigned Executory Contract or Unexpired Lease and, accordingly, the Debtors and the Reorganized Debtors shall be relieved, pursuant to and to the extent set forth in section 365(k) of the Bankruptcy Code, from any further liability under such assigned Executory Contract or Unexpired Lease.

C.      *Rejection of Executory Contracts and Unexpired Leases*

The Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease (subject to the consent of the Proposed Purchaser). All Executory Contracts and Unexpired Leases listed on Plan Schedule [_] shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VI pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of any preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

D.      *Claims on Account of the Rejection of Executory Contracts and Unexpired Leases*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article X.G hereof. To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant rejection Claim, including, without limitation, subsection 502(b)(6) and subsection 502(b)(7) thereof.

E.      *Extension of Time to Assume or Reject*

Notwithstanding anything to the contrary set forth in Article VI of this Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease shall be extended until the date that is ten (10) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Article VI of this Plan shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided in the "Treatment" sections in Article III hereof or as ordered by the Bankruptcy Court, initial distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Initial Distribution Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions on account of Disputed Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Article VIII hereof.

B.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in this Plan, the Confirmation Order or Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

NY\6181461.2

C.      *Distributions by the Reorganized Debtors or Other Applicable Distribution Agent*

Other than as specifically set forth below, the Debtors, the Reorganized Debtors or other applicable Distribution Agent shall make all distributions required to be distributed under this Plan; provided that, solely with respect to any Assumed Liability, the Proposed Purchaser shall serve as Distribution Agent under this Plan.  Distributions on account of the Allowed DIP Facility Claims and Allowed Prepetition Credit Agreement Claims shall be made directly to the DIP Facility Agent and Prepetition Agent, respectively, and such applicable agent will be, and shall act as, the Distribution Agent with respect to its respective Class of Claims and shall make distributions with respect thereto in accordance with the applicable terms and conditions of the Credit Agreement or, to the extent that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, shall be made to the relevant administrative agent thereunder for distribution to the lenders thereunder.  The Reorganized Debtors may employ or contract with other entities to assist in or make the distributions required by this Plan and may pay the reasonable fees and expenses of such entities and the Distribution Agents in the ordinary course of business.  No Distribution Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

D.      *Delivery and Distributions; Undeliverable or Unclaimed Distributions*

1.      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed.  Accordingly, the Debtors, the Reorganized Debtors or other applicable Distribution Agent will have no obligation to recognize the assignment, transfer or other disposition of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices and other documents only to those Holders of Allowed Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Reorganized Debtors or other applicable Distribution Agent shall be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the Claims Register, or their books and records, as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, any distributions made to the DIP Facility Agent or Prepetition Agent shall be treated by such applicable agent in accordance with the applicable terms and conditions of the Credit Agreement or, to the extent that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, shall be made to the relevant administrative agent thereunder for distribution to the lenders thereunder.

2.      Delivery of Distributions in General

Except as otherwise provided herein, the Debtors, the Reorganized Debtors or other applicable Distribution Agent, as applicable, shall make distributions to Holders of Allowed Claims, or in care of their authorized agents, as appropriate, at the address for each such Holder or agent as indicated on the Debtors' or other applicable Distribution Agent's books and records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined in the discretion of the applicable Distribution Agent (subject to the terms and conditions of the Credit Agreement), including, in the event that all remaining DIP Facility Claims or Prepetition Credit Agreement Claims shall have been refinanced pursuant to, or assumed under, any Exit Facility, that such distributions shall be made to the relevant administrative agent thereunder for distribution to the lenders thereunder; provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in the latest Proof of Claim Filed by such Holder pursuant to Bankruptcy Rule 3001 as of the Distribution Record Date.

41

3.   <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, no Distribution Agent shall be required to make distributions or payments of less than $25.00 (whether in Cash or otherwise) or to make partial distributions or payments of fractions of dollars or shares of NewCo Ownership Interests, in each case with respect to Impaired Claims.  With respect to Impaired Claims, whenever any payment or distribution of a fraction of a dollar or share of NewCo Ownership Interests under this Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar or share of NewCo Ownership Interests (up or down), with half dollars or shares of NewCo Ownership Interests or more being rounded up to the next higher whole number and with less than half dollars or shares of NewCo Ownership Interests being rounded down to the next lower whole number.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim that is Impaired under this Plan if: (a) the aggregate amount of all distributions authorized to be made on the Subsequent Distribution Date in question is or has an economic value less than $25,000, unless such distribution is a final distribution; or (b) the amount to be distributed to the specific Holder of an Allowed Claim on such Subsequent Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $25.00, which shall be treated as an undeliverable distribution under <u>Article VII.D.4</u> below.

4.   <u>Undeliverable Distributions</u>

(a)      Holding of Certain Undeliverable Distributions

If the distribution to any Holder of an Allowed Claim is returned to the Distribution Agent as undeliverable or is otherwise unclaimed, no further distributions shall be made to such Holder unless and until the Distribution Agent is notified in writing of such Holder's then current address, at which time all currently due but missed distributions shall be made to such Holder on the next Subsequent Distribution Date (or such earlier date as determined by the applicable Distribution Agent).  Undeliverable distributions shall remain in the possession of the Reorganized Debtors or in the applicable reserve, subject to <u>Article VII.D.4(b)</u> hereof, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of the distribution being undeliverable.

(b)      Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim (or any successor or assignee or other Person or Entity claiming by, through, or on behalf of, such Holder) that does not assert a right pursuant to this Plan for an undeliverable or unclaimed distribution within one (1) year after the later of the Effective Date or the date such distribution is due shall be deemed to have forfeited its rights for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such rights for an undeliverable or unclaimed distribution against the Debtors or their Estates, the Reorganized Debtors, the Proposed Purchaser or their respective assets or property, or any Distribution Agent.  In such case, any Cash for distribution on account of such rights for undeliverable or unclaimed distributions shall become the property of the Estates free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.  Any Cash, Plan Securities and Documents, or other property held for distribution or allocation on account of such Claim shall be distributed or allocated to the Prepetition Agent for distribution or allocation in accordance with this Plan. Nothing contained in this Plan shall require the Debtors, the Reorganized Debtors, or any Distribution Agent to attempt to locate any Holder of an Allowed Claim.

(c)     Failure to Present Checks

Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 90 days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Cases stay open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 365 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Debtors or their Estates, the Reorganized Debtors, the Proposed Purchaser or their respective assets or property. In such case, any Cash held for payment on account of such Claims shall be distributed to the Prepetition Agent for distribution in accordance with this Plan, free and clear of any Claims of such Holder with respect thereto and notwithstanding any federal or state escheat laws to the contrary.

E.     *Compliance with Tax Requirements*

In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors or other applicable Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. All Persons holding Claims shall be required to provide any information necessary to effect information reporting and the withholding of such taxes. Notwithstanding any other provision of this Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.     *Allocation of Plan Distributions Between Principal and Interest*

To the extent that any Allowed Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for income tax purposes to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

G.     *Means of Cash Payment*

Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option of the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable), by checks drawn on, or wire transfer from, a domestic bank selected by such Person. Cash payments to foreign creditors may be made, at the option of the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable), in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

H.    *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the "Treatment" sections in <u>Article III</u> hereof or as ordered by the Bankruptcy Court, on the Initial Distribution Date (or if a Claim is not an Allowed Claim on the Effective Date, on the Subsequent Distribution Date occurring after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in <u>Article VIII</u> hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

I.    *Setoffs*

Without altering or limiting any of the rights and remedies of the Debtors and the Reorganized Debtors under section 502(d) of the Bankruptcy Code, all of which rights and remedies are hereby reserved, the Debtors, the Reorganized Debtors, and the Proposed Purchaser (as applicable) may, but shall not be required to, withhold (but not setoff except as set forth below) from the distributions called for hereunder on account of any Allowed Claim an amount equal to any claims, Causes of Action and Litigation Claims of any nature that the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable) may hold against the Holder of any such Allowed Claim; <u>provided</u> that, at least ten (10) days prior to effectuating such withholding, the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable), shall provide written notice thereof to the applicable Holder of such Claim, and all objections and defenses of such Holder to such withholding are preserved.  In the event that any such claims, Causes of Action or Litigation Claims are adjudicated by Final Order or otherwise resolved against the applicable Holder, the Debtors, the Reorganized Debtors, and the Proposed Purchaser (as applicable) may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of such adjudicated or resolved claims, Causes of Action or Litigation Claims.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Proposed Purchaser (as applicable) of any such claims, Causes of Action or Litigation Claims, all of which are reserved unless expressly released or compromised pursuant to this Plan or the Confirmation Order.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.    *Resolution of Disputed Claims*

1.    <u>Allowance of Claims</u>

After the Effective Date, the Debtors and the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including, without limitation, the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner

and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

    2.   Prosecution of Objections to Claims

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the applicable Reorganized Debtors shall have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in an Unimpaired Class or otherwise; provided, however, this provision shall not apply to Professional Fee Claims, which may be objected to by any party-in-interest in these Chapter 11 Cases; provided further that, solely with respect to the Assumed Liabilities, the foregoing rights and powers shall belong exclusively to the Proposed Purchaser.  From and after the Effective Date, the applicable Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court; provided that, solely with respect to the Assumed Liabilities, the foregoing rights and powers shall belong exclusively to the Proposed Purchaser.  The applicable Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register and their respective books and records to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

    3.   Claims Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the applicable Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claims, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection; provided that, solely with respect to the Assumed Liabilities, the foregoing rights and powers shall belong exclusively to the Proposed Purchaser.  All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation.

    4.   Deadline to File Objections to Claims

Any objections to Claims shall be Filed by no later than the Claims Objection Deadline; provided that nothing contained herein shall limit the Reorganized Debtors' or Proposed Purchaser's right to object to Claims, if any, Filed or amended after the Claims Objection Deadline.  Moreover, notwithstanding the expiration of the Claims Objection Deadline, the Debtors, the Reorganized Debtors and Proposed Purchaser shall, as applicable, continue to have the right to amend any claims objections and to file and prosecute supplemental objections and counterclaims to a Disputed Claim until such Disputed Claim is or becomes Allowed by Final Order of the Bankruptcy Court.

B.    *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim pursuant to a Final Order.

C.    *Distributions on Account of Disputed Claims Once They Are Allowed and Additional Distributions on Account of Previously Allowed Claims*

On each Subsequent Distribution Date (or such earlier date as determined by the Reorganized Debtors in their sole discretion), the Reorganized Debtors or other applicable Distribution Agent will make distributions (a) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (b) on account of previously Allowed Claims of property that would have been distributed to the Holders of such Claim on the dates distributions previously were made to Holders of Allowed Claims in such Class had the Disputed Claims that have become Allowed Claims or Disallowed Claims by Final Order of the Bankruptcy Court been Allowed or disallowed, as applicable, on such dates.  Such distributions will be made pursuant to the applicable provisions of Article VII of this Plan.

D.    *Reserve for Disputed Claims*

The Debtors, the Reorganized Debtors and the Distribution Agent, as applicable, shall establish such appropriate reserves for Disputed Claims in Classes as it determines necessary or appropriate. Without limiting the foregoing, reserves for Disputed Claims shall equal an amount of Cash equal to 100% of distributions to which Holders of such Disputed Claims in each applicable Class would be entitled under this Plan as of such date if such Disputed Claims were Allowed Claims in their respective Face Amount (or based on the Debtors' books and records if the applicable Holder has not yet Filed a Proof of Claim and the Claims Bar Date has not yet expired); provided, however, that the Debtors, the Reorganized Debtors, and Proposed Purchaser, as applicable, shall have the right to file a motion seeking to estimate any Disputed Claims in accordance with Article VIII.A.3 above.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order, this Plan, and the Restructuring Documents shall be in form and substance consistent in all material respects with the Restructuring Term Sheet or otherwise acceptable to the Debtors, the Agent, and the Aggregate Required Lenders; and

2.    The Confirmation Order shall have been entered by the Bankruptcy Court.

B.    *Conditions Precedent to Consummation*

It shall be a condition to Consummation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.    The Confirmation Order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal;

2.    The Bankruptcy Court shall have entered one or more Final Orders (which may include the Confirmation Order), in form and substance acceptable to the Debtors, the Agent, and the Aggregate

Required Lenders, authorizing and approving the assumption, assumption and assignment, and rejection of the Executory Contracts and Unexpired Leases by the Debtors as contemplated in this Plan and the Plan Supplement;

3.     The Canadian Bankruptcy Court shall have entered a recognition order of the Confirmation Order, and such recognition order shall be in full force and effect, shall have become a Final Order, and shall not have been amended, modified, reversed, vacated, or stayed pending appeal.

4.     This Plan and the Restructuring Documents shall not have been amended or modified other than in a manner in form and substance consistent in all material respects with the Restructuring Term Sheet or otherwise acceptable to the Debtors, the Agent, and the Aggregate Required Lenders;

5.     The Restructuring Documents shall have been filed, tendered for delivery, and been effected or executed by all Entities party thereto (as appropriate), and in each case be in full force and effect.  All conditions precedent to the effectiveness of such Restructuring Documents, including, without limitation, the Purchase Agreement, shall have been satisfied or waived pursuant to the terms of such applicable Restructuring Documents (or shall be satisfied or waived concurrently with the occurrence of the Effective Date);

6.     All consents, actions, documents, certificates and agreements necessary to implement this Plan and the transactions contemplated by the Purchase Agreement shall have been, as applicable, obtained and not otherwise subject to unfulfilled conditions, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws, and in each case be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, shall have expired;

7.     The Debtors shall have received, or will receive concurrently with the occurrence of the Effective Date, the Purchase Price Cash Component in accordance with the terms and conditions of the Purchase Agreement;

8.     The New Board and Plan Administrator shall each have been selected and appointed;

9.     The Exit Facility, if any, shall have closed or will close simultaneously with the effectiveness of this Plan.

10.     The Cash Reserves shall have been funded in full in Cash by the Debtors in accordance with the terms and conditions of this Plan;

11.     The Restructuring Support Agreement shall be in full force and effect;

12.     All Prepetition Agent Fees and Expenses shall, to the extent invoiced, have been paid in full in Cash; and

13.     The Confirmation Date shall have occurred.

C.     *Waiver of Conditions*

Subject to section 1127 of the Bankruptcy Code, the conditions to Confirmation and Consummation of this Plan set forth in this <u>Article IX</u> may be waived by the Debtors, with the consent of the Agent and the Aggregate Required Lenders, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan.  The failure of the Debtors

or Reorganized Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each right shall be deemed an ongoing right that may be asserted at any time.

D.      *Effect of Non-Occurrence of Conditions to Confirmation or Consummation*

If the Confirmation or the Consummation of this Plan does not occur with respect to one or more of the Debtors, then this Plan shall, solely with respect to such applicable Debtor or Debtors, be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (3) constitute an Allowance of any Claim or Equity Interest; or (4) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE X.

## RELEASE, DISCHARGE, INJUNCTION AND RELATED PROVISIONS

A.      *General*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable and reasonable.

Notwithstanding anything contained herein to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions (if any) and treatments hereunder, are settled, compromised, terminated and released pursuant hereto; *provided*, *however*, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan.

B.      *Release of Claims and Causes of Action*

1.      *Release by the Debtors*.  Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this Article X or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their respective individual capacities and as debtors-in-possession, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (collectively, the "**Debtor**

**Releasing Parties**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Debtor Releasing Parties) and their respective assets and properties (the "**Debtor Release**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale, or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for, or on behalf or in the name of, any Debtor, its respective Estate or any Reorganized Debtor (whether directly or derivatively) against any of the Released Parties; *provided*, *however*, that the foregoing provisions of this Debtor Release shall not operate to waive or release: (i) any Causes of Action expressly listed on Plan Schedule [_]; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (iii) the rights of such Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Debtor Release.  Notwithstanding the foregoing, nothing in this Article X.B shall or shall be deemed to operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

The foregoing release shall not affect or impair the releases and claim and lien allowances provided in the DIP Facility Orders.

2.      *Release By Third Parties*.    Pursuant to section 1123(b) and any other applicable provisions of the Bankruptcy Code, and except as otherwise expressly provided in this <u>Article X</u> or elsewhere in this Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which is hereby confirmed, and without limiting or otherwise modifying the scope of the Debtor Release provided by the Debtor Releasing Parties in <u>paragraph 1</u> above, each Non-Debtor Releasing Party and each other Holder of a Claim against any Debtor (together with the Debtor Releasing Parties, the "**<u>Releasing Parties</u>**") will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to each of the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Non-Debtor Releasing Parties) and their respective assets and properties (the "**<u>Third Party Release</u>**") from any and all Claims, Causes of Action, Litigation Claims and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, whether directly or derivatively held, existing as of the Effective Date or thereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to any of (i) the Debtors, the Chapter 11 Cases, the Disclosure Statement, this Plan, the Restructuring Support Agreement and the Restructuring Documents, (ii) the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, (iii) the business or contractual arrangements between any Debtor and any Released Parties, (iv) the negotiation, formulation or preparation of the Restructuring Support Agreement, this Plan, the Disclosure Statement, the Plan Supplement, the Restructuring Documents, or related agreements, instruments or other documents, (v) the restructuring of Claims or Equity Interests prior to or during the Chapter 11 Cases, (vi) the purchase, sale or rescission of the purchase or sale of any Equity Interest of the Debtors or the Reorganized Debtors, and/or (vii) the Confirmation or Consummation of this Plan or the solicitation of votes on this Plan that such Non-Debtor Releasing Party would have been legally entitled to assert (whether individually or collectively) against any of the Released Parties; <u>provided</u>, <u>however</u>, that the foregoing provisions of this Third Party Release shall neither (1) apply to any Person or Entity that affirmatively opts-out of such Third Party Release on its respective ballot or other opt-out notice, in each case in accordance with the procedures set forth therein, nor (2) operate to waive or release (i) any Causes of Action expressly listed on <u>Plan Schedule [  ]</u>; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Non-Debtor Releasing Party to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's interim or final fee application in these Chapter 11 Cases.

The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person and the Confirmation Order will permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities released pursuant to this Third Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Third Party Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims released by the Third Party

NY\6181461.2

Release; (iii) in the best interest of the Debtors and their Estates; (iv) fair, equitable and reasonable; and (v) given and made after due notice and opportunity for hearing.

The foregoing release shall not affect or impair the releases and claim and lien allowances provided in the DIP Facility Orders.

C.      Waiver of Statutory Limitations on Releases

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in this Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

D.      Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, effective as of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims, Equity Interests and Causes of Action of any kind or nature whatsoever against the Debtors or any of their respective assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, Equity Interests or Causes of Action.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates shall be deemed discharged and released under and to the fullest extent provided under sections 524 and 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Such discharge shall void any judgment obtained against the Debtors or the Reorganized Debtors at any time, to the extent that such judgment relates to a discharged Claim.

Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date: (i) the rights afforded herein and the treatment of all Claims and Equity Interests shall be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or the Proposed Purchaser, or any of their respective assets, property, or Estates; (ii) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and each of the Debtor's liability with respect thereto shall be extinguished completely without further notice or action; and (iii) all Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, the Proposed Purchaser, each of their respective successors and assigns, and each of their respective assets and properties, any such Claims or Equity Interests, whether based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date or otherwise.

E.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Entity for any claims or Causes of Action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or Consummation of this Plan, the Disclosure Statement, the Restructuring Documents or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan, including the Restructuring Support Agreement and Purchase Agreement, or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or Consummation of this Plan; *provided*, *however*, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action expressly set forth in and preserved by this Plan or the Plan Supplement; (ii) any Causes of Action arising from gross negligence, actual fraud or willful misconduct of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any objections with respect to any Professional's interim or final fee application in these Chapter 11 Cases; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this Article X.E shall or shall be deemed to operate as a release or waiver of any Intercompany Claims, in each case unless otherwise expressly provided for in this Plan.

The foregoing exculpation shall not affect or impair the releases and claim and lien allowances provided in the DIP Facility Orders.

F.    *Preservation of Causes of Action*

1.    Maintenance of Causes of Action

Except as otherwise provided in this Article X or elsewhere in this Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all applicable Litigation Claims not otherwise transferred or conveyed to the Proposed Purchaser pursuant to the Purchase Agreement, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors-in-interest to the Debtors and the Estates, may, and shall have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of their applicable Litigation Claims not otherwise transferred or conveyed to the Proposed Purchaser pursuant to the Purchase Agreement without notice to or approval from the Bankruptcy Court.

2.    Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors expressly reserve all Causes of Action and Litigation Claims for later adjudication by, as applicable, the Debtors, the Reorganized Debtors or the Proposed Purchaser (including, without

limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action or Litigation Claims upon or after the Confirmation or Consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except in each case where such Causes of Action or Litigation Claims have been expressly waived, relinquished, released, compromised or settled in this Plan (including, without limitation, and for the avoidance of doubt, the Release contained in <u>Article X.B</u> and Exculpation contained in <u>Article X.E</u> hereof) or any other Final Order (including, without limitation, the DIP Facility Orders or the Confirmation Order).  In addition, the Debtors, the Reorganized Debtors and Proposed Purchaser, as applicable, expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any of the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

G.      **Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE, TO THE FULLEST EXTENT PROVIDED UNDER SECTION 524 AND OTHER APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, PERMANENTLY ENJOINED FROM (I) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY SUIT, ACTION OR OTHER PROCEEDING; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE, OR ORDER; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE; (IV) ASSERTING A SETOFF OR RIGHT OF SUBROGATION OF ANY KIND; OR (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND,  IN EACH CASE ON ACCOUNT OF OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, SETTLED OR TO BE SETTLED OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER AGAINST ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED (OR THE PROPERTY OR ESTATE OF ANY ENTITY SO RELEASED, DISCHARGED, OR EXCULPATED).  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR SECTION 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

H.      **Binding Nature Of Plan**

**ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THIS PLAN SHALL BIND, AND SHALL BE DEEMED BINDING UPON, THE DEBTORS, THE REORGANIZED DEBTORS, ANY AND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, ALL ENTITIES THAT ARE PARTIES TO OR ARE SUBJECT TO THE SETTLEMENTS, COMPROMISES, RELEASES, DISCHARGES, AND INJUNCTIONS DESCRIBED IN THIS PLAN, THE PROPOSED PURCHASER, EACH ENTITY ACQUIRING PROPERTY UNDER THIS PLAN, ANY AND ALL NON-DEBTOR PARTIES TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES WITH THE DEBTORS AND THE RESPECTIVE SUCCESSORS AND ASSIGNS OF EACH OF THE FOREGOING, TO THE MAXIMUM**

**EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING WHETHER OR NOT SUCH ENTITY (I) WILL RECEIVE OR RETAIN ANY PROPERTY, OR INTEREST IN PROPERTY, UNDER THIS PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THIS PLAN, AFFIRMATIVELY VOTED TO REJECT THIS PLAN OR IS CONCLUSIVELY PRESUMED TO REJECT THIS PLAN.**

I.    *Protection Against Discriminatory Treatment*

To the extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Proposed Purchaser, or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant, against the Reorganized Debtors or the Proposed Purchaser, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted a denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.    *Plan Indemnity*

In addition to the matters set forth in this Plan and not by way of limitation thereof, the Reorganized Debtors and the Proposed Purchaser shall, and the Debtors shall continue to, indemnify and hold harmless all Persons who are or were managers, officers or directors of any of the Debtors at any time on or after the Petition Date (collectively, the "**Indemnified Parties**") on account of and with respect to any Claims (whether or not any Proof of Claim or cure claim has been Filed with respect thereto) or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities threatened or asserted by any Person against any such managers, officers or directors with respect to or based upon, in whole or in part, any act taken or omitted to be taken, or alleged act taken or omitted to be taken, in such capacities on or prior to the Effective Date, irrespective of whether such amounts are owed in connection with a prepetition or postpetition act or omission (collectively, the "**Indemnified Claims**"), but in each case only to the extent that (a) the acts, omissions or alleged acts or omissions of such applicable Person were indemnifiable under the Debtors' prepetition organizational documents (whether in the bylaws, certificates of incorporation, charters, operating agreements, board resolutions, employment contracts or otherwise) and (b) the otherwise indemnifiable expense, liability, loss, or other amount is determined not to be covered under the D&O Tail Policy purchased by the Debtors prior to the Petition Date; provided, however, that in addition to the foregoing limitations, the Proposed Purchaser shall have no obligation to indemnify or hold harmless any Indemnified Parties for any Indemnified Claims to the extent such Indemnified Claims arise from gross negligence, actual fraud or willful misconduct of such applicable Indemnified Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

The Debtors are further authorized to take such actions, and to execute and deliver such documents, as may be reasonably necessary or appropriate to implement, maintain, cause the binding of, satisfy any terms or conditions of, or otherwise secure for the insureds the benefits of the D&O Tail Policy, without further notice to or order of the Bankruptcy Court.

K.    *Integral Part of Plan*

Each of the provisions set forth in this Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of

Action are an integral part of this Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, on and after the Effective Date, retain exclusive jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any such Claim or Equity Interest;

2. grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; _provided_, _however_, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals for the Debtors in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3. resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors or Reorganized Debtors may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected (as applicable);

4. resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, _provided_, _however_ that the Reorganized Debtors and Proposed Purchaser shall reserve the right to commence their applicable actions in all appropriate forums and jurisdictions;

7. enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, the Plan Supplement, or the Disclosure Statement;

8. resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9.    hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10. issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan or the Purchase Agreement;

11. enforce the terms and conditions of the Purchase Agreement, this Plan, and the Confirmation Order;

12. resolve any cases, controversies, suits or disputes with respect to the Release, the Exculpation, the Indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such provisions;

13. hear and determine the Litigation Claims by or on behalf of the Debtors or Reorganized Debtors or, to the extent constituting a Purchased Asset, by or on behalf of the Proposed Purchaser;

14. hear and determine all matters related to the administration or implementation of the Plan Administrator Agreement, the sale or other disposition of any remaining property of the Estate of Reorganized HoldCo, and the dissolution and winding up of the affairs of Reorganized HoldCo;

15. enter and implement such orders or take such other actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

16. resolve any other matters that may arise in connection with or relate to the Purchase Agreement, the Plan Administrator Agreement, this Plan, the Disclosure Statement, the Confirmation Order or any release or exculpation adopted in connection with this Plan; and

17. enter an order concluding or closing the Chapter 11 Cases.

Notwithstanding the foregoing, if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

*A.     Dissolution of the Committee*

On and as of the Effective Date, the Committee shall dissolve automatically and its members shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.  The Reorganized Debtors shall not be responsible for paying any fees or expenses incurred by the members or advisors to the Committee after the Effective Date.

B.        *Payment of Statutory Fees; Post-Effective Date Professional Fees and Expenses*

All outstanding fees payable pursuant to section 1930 of title 28, United States Code shall be paid when due.  The Reorganized Debtors shall pay the liabilities and charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services (including reasonable fees, costs and expenses incurred by Professionals relating to the preparation of interim and final fee applications and obtaining Bankruptcy Court approval thereof) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court, including, without limitation, fees, costs and expenses incurred by Professionals in connection with the implementation, enforcement and Consummation of this Plan and the Purchase Agreement.

C.        *Conflicts*

In the event that a provision of the Restructuring Documents or the Disclosure Statement (including any and all exhibits and attachments thereto) conflicts with a provision of this Plan or the Confirmation Order, the provision of this Plan and the Confirmation Order (as applicable) shall govern and control to the extent of such conflict.

D.        *Modification of Plan*

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order in a manner that is acceptable to the Agent and Aggregate Required Lenders; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify this Plan in a manner that is acceptable to the Agent and Aggregate Required Lenders, in accordance with section 1127(b) of the Bankruptcy Code.  Notwithstanding the foregoing, the Debtors or Reorganized Debtors may, as applicable and with the consent of the Agent and Aggregate Required Lenders, remedy any defect or omission or reconcile any inconsistency in this Plan in such a manner as may be necessary or appropriate to carry out the purpose and intent of this Plan, without further notice to or order of the Bankruptcy Court.  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

E.        *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and/or to File subsequent chapter 11 plans, with respect to one or both of the Debtors.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation of this Plan does not occur with respect to one or both of the Debtors, then solely with respect to the applicable Debtor or Debtors for which this Plan was revoked or withdrawn or for which Confirmation or Consummation of this Plan did not occur: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the applicable Debtors or any other Entity; (b) prejudice in any manner the rights of the applicable Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the applicable Debtors or any other Entity.

NY\6181461.2

F.      *Successors and Assigns*

This Plan shall be binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the Proposed Purchaser, all present and former Holders of Claims and Equity Interests, other parties-in-interest, and their respective heirs, executors, administrators, successors, and assigns, including, without limitation, any trustee, successor, or other representative of HoldCo appointed in the CCAA Case or any proceeding commenced under the BIA.  The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

G.      *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated.  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

H.      *Further Assurances*

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder, the Proposed Purchaser and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

I.      *Severability*

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

*J.*      *Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan (each, a "**Notice**") must be in writing, sent by personal delivery, electronic mail, courier or facsimile and addressed as follows:

If to the Debtors:

Tuscany International Drilling Inc.
Suite 1950, 140 – 4th Avenue SW.
Calgary, Alberta
Canada T2P 3N3
Attn:  Walter Dawson
Email:  wdawson@tuscanydrilling.com
Facsimile:  403-265-8793

and

FTI Consulting
1000, 888-3rd Street SW
Bankers Hall, West Tower
Calgary, AB
T2P 5C5
Attn:  Deryck Helkaa
Email:  deryck.helkaa@fticonsulting.com
Facsimile:  403-444-6758

*with a copy to* (which shall not constitute notice):

Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Attn:  Mitchell A. Seider
Attn:  Keith Simon
Facsimile:  212-751-4864
Email:  mitchell.seider@lw.com
Email:  keith.simon@lw.com

*and*

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn:  Michael R. Nestor
Facsimile:  302-576-3321
Email:  mnestor@ycst.com

<u>If to the Proposed Purchaser</u>:

        [insert]

*with a copy to* (which shall not constitute notice):

        [insert]

<u>If to the Agent</u>:

        Credit Suisse
        Eleven Madison Avenue, OMA-2
        New York, New York 10010
        Attn:  Agency Manager, Agency Group
        Email:  agency.loanops@credit-suisse.com
        Facsimile:  212-322-2291

*with a copy to* (which shall not constitute notice):

        Mayer Brown LLP
        1675 Broadway
        New York, New York 10019-5820
        Attn:  Howard S. Beltzer
        Facsimile:  212-262-1910
        Email:  hbeltzer@mayerbrown.com

        *and*

        Richards, Layton & Finger, P.A.
        One Rodney Square
        920 North King Street
        Wilmington, Delaware 19801
        Attn:  Mark D. Collins
        Facsimile:  302-498-7531
        Email:  Collins@rlf.com

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by facsimile, on the Business Day following the date of confirmation of transmission by the originating facsimile, or (c) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

NY\6181461.2

K.      *Exemption from Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code*

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer of property, pursuant to or in connection with this Plan, the Purchase Agreement or the Restructuring Documents shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States or by any other Governmental Unit, and the Confirmation Order shall direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents evidencing such action or event without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of, transactions contemplated by and the distributions to be made under this Plan, the Purchase Agreement, or the Restructuring Documents, (ii) the issuance and distribution of the New Equity Interests or Plan Securities and Documents, and (iii) the maintenance or creation of security interests or any Lien as contemplated by this Plan, the Purchase Agreement, or the Restructuring Documents.

L.      *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Restructuring Document or an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

M.      *Tax Reporting and Compliance*

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the applicable Debtor for all taxable periods ending after the Petition Date through and including the Effective Date.

N.      *Schedules*

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated herein and are a part of this Plan as if set forth in full herein.

O.      *No Strict Construction*

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Agent, the DIP Facility Lenders, the Consenting Prepetition Lenders, the Proposed Purchaser and their respective professionals. Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, the Purchase Agreement, the Exhibits and the Plan Schedules, and the agreements and documents ancillary or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, the Purchase Agreement, the Exhibits or the Plan Schedules, or the documents ancillary and related thereto.

P.      *Entire Agreement*

Except as otherwise provided herein or therein, this Plan, the Purchase Agreement, and the Restructuring Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan, the Purchase Agreement, and the Restructuring Documents.

Q.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

R.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

S.      *2002 Notice Parties*

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed a renewed request after the Confirmation Hearing to receive documents pursuant to Bankruptcy Rule 2002.

T.      *Request for Court Hearing and Right to be Heard*

Notwithstanding whether or not a matter requires the consultation of the Proposed Purchaser under this Plan, the Debtors, the Reorganized Debtors, and the Proposed Purchaser shall have the right to request a hearing, and be heard as a party in interest under section 1109(b) of the Bankruptcy Code, before the Bankruptcy Court on any and all matters arising under or in connection with or related to this Plan or the Purchase Agreement.

U.      *Powers of Proposed Purchaser*

From and after the Effective Date and continuing through the date of entry of a final decree closing these Chapter 11 Cases, the Proposed Purchaser shall possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under or related to these Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and an opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court.

Dated:  [_____], 2014

                     Respectfully submitted,

                     TUSCANY INTERNATIONAL DRILLING INC.
                     AND ITS AFFILIATE DEBTOR

                     By:    /s/_____
                     Title:   _____

NY\6181461.2